**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 2 5 2021

JAMES W. McCORMACK, CLERK
By:_____
                    **DEP CLERK**

UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF ARKANSAS CENTRAL DIVISION

Alaahcontayna Al, In Propria Persona
Sui Juris,

       Plaintiff,

      - against-

STATE OF OKLAHOMA
2300 N Lincoln Blvd #212 Oklahoma City OK
73105 , 303 W 1st St, Tulsa OK 74103 Vic
Regalado Sheriff Dunns #040033893, Tulsa
County Bar Foundation Inc Dunns
#107272940, Officer A. McGowan Badge
Number 2705/Officer S. Lillie Badge Number
2675 City of Tulsa Police Dept Dunns
#104548344

       Defendants.

Case No: 4:21-cv- 150 - SWW

This case assigned to District Judge Wright
and to Magistrate Judge Harris
Magistrate Demanded

(Non JURY TRAIL)

# Claim

Plaintiff, Alaahcontayna Al, In Propria Persona Sui Juris make's the following claim's against Defendants. Defendants have committed the following:

**1.** 18 U.S. Code § 241, Conspiracy against rights.

**2.** 18 U.S. Code § 242, Deprivation of rights under color of law.

**3.** 18 U.S. ode § 287, False, fictitious or fraudulent claims.

**4.** 18 U.S. Code § 1951 (a)(b)(2),  Interference with comm. by threats or violence.

**5.** 42 U.S. Code § 658, Title IV-D, Section 458, Social Security Act, Incentive payments to states.

**6.** 18 U.S. Code § 1961(1)(A)(B)(2)(3)(4)(5),  Racketeering activity.

**7.** 17 U.S. Code § 511.Liability of States, instrumentalities of States, and State officials for infringement of copyright, *see* Alaahcontayna Al©™ Attachment in Exhibit (1)

**8.** <u>Eleventh Amendment</u> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

**09.** Defendant(s) have acted on Prima Facie legal definition, prima facie may be used as an adjective meaning 'sufficient to establish a fact or raise a presumption unless disproved or rebutted. " An example of this would be use the term "prima facie evidence."

It may also be used as an adverb meaning "on first appearance but subject to further evidence or information." An example of this would be use the term "prima facie valid."

A prima facie case is the establishment of a legally required rebuttable presumption. A prima facie case is a cause of action of defense that is sufficiently established by a party's evidence to justify a verdict in his or her favor, provided such evidence is not rebutted by the other party.

**10.** 18 U.S. Code § 1521. Retaliating against a Federal judge or Federal law enforcement officer by false claim or slander of title.

**11.** Department of Justice: The Privacy act of 1974, U.S. Code § 552a

**12.** Article 1, Section 10, of the Constitution.

**13.** 42 U.S. Code § 1983. Civil action for deprivation

**14.** 42 U.S. Code § 408 "Whoever ... (8) discloses. Uses, or compels the disclosure of the social security number of any person in violation of the laws the laws of the United States, shall be guilty of a felony and upon conviction thereof shall be fined under title 18 or imprisoned for not more than five years, or both."

**15.** 42 U.S. Code § 3617. Interference, coercion, or intimidation.

**16.**The  5th Amendment states; "No Person shall be held to answer for a **capitol, or otherwise infamous crime,** unless on **presentment of a Grand Jury..." If there is no victim and criminal intent, there is no crime** what crime was committed for the debt to be demanded and to not  be arrested or imprisoned falsely.

**17.** STATE OF OKLAHOMA is a **corporation** therefore they are registered with duns & Bradstreet, Duns Number (043440601) the officers of the STATE OF OKLAHOMA or any STATE OF CORPORATIONS  are employees of said corporations try any arrest attempted on Alaahcontayna Al the living flesh and blood man is a **forgery** into a contract without an **Express Agreement, kidnapping,** which Alaahcontayna Al do not consent to and  preserve all my rights at all times **"without prejudice" UCC1-308, larceny** which Defendants has committed ,  **27 CFR 72.11** under The Uniform Commercial Code **makes crimes commercial.**

**18.** Statues creating corporations  are **private** acts. **(20 Amjur 35,p.60).**

**19.** USC 42 1985- CONSPIRACY TO INTERFRE WITH CIVIL RIGHTS

**20.** Alaahcontayna Al did not **consent** to the STATE OF OKLAHOMA CORPERATION **institutions,** *see* case law section 02.

**21.** Defendant(s) operate under The United States (Inc.) federal corporation (*De facto*), not *"these united States of America"* (*De jure*), *see* case law section 14.

**22.** Defendant(s) has violated Alaahcontayna Al's 5th/6th/7th Amendment rights

**24.  USC 18 §2382-** Misprision  of Treason

**25. USC 18 §201-** BRIBERY

**26. USC 18 §2071 -** Concealment, etc

**27. USC 18  §2076 -** CLERK IS TO FILE

**28. USC 42  §1983 –** CIVIL ACTION FOR DEPRIVATION OF RIGHTS

<div align="center">

**Jurisdiction**

</div>

29. Jurisdiction of this court arises under 28 U.S.C. §§ 1331, 1367, and 15

U.S.C. § 1692k(d).

<div align="center">

**Treaty Violations**

**THE TREATY OF PEACE AND FRIENDSHIP OF 1836 A.D.**
Between Morocco and the United States
**Article 20**

</div>

"If any of the Citizens of the United States, or any Persons under their Protection, shall have any disputes with each other, the Consul shall decide between the Parties, and whenever the Consul shall require any Aid or Assistance from our Government, to enforce his decisions, it shall be immediately granted to him."

<div align="center">

**Article 21**

</div>

"If any Citizen of the United States should kill or wound a Moor, or, on the contrary, if a Moor shall kill or wound a Citizen of the United States, the Law of the Country shall take place, and equal Justice shall be rendered, the Consul assisting at the Trial; and if any Delinquent shall make his escape, the Consul shall not be answerable for him in any manner whatever."

<div align="center">

United Nations Declaration of the Rights of the Child Principal Three (3)

United Nations Rights of Indigenous Peoples Part 1, Article Four (4)

United Nations Declaration of Human Rights Article Fifteen (15)

**Case Law**

</div>

1. If a person is arrested on less than probable cause, the United States Supreme Court has long recognized that the aggrieved party has a cause of action under 42 U.S.C. §1983 for violation of Fourth Amendment rights. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213 (1967). Harlow v. Fitzgerald, 457 U.S. 800, 818 (there can be no objective reasonableness where officials violate clearly established constitutional rights such as-- (a) United States Constitution, Fourth Amendment (including Warrants Clause), Fifth Amendment (Due Process and Equal Protection), Ninth Amendment (Rights to Privacy and Liberty), Fourteenth Amendment (Due Process and Equal Protection).

2. *"There, every man is independent of all laws, except those prescribed by nature. He is not bound by any institutions formed by his fellowman without his consent."* **Cruden v. Neale, 2 N.C. 338 (1796) 2 S.E.**

3. *"All codes, rules, and regulations are for government authorities only, not human/creators in accordance with God's laws. All codes, rules, and regulations are unconstitutional and lacking due process..."* **Rodriques v. Ray Donavan (U.S. Department of Labor) 769 F. 2d 1344, 1348 (1985)** and again *"All laws, rules and practices which are repugnant to the Constitution are null and void"* **Marbury v. Madison, 5th (2 Cranch) 137, 174, 176,(1803).**

4. *"The practice of law cannot be licensed by any state/State."* **Schware v. Board of Examiners, United State Reports 353 U.S. pages 283, 239**

5. *"The practice of law is an occupation of common right".* **Sims v. Ahrens, 271 SW 720 (1925)**

6. *It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal."* **Marbury v. Madison, 5 U.S. 137 (1803).**

7. The Constitution of the *original united States of America* was never removed; it has lain dormant since 1871 and is still intact to this day. This point was made clear by Supreme Court Justice Marshall Harlan in ***Downes v. Bidwell*** 182, U.S. 244 1901 by the

following dissenting opinion: *"Two national government exist; one to be maintained under the Constitution with all its restrictions; the other to be maintained by Congress outside and independently of that Instrument."*

8. *"No individual may be appointed or reappointed to serve as a magistrate judge under this chapter unless: (1) He has been for at least five years a member in good standing of the bar of ..."* 28 USC §631(b)(1)

9. *Cooper v. Aron, 358 U.S. 1, 78 S. Ct. 1401 (1959)-* "No **state** *Legislator or Executive* or **Judicial officer** can war against the **constitution** without his undertaking to support it. "

10. *Miller v. Kansas 230 F 2nd 486,489-* "The **claim** and **exercise** of **Constitutional rights** cannot be converted into a *crime."*

11. *U.S. v. Bishop, 412 US 346 –* If you have **relied** on *prior decisions* of the **Supreme Court,** you have the *perfect defense* for **willfulness.**

12. *US v. Minker, 350 US 179-* "Because of what appears to be a lawful command on the surface, many citizens, because of their respect for what only **appears to be a law,** are **cunningly coerced** into waiving their rights, **due to ignorance."**

13. *Brady v. U.S 116 U.S. 616-* "Waivers of **constitutional rights** not only must they *voluntary,* they must be *knowingly intelligent acts* done with *sufficient awareness."*

14. A "person" "driving" an automobile cannot be stopped to see if he or she is licensed to "drive" unless there is reasonable suspicion the "person" has engaged in criminal conduct. **Delaware v Prouse, (1979) 440 US 648, 59 Led2d 660**

15. "Traffic infractions are not crimes." **People v. Battle, 50 Cal. App. 3, step 1, 123 Cal.Rptr. 636,639.**

16. "Speeding, driving without a license, wrong plates or no plates, no registration, no tags, etc., have been held to be "non-arrest able offenses" **(Cal V. Farley, 98 Cal. Rep.89,20 CA 3d 1032.**

17. *It is an established fact that the United States Federal Government has been dissolved by the Emergency Banking Act, March 9, 1933, 48 stat. , Public Law 89-719; declared by President Roosevelt, being bankrupt and insolvent, H.J.R. 192, 73rd Congress in session June 5, 1933 – Joint Resolution To Suspend The Gold Standard and Abrogate The Gold Clause dissolved the Sovereign Authority of the United States Government Offices, Officers, and Departments, and is further evidence that the United States Federal Government exists today in name only."*

18. *No State Shall, enter into any treaty, Alliance, or Confederation, grant Letters of Marque and Reprisal: coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, impairing the Obligation of Contracts, or grant any Title of Nobility.*

19. *" Members of groups who are competent non-lawyers can assist other members of the group achieve the goals of the group in court without being charge with "unauthorized practice of law'."* **[NAACP v. Button, 371 U.S. 415); United Mineworkers of America v. Gibbs, 383 U.S. 715; and Johnson v. Avery, 89 S. Ct. 747 (1969)]**

20. *" There can be no sanction or penalty imposed upon became of his exercise of Constitutional Rights."* **[Sherar v. Cullen, 481 F. 2d 946 (1973)]**

21. *"Under our system of government upon the individuality and intelligence of the citizen, the state does not claim to control to control him/her, except as his/her conduct to others, leaving him/her the sole judge as to all that affects himself/herself ."* **[Mugler v. Kansas 123 U.S. 623, 659-60.]**

22. The Constitution was ordained and established by the people "for" the United States of America a.k.a. government. Therefore government was created by an act of the people therefore the created cannot trump the creator. *"If any statement, within any law which is passed, is unconstitutional, the whole law is unconstitutional..."* **[Marbury v. Madison; 5 US 137 (1803)]**…therefore no legislation.

I, Alaahcontayna Al, In Propria Persona Sui Juris , In Full Life Flesh and Blood Living Man, Living Soul

I, Alaahcontayna Al, **am not a "person" or a "citizen" as defined in commercial "statues"** of the United States or statutes of the several states when such when definition includes "artificial entities. " I refuse to treated as a "federally' or "state" created entity which is only capable of exercising certain rights, privileges, or immunities as specifically "granted" by "federal" or "state" " governments.

I, Alaahcontayna Al, am not "**BLACK, NEGRO, COLORED, AFRICAN AMERICAN, INDIAN, SOVEREIGN CITIZEN**" or any misnomers nor brands of the United States Federal Corporation, *See* **Congressional act of 1871** and **28 USC 3002**, Part VI, chapter 176, sub chapter 176, subsection A, (15) **"United States"** means **a Federal corporation.**

I, Alaahcontayna Al, am not a 14th amendment citizens of the United States, *see* certified copy of the of the 14th from the Library of Congress pages Exhibit VII.

Nationality: Moorish American

## EXHIBITS

Exhibit 1: Common Law Copyright for Alaahcontayna Al©™

Exhibit 2: Affidavit of Fact

Exhibit 3: Certified 14th Amendment from the Library of Congress

Exhibit 4: Library of Congress Rights of Indigenous Peoples

Exhibit 5: Library of Congress The United States Code 2012 Edition

Exhibit 6: Library of Congress The Discovery of American an outgrowth of the conquest of the Moors by the Spaniards

Exhibit 7: Library of Congress Proceedings and Debates of the 76th Congress, First Session, Appendix, Volume 84- Part 14, July 13, 1939-August 5, 1989

Exhibit 8: Library of Congress   Public Laws 93-246 Through 93-446

Exhibit 9: Library of Congress United States Code 2018 Edition Flag and Seal, Seat of Government, and the Sates

Exhibit 10: Library of Congress The Congressional Globe: Containing the Sketches of the Debates and Proceedings of the Second Session of the twenty-eighth congress

Exhibit 11: Library of Congress The United States Code 2012 Edition 1028 fraud and related activity in connection with identification documents, authentication features and information

Exhibit 12: Library of Congress The Papers of Abraham Lincoln, Legal Documents and Case Dungey V, Spencer, 1855

Exhibit 13: Library of Congress The New York Packet, Friday, November 23,

1787 Federalist No. 10

Exhibit 14: Affidavit of Truth

**Prayer for Relief**

Pay common law copyright violations in the schedule of fees which consists of:

Number 1. 2. 3. 4. 5. 6. 7. 8. 10. 11. 12. 20. 21. 22. 23. 24. 25. 26. 27.  Listed in

Exhibit 1.

Without Prejudice

:Alaahcontayna Al:

with All Rights Reserved

Authorized Representative without the U.S.

9413 Dortmoor Dr Lot 10

Little Rock AR, 72209



2021006583

PRESENTED: 01-29-2021 09:48:28 AM    RECORDED: 01-29-2021 09:58:32 AM

In Official Records of Terri Hollingsworth Circuit/County Clerk

PULASKI CO, AR FEE $70.00

Copyright for ALAAHCONTAYANA AL

Copyright Notice: All rights reserved re; common-law copyright of trade-name/trademark, **Alaahcontayana Al©™**, an original phrase created on or about May 28, 2019, with all rights reserved domiciling on North America as well as any and all derivatives and variations in the spelling of said trade-name/trade-mark-Common Law Copyright© 2019 by **Ulaahlawee El Revocable Living Trust©**. Said common-law trade-name/trade-mark, **Alaahcontayna Al©**, may not be used, printed, duplicated, reproduced, distributed, transmitted, displayed, neither in whole nor in part, nor in any manner whatsoever, without the prior, express, written consent and acknowledgement of the **Ulaahlawee El Revocable Living Trust**, hereinafter "Secured Party." With the intent of being contractually bound, any juristic person, as well as the agent of said juristic person, assents, consents, and agrees by this Common Law Copyright Notice that neither said juristic person, nor the agent of said juristic person, shall display, nor otherwise use in any manner, the common-law trade-name/trade-mark **Alaahcontayna Al©**, nor the common-law copyright described herein, nor any derivative of, nor variation in the spelling of, **Alaahcontayna Al©**, including but not limited to **Alaahcontayna Al, AL ALAAHCONTAYNA**, without the prior, express, written consent and acknowledgement of Secured Party, as signified by Secured Party's hand-signed signature in red ink, Secured Party neither assents, nor consents, nor agrees with, nor grants, nor implies any authorization for, any unauthorized use of Alaahcontayna Al©, and all unauthorized use is strictly prohibited. Mutual Assent Implied and Express Contract Executed by Unauthorized Use of Secured Party's Common Law-Copyrighted Property; Self-Executing Security Agreement in Event of Unauthorized Use of Secured Party's Common Law-Copyrighted Property: By this Common Law Copyright Notice, both the juristic person and the agent of said juristic person, hereinafter jointly and severally "user," assent, consent, and agree that any use of **Alaahcontayna Al©** other than authorized use as set above constitutes unauthorized use, unauthorized reproduction, copyright infringement, and counterfeiting, of Secured Party's common-law copyrighted property, which contractually binds the Third Party, rendering this Notice, a self executing Contract including a Security Agreement wherein the Third Party Interloper, attaches as the debtor and **Ulaahlawee El Revocable Living Trust**, as the Secured Party, and signifies that The Third Party Interloper: (1) incurs a contractual obligation in favor of Secured Party, and grants Secured Party a security in interest in all of Third Party Interloper's assets, land, and personal property and all of Third Party Interloper rights, title, and interest in assets, land, and personal property, in the sum certain amount of $1,700,000.00 per each occurrence of use of the common-law-copyrighted trade-name/trade-mark **Alaahcontayna Al©**, as well as for each and every occurrence of use of any and all derivatives of, and variations in the spelling of, **Alaahcontayna Al©**; (2) has present intention to authenticate, and hereby and herewith authenticates, this Security Agreement; (3) assents, consents, and agrees with Secured Party's filing of a Uniform Commercial Code, hereafter "UCC." Financing Statement in the UCC filing office, as well as in any county-level recording/ registration office, wherein Third Party Interloper is debtor and **Ulaahlawee El Revocable Living Trust©** is Secured Party. Third Party Interloper Further Assents, Consents, and Agrees with the Following Additional Terms of "Mutual Assents Implied and Express Contract Executed by Unauthorized



Use of Secured Party's Common Law-Copyrighted Property; Self Executing Security Agreement in Event of Unauthorized use of Secured Party's Common Law-Copyrighted Property: Payment Terms: in accordance with fees for unauthorized use of **Alaahcontayna Al©** as set forth above, and further defined in the Fee Schedule, Third Party Interloper

hereby assents, consents, and agrees that Third Party Interloper shall pay secured Party all unauthorized-use fees in full within ten (10) days of the date Secured Party sends Third Party Interloper the invoice, hereinafter "invoice," itemizing said fees. Default Terms: In event of non-payment in full of all unauthorized-use fees by Third Party Interloper within ten (10) days of date Invoice is sent, Third Party Interloper shall be deemed in default and: (a) all of Third Party Interloper's property and rights, title, and interest in property pledged as collateral by Third Party Interloper, as set forth above, immediately becomes, property of Secured Party; (b) Secured Party is appointed Third Party Interloper's Authorized Representative and (c) Third Party Interloper assets, consents, and agrees that Secured Party may take possession of, as well as otherwise dispose of in any manner that Secured Party, in Secured Party's sole discretion, deems appropriate, including, but not limited to, sale at auction, at any time following Third Party Interloper's default, and without further notice, any and all of Third Party Interloper's Property and rights, title, and interest in property, described above, formerly pledged as collateral by Third Party Interloper.

Record Owner: Ulaahlawee El Revocable Living Trust Copyrighted Date: _25_ day _Jan_ of January 2021. _Alahcontayna Al_

By: Al, Alaahcontayna, Trustee By: Al,

Alaahcontayna, Sr., Grantor State of Oklahoma } ss

County of Tulsa }

Before me, a Notary Public in and for said county, personally appeared the above named persons who acknowledged that they did sign the forgoing instrument and that the same is their free act and deed.

In Testimony Whereof, I have hereunto affixed my name and official seal this _____ _25_ day of _____ _Jan_ _____, 2021. (signed) _____

**Copyright Notice for Alaahcontayna Al**

Usage of ALAAHCONTAYNA AL is protected by United States of America, copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written request to the Ulaahlawee El Revocable Living (trust). If you have any questions regarding copyright or if you are looking to purchase duplications, publications, or displays of ALAAHCONTAYNA AL you may contact Al, Alaahcontayna, trustee for Ulaahlawee El Revocable Living Trust at ulaahwee81@gmail.com. Violations of this notice are subject to federal prosecution as well as the Fee Schedule, on record with the Board of Trustees.

Executed this 25th day of January 2021,

_Alaahcontayna Al_ Al, Alaahcontayna, Executor, Trustee

### Acknowledgment Oklahoma State}

}  ss. Tulsa County }

This instrument was acknowledged before me this 25 day of Jan 2021, by Al, Alaahcontayna, Executor for the Estate (or trust) of Ulaahlawee El Revocable Living Trust , on behalf of said Estate (or trust)

_Jessika McDaniel_ (Signature Notary)

Jessika McDaniel Name of Notary Typed, Stamped or Printed Notary Public, State of Oklahoma

**NOTICE**

A SECURITY (15 USC)

COMMERCIAL AFFIDAVIT
THIS IS A U.S. S.E.C. TRACER FLAG
NOT A POINT OF LAW*
see attached instruction APPENDIX A

This Schedule of Fees has been approved for public record by Alaahcontayna Al, hereinafter with ALAAHCONTAYNA AL Dtd 10-09-20. All trustees, fiduciaries, employees, and contractors are hereby given notice that the Trust restricts the usage of its property including the ALAAHCONTAYNA AL © ™ and all associated trade names and derivatives thereof.

### Affidavit in regard to the attached Schedule of Fees

I, Alaahcontayna Al, in full life, sui juris, hereinafter the 'Affiant' whose domicile is on the land near 2012 E Xlyer St, Tusla, Oklahoma, being of the full age of majority, and of sound mind, hereinafter affirm that:

1. The Affiant is the Executor and Trustee for the ALAAHCONTAYNA AL Dtd 10-09-20, hereinafter Trust, in Tusla, Oklahoma whose business address is 2012 E Xlyer St, upon which this Affidavit shall be annexed to and annotated therewith; and that

2. This affidavit and the attached Schedule of Fees are approved for all official business of the trust, including business conducted upon the Trust while any trustee is operating in trust, and such schedule shall be binding upon third party interlopers, and other parties, who proceed without a bonafide contract with the Trust.

3. The Trust holds the registered trademarks of the ALAAHCONTAYNA AL © ™, and holds all rights and title to the copyright, trademarkings, and derivatives including but not limited to Alaahcontayna Al, ALAAHCNTAYNA AL and all other variations of the same intent; and that

4. The Grantor of the Trust, also being the testator of the Will, has approved the attached schedule of fees for the assessment for settling grievances, trespasses upon the estate, breaches of trust, in regard to each particular as set forth therein; and that

5. The execution of this instrument shall not be construed as consent to use the Trusts property, trade name, or trademark, wherein the Grantor estate neither assents, nor consents, nor agrees with, nor grants, nor implies any authorization for any use of the trade name or trademark not secured by a proven contract; and that

6. Any person continuing to use the estates property without an authenticated contract creates a commercial obligation in default until the satisfaction of the assessment made here from; and that

7. The above statement of fact is a memorialization of the accepted and approved order of business for the trust.

Further Affiant sayeth not.

Alaahcontayna Al, Executor/Trustee
ALAAHCONTAYNA AL© ™

---

**JURAT**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Oklahoma
County of Tusla

Subscribed and sworn to (or affirmed) before me on this 25 day of ___Jan___, 2021 by _
_____ALAAHCONTAYNA AL, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

**Annotation I**

# NOTICE

## SCHEDULE OF FEES

Any corporation or Natural person or Agency's who, by coercion, threat, force, or demand, requires an employee, trustee, or fiduciary of the Trust to perform, produce material, answer, comply with, or act in accord with any particular act as set forth in this schedule, shall be assessed according to this schedule of fees. All intervenors agree to be held liable in their private, individual, and corporate capacity for their actions, and further may be subject to parallel claims of criminal activity including piracy, slavery (suretyship), trespassing, breach of Fiduciary Duty, Perjury, Misprision of Felony, RICO, Forfeiture.

**Administrative Fees:**

Any Trustee or Fiduciary employed for the matter of processing this claim shall be entitled to
5% of first $1,000,000.00 4% of next $500,000.00 3% of next $500,000.00, 2% over $2,000,000.

**Copyright, trademark, trade name violation**
1.  Usage of Alaahcontayna Al©™ including all derivatives, spellings, and upper case lower case combinations
    and renderings of the trademark and trade name without express written consent
                                                                    $ 1,700,000.00
**Acceptance of Presentments (without contract)**

2.  Unauthorized Citations                                          $ 20,000.00
3.  Warnings Issued on Paper                                        $ 20,000.00
4.  Summons, Court Notices (without contract)                       $ 30,000.00
5.  All other related items, fees, or offers                        $ 20,000.00

**Depositions, Interrogation** (unsolicited)
6.  Name                                                            $10,000.00
7.  Drivers License Number                                          $ 10,000.00
8.  Social Security Number                                          $ 50,000.00
9.  Retinal Scans                                                   $ 50,000.00
10. Fingerprinting                                                  $ 50,000.00
11. Photographing                                                   $ 50,000.00

**DNA or Body Fluids:**
12. Mouth swab                                                      $ 1,000,000.00
13. Blood samples                                                   $ 1,000,000.00
14. Urine samples                                                   $ 1,000,000.00
15. Breathalyzer testing                                            $ 1,000,000.00
16. Hair samples                                                    $ 1,000,000.00
17. Skin samples                                                    $ 1,000,000.00
18. Clothing samples                                                $ 1,000,000.00
19. Forced giving of fluids/samples                                 $ 1,000,000.00

**Obstruction of Travel, Property Search, Trespass, Theft, Carjacking, Interference with Commerce**

20. Interference with travel (without contract or emergency)       $2500.00/ minute after warning
21. Temporary detention, obstruction, or restraint (without warrant) $2500.00/ minute after warning
22. Automobile/Vessel/Car Search                                   $ 2,000,000.00
23. Body/Clothing Search                                           $ 2,000,000.00
24. Handcuffing, being tied or otherwise restricted                $ 2,500,000.00
25. Taking/Theft/Deprivation of Property                           $ 15,000.00 per day
26. Jailed, Warehousing, Incarceration                             $ 1,700,000.00 per day

**Signature, Endorsement, Autograph (SEA)**

27. Autograph under threat, duress, or coercion                    $ 2,000,000.00


                                                                   **Annotation I**

**NOTICE**

**APPENDIX A**

The Lien Claimant does NOT rely on Title 15 as a basis for the "Commercial Lien." ALL Commercial processes, by using or relying on notes or paper in Commerce (e.g. Federal Reserve Notes), must bear some sort of Federal tracking code, a County Recorder's number or a serial number, which process must be accessible for inspection at the nearest relevant County Recorder's Office or be widely advertised. When a Lien matures in three (3) months, ninety (90) days, by default of the Lien Debtor through the Lien Debtors failure to rebut the AFFIDAVIT OF OBLIGATION point-for-point categorically, it becomes an accounts receivable in the ordinary sense of a collectable debt upon which assignments, collateralization, and other commercial transactions can be based, hence becomes a Security subject to observation, tracking, and regulation by the United States Securities and Exchange Commission (hereinafter U.S. S.E.C.).

The notation "A Security — 15 USC" is a flag in Commerce telling the U.S. S.E.C. that a speculation account is being established to enforce a lien. The U.S. S.E.C. can then monitor the process. As long as the process is truthful, open, and above-board (Full disclosure), the U.S. S.E.C. has no jurisdiction over it, for even the U.S. S.E.C. has no jurisdiction over the truth of testimony, depositions, affidavits, and affidavits of obligation (Commercial Liens), and an unrebutted affidavit stands as the truth in Commerce.

Legal Authority: Universal moral/existential truths/principles, expressed in Judaic (Mosaic) Orthodox Hebrew/Jewish Commercial Code, corollary to Exodus (chiefly Exodus 20:15, 16). This is the best known Commercial process in America.

When an Affidavit is so flagged in Commerce, it becomes a Federal Document because it could become translated into a Security (for example by being attached in support of a Commercial Lien), and not accepting and/or filing a Commercial Affidavit becomes a Federal offense.



Annotation I



I hereby certify that the foregoing instrument is a true and correct copy of the Original _____
filed in this office _____ 1 ___ 29 _, 20 21_ in TESTIMONY that I have hereunto set my hand and seal of this office this _ 1 _ 29 _, 20 21

TERRI HOLLINGSWORTH, Pulaski County, Arkansas Circuit/County Clerk
By: _____ Deputy Clerk

REGINA STEWART HAMPTON







Affidavit of Fact

I, Alaahcontayna Al,  In Propria Persona Sui Juris In Full Life; am an Islamic Moslem Moor, Aboriginal, Indigenous Moorish American[1] National and a Natural Divine Freeholder of this land of America. I domicile in the jurisdiction of my ancestral inherited estate at all times.  All of my rights are reserved at all times; whereby I am exercising them now.

The Following Corporations have committed the these violations:  City of Tulsa Dunns Number (043465560)/City of Tulsa Police Department Dunns Number (104548344)/State of Oklahoma Dunns Number (043440601)/Jim Rice For Tulsa County Sheriff Dunns (040033893), also here in this Affidavit of Fact or case laws to back any facts of this  claim

<div align="center">Fact</div>

1. *"No individual may be appointed or reappointed to serve as a magistrate judge under this chapter unless: (1) He has been for at least five years a member in good standing of the bar of ..."*  28 USC §631(b)(1)
2. *Cooper v. Aron, 358 U.S. 1, 78 S. Ct. 1401 (1959)-* **"No state Legislator or Executive or Judicial officer** can war against the **constitution** without his undertaking to support it. "
3. *Miller v. Kansas 230 F 2nd 486,489-* "The **claim** and **exercise** of **Constitutional rights** cannot be converted into a *crime."*
4. *U.S. v. Bishop, 412 US 346 –* If you have **relied** on *prior decisions* of the **Supreme Court,** you have the *perfect defense* for **willfulness.**
5. *US v. Minker, 350 US 179-* "Because of what appears to be a lawful command on the surface, many citizens, because of their respect for what only **appears to be a law,** are **cunningly coerced** into waiving their rights, **due to ignorance."**
6. *Brady v. U.S 116 U.S. 616-* "Waivers of **constitutional rights** not only must they **voluntary,** they must be **knowingly intelligent acts** done with **sufficient awareness.**"A "person" "driving" an automobile cannot be stopped to see if he or she is licensed to "drive" unless there is reasonable suspicion the "person" has engaged in criminal conduct. "Traffic infractions are not crimes." **People v. Battle, 50 Cal. App. 3, step 1, 123 Cal.Rptr. 636,639.**
7. "Speeding, driving without a license, wrong plates or no plates, no registration, no tags, etc., have been held to be "non-arrestable offenses" **(Cal V. Farley, 98 Cal. Rep.89,20 CA 3d 1032.**

8. "No state shall convert a liberty into a privilege, license it, and attach a fee to it." **Shuttlesworth v. Birmingham, 373 US 262**

9. A right which is free and open to all is not the subject of a license or tax. **Chicago c Collins, 51 NE 907;Freeburg v Dawson 274 F 240**

10. The respective trial judges held that the police were under no specific legal duty to provide protection to individual appellants and dismissed the complaint for failure to state a claim upon which could be granted. **Warren v. District of Columbia**

11. **THE UNITED STATES OF AMERICA** is a corporation  **28 USC § 3002 (15)(a)**

12. *"It is an established fact that the United States Federal Government has been dissolved by the Emergency Banking Act, March 9, 1933, 48 stat. , Public Law 89-719; declared* **THE UNITED STATES OF AMERICA** is a corporation  **28 USC § 3002 (15)(a)**

13. *"It is an established fact that the United States Federal Government has been dissolved by the Emergency Banking Act, March 9, 1933, 48 stat. , Public Law 89-719; declared by President Roosevelt, being bankrupt and insolvent, H.J.R. 192, 73rd Congress in session June 5, 1933 – Joint Resolution To Suspend The Gold Standard and Abrogate The Gold Clause dissolved the Sovereign Authority of the United States Government Offices, Officers, and Departments, and is further evidence that the United States Federal Government exists today in name only."*

14. *No State Shall, enter into any treaty, Alliance, or Confederation, grant Letters of Marque and Reprisal: coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass ant Bill of Attainder, ex post facto Law, impairing the Obligation of Contracts, or grant any Title of Nobility.*

15. **18 U.S. Code § 241, Conspiracy against rights.**

16. **2. 18 U.S. Code § 242, Deprivation of rights under color of law.**

17. **3. 18 U.S. ode § 287, False, fictitious or fraudulent claims.**

18. **4. 18 U.S. Code § 1951 (a)(b)(2), Interference with comm. by threats or violence.**

19. **THE TREATY OF PEACE AND FRIENDSHIPOF 1836 A.D.** Between Morocco and the United States

### Article 20

20. "If any of the Citizens of the United States, or any Persons under their Protection, shall have any disputes with each other, the Consul shall decide between the Parties, and whenever the Consul shall require any Aid or Assistance from our Government, to enforce his decisions, it shall be immediately granted to him."

### Article 21

21. "If any Citizen of the United States should kill or wound a Moor, or, on the contrary, if a Moor shall kill or wound a Citizen of the United States, the Law of the Country shall take place, and equal Justice shall be rendered, the Consul assisting at the Trial; and if any Delinquent shall make his escape, the Consul shall not be answerable for him in any manner whatever."

22. 18 U.S. Code § 1521. Retaliating against a Federal judge or Federal law enforcement

officer by false claim or slander of title.

**23.** 42 U.S. Code § 1983. Civil action for deprivation

**24.** 42 U.S. Code § 3617. Interference, coercion, or intimidation.

**25.** The 5th Amendment states; "No Person shall be held to answer for a **capitol, or otherwise infamous crime,** unless on **presentment of a Grand Jury…" If there is <u>no victim</u> and <u>criminal intent</u>, there is <u>no crime</u>** what crime was committed for the debt to be demanded and to not be arrested or imprisoned falsely.

**26.** Statues creating corporations are **private** acts. **(20 Amjur 35,p.60).**

**27. USC 42 1985- CONSPIRACY TO INTERFRE WITH CIVIL RIGHTS**

Constitutional Rights Violations

**28. 6th Amendment** In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

**29. 7th Amendment** In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law.

**30. 4th Amendment** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**31. 8th Amendment** Excessive bail shall not be required, nor excessive fines imposed, nor

cruel and unusual punishments inflicted.

**32. 9th** The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

Rights of Indigenous Peoples

**33. Article 2** Indigenous peoples and individuals are free and equal to all other peoples and individuals and have the right to be free from any kind of discrimination, in the exercise of their rights, in particular that based on their indigenous origin or identity.

**34. Article 3** Indigenous peoples have the right to self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

**35. Article 4** Indigenous peoples, in exercising their right to self-determination, have the right to autonomy or self-government in matters relating to their internal and local affairs, as well as ways and means for financing their autonomous functions.

**36. Article 5** Indigenous peoples have the right to maintain and strengthen their distinct political, legal, economic, social and cultural institutions, while retaining their right to participate fully, if they so choose, in the political, economic, social and cultural life of the State.

**37. Article 6** Every indigenous individual has the right to a nationality.

**38. Article 7** 1. Indigenous individuals have the rights to life, physical and mental integrity, liberty and security of person. 2. Indigenous peoples have the collective right to live in freedom, peace and security as distinct peoples and shall not be subjected to any act of genocide or any other act of violence, including forcibly removing children of the group to another group.

**39. Article 8** 1. Indigenous peoples and individuals have the right not to be subjected to forced assimilation or destruction of their culture. 2. States shall provide effective mechanisms for prevention of, and redress for: (a) Any action which has the aim or effect of depriving them of their integrity as distinct peoples, or of their cultural values or ethnic identities; (b) Any action which has the aim or effect of dispossessing them of their lands, territories or resources; (c) Any form of forced population transfer which has the aim or effect of violating or undermining any of their rights; (d) Any form of forced assimilation or integration; (e) Any form of propaganda designed to promote or incite racial or ethnic discrimination directed against them.

**40. Article 10** Indigenous peoples shall not be forcibly removed from their lands or territories. No relocation shall take place without the free, prior and informed consent of the indigenous peoples concerned and after agreement on just and fair compensation and, where possible, with the option of return.

**41.** Article 17 1. Indigenous individuals and peoples have the right to enjoy fully all rights established under applicable international and domestic labour law. 2. States shall in consultation and cooperation with indigenous peoples take specific measures to protect indigenous children from economic exploitation and from performing any work that is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development, taking into account their special vulnerability and the importance of education for their empowerment. 3. Indigenous individuals have the right not to be subjected to any discriminatory conditions of labour and, inter alia, employment or salary.

**42.** Article 24 1. Indigenous peoples have the right to their traditional medicines and to

maintain their health practices, including the conservation of their vital medicinal plants, animals and minerals. Indigenous individuals also have the right to access, without any discrimination, to all social and health services. 2. Indigenous individuals have an equal right to the enjoyment of the highest attainable standard of physical and mental health. States shall take the necessary steps with a view to achieving progressively the full realization of this right.

**43.** Article 37 1. Indigenous peoples have the right to the recognition, observance and enforcement of treaties, agreements and other constructive arrangements concluded with States or their successors and to have States honour and respect such treaties, agreements and other constructive arrangements. 2. Nothing in this Declaration may be interpreted as diminishing or eliminating the rights of indigenous peoples contained in treaties, agreements and other constructive arrangements.

**44.** Article 40 Indigenous peoples have the right to access to and prompt decision through just and fair procedures for the resolution of conflicts and disputes with States or other parties, as well as to effective remedies for all infringements of their individual and collective rights. Such a decision shall give due consideration to the customs, traditions, rules and legal systems of the indigenous peoples concerned and international human rights.

I, Alaahcontayna Al, ,  In Propria Persona Sui Juris In Full Life; am an Islamic Moslem Moor, Aboriginal, Indigenous Moorish American[2] National and a Natural Divine Freeholder of this land of America am not, BLACK/NEGRO/COLORED or African American nor a corporate U.S. Citizen.

_____

*Affidavit pursuant to 29,* United States Code, Title 1746

*See Dickerson vs. Wainwright,* 626 F.2d Title 1184, *held* affidavit sworn true and correct under penalty of perjury has full force of law and does not have to be verified by Notary Public to have same effect.

Under penalty of perjury I declare that the foregoing facts within this document/verified complaint/affidavit are true, correct and complete.

"Ministerial officers are incompetent to receive grants of judicial power from the legislature, their acts in attempting to exercise such powers are necessarily nullities." **Burns v. Supp. Ct., SF, 140 Cal. 1.**

A response is required within 10 days of receipt of this Affidavit of Fact.

**Notice to Agent is Notice to Principal – Notice to Principal is Notice to Agent.**

Thank You,
I Am:
Alaahcontayna Al , Authorized Representative
Natural Person, In Propria Persona:

All Rights Reserved: U.C.C. 1-207 1-308; U.C.C.1-103
Okla Humma Territory
c/o 2012 East Xyler Street
Tulsa, Oklahoma Republic [Zip Exempt]
Non-Domestic





LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a serial entitled **CONGRESSIONAL RECORD, Proceedings and Debates of the 90th Congress, First Session, Vol. 113, Part 12, June 12, 1967, to June 20, 1967,** and that the attached photocopies from that serial - the title page, and pages 15641 through 15646, on which appears *The 14th Amendment –Equal Protection Law or Tool of Usurpation-* are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on February 3, 2020.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress





UNITED STATES   OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 90th CONGRESS
FIRST SESSION

## VOLUME 113—PART 12

JUNE 12, 1967, TO JUNE 20, 1967

(PAGES 15309 TO 16558)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1967

groups from other nations. This bipartisan organization is doing something more than just talking about international understanding—it is doing something about it.

If mankind is ever to abolish war from the face of the earth, we first must break down the barriers of mistrust and suspicion among the peoples of the world. There is no better way to accomplish this than through just such programs as this one conducted by the American Council of Young Political Leaders.

These young people will be the leaders of the world in years to come. They will be better leaders, more understanding and tolerant leaders, if they are able to expand their knowledge of other nations, other peoples, and other political systems.

This is why, Mr. Speaker, I am so pleased with the work being done by the American Council of Young Political Leaders. They have my wholehearted support in their program to further world understanding.

## THE 14TH AMENDMENT—EQUAL PROTECTION LAW OR TOOL OF USURPATION

Mr. PRYOR. Mr. Speaker, I ask unanimous consent that the gentleman from Louisiana [Mr. RARICK] may extend his remarks at this point in the RECORD and include extraneous matter.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Arkansas?

There was no objection.

Mr. RARICK. Mr. Speaker, arrogantly ignoring clearcut expressions in the Constitution of the United States, the declared intent of its drafters notwithstanding, our unelected Federal judges read out prohibitions of the Constitution of the United States by adopting the fuzzy base of the 14th amendment to legislate their personal ideas, prejudices, theories, guilt complexes, aims, and whims.

Through the cooperation of intellectual educators, we have subjected ourselves to accept destructive use and meaning of words and phrases. We blindly accept new meanings and changed values to alter our traditional thoughts.

We have tolerantly permitted the habitual misuse of words to serve as a vehicle to abandon our foundations and goals. Thus, the present use and expansion of the 14th amendment is a sham—serving as a crutch and hoodwink to precipitate a quasi-legal approach for overthrow of the tender balances and protections of limitation found in the Constitution.

But, interestingly enough, the 14th amendment—whether ratified or not—was but the expression of emotional outpouring of public sentiment following the War Between the States.

Its obvious purpose and intent was but to free human beings from ownership as a chattel by other humans. Its aim was no more than to free the slaves.

As our politically appointed Federal judiciary proceeds down their chosen path of chaotic departure from the peoples' government by substituting their personal law rationalized under the 14th amendment, their actions and verbiage brand them and their team as secessionists—rebels with pens instead of guns—seeking to divide our Union.

They must be stopped. Public opinion must be aroused. The Union must and shall be preserved.

Mr. Speaker, I ask to include in the RECORD, following my remarks, House Concurrent Resolution 208 of the Louisiana Legislature urging this Congress to declare the 14th amendment illegal. Also, I include in the RECORD an informative and well-annotated treatise on the illegality of the 14th amendment—the play toy of our secessionist judges—which has been prepared by Judge Leander H. Perez, of Louisiana.

The material referred to follows:

H. CON. RES. 208

A concurrent resolution to expose the unconstitutionality of the 14th amendment to the Constitution of the United States; to interpose the sovereignty of the State of Louisiana against the execution of said amendment in this State; to memorialize the Congress of the United States to repeal its joint resolution of July 28, 1868, declaring that said amendment had been ratified; and to provide for the distribution of certified copies of this resolution

Whereas the purported 14th Amendment to the United States Constitution was never lawfully adopted in accordance with the requirements of the United States Constitution because eleven states of the Union were deprived of their equal suffrage in the Senate in violation of Article V, when eleven southern states, including Louisiana, were excluded from deliberation and decision in the adoption of the Joint Resolution proposing said 14th Amendment; said Resolution was not presented to the President of the United States in order that the same should take effect, as required by Article 1, Section 7; the proposed amendment was not ratified by three-fourths of the states, but to the contrary fifteen states of the then thirty-seven states of the Union rejected the proposed 14th Amendment between the dates of its submission to the states by the Secretary of State on June 16, 1866 and March 24, 1868, thereby nullifying said Resolution and making it impossible for ratification by the constitutionally required three-fourths of such states; said southern states which were denied their equal suffrage in the Senate had been recognized by proclamations of the President of the United States to have duly constituted governments with all the powers which belong to free states of the Union, and the Legislatures of seven of said southern states had ratified the 13th Amendment which would have failed of ratification but for the ratification of said seven southern states; and

Whereas the Reconstruction Acts of Congress unlawfully overthrew their existing governments, removed their lawfully constituted legislatures by military force and replaced them with rump legislatures which carried out military orders and pretended to ratify the 14th Amendment; and

Whereas in spite of the fact that the Secretary of State in his first proclamation, on July 20, 1868, expressed doubt as to whether three-fourths of the required states had ratified the 14th Amendment, Congress nevertheless adopted a resolution on July 28, 1868, unlawfully declaring that three-fourths of the states had ratified the 14th Amendment and directed the Secretary of State to so proclaim, said Joint Resolution of Congress and the resulting proclamation of the

Secretary of State included the purported ratifications of the military enforced rump legislatures of ten southern states whose lawful legislatures had previously rejected said 14th Amendment, and also included purported ratifications by the legislatures of the States of Ohio and New Jersey although they had withdrawn their legislative ratifications several months previously, all of which proves absolutely that said 14th Amendment was not adopted in accordance with the mandatory constitutional requirements set forth in Article V of the Constitution and therefore the Constitution itself strikes with nullity the purported 14th Amendment.

Now therefore be it resolved by the Legislature of Louisiana, the House of Representatives and the Senate concurring:

(1) That the Legislature go on record as exposing the unconstitutionality of the 14th Amendment, and interpose the sovereignty of the State of Louisiana against the execution of said 14th Amendment against the State of Louisiana and its people;

(2) That the Legislature of Louisiana opposes the use of the invalid 14th Amendment by the Federal courts to impose further unlawful edicts and hardships on its people;

(3) That the Congress of the United States be memorialized by this Legislature to repeal its unlawful Joint Resolution of July 28, 1868, declaring that three-fourths of the states had ratified the 14th Amendment to the United States Constitution;

(4) That the Legislatures of the other states of the Union be memorialized to give serious study and consideration to take similar action against the validity of the 14th Amendment and to uphold and support the Constitution of the United States which strikes said 14th Amendment with nullity; and

(5) That copies of this Resolution, duly certified, together with a copy of the treatise on "The Unconstitutionality of the 14th Amendment" by Judge L. H. Perez, be forwarded to the Governors and Secretaries of State of each state in the Union, and to the Secretaries of the United States Senate and House of Congress, and to the Louisiana Congressional delegation, a copy hereof to be published in the Congressional Record.

VAIL M. DELONY,
*Speaker of the House of Representatives.*

O. C. AYCOCK,
*Lieutenant Governor and President of the Senate.*

THE 14TH AMENDMENT IS UNCONSTITUTIONAL

The purported 14th Amendment to the United States Constitution is and should be held to be ineffective, invalid, null, void and unconstitutional for the following reasons:

1. The Joint Resolution proposing said Amendment was not submitted to or adopted by a Constitutional Congress. Article I, Section 3, and Article V of the U.S. Constitution.

2. The Joint Resolution was not submitted to the President for his approval. Article I, Section 7.

3. The proposed 14th Amendment was rejected by more than one-fourth of all the States then in the Union, and it was never ratified by three-fourths of all the States in the Union. Article V.

I. THE UNCONSTITUTIONAL CONGRESS

The U.S. Constitution provides:

Article I, Section 3. "The Senate of the United States shall be composed of two Senators from each State * * *"

Article V provides: "No State, without its consent, shall be deprived of its equal suffrage in the Senate."

The fact that 23 Senators had been unlawfully excluded from the U.S. Senate, in order to secure a two-thirds vote for adoption of the Joint Resolution proposing the 14th Amendment is shown by Resolutions of pro-

test adopted by the following State Legislatures:

The New Jersey Legislature by Resolution of March 27, 1868, protested as follows:

"The said proposed amendment not having yet received the assent of the three-fourths of the states, which is necessary to make it valid, the natural and constitutional right of this state to withdraw its assent is undeniable * * *."

"That it being necessary by the constitution that every amendment to the same should be proposed by two-thirds of both houses of congress, the authors of said proposition, for the purpose of securing the assent of the requisite majority, determined to, and did, exclude from the said two houses eighty representatives from eleven states of the union, upon the pretense that there were no such states in the Union; but, finding that two-thirds of the remainder of the said houses could not be brought to assent to the said proposition, they deliberately formed and carried out the design of mutilating the integrity of the United States senate, and without any pretext or justification, other than the possession of the power, without the right, and in palpable violation of the constitution, ejected a member of their own body, representing this state, and thus practically denied to New Jersey its equal suffrage in the senate, and thereby nominally secured the vote of two-thirds of the said houses." [2]

The Alabama Legislature protested against being deprived of representation in the Senate of the U.S. Congress.[3]

The Texas Legislature by Resolution on October 15, 1866, protested as follows:

"The amendment to the Constitution proposed by this joint resolution as Article XIV is presented to the Legislature of Texas for its action thereon, under Article V of that Constitution. This Article V, providing the mode of making amendments to that instrument, contemplates the participation by all the States through their representatives in Congress, in proposing amendments. As representatives from nearly one-third of the States were excluded from the Congress proposing the amendments, the constitutional requirement was not complied with; it was violated in letter and in spirit; and the proposing of these amendments to States which were excluded from all participation in their initiation in Congress, is a nullity." [3]

The Arkansas Legislature, by Resolution on December 17, 1866, protested as follows:

"The Constitution authorized two-thirds of both houses of Congress to propose amendments; and, as eleven States were excluded from deliberation and decision upon the one now submitted, the conclusion is inevitable that it is not proposed by legal authority, but in palpable violation of the Constitution." [4]

The Georgia Legislature, by Resolution on November 9, 1866, protested as follows:

"Since the reorganization of the State government, Georgia has elected Senators and Representatives. So has every other State. They have been arbitrarily refused admission to their seats, not on the ground that the qualifications of the members elected did not conform to the fourth paragraph, second section, first article of the Constitution, but because their right of representation was denied by a portion of the States having equal but not greater rights than themselves. They have in fact been forcibly excluded; and, inasmuch as all legislative power granted by the States to the Congress is defined, and this power of exclusion is not among the powers expressly or by implication, in the assemblage, at the capitol, of representatives from a portion of the States, to the exclusion of the representatives of another portion,

cannot be a constitutional Congress, when the representation of each State forms an integral part of the whole.

"This amendment is tendered to Georgia for ratification, under that power in the Constitution which authorizes two-thirds of the Congress to propose amendments. We have endeavored to establish that Georgia had a right, in the first place, as a part of the Congress, to act upon the question, 'Shall these amendments be proposed?' Every other excluded State had the same right.

"The first constitutional privilege has been arbitrarily denied. Had these amendments been submitted to a constitutional Congress, they never would have been proposed to the States. Two-thirds of the whole Congress never would have proposed to eleven States voluntarily to reduce their political power in the Union, and at the same time, disfranchise the larger portion of the intellect, integrity and patriotism of eleven co-equal States." [5]

The Florida Legislature, by Resolution of December 5, 1866, protested as follows:

"Let this alteration be made in the organic system and come anew and more startling demands may or may not be required by the predominant party previous to allowing the ten States now unlawfully and unconstitutionally deprived of their right of representation to enter the Halls of the National Legislature. Their right to representation is guaranteed by the Constitution of this country and there is no act, not even that of rebellion, can deprive them of its exercise." [6]

The South Carolina Legislature by Resolution of November 27, 1866, protested as follows:

"Eleven of the Southern States, including South Carolina, are deprived of their representation in Congress. Although their Senators and Representatives have been duly elected and have presented themselves for the purpose of taking their seats, their credentials have, in most instances, been laid upon the table without being read, or have been referred to a committee, who have failed to make any report on the subject. In short, Congress has refused to exercise its Constitutional functions, and decide either upon the election, the return, or the qualification of those selected by the States and people to represent us. Some of the Senators and Representatives from the Southern States were prepared to take this test oath, but even these have been persistently ignored, and kept out of the seats to which they were entitled under the Constitution and laws.

"Hence this amendment has not been proposed by 'two-thirds of both Houses' of a legally constituted Congress, and is not, Constitutionally or legitimately, before a single Legislature for ratification." [7]

The North Carolina Legislature protested by Resolution of December 6, 1866 as follows:

"The Federal Constitution declares, in substance, that Congress shall consist of a House of Representatives, composed of members apportioned among the respective States in the ratio of their population, and of a Senate, composed of two members from each State. And in the Article which concerns Amendments, it is expressly provided that no State, without its consent, shall be deprived of its equal suffrage in the Senate. The contemplated Amendment was not proposed to the States by a Congress thus constituted. At the time of its adoption, the eleven seceding States were deprived of representation both in the Senate and House, although they all, except the State of Texas, had Senators and Representatives duly elected and claiming their privileges under

the Constitution. In consequence of this, these States had no voice on the important question of proposing the Amendment. Had they been allowed to give their vote, the proposition would doubtless have failed to command the required two-thirds majority. * * *

"If the votes of these States are necessary to a valid ratification of the Amendment, they were equally necessary on the question of proposing it to the States; for it would be difficult, in the opinion of the Committee, to show by what process in logic, men of intelligence could arrive at a different conclusion." [8]

## II. JOINT RESOLUTION INEFFECTIVE

Article I, Section 7 provides that not only every bill which shall have been passed by the House of Representatives and the Senate of the United States Congress, but that:

"Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill."

The Joint Resolution proposing the 14th Amendment was never presented to the President of the United States for his approval, as President Andrew Johnson stated in his message on June 22, 1866.[9] Therefore, the Joint Resolution did not take effect.

## III. PROPOSED AMENDMENT NEVER RATIFIED BY THREE-FOURTHS OF THE STATES

1. Pretermitting the ineffectiveness of said resolution, as above, fifteen (15) States out of the then thirty-seven (37) States of the Union rejected the proposed 14th Amendment between the date of its submission to the States by the Secretary of State on June 16, 1866 and March 24, 1868, thereby further nullifying said resolution and making it impossible for its ratification by the constitutionally required three-fourths of such States, as shown by the rejections thereof by the Legislatures of the following states:

Texas rejected the 14th Amendment on October 27, 1866.[11]

Georgia rejected the 14th Amendment on November 9, 1866.[12]

Florida rejected the 14th Amendment on December 6, 1866.[13]

Alabama rejected the 14th Amendment on December 7, 1866.[14]

North Carolina rejected the 14th Amendment on December 14, 1866.[15]

Arkansas rejected the 14th Amendment on December 17, 1866.[16]

South Carolina rejected the 14th Amendment on December 20, 1866.[17]

Kentucky rejected the 14th Amendment on January 8, 1867.[18]

[2] New Jersey Acts, March 27, 1866.
[3] Alabama House Journal 1866, pp. 210–213.
[3] Texas House Journal, 1866, p. 577.
[4] Arkansas House Journal, 1866, p. 287.
[5] Georgia House Journal, November 9, 1866, pp. 66–67.
[6] Florida House Journal, 1866, p. 76.
[7] South Carolina House Journal, 1866, pp. 33 and 34.
[8] North Carolina Senate Journal, 1866–67, pp. 92 and 93.
[9] 14 Stat. 358 etc.
[11] Senate Journal, 39th Congress, 1st session, p. 563, and House Journal p. 559.
[12] House Journal 1866, pp. 875–584—Senate Journal 1866, p. 471.
[13] House Journal 1866, p. 65—Senate Journal 1866, p. 72.
[14] House Journal 1866, p. 76—Senate Journal 1866, p. 8.
[15] House Journal 1866, pp. 210–213—Senate Journal 1866, p. 183.
[16] House Journal 1866–1867, p. 183—Senate Journal 1866–1867, p. 138.
[17] House Journal 1866, pp. 283–291—Senate Journal 1866, p. 262.
[18] House Journal 1866, p. 284—Senate Journal 1866, p. 230.
[18] House Journal 1867, p. 60—Senate Journal 1867, p. 62.

Case 4:21-cv-00150-SWW   Document 2   Filed 02/25/21   Page 27 of 212

Virginia rejected the 14th Amendment on January 9, 1867.[20]

Louisiana rejected the 14th Amendment on February 6, 1867.[21]

Delaware rejected the 14th Amendment on February 7, 1867.[21]

Maryland rejected the 14th Amendment on March 23, 1867.[22]

Mississippi rejected the 14th Amendment on January 31, 1867.[23]

Ohio rejected the 14th Amendment on January 15, 1868.[24]

New Jersey rejected the 14th Amendment on March 24, 1868.[25]

There was no question that all of the Southern states which rejected the 14th Amendment had legally constituted governments, were fully recognized by the federal government, and were functioning as member states of the Union at the time of their rejection.

President Andrew Johnson, in his Veto message of March 2, 1867,[26] pointed out that:

"It is not denied that the States in question have each of them an actual governments with all the powers, executive, judicial and legislative, which properly belong to a free State. They are organized like the other States of the Union, and, like them, they make, administer, and execute the laws which concern their domestic affairs."

If further proof were needed that these States were operating under legally constituted governments as member States in the Union, the ratification of the 13th Amendment by December 5, 1865 undoubtedly supplies this official proof. If the Southern States were not member States of the Union, the 13th Amendment would not have been submitted to their Legislatures for ratification.

2. The 13th Amendment to the United States Constitution was proposed by Joint Resolution of Congress[27] and was approved February 1, 1865 by President Abraham Lincoln, as required by Article I, Section 7 of the United States Constitution. The President's signature is affixed on the Resolution.

The 13th Amendment was ratified by 27 states of the then 36 states of the Union, including the Southern States of Virginia, Louisiana, Arkansas, South Carolina, Alabama, North Carolina and Georgia. This is shown by the Proclamation of the Secretary of State December 18, 1865.[27] Without the votes of these 7 Southern State Legislatures the 13th Amendment would have failed. There can be no doubt but that the ratification by these 7 Southern States of the 13th Amendment again established the fact that their Legislatures and State governments were duly and lawfully constituted and functioning as such under their State Constitutions.

3. Furthermore, on April 2, 1866, President Andrew Johnson issued a proclamation that, "the insurrection which heretofore existed in the States of Georgia, South Carolina, Virginia, North Carolina, Tennessee, Alabama, Louisiana, Arkansas, Mississippi and Florida is at an end, and is henceforth to be so regarded."[28]

[20] House Journal 1866–1867, p. 108—Senate Journal 1866–1867, p. 101.
[21] McPherson, Reconstruction, p. 194; Annual Encyclopedia, p. 452.
[22] House Journal 1867, p. 223—Senate Journal 1867, p. 176.
[23] House Journal 1867, p. 1141—Senate Journal 1867, p. 808.
[24] McPherson, Reconstruction, p. 194.
[25] House Journal 1868, pp. 44–50—Senate Journal 1868, pp. 33–38.
[26] Minutes of the Assembly 1868, p. 743—Senate Journal 1868, p. 356.
[27] House Journal, 39th Congress, 2nd Session, p. 563 etc.
[28] 13 Stat, p. 567,.
[29] 13 Stat, p. 774.
[30] Presidential Proclamation No. 153, General Records of the United States, G.S.A. National Archives and Records Service.

On August 20, 1866, President Andrew Johnson issued another proclamation[31] pointing out the fact that the House of Representatives and Senate had adopted identical Resolutions on July 22nd[32] and July 25th, 1861,[33] that the Civil War forced by disunionists of the Southern States, was not waged for the purpose of conquest or to overthrow the rights and established institutions of those States, but to defend and maintain the supremacy of the Constitution and to preserve the Union with all equality and rights of the several states unimpaired, and that as soon as these objects are accomplished, the war ought to cease. The President's proclamation on June 13, 1865, declared the insurrection in the State of Tennessee had been suppressed.[34] The President's proclamation on April 2, 1866[35] declared the insurrection in the other Southern States, except Texas, no longer existed. On August 20, 1866,[36] the President proclaimed that the insurrection in the State of Texas had been completely ended; and his proclamation continued: "the insurrection which heretofore existed in the State of Texas is at an end, and is to be henceforth so regarded in that State, as in the other States before named in which the said insurrection was proclaimed to be at an end by the aforesaid proclamation of the second day of April, one thousand, eight hundred and sixty-six.

"And I do further proclaim that the said insurrection is at an end, and that peace, order, tranquility, and civil authority now exist, in and throughout the whole of the United States of America."

4. When the State of Louisiana rejected the 14th Amendment on February 6, 1867, making the 10th state to have rejected the same, or more than one-fourth of the total number of 36 states of the Union as of that date, thus leaving less than three-fourths of the states possibly to ratify the same, the Amendment failed of ratification in fact and in law, and it could not have been revived except by a new Joint Resolution of the Senate and House of Representatives in accordance with Constitutional requirement.

5. Faced with the positive failure of ratification of the 14th Amendment, both Houses of Congress passed over the veto of the President three Acts known as Reconstruction Acts, between the dates of March 2 and July 19, 1867, especially the third of said Acts, 13 Stat, p. 14 etc., designed illegally to remove with "Military force" the lawfully constituted State Legislatures of the 10 Southern States of Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Arkansas, Louisiana and Texas. In President Andrew Johnson's Veto message on the Reconstruction Act of March 2, 1867,[36] he pointed out these unconstitutionalities:

"If ever the American citizen should be left to the free exercise of his own judgment, it is when he is engaged in the work of forming the fundamental law under which he is to live. That work is his work, and it cannot properly be taken out of his hands. All this legislation proceeds upon the contrary Assumption that the people of each of these States shall have no constitution, except such as may be arbitrarily dictated by Congress, and formed under the restraint of military rule. A plain statement of facts makes this evident.

[31] 14 Stat, p. 814.
[32] House Journal, 37th Congress, 1st Sessn. p. 123 etc.
[33] Senate Journal, 37th Congress, 1st Sessn. p. 91 etc.
[34] 13 Stat. 763.
[35] 14 Stat. p. 811.
[36] 14 Stat. 814.
[37] House Journal, 39th Congress, 2nd Sessn. p. 563 etc.

"In all these States there are existing constitutions, framed in the accustomed way by the people, Congress, however, declares that these constitutions are not 'loyal and republican,' and requires the people to form them anew. What, then, in the opinion of Congress, is necessary to make the constitution of a State 'loyal and republican?' The original act answers the question: 'It is universal negro suffrage, a question which the federal Constitution leaves exclusively to the States themselves. All this legislative machinery of martial law, military coercion, and political disfranchisement is avowedly for that purpose and none other. The existing constitutions of the ten States conform to the acknowledged standards of loyalty and republicanism. Indeed, if there are degrees in republican forms of government their constitutions are more republican now, than when these States—four of which were members of the original thirteen—first became members of the Union."

In President Andrew Johnson's Veto message on the Reconstruction Act on July 19, 1867,[37] he pointed out various unconstitutionalities as follows:

"The veto of the original bill of the 2d of March was based on two distinct grounds, the interference of Congress in matters strictly appertaining to the reserved powers of the States, and the establishment of military tribunals for the trial of citizens in time of peace.

*     *     *     *     *

"A singular contradiction is apparent here. Congress declares these local State governments to be illegal governments, and then provides that these illegal governments shall be carried on by federal officers, who are to perform the very duties on its own officers by this illegal State authority. It certainly would be a novel spectacle if Congress should attempt to carry on a legal State government by the agency of its own officers. It is yet more strange that Congress attempts to sustain and carry on an illegal State government by the same federal agency.

*     *     *     *     *

"It is now too late to say that these ten political communities are not States of this Union. Declarations to the contrary made in these three acts are contradicted again and again by repeated acts of legislation enacted by Congress from this year 1861 to the year 1867.

"During that period, while these States were in actual rebellion, and after that rebellion was brought to a close, they have been again and again recognized as States of the Union. Representation has been apportioned to them as States. They have been divided into judicial districts for the holding of districts and circuit courts of the United States, as States of the Union only can be districted. The last act on this subject was passed July 23, 1866, by which every one of these ten States was arranged into districts and circuits.

"They have been called upon by Congress to act through their legislatures upon at least two amendments to the Constitution of the United States. As States they have ratified one amendment, which required the vote of twenty-seven States of the thirty-six then composing the Union. When the requisite twenty-seven votes were given in favor of that amendment—seven of which votes were given by seven of these ten States—it was proclaimed to be a part of the Constitution of the United States, and slavery was declared no longer to exist within the United States or at any place subject to their jurisdiction. If these seven States were not legal States of the Union, it follows as an inevitable consequence that in some of the States slavery yet exists. It does not exist

[37] 40th Congress, 1st Sessn, House Journal p. 222 etc.

in these seven States, for they have abolished it also in their State constitutions; but Kentucky not having done so, it would still remain in that State. But, in truth, if this assumption that these States have no legal State governments be true, then the abolition of slavery by these illegal governments binds no one, for Congress now denies to these States the power to abolish slavery by denying to them the power to elect a legal State legislature, or to frame a constitution for any purpose, even for such a purpose as the abolition of slavery.

"As to the other constitutional amendment having reference to suffrage, it happens that these States have not accepted it. The consequence is, that it has never been proclaimed or understood, even by Congress, to be a part of the Constitution of the United States. The Senate of the United States has repeatedly given its sanction to the appointment of judges, district attorneys, and marshals for every one of these States; yet, if they are not legal States, not one of these judges is authorized to hold a court. So, too, both houses of Congress have passed appropriation bills to pay all these judges, attorneys, and officers of the United States for exercising their functions in these States. Again, in the machinery of the internal revenue laws, all these States are districted, not as 'Territories,' but as 'States.'

"So much for continuous legislative recognition. The instances cited, however, fall far short of all that might be enumerated. Executive recognition, as is well known, has been frequent and unwavering. The same may be said as to judicial recognition through the Supreme Court of the United States.

* * * * *

"To me these considerations are conclusive of the unconstitutionality of this part of the bill now before me, and I earnestly commend their consideration to the deliberate judgment of Congress. [And now to the Court.]

"Within a period less than a year the legislation of Congress has attempted to strip the executive department of the government of some of its essential powers. The Constitution, and the oath provided in it, devolve upon the President the power and duty to see that the laws are faithfully executed. The Constitution, in order to carry out this power, gives him the choice of the agents, and makes them subject to his control and supervision. But in the execution of these laws the constitutional obligation upon the President remains, but the powers to exercise that constitutional duty is effectually taken away. The military commander is, as to the power of appointment, made to take the place of the President, and the General of the Army the place of the Senate; and any attempt on the part of the President to assert his own constitutional power may, under pretence of law, be met by official insubordination. It is to be feared that these military officers, looking to the authority given by these laws rather than to the letter of the Constitution, will recognize no authority but the commander of the district and the General of the army.

"If there were no other objection than this to this proposed legislation, it would be sufficient."

No one can contend that the Reconstruction Acts were ever upheld as being valid and constitutional.

They were brought into question, but the Courts either avoided decision or were prevented by Congress from finally adjudicating upon their constitutionality.

In Mississippi v. President Andrew Johnson, (4 Wall. 475–502), where the suit sought to enjoin the President of the United States from enforcing provisions of the Reconstruction Acts, the U.S. Supreme Court held that the President cannot be enjoined because of the Judicial Department of the government to attempt to enforce the performance of the duties by the President might be justly characterized, in the language of Chief Justice Marshall, as "an absurd and excessive extravagance." The Court further said that if the Court granted the injunction against enforcement of the Reconstruction Acts, and if the President refused obedience, it is needless to observe that the Court is without power to enforce its process.

In a joint action, the states of Georgia and Mississippi brought suit against the President and the Secretary of War, (6 Wall. 50–78, 154 U.S. 554).

The Court said that:

"The bill then sets forth that the intent and design of the acts of Congress, as apparent on their face and by their terms, are to overthrow and annul this existing state government, and to erect another and different government in its place, unauthorized by the Constitution and in defiance of its guaranties; and that, in furtherance of this intent and design, the defendants, the Secretary of War, the General of the Army, and Major-General Pope, acting under orders of the President, are about setting in motion a portion of the army to take military possession of the state, and threaten to subvert her government and subject her people to military rule; that this suit is holding inadequate means to resist the power and force of the Executive Department of the United States; and she therefore insists that such protection can, and ought to be afforded by a decree or order of this court in the premises."

The applications for injunction by these two states to prohibit the Executive Department from carrying out the provisions of the Reconstruction Acts directed to the overthrow of these government, including this dissolution of their state legislatures, were denied on the grounds that the organization of the government into three great departments, the executive, legislative and judicial, carried limitations of the power of each by the Constitution. This case when the same way as the previous case of Mississippi against President Johnson and was dismissed without adjudicating upon the constitutionality of the Reconstruction Acts.

In another case, ex parte William H. McCardle (7 Wall. 506–515), a petition for the writ of habeas corpus for unlawful restraint by military troops of a citizen not in the military service of the United States was before the United States Supreme Court. After the case was argued and taken under advisement, and before conference in regard to the decision to be made, Congress passed an emergency Act, (Act March 27, 1868, 15 Stat. at L. 44), vetoed by the President and repassed over his veto, repealing the jurisdiction of the U.S. Supreme Court in such case. Accordingly, the Supreme Court dismissed the appeal without passing upon the constitutionality of the Reconstruction Acts, under which the non-military citizen was held by the military without benefit of writ of habeas corpus, in violation of Section 9, Article I of the U.S. Constitution which prohibits the suspension of the writ of habeas corpus.

That Act of Congress placed the Reconstruction Acts beyond judicial recourse and avoided tests of constitutionality.

It is recorded that one of the Supreme Court Justices, Grier, protested against the action of the Court as follows:

"This case we fully argued in the beginning of this month. It is a case which involves the liberty and rights, not only of the appellant but of millions of our fellow citizens. The country and the parties had a right to expect that it would receive the immediate and solemn attention of the court. By the postponement of this case we shall subject ourselves, whether justly or unjustly, to the imputation that we have evaded the performance of a duty imposed on us by the Constitution, and waited for Legislative interposition to supersede our action, and relieve us from responsibility. I am not willing to be a partaker of the eulogy or opprobrium that may follow. I can only say . . . I am ashamed that such opprobrium should be cast upon the court and that it cannot be refuted."

The ten States were organized into Military Districts under the unconstitutional "Reconstruction Acts," their lawfully constituted Legislatures illegally were removed by "military force," and they were replaced by new, so-called Legislatures, seven of which carried out military orders and pretended to ratify the 14th Amendment, as follows:

Arkansas on April 6, 1868;[34]
North Carolina on July 2, 1868;[35]
Florida on June 9, 1868;[36]
Louisiana on July 9, 1868;[37]
South Carolina on July 9, 1868;[42]
Alabama on July 13, 1868;[43] and Georgia on July 21, 1868.[44]

5. Of the above 7 States whose Legislatures were removed and replaced by rump, so-called Legislatures, six (6) Legislatures of the States of Louisiana, Arkansas, South Carolina, Alabama, North Carolina and Georgia had ratified the 13th Amendment, as shown by the Secretary of State's Proclamation of December 18, 1865, without which 6 States' ratifications, the 13th Amendment could not and would not have been ratified because said 6 States made a total of 27 out of 36 States or exactly three-fourths of the number required by Article V of the Constitution for ratification.

Furthermore, governments of the States of Louisiana and Arkansas had been re-established under a Proclamation issued by President Abraham Lincoln December 8, 1863.[45]

The government of North Carolina had been re-established under a Proclamation issued by President Andrew Johnson dated May 29, 1865.[46]

The government of Georgia had been re-established under a proclamation issued by President Andrew Johnson dated June 17, 1865.[47]

The government of Alabama had been re-established under a Proclamation issued by President Andrew Johnson June 21, 1865.[48]

The government of South Carolina had been re-established under a Proclamation issued by President Andrew Johnson dated June 30, 1865.[49]

These three "Reconstruction Acts"[50] under which the above State Legislatures were illegally removed and unlawful rump or puppet so-called Legislatures were substituted in a mock effort to ratify the 14th Amendment, were unconstitutional, null and void, ab initio, and all acts done thereunder were also null and void, including the purported ratification of the 14th Amendment by said 6 Southern puppet State Legislatures of

[34] McPherson, Reconstruction, p. 58.
[35] House Journal 1868, p. 15, Senate Journal 1868, p. 15.
[36] House Journal 1868, p. 9, Senate Journal 1868, p. 8.
[37] Senate Journal 1868, p. 21.
[42] House Journal 1868, p. 50, Senate Journal 1868, p. 12.
[43] Senate Journal, 40th Congress, 2nd Sess., p. 725.
[44] House Journal, 1868, p. 50.
[45] Vol. I, pp. 288–306; Vol. II, pp. 1429–1448—"The Federal and State Constitutions," etc., compiled under Act of Congress on June 30, 1906, Francis Newton Thorpe, Washington Government Printing Office (1909).
[46] Same, Thorpe, Vol. V, pp. 2799–2800.
[47] Same, Thorpe, Vol. II, pp. 809–822.
[48] Same, Thorpe, Vol. I, pp. 116–132.
[49] Same, Thorpe, Vol. VI, pp. 3269–3281.
[50] 14 Stat. p. 428, etc. 15 Stat. p. 14, etc.

Arkansas, North Carolina, Louisiana, South Carolina, Alabama and Georgia.

Those Reconstruction Acts of Congress and all acts and things unlawfully done thereunder were in violation of Article IV, Section 4 of the United States Constitution, which required the United States to guarantee every State in the Union a republican form of government. They violated Article I, Section 3, and Article V of the Constitution, which entitled every State in the Union to two Senators, because under provisions of these unlawful Acts of Congress, 10 States were deprived of having two Senators, or equal suffrage in the Senate.

7. The Secretary of State expressed doubt as to whether three-fourths of the required states had ratified the 14th Amendment, as shown by his Proclamation of July 20, 1868.[n] Promptly on July 21, 1868, a Joint Resolution [o] was adopted by the Senate and House of Representatives declaring that three-fourths of the several States of the Union had ratified the 14th Amendment. That resolution, however, included purported ratifications by the unlawful puppet Legislatures of 5 States, Arkansas, North Carolina, Louisiana, South Carolina and Alabama, which had previously rejected the 14th Amendment by action of their lawfully constituted Legislatures, as above shown. This Joint Resolution assumed to perform the function of the Secretary of State in whom Congress, by Act of April 20, 1818, had vested the function of issuing such proclamation declaring the ratification of Constitutional Amendments.

The Secretary of State bowed to the action of Congress and issued his Proclamation of July 28, 1868,[p] in which he stated that he was acting under authority of the Act of April 20, 1818, but pursuant to said Resolution of July 21, 1868. He listed three-fourths or so of the then 37 states as having ratified the 14th Amendment, including the purported ratification of the unlawful puppet Legislatures of the States of Arkansas, North Carolina, Louisiana, South Carolina and Alabama. Without said 5 unlawful purported ratifications there would have been only 25 states left to ratify out of 37 when a minimum of 28 states was required for ratification by three-fourths of the States of the Union.

The Joint Resolution of Congress and the resulting Proclamation of the Secretary of State also included purported ratifications by the States of Ohio and New Jersey, although the Proclamation recognized the fact that the Legislatures of said states, several months previously, had withdrawn their ratifications and effectively rejected the 14th Amendment in January, 1868, and April, 1868.

Therefore, deducting these two states from the purported ratifications of the 14th Amendment, only 23 State ratifications at most could be claimed; whereas the ratification of 28 States, or three-fourths of 37 States in the Union, were required to ratify the 14th Amendment.

From all of the above documented historic facts, it is inescapable that the 14th Amendment never was validly adopted as an article of the Constitution, that it has no legal effect, and it should be declared by the Courts to be unconstitutional, and therefore null, void and of no effect.

**THE CONSTITUTION STRIKES THE 14TH AMENDMENT WITH NULLITY**

The defenders of the 14th Amendment contend that the U.S. Supreme Court has finally decided upon its validity. Such is not the case.

In what is considered the leading case, Coleman v. Miller, 307 U.S. 448, 59 S. Ct. 972, the U.S. Supreme Court did not uphold the validity of the 14th Amendment.

In that case, the Court brushed aside constitutional questions as though they did not exist. For instance, the Court made the statement that:

"The legislatures of Georgia, North Carolina and South Carolina had rejected the amendment in November and December, 1866. New governments were erected in those States (and in others) under the direction of Congress. The new legislatures ratified the amendment, that of North Carolina on July 4, 1868, that of South Carolina on July 9, 1868, and that of Georgia on July 21, 1868."

And the Court gave no consideration to the fact that Georgia, North Carolina and South Carolina were three of the original states of the Union with valid and existing constitutions on an equal footing with the other original states and those later admitted into the Union.

What constitutional right did Congress have to remove those state governments and their legislatures under unlawful military power set up by the unconstitutional "Reconstruction Acts," which had for their purpose, the destruction and removal of these legal state governments and the nullification of their Constitutions?

The fact that these three states and seven other Southern States had existing Constitutions, were recognized as states of the Union, again and again; had been divided into judicial districts for holding their district and circuit courts of the United States; had been called upon by Congress to act through their legislatures upon two Amendments, the 13th and 14th, and by their ratifications had actually made possible the adoption of the 13th Amendment; as well as their state governments having been re-established under Presidential Proclamations, as shown by President Andrew Johnson's Veto message and proclamations, were all brushed aside by the Court in Coleman by the statement that: "New governments were erected in those States (and in others) under the direction of Congress," and that these new legislatures ratified the Amendment.

The U.S. Supreme Court overlooked that it previously had held that at no time were these Southern States out of the Union, White v. Hart, 1871, 13 Wall. 646, 654.

In Coleman, the Court did not adjudicate upon the invalidity of the Acts of Congress which set aside those state Constitutions and abolished their state legislatures,—the Court simply referred to the fact that their legally constituted legislatures had rejected the 14th Amendment and that the "new legislatures" had ratified the Amendment.

The Court overlooked the fact, too, that the State of Virginia was also one of the original states with its Constitution and Legislature in full operation under its civil government at the time.

The Court also ignored the fact that the other six Southern States, which were given the same treatment by Congress under the unconstitutional "Reconstruction Acts," all had legal constitutions and a republican form of government in each state, as we recognized by Congress by its admission of those states into the Union. The Court certainly must take judicial cognizance of the fact that before a new state is admitted by Congress into the Union, Congress enacts an Enabling Act to enable the inhabitants of the territory to adopt a Constitution to set up a republican form of government as a condition precedent to the admission of the state into the Union, and upon approval of such Constitution, Congress then passes the Act of Admission of such state.

All this was ignored and brushed aside by the Court in the Coleman case. However, in Coleman the Court inadvertently said this:

"Whenever official notice is received at the Department of State that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Secretary of State shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States."

In Hawke v. Smith, 1920, 253 U.S. 221, 40 S. Ct. 227, the U.S. Supreme Court unmistakably held:

"The fifth article is a grant of authority by the people to Congress. The determination of the method of ratification is the exercise of a national power specifically granted by the Constitution; that power is conferred upon Congress, and is limited to two methods, by action of the Legislatures of three-fourths of the states, or conventions in a like number of states. Dodge v. Woolsey, 18 How. 331, 348, 15 L. Ed. 401. The framers of the Constitution might have adopted a different method. Ratification might have been left to a vote of the people, or to some authority of government other than that selected. The language of the article is plain, and admits of no doubt in its interpretation. It is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed."

We submit that in none of the cases, in which the Court avoided the constitutional issues involved in the composition of the Congress which adopted the Joint Resolution for the 14th Amendment, did the Court pass upon the constitutionality of the Congress which purported to adopt the Joint Resolution for the 14th Amendment, with 80 Representatives and 23 Senators, in effect, forcibly ejected or denied their seats and their votes on the Joint Resolution proposing the Amendment, in order to pass the same by a two-thirds vote, as pointed out in the New Jersey Legislature Resolution on March 27, 1868.

The constitutional requirements set forth in Article V of the Constitution permit the Congress to propose amendments only whenever two-thirds of both houses shall deem it necessary,—that is, two-thirds of both houses as then constituted without forcible ejections.

Such a fragmentary Congress also violated the constitutional requirements of Article V that no state, without its consent, shall be deprived of its equal suffrage in the Senate.

There is no such thing as giving life to an amendment illegally proposed or never legally ratified by three-fourths of the states. There is no such thing as amendment by laches; no such thing as amendment by waiver; no such thing as amendment by acquiescence; and no such thing as amendment by any other means whatsoever except the means specified in Article V of the Constitution itself.

It does not suffice to say that there have been hundreds of cases decided under the 14th Amendment to supply the constitutional deficiencies in its proposal or ratification as required by Article V. If hundreds of litigants did not question the validity of the 14th Amendment, or questioned the same perfunctorily without submitting documentary proof or the facts of record which made its purported adoption unconstitutional, their failure cannot change the Constitution for the millions in America. The same thing is true of laches; the same thing is true of acquiescence; the same thing is true of ill considered court decisions.

To ascribe constitutional life to an alleged amendment which never came into being according to specific methods laid down in Article V cannot be done without doing violence to Article V itself. This is true, because the only question open to the courts is whether the alleged 14th Amendment became a part of the Constitution through a

[n] 15 Stat. p. 706.
[o] House Journal, 40th Congress, 2nd Sessn. p. 1126 etc.
[p] 15 Stat. p. 708.

method required by Article V. Anything beyond that which a court is called upon to hold in order to validate an amendment, would be equivalent to writing into Article V another mode of the amendment which has never been authorized by the people of the United States.

On this point, therefore, the question is, was the 14th Amendment proposed and ratified in accordance with Article V?

In answering this question, it is of no real moment that decisions have been rendered in which the parties did not contest or submit proper evidence, or the Court assumed that there was a 14th Amendment; if a statute never in fact passed by Congress, through some error of administration and printing got into the published reports of the statutes, and if under such supposed statute courts had levied punishment upon a number of persons charged under it, and if the error in the published volume was discovered and the fact became known that no such statute had ever passed in Congress, it is unthinkable that the Courts would continue to administer punishment in similar cases, on a non-existent statute because prior decisions had done so. If that be true as to a statute we need only realize the greater truth when the principle is applied to the solemn question of the contents of the Constitution.

While the defects in the method of proposing and the subsequent method of computing "ratification" is briefed elsewhere, it should be noted that the failure to comply with Article V began with the first action by Congress. The very Congress which proposed the alleged 14th Amendment under the first part of Article V was itself, at that very time, violating the last part as well as the first part of Article V of the Constitution. We shall see how this was done.

There is one, and only one, provision of the Constitution of the United States which is forever immutable—which can never be changed or expunged. The Courts cannot alter it; the executives cannot change it; the Congress cannot change it; the States themselves—even all the States in perfect concert—cannot amend it in any manner whatsoever, whether they act through conventions called for the purpose or through their legislatures. Not even the unanimous vote of every voter in the United States could amend this provision. It is a perpetual fixture in the Constitution, so perpetual and so fixed that if the people of the United States desired to change or exclude it, they would be compelled to abolish the Constitution and start afresh.

The unalterable provision is this: "that no State, without its consent, shall be deprived of its equal suffrage in the Senate."

A state, by its own consent, may waive this right of equal suffrage, but that is the only legal method by which a failure to accord this immutable right of equal suffrage in the Senate can be justified. Certainly not by forcible ejection and denial by a majority in Congress, as was done for the adoption of the Joint Resolution for the 14th Amendment.

Statements by the Court in the Coleman case that Congress was left in complete control of the mandatory process, and therefore it was a political affair for Congress to decide if an amendment had been ratified, does not square with Article V of the Constitution which shows no intention to leave Congress in charge of deciding whether there has been a ratification. Even a constitutionally recognized Congress is given but one volition in Article V, that is, to vote whether to propose an Amendment on its own initiative. The remaining steps by Congress are mandatory. If two-thirds of both houses shall deem it necessary. Congress shall propose amendments; if the Legislatures of two-thirds of the States make application, Congress shall call a convention. For the Court to give Congress any power beyond that to be

found in Article V is to write the new material into Article V.

It would be inconceivable that the Congress of the United States could propose, compel submission to, and then give life to an invalid amendment by resolving that its effort had succeeded—regardless of compliance with the positive provisions of Article V.

It should need no further citations to sustain the proposition that neither the Joint Resolution proposing the 14th Amendment nor its ratification by the required three-fourths of the States in the Union were in compliance with the requirements of Article V of the Constitution.

When the mandatory provisions of the Constitution are violated, the Constitution itself strikes with nullity the Act that did violence to its provisions. Thus, the Constitution strikes with nullity the purported 14th Amendment.

The Courts, bound by oath to support the Constitution, should review all of the evidence herein submitted and measure the facts proving violations of the mandatory provisions of the Constitution with Article V, and finally render judgment declaring said purported Amendment never to have been adopted as required by the Constitution.

The Constitution makes it the sworn duty of the judges to uphold the Constitution which strikes with nullity the 14th Amendment.

And, as Chief Justice Marshall pointed out for a unanimous Court in Marbury v. Madison (1 Cranch 135 @ 179):

"The framers of the constitution contemplated the instrument as a rule for the government of courts, as well as of the legislature."

*    *    *    *    *

"Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government?"

*    *    *    *    *

"If such be the real state of things, that is worse than solemn mockery. To prescribe, or to take this oath, becomes equally a crime."

*    *    *    *    *

"Thus, the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that courts, as well as other departments, are bound by that instrument."

The federal courts actually refuse to hear argument on the invalidity of the 14th Amendment, even when the issue is presented squarely by the pleadings and the evidence as above.

Only an aroused public sentiment in favor of preserving the Constitution and our institutions and freedoms under constitutional government, and the future security of our country, will break the political barrier which now prevents judicial consideration of the unconstitutionality of the 14th amendment.

## THE MIDEAST CRISIS—NOT BACKWARD TO BELLIGERENCY BUT FORWARD TO PEACE

Mr. PRYOR. Mr. Speaker, I ask unanimous consent that the gentleman from New York [Mr. TENZER] may extend his remarks at this point in the RECORD and include extraneous matter.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Arkansas?

There was no objection.

Mr. TENZER. Mr. Speaker, the distinguished Foreign Minister of the State

of Israel, Abba Eban, in his address to the United Nations Security Council on June 6, 1967, set the theme for a lasting peace in the Middle East so much desired by all the peace-loving nations of the world. His address was entitled, "Not Backward to Belligerency but Forward to Peace."

On June 7, 1967, following the first United Nations resolution calling for a cease-fire in the Middle East, I stated to a distinguished group of Americans who visited me in Washington as follows:

I deem it most imperative that the terms of the agreement to follow the cease fire provide effective guarantees, to the end that permanent peace may be established in the Middle East.

The interests of world peace would best be served if the terms provide:

1. For recognition of the validity of the sovereignty of the State of Israel by the U.A.R. and other Arab states.

2. A reaffirmation that the Gulf of Aqaba is an international waterway and will remain open for free passage to shipping of all nations through the Straits of Tiran.

3. An opening of the Suez Canal to shipping of all nations.

4. An ending of terrorism and border raids so that Israel may carry out its desire to live in peace with its neighbors.

5. For direct negotiations between Israel and her Arab neighbors for the resolution of other pending issues.

Indeed, it is within the province of the sovereign State of Israel to speak its mind on the terms of the agreement to follow the cease-fire—the terms which in its view will best insure permanent peace in the Middle East. We on the other hand take the opportunity to make suggestions which in our opinion will best secure the peace of the world—thereby also serving the best interests of the United States.

An elaboration of the five points suggested on June 7, 1966, is accordingly in order.

### I. THE STATE OF ISRAEL A SOVEREIGN NATION

The State of Israel is a member of the United Nations—a full-fledged member of the family of nations. Though the integrity of her borders was guaranteed by the major powers—three times in 20 years—the State of Israel was obliged to go to war to put a stop to the violation of her boundary lines.

It is therefore basic to any plan for permanent peace in the Middle East that the sovereignty of the State of Israel be recognized by her neighbors. This fact cannot be questioned—this truth is and should not be negotiable because its import was underlined by the events of the past 10 days.

The foundation for a permanent peace in the Middle East must be the absolute and unqualified recognition by the Arab States of the right of the State of Israel to exist as a sovereign state among other sovereign states. When this foundation is laid, then Israel and her Arab neighbors can, through direct negotiations, begin to build the structure leading to permanent peace.

### II. STRAIT OF TIRAN AN INTERNATIONAL WATERWAY

Since 1950, Egypt has repeatedly given assurances that the Strait of Tiran would remain open for "innocent passage

LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **UNITED NATIONS DECLARATION ON THE RIGHTS OF INDIGENOUS PEOPLES**, and that the attached photocopies – the front and back outer cover of the book, the inner cover, an introductory page, the title page, pages 4 through 59, the website page, a blank page, and the inner back cover, – are a true representation from that work.

THIS IS TO CERTIFY FURTHER, that the front outer cover bears a sticker with the Library of Congress call number that reads "LL K3246.4 2008 copy 2." that the back outer cover has a barcode sticker with the legend "LIBRARY OF CONGRESS 0 029 812 030 6", that the inner title page bears a sticker with the same call number as the outer cover, that the back inner cover bears another bar code sticker with the legend. LIBRARY OF CONGRESS 0 029 812 030 6".

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on July 7, 2017.

Deidre Scott
Business Enterprises Officer
Office of Business Enterprises
Library of Congress

101 Independence Avenue, SE Washington, DC 20540-4917 Tel 202.707.5650 www.loc.gov, duplicationservices@loc.gov



LL
K 3246
A
20/08
Copy 2





UNITED NATIONS
DECLARATION ON
THE RIGHTS OF
INDIGENOUS PEOPLES

adopted by the General Assembly on 13 September 2007

United Nations
Human Rights



The United Nations Declaration on the Rights of Indigenous Peoples was adopted by the General Assembly on 13 September 2007. By issuing the Declaration in this pocket-sized format, the Office of the United Nations High Commissioner for Human Rights wishes to make this important new human rights standards available to Government officials, human rights defenders, indigenous peoples, scholars, legal practitioners, civil society and others working to promote the rights of these peoples worldwide.

For further information about indigenous peoples and human rights, please visit the OHCHR website: WWW.OHCHR.ORG

*The General Assembly,*

*Guided* by the purposes and principles of the Charter of the United Nations, and good faith in the fulfilment of the obligations assumed by States in accordance with the Charter,

*Affirming* that indigenous peoples are equal to all other peoples, while recognizing the right of all peoples to be different, to consider themselves different, and to be respected as such,

*Affirming also* that all peoples contribute to the diversity and richness of civilizations and cultures, which constitute the common heritage of humankind,

*Affirming further* that all doctrines, policies and practices based on or advocating superiority of peoples or individuals on the basis of national origin or racial, religious, ethnic or cultural differences are racist, scientifically false, legally invalid, morally condemnable and socially unjust,

*Reaffirming* that indigenous peoples, in the exercise of their rights, should be free from discrimination of any kind,

*Concerned* that indigenous peoples have suffered from historic injustices as a result of, inter alia, their colonization and dispossession of their lands, territories and resources, thus preventing them from exercising, in particular, their right to development in accordance with their own needs and interests,

*Recognizing* the urgent need to respect and promote the inherent rights of indigenous peoples which derive from their political, economic and social structures and from their cultures, spiritual traditions, histories and philosophies, especially their rights to their lands, territories and resources,

*Recognizing* also the urgent need to respect and promote the rights of indigenous peoples affirmed in treaties, agreements and other constructive arrangements with States,

*Welcoming* the fact that indigenous peoples are organizing themselves for political, economic, social and cultural enhancement and in order to bring to an end all forms of discrimination and oppression wherever they occur,

*Convinced* that control by indigenous peoples over developments affecting them and their lands, territories and resources will enable them to maintain and strengthen their institutions, cultures and traditions, and to promote their development in accordance with their aspirations and needs,

*Recognizing* that respect for indigenous knowledge, cultures and traditional practices contributes to sustainable and equitable development and proper management of the environment,

*Emphasizing* the contribution of the demilitarization of the lands and territories of indigenous peoples to peace, economic and social progress and development, understanding and friendly relations among nations and peoples of the world,

*Recognizing in particular* the right of indigenous families and communities to retain shared responsibility for the upbringing, training, education and well-being of their children, consistent with the rights of the child,

*Considering* that the rights affirmed in treaties, agreements and other constructive arrangements between States and indigenous peoples are, in some situations, matters of international concern, interest, responsibility and character,

*Considering also* that treaties, agreements and other constructive arrangements, and the relationship they represent, are the basis for a strengthened partnership between indigenous peoples and States,

*Acknowledging* that the Charter of the United Nations, the International Covenant on Economic, Social and Cultural Rights and the International Covenant on Civil and Political Rights, as well as the Vienna Declaration and Programme of Action, affirm the fundamental importance of the right to self-determination of all peoples, by virtue of which they freely determine their political status and freely pursue their economic, social and cultural development,

*Bearing in mind* that nothing in this Declaration may be used to deny any peoples their right to self-determination, exercised in conformity with international law,

*Convinced* that the recognition of the rights of indigenous peoples in this Declaration will enhance harmonious and cooperative relations between the State and indigenous peoples, based on principles of justice, democracy, respect for human rights, non-discrimination and good faith,

*Encouraging* States to comply with and effectively implement all their obligations as they apply to indigenous peoples under international instruments, in particular those related to human rights, in consultation and cooperation with the peoples concerned,

*Emphasizing* that the United Nations has an important and continuing role to play in promoting and protecting the rights of indigenous peoples,

*Believing* that this Declaration is a further important step forward for the recognition, promotion and protection of the rights and freedoms of indigenous peoples and in the development of relevant activities of the United Nations system in this field,

*Recognizing and reaffirming* that indigenous individuals are entitled without discrimination to all human rights recognized in international law, and that indigenous peoples possess collective rights which are indispensable for their existence, well-being and integral development as peoples,

**ARTICLE 1**



**ARTICLE 2**

Indigenous peoples and individuals are free and equal to all other peoples and individuals and have the right to be free from any kind of discrimination, in the exercise of their rights, in particular that based on their indigenous origin or identity.

**ARTICLE 3**

Indigenous peoples have the right to self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

**ARTICLE 4:**

Indigenous peoples, in exercising their right to self-determination, have the right to autonomy or self-government in matters relating to their internal and local affairs, as well as ways and means for financing their autonomous functions.

**ARTICLE 5:**

Indigenous peoples have the right to maintain and strengthen their distinct political, legal, economic, social and cultural institutions, while retaining their right to participate fully, if they so choose, in the political, economic, social and cultural life of the State.

**ARTICLE 6:**

Every indigenous individual has the right to a nationality.

**ARTICLE 7:**

1. Indigenous individuals have the rights to life, physical and mental integrity, liberty and security of person.

2. Indigenous peoples have the collective right to live in freedom, peace and security as distinct peoples and shall not be subjected to any act of genocide or any other act of violence, including forcibly removing children of the group to another group.



**ARTICLE 8**

1. Indigenous peoples and individuals have the right not to be subjected to forced assimilation or destruction of their culture.

2. States shall provide effective mechanisms for prevention of, and redress for:

(a) Any action which has the aim or effect of depriving them of their integrity as distinct peoples, or of their cultural values or ethnic identities;

(b) Any action which has the aim or effect of dispossessing them of their lands, territories or resources;

(c) Any form of forced population transfer which has the aim or effect of violating or undermining any of their rights;

(d) Any form of forced assimilation or integration;

(e) Any form of propaganda designed to promote or incite racial or ethnic discrimination directed against them.

**ARTICLE 9**

Indigenous peoples and individuals have the right to belong to an indigenous community or nation, in accordance with the traditions and customs of the community or nation concerned. No discrimination of any kind may arise from the exercise of such a right.

**ARTICLE 10**

Indigenous peoples shall not be forcibly removed from their lands or territories. No relocation shall take place without the free, prior and informed consent of the indigenous peoples concerned and after agreement on just and fair compensation and, where possible, with the option of return.

**ARTICLE 11:**

1. Indigenous peoples have the right to practise and revitalize their cultural traditions and customs. This includes the right to maintain, protect and develop the past, present and future manifestations of their cultures, such as archaeological and historical sites, artefacts, designs, ceremonies, technologies and visual and performing arts and literature.

2. States shall provide redress through effective mechanisms, which may include restitution, developed in conjunction with indigenous peoples, with respect to their cultural, intellectual, religious and spiritual property taken without their free, prior and informed consent or in violation of their laws, traditions and customs.

## ARTICLE 12

1. Indigenous peoples have the right to manifest, practise, develop and teach their spiritual and religious traditions, customs and ceremonies; the right to maintain, protect, and have access in privacy to their religious and cultural sites; the right to the use and control of their ceremonial objects; and the right to the repatriation of their human remains.

2. States shall seek to enable the access and/or repatriation of ceremonial objects and human remains in their possession through fair, transparent and effective mechanisms developed in conjunction with indigenous peoples concerned.

## ARTICLE 13

1. Indigenous peoples have the right to revitalize, use, develop and transmit to future generations their histories, languages, oral traditions, philosophies, writing systems and literatures, and to designate and retain their own names for communities, places and persons.

2. States shall take effective measures to ensure that this right is protected and also to ensure that indigenous peoples can understand and be understood in political, legal and administrative proceedings, where necessary through the provision of interpretation or by other appropriate means.

## ARTICLE 14

1. Indigenous peoples have the right to establish and control their educational systems and institutions providing education in their own languages, in a manner appropriate to their cultural methods of teaching and learning.

2. Indigenous individuals, particularly children, have the right to all levels and forms of education of the State without discrimination.

3. States shall, in conjunction with indigenous peoples, take effective measures, in order for indigenous individuals, particularly children, including those living outside their communities, to have access, when possible, to an education in their own culture and provided in their own language.

## ARTICLE 15

1. Indigenous peoples have the right to the dignity and diversity of their cultures, traditions, histories and aspirations which shall be appropriately reflected in education and public information.

2. States shall take effective measures, in consultation and cooperation with the indigenous peoples concerned, to combat prejudice and eliminate discrimination and to promote tolerance, understanding and good relations among indigenous peoples and all other segments of society.



### ARTICLE 16:

1. Indigenous peoples have the right to establish their own media in their own languages and to have access to all forms of non-indigenous media without discrimination.

2. States shall take effective measures to ensure that State-owned media duly reflect indigenous cultural diversity. States, without prejudice to ensuring full freedom of expression, should encourage privately owned media to adequately reflect indigenous cultural diversity.

### ARTICLE 17:

1. Indigenous individuals and peoples have the right to enjoy fully all rights established under applicable international and domestic labour law.

2. States shall in consultation and cooperation with indigenous peoples take specific measures to protect indigenous children from economic exploitation and from performing any work that is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development, taking into account their special vulnerability and the importance of education for their empowerment.

3. Indigenous individuals have the right not to be subjected to any discriminatory conditions of labour and, inter alia, employment or salary.

38

## ARTICLE 18

Indigenous peoples have the right to participate in decision-making in matters which would affect their rights, through representatives chosen by themselves in accordance with their own procedures, as well as to maintain and develop their own indigenous decision-making institutions.

## ARTICLE 19

States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that may affect them.

31

## ARTICLE 20

1. Indigenous peoples have the right to maintain and develop their political, economic and social systems or institutions, to be secure in the enjoyment of their own means of subsistence and development, and to engage freely in all their traditional and other economic activities.

2. Indigenous peoples deprived of their means of subsistence and development are entitled to just and fair redress.

## ARTICLE 21

1. Indigenous peoples have the right, without discrimination, to the improvement of their economic and social conditions, including, inter alia, in the areas of education, employment, vocational training and retraining, housing, sanitation, health and social security.

2. States shall take effective measures and, where appropriate, special measures to ensure continuing improvement of their economic and social conditions. Particular attention shall be paid to the rights and special needs of indigenous elders, women, youth, children and persons with disabilities.

33

**ARTICLE 22**

1. Particular attention shall be paid to the rights and special needs of indigenous elders, women, youth, children and persons with disabilities in the implementation of this Declaration.

2. States shall take measures, in conjunction with indigenous peoples, to ensure that indigenous women and children enjoy the full protection and guarantees against all forms of violence and discrimination.

**ARTICLE 23**

Indigenous peoples have the right to determine and develop priorities and strategies for exercising their right to development. In particular, indigenous peoples have the right to be actively involved in developing and determining health, housing and other economic and social programmes affecting them and, as far as possible, to administer such programmes through their own institutions.





## ARTICLE 24

1. Indigenous peoples have the right to their traditional medicines and to maintain their health practices, including the conservation of their vital medicinal plants, animals and minerals. Indigenous individuals also have the right to access, without any discrimination, to all social and health services.

2. Indigenous individuals have an equal right to the enjoyment of the highest attainable standard of physical and mental health. States shall take the necessary steps with a view to achieving progressively the full realization of this right.

## ARTICLE 25

Indigenous peoples have the right to maintain and strengthen their distinctive spiritual relationship with their traditionally owned or otherwise occupied and used lands, territories, waters and coastal seas and other resources and to uphold their responsibilities to future generations in this regard.

37

**ARTICLE 26**

1. Indigenous peoples have the right to the lands, territories and resources which they have traditionally owned, occupied or otherwise used or acquired.

2. Indigenous peoples have the right to own, use, develop and control the lands, territories and resources that they possess by reason of traditional ownership or other traditional occupation or use, as well as those which they have otherwise acquired.

3. States shall give legal recognition and protection to these lands, territories and resources. Such recognition shall be conducted with due respect to the customs, traditions and land tenure systems of the indigenous peoples concerned.

**ARTICLE 27**

States shall establish and implement, in conjunction with indigenous peoples concerned, a fair, independent, impartial, open and transparent process, giving due recognition to indigenous peoples' laws, traditions, customs and land tenure systems, to recognize and adjudicate the rights of indigenous peoples pertaining to their lands, territories and resources, including those which were traditionally owned or otherwise occupied or used. Indigenous peoples shall have the right to participate in this process.



**ARTICLE 28**

1. Indigenous peoples have the right to redress, by means that can include restitution or, when this is not possible, just, fair and equitable compensation, for the lands, territories and resources which they have traditionally owned or otherwise occupied or used, and which have been confiscated, taken, occupied, used or damaged without their free, prior and informed consent.

2. Unless otherwise freely agreed upon by the peoples concerned, compensation shall take the form of lands, territories and resources equal in quality, size and legal status or of monitory compensation or other appropriate redress.

**ARTICLE 29**

1. Indigenous peoples have the right to the conservation and protection of the environment and the productive capacity of their lands or territories and resources. States shall establish and implement assistance programmes for indigenous peoples for such conservation and protection, without discrimination.

2. States shall take effective measures to ensure that no storage or disposal of hazardous materials shall take place in the lands or territories of indigenous peoples without their free, prior and informed consent.

3. States shall also take effective measures to ensure, as needed, that programmes for monitoring, maintaining and restoring the health of indigenous peoples, as developed and implemented by the peoples affected by such materials, are duly implemented.



## ARTICLE 30

1. Military activities shall not take place in the lands or territories of indigenous peoples, unless justified by a relevant public interest or otherwise freely agreed with or requested by the indigenous peoples concerned.

2. States shall undertake effective consultations with the indigenous peoples concerned, through appropriate procedures and in particular through their representative institutions, prior to using their lands or territories for military activities.

## ARTICLE 31

1. Indigenous peoples have the right to maintain, control, protect and develop their cultural heritage, traditional knowledge and traditional cultural expressions, as well as the manifestations of their sciences, technologies and cultures, including human and genetic resources, seeds, medicines, knowledge of the properties of fauna and flora, oral traditions, literatures, designs, sports and traditional games and visual and performing arts. They also have the right to maintain, control, protect and develop their intellectual property over such cultural heritage, traditional knowledge, and traditional cultural expressions.

2. In conjunction with indigenous peoples, States shall take effective measures to recognize and protect the exercise of these rights.

## ARTICLE 32

1. Indigenous peoples have the right to determine and develop priorities and strategies for the development or use of their lands or territories and other resources.

2. States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free and informed consent prior to the approval of any project affecting their lands or territories and other resources, particularly in connection with the development, utilization or exploitation of mineral, water or other resources.

3. States shall provide effective mechanisms for just and fair redress for any such activities, and appropriate measures shall be taken to mitigate adverse environmental, economic, social, cultural or spiritual impact.

## ARTICLE 33

1. Indigenous peoples have the right to determine their own identity or membership in accordance with their customs and traditions. This does not impair the right of indigenous individuals to obtain citizenship of the States in which they live.

2. Indigenous peoples have the right to determine the structures and to select the membership of their institutions in accordance with their own procedures.

**ARTICLE 34**

Indigenous peoples have the right to promote, develop and maintain their institutional structures and their distinctive customs, spirituality, traditions, procedures, practices and, in the cases where they exist, juridical systems or customs, in accordance with international human rights standards.

**ARTICLE 35**

Indigenous peoples have the right to determine the responsibilities of individuals to their communities.



### ARTICLE 36

1. Indigenous peoples, in particular those divided by international borders, have the right to maintain and develop contacts, relations and cooperation, including activities for spiritual, cultural, political, economic and social purposes, with their own members as well as other peoples across borders.

2. States, in consultation and cooperation with indigenous peoples, shall take effective measures to facilitate the exercise and ensure the implementation of this right.

### ARTICLE 37

1. Indigenous peoples have the right to the recognition, observance and enforcement of treaties, agreements and other constructive arrangements concluded with States or their successors and to have States honour and respect such treaties, agreements and other constructive arrangements.

2. Nothing in this Declaration may be interpreted as diminishing or eliminating the rights of indigenous peoples contained in treaties, agreements and other constructive arrangements.

### ARTICLE 38

### ARTICLE 38

**ARTICLE 40**

Indigenous peoples have the right to access to and prompt decision through just and fair procedures for the resolution of conflicts and disputes with States or other parties, as well as to effective remedies for all infringements of their individual and collective rights. Such a decision shall give due consideration to the customs, traditions, rules and legal systems of the indigenous peoples concerned and international human rights.

**ARTICLE 41**

The organs and specialized agencies of the United Nations system and other intergovernmental organizations shall contribute to the full realization of the provisions of this Declaration through the mobilization, inter alia, of financial cooperation and technical assistance. Ways and means of ensuring participation of indigenous peoples on issues affecting them shall be established.

### ARTICLE 42

The United Nations, its bodies, including the Permanent Forum on Indigenous Issues, and specialized agencies, including at the country level, and States shall promote respect for and full application of the provisions of this Declaration and follow up the effectiveness of this Declaration.

### ARTICLE 43

The rights recognized herein constitute the minimum standards for the survival, dignity and well-being of the indigenous peoples of the world.

**ARTICLE 44**

All the rights and freedoms recognized herein are equally guaranteed to male and female indigenous individuals.

**ARTICLE 45**

Nothing in this Declaration may be construed as diminishing or extinguishing the rights indigenous peoples have now or may acquire in the future.

## ARTICLE 46

1. Nothing in this Declaration may be interpreted as implying for any State, people, group or person any right to engage in any activity or to perform any act contrary to the Charter of the United Nations or construed as authorizing or encouraging any action which would dismember or impair, totally or in part, the territorial integrity or political unity of sovereign and independent States.

2. In the exercise of the rights enunciated in the present Declaration, human rights and fundamental freedoms of all shall be respected. The exercise of the rights set forth in this Declaration shall be subject only to such limitations as are determined by law and in accordance with international human rights obligations. Any such limitation shall be non-discriminatory and strictly necessary solely for the purpose of securing due recognition and respect for the rights and freedoms of others and for meeting the just and most compelling requirements of a democratic society.

3. The provisions set forth in this Declaration shall be interpreted in accordance with the principles of justice, democracy, respect for human rights, equality, non-discrimination, good governance and good faith.

66

website: WWW.OHGHR.ORG



LIBRARY OF CONGRESS

0 029 812 030 6

HF GROUP



## LIBRARY OF CONGRESS

# 5

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **THE UNITED STATES CODE, 2012 EDITION,** and that the attached photocopies from Volume 1 – the spine, the title page, and pages LXI through LXXV on which appears **THE CONSTITUTION OF THE UNITED STATES OF AMERICA, 1787** -- are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on September 17, 2015.

Deirdre Scott
Assistant Head
Office of Business Enterprises
Library of Congress





# UNITED STATES CODE

## 2012 EDITION

CONTAINING THE GENERAL AND PERMANENT LAWS
OF THE UNITED STATES ENACTED THROUGH THE
112TH CONGRESS

(ending January 2, 2013, the last law of which was signed on January 15, 2013)

Prepared and published under authority of Title 2, U.S. Code, Section 285b,
by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME ONE

### ORGANIC LAWS

TITLE 1—GENERAL PROVISIONS

TO

TITLE 5—GOVERNMENT ORGANIZATION AND EMPLOYEES
§§ 101–5949

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 2013

76-400 D Sig-1

# CONSTITUTION OF THE UNITED STATES OF AMERICA—1787[1]

WE THE PEOPLE of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

## ARTICLE. I.

SECTION 1. All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

SECTION. 2. [1] The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

[2] No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

[3] Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.[2] The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode-Island and Providence Plantations one, Connecticut five, New-York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

[4] When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies. [1]

[5] The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.

SECTION. 3. [1] The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof,[3] for six Years; and each Senator shall have one Vote.

---

[1] This text of the Constitution follows the engrossed copy signed by Gen. Washington and the deputies from 12 States. The small superior figures preceding the paragraphs designate clauses, and were not in the original and have no reference to footnotes.

In May 1785, a committee of Congress made a report recommending an alteration in the Articles of Confederation, but no action was taken on it, and it was left to the State Legislatures to proceed in the matter. In January 1786, the Legislature of Virginia passed a resolution providing for the appointment of five commissioners, who, or any three of them, should meet such commissioners as might be appointed in the other States of the Union, at a time and place to be agreed upon, to take into consideration the trade of the United States; to consider how far a uniform system in their commercial regulations may be necessary to their common interest and their permanent harmony; and to report to the several States such an act, relative to this great object, as, when ratified by them, will enable the United States in Congress effectually to provide for the same. The Virginia commissioners, after some correspondence, fixed the first Monday in September as the time, and the city of Annapolis as the place for the meeting, but only four other States were represented, viz: Delaware, New York, New Jersey, and Pennsylvania; the commissioners appointed by Massachusetts, New Hampshire, North Carolina, and Rhode Island failed to attend. Under the circumstances of so partial a representation, the commissioners present agreed upon a report, (drawn by Mr. Hamilton, of New York,) expressing their unanimous conviction that it might essentially tend to advance the interests of the Union if the States by which they were respectively delegated would concur, and use their endeavors to procure the concurrence of the other States, in the appointment of commissioners to meet at Philadelphia on the Second Monday of May following, to take into consideration the situation of the United States; to devise such further provisions as should appear to them necessary to render the Constitution of the Federal Government adequate to the exigencies of the Union; and to report such an act for that purpose to the United States in Congress assembled as, when agreed to by them and afterwards confirmed by the Legislatures of every State, would effectually provide for the same.

Congress, on the 21st of February, 1787, adopted a resolution in favor of a convention, and the Legislatures of those States which had not already done so (with the exception of Rhode Island) promptly appointed delegates. On the 25th of May, seven States having convened, George Washington, of Virginia, was unanimously elected President, and the consideration of the proposed constitution was commenced. On the 17th of September, 1787, the Constitution as engrossed and agreed upon was signed by all the members present, except Mr. Gerry of Massachusetts, and Messrs. Mason and Randolph, of Virginia. The president of the convention transmitted it to Congress, with a resolution stating how the proposed Federal Government should be put in operation, and an explanatory letter. Congress, on the 28th of September, 1787, directed the Constitution so framed, with the resolutions and letter concerning the same, to "be transmitted to the several Legislatures in order to be submitted to a convention of delegates chosen in each State by the people thereof, in conformity to the resolves of the convention."

On the 4th of March, 1789, the day which had been fixed for commencing the operations of Government under the new Constitution, it had been ratified by the conventions chosen in each State to consider it, as follows: Delaware, December 7, 1787; Pennsylvania, December 12, 1787; New Jersey, December 18, 1787; Georgia, January 2, 1788; Connecticut, January 9, 1788; Massachusetts, February 6, 1788; Maryland, April 28, 1788; South Carolina, May 23, 1788; New Hampshire, June 21, 1788; Virginia, June 25, 1788; and New York, July 26, 1788.

The President informed Congress, on the 28th of January, 1790, that North Carolina had ratified the Constitution November 21, 1789; and he informed Congress on the 1st of June, 1790, that Rhode Island had ratified the Constitution May 29, 1790. Vermont, in convention, ratified the Constitution January 10, 1791, and was, by an act of Congress approved February 18, 1791, "received and admitted into this Union as a new and entire member of the United States."

[2] The part of this clause relating to the mode of apportionment of representatives among the several States has been affected by section 2 of amendment XIV, and as to taxes on incomes without apportionment by amendment XVI.

[3] This clause has been affected by clause 1 of amendment XVII.

[2]Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes. The Seats of the Senators of the first Class shall be vacated at the Expiration of the second Year, of the second Class at the Expiration of the fourth Year, and of the third Class at the Expiration of the sixth Year, so that one third may be chosen every second Year; and if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.[4]

[3]No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen.

[4]The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.

[5]The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President, or when he shall exercise the Office of President of the United States.

[6]The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.

[7]Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

SECTION. 4. [1]The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

[2]The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they shall by Law appoint a different Day.

SECTION. 5. [1]Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

[2]Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

[3]Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal.

[4]Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days, nor to any other Place than that in which the two Houses shall be sitting.

SECTION. 6. [1]The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

[2]No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created; or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

SECTION. 7. [1]All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

[2]Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and, if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

[3]Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

SECTION. 8. [1]The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Ex-

---

[4]This clause has been affected by clause 2 of amendment XVIII.

[5]This clause has been affected by amendment XX.

[6]This clause has been affected by amendment XXVII.

cises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

[2]To borrow Money on the credit of the United States;

[3]To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

[4]To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

[5]To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

[6]To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

[7]To establish Post Offices and post Roads;

[8]To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

[9]To constitute Tribunals inferior to the supreme Court;

[10]To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

[11]To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

[12]To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

[13]To provide and maintain a Navy;

[14]To make Rules for the Government and Regulation of the land and naval Forces;

[15]To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

[16]To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

[17]To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;—And

[18]To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

SECTION. 9. [1]The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

[2]The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of

Rebellion or Invasion the public Safety may require it.

[3]No Bill of Attainder or ex post facto Law shall be passed.

[4]No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.[7]

[5]No Tax or Duty shall be laid on Articles exported from any State.

[6]No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another.

[7]No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

[8]No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

SECTION. 10. [1]No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

[2]No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

[3]No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

## ARTICLE. II.

SECTION. 1. [1]The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows

[2]Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

[3]The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall

[7]This clause has been affected by amendment XVI.

make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted. The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no Person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote; A quorum for this Purpose shall consist of a Member or Members from two thirds of the States, and a Majority of all the States shall be necessary to a Choice. In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.[4]

[4]The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.[5]

[5]No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

[6]In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office,[6] the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

[7]The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

[8]Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:—"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

SECTION. 2. [1]The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment.

[2]He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

[3]The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

SECTION. 3. He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

SECTION. 4. The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

## ARTICLE. III.

SECTION. 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

SECTION. 2. [1]The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State; [10]—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different

[4]This clause has been superseded by amendment XII.

[5]This clause has been affected by amendment XXV.

[10]This clause has been affected by amendment XI.

States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

[2] In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

[3] The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

SECTION. 3. [1] Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

[2] The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

### ARTICLE. IV.

SECTION. 1. Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

SECTION. 2. [1] The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

[2] A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

[3] No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.[11]

SECTION. 3. [1] New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

[2] The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

[11] This clause has been affected by amendment XIII.

SECTION. 4. The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

### ARTICLE. V.

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

### ARTICLE. VI.

[1] All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

[2] This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

[3] The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

### ARTICLE. VII.

The Ratification of the Conventions of nine States, shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

DONE in Convention by the Unanimous Consent of the States present the Seventeenth Day of September in the Year of our Lord one thousand seven hundred and Eighty seven and of the Independence of the United States of America the Twelfth IN WITNESS whereof We have hereunto subscribed our Names,

G°. WASHINGTON—Presid'.
*and deputy from Virginia*

[Signed also by the deputies of twelve States.]
*New Hampshire*
JOHN LANGDON

NICHOLAS GILMAN

*Massachusetts*

NATHANIEL GORHAM
RUFUS KING

*Connecticut*

W<sup>M</sup>. SAM<sup>L</sup>. JOHNSON
ROGER SHERMAN

*New York*

ALEXANDER HAMILTON

*New Jersey*

WIL: LIVINGSTON
DAVID BREARLEY.
W<sup>M</sup>. PATERSON.
JONA: DAYTON

*Pennsylvania*

B FRANKLIN
THOMAS MIFFLIN
ROB<sup>T</sup> MORRIS
GEO. CLYMER
THO<sup>S</sup>. FITZSIMONS
JARED INGERSOLL
JAMES WILSON.
GOUV MORRIS

*Delaware*

GEO: READ
GUNNING BEDFORD jun
JOHN DICKINSON
RICHARD BASSETT
JACO: BROOM

*Maryland*

JAMES McHENRY
DAN OF S<sup>T</sup> THO<sup>S</sup>. JENIFER
DAN<sup>L</sup>. CARROLL.

*Virginia*

JOHN BLAIR—
JAMES MADISON Jr.

*North Carolina*

W<sup>M</sup> BLOUNT
RICH<sup>D</sup>. DOBBS SPAIGHT.
HU WILLIAMSON

*South Carolina*

J. RUTLEDGE
CHARLES COTESWORTH PINCKNEY
CHARLES PINCKNEY
PIERCE BUTLER.

*Georgia*

WILLIAM FEW
ABR BALDWIN

Attest   WILLIAM JACKSON *Secretary*

ARTICLES IN ADDITION TO, AND AMEND-
MENT OF, THE CONSTITUTION OF THE
UNITED STATES OF AMERICA, PROPOSED
BY CONGRESS, AND RATIFIED BY THE
LEGISLATURES    OF    THE    SEVERAL
STATES, PURSUANT TO THE FIFTH ARTI-
CLE OF THE ORIGINAL CONSTITUTION [12]

---

ARTICLE [I.] [13]

Congress shall make no law respecting an es-
tablishment of religion, or prohibiting the free
exercise thereof; or abridging the freedom of
speech, or of the press; or the right of the people
peaceably to assemble, and to petition the Gov-
ernment for a redress of grievances.

ARTICLE [II.]

A well regulated Militia, being necessary to
the security of a free State, the right of the peo-
ple to keep and bear Arms, shall not be in-
fringed.

ARTICLE [III.]

No Soldier shall, in time of peace be quartered
in any house, without the consent of the Owner,
nor in time of war, but in a manner to be pre-
scribed by law.

ARTICLE [IV.]

The right of the people to be secure in their
persons, houses, papers, and effects, against un-
reasonable searches and seizures, shall not be
violated, and no Warrants shall issue, but upon
probable cause, supported by Oath or affirma-
tion, and particularly describing the place to be
searched, and the persons or things to be seized.

ARTICLE [V.]

No person shall be held to answer for a capital,
or otherwise infamous crime, unless on a pre-
sentment or indictment of a Grand Jury, except
in cases arising in the land or naval forces, or in
the Militia, when in actual service in time of
War or public danger; nor shall any person be
subject for the same offence to be twice put in
jeopardy of life or limb; nor shall be compelled
in any criminal case to be a witness against
himself, nor be deprived of life, liberty, or prop-
erty, without due process of law; nor shall pri-
vate property be taken for public use, without
just compensation.

ARTICLE [VI.]

In all criminal prosecutions, the accused shall
enjoy the right to a speedy and public trial, by
an impartial jury of the State and district
wherein the crime shall have been committed,
which district shall have been previously ascer-
tained by law, and to be informed of the nature
and cause of the accusation; to be confronted
with the witnesses against him; to have compul-
sory process for obtaining witnesses in his favor,
and to have the Assistance of Counsel for his de-
fence.

---

[12] The first ten amendments to the Constitution of the United
States (and two others, one of which failed of ratification and
the other which later became the 27th amendment) were pro-
posed to the legislatures of the several States by the First Con-
gress on September 25, 1789. The first ten amendments were rati-

fied by the following States, and the notifications of ratification
by the Governors thereof were successively communicated by
the President to Congress: New Jersey, November 20, 1789; Mary-
land, December 19, 1789; North Carolina, December 22, 1789; South
Carolina, January 19, 1790; New Hampshire, January 25, 1790;
Delaware, January 28, 1790; New York, February 24, 1790; Penn-
sylvania, March 10, 1790; Rhode Island, June 7, 1790; Vermont,
November 3, 1791; and Virginia, December 15, 1791.
Ratification was completed on December 15, 1791.
The amendments were subsequently ratified by the legisla-
tures of Massachusetts, March 2, 1939; Georgia, March 18, 1939;
and Connecticut, April 19, 1939.
[13] Only the 13th, 14th, 15th, and 16th articles of amendment had
numbers assigned to them at the time of ratification.

### ARTICLE [VII.]

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

### ARTICLE [VIII.]

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

### ARTICLE [IX.]

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

### ARTICLE [X.]

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

### [ARTICLE XI.]

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

#### PROPOSAL AND RATIFICATION

The eleventh amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Third Congress, on the 4th of March 1794; and was declared in a message from the President to Congress, dated the 8th of January, 1798, to have been ratified by the legislatures of three-fourths of the States. The dates of ratification were: New York, March 27, 1794; Rhode Island, March 31, 1794; Connecticut, May 8, 1794; New Hampshire, June 16, 1794; Massachusetts, June 26, 1794; Vermont, between October 9, 1794 and November 9, 1794; Virginia, November 18, 1794; Georgia, November 29, 1794; Kentucky, December 7, 1794; Maryland, December 26, 1794; Delaware, January 23, 1795; North Carolina, February 7, 1795.

Ratification was completed on February 7, 1795.

The amendment was subsequently ratified by South Carolina on December 4, 1797. New Jersey and Pennsylvania did not take action on the amendment.

### [ARTICLE XII.]

The Electors shall meet in their respective states, and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the greatest number of votes for President, shall be the President, if such number

be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President.[14]—The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

#### PROPOSAL AND RATIFICATION

The twelfth amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Eighth Congress, on the 9th of December, 1803, in lieu of the original third paragraph of the first section of the second article; and was declared in a proclamation of the Secretary of State, dated the 25th of September, 1804, to have been ratified by the legislatures of 13 of the 17 States. The dates of ratification were: North Carolina, December 21, 1803; Maryland, December 24, 1803; Kentucky, December 27, 1803; Ohio, December 30, 1803; Pennsylvania, January 5, 1804; Vermont, January 30, 1804; Virginia, February 3, 1804; New York, February 10, 1804; New Jersey, February 22, 1804; Rhode Island, March 12, 1804; South Carolina, May 15, 1804; Georgia, May 19, 1804; New Hampshire, June 15, 1804.

Ratification was completed on June 15, 1804.

The amendment was subsequently ratified by Tennessee, July 27, 1804.

The amendment was rejected by Delaware, January 18, 1804; Massachusetts, February 3, 1804; Connecticut, at its session begun May 10, 1804.

### ARTICLE XIII.

SECTION 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

SECTION 2. Congress shall have power to enforce this article by appropriate legislation.

#### PROPOSAL AND RATIFICATION

The thirteenth amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Thirty-eighth Congress, on the 31st day of January, 1865, and was declared, in a procla-

[14]This sentence has been superseded by section 3 of amendment XX.

mation of the Secretary of State, dated the 18th of December, 1865, to have been ratified by the legislatures of twenty-seven of the thirty-six States. The dates of ratification were: Illinois, February 1, 1865; Rhode Island, February 2, 1865; Michigan, February 2, 1865; Maryland, February 3, 1865; New York, February 3, 1865; Pennsylvania, February 3, 1865; West Virginia, February 3, 1865; Missouri, February 6, 1865; Maine, February 7, 1865; Kansas, February 7, 1865; Massachusetts, February 7, 1865; Virginia, February 9, 1865; Ohio, February 10, 1865; Indiana, February 13, 1865; Nevada, February 16, 1865; Louisiana, February 17, 1865; Minnesota, February 23, 1865; Wisconsin, February 24, 1865; Vermont, March 9, 1865; Tennessee, April 7, 1865; Arkansas, April 14, 1865; Connecticut, May 4, 1865; New Hampshire, July 1, 1865; South Carolina, November 13, 1865; Alabama, December 2, 1865; North Carolina, December 4, 1865; Georgia, December 6, 1865.

Ratification was completed on December 6, 1865.

The amendment was subsequently ratified by Oregon, December 8, 1865; California, December 19, 1865; Florida, December 28, 1865 (Florida again ratified on June 9, 1868, upon its adoption of a new constitution); Iowa, January 15, 1866; New Jersey, January 23, 1866 (after having rejected the amendment on March 16, 1865); Texas, February 18, 1870; Delaware, February 12, 1901 (after having rejected the amendment on February 8, 1865); Kentucky, March 18, 1976 (after having rejected it on February 24, 1865); Mississippi, March 16, 1995 (after having rejected it on December 4, 1865).

## ARTICLE XIV.

SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

SECTION 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age,[16] and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

SECTION 3. No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or

given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

SECTION 4. The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

SECTION 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

### PROPOSAL AND RATIFICATION

The fourteenth amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Thirty-ninth Congress, on the 13th of June, 1866. It was declared, in a certificate of the Secretary of State dated July 28, 1868 to have been ratified by the legislatures of 28 of the 37 States. The dates of ratification were: Connecticut, June 25, 1866; New Hampshire, July 6, 1866; Tennessee, July 19, 1866; New Jersey, September 11, 1866 (subsequently the legislature rescinded its ratification, and on March 24, 1868, readopted its resolution of rescission over the Governor's veto, and on Nov. 12, 1980, expressed support for the amendment); Oregon, September 19, 1866 (and rescinded its ratification on October 15, 1868, but ratified the amendment on April 25, 1973); Vermont, October 30, 1866; Ohio, January 11, 1867 (and rescinded its ratification on January 15, 1868, but ratified the amendment on March 12, 2003); New York, January 10, 1867; Kansas, January 11, 1867; Illinois, January 15, 1867; West Virginia, January 16, 1867; Michigan, January 16, 1867; Minnesota, January 16, 1867; Maine, January 19, 1867; Nevada, January 22, 1867; Indiana, January 23, 1867; Missouri, January 25, 1867; Rhode Island, February 7, 1867; Pennsylvania, February 12, 1867; Massachusetts, March 20, 1867; Nebraska, June 15, 1867; Iowa, March 16, 1868; Arkansas, April 6, 1868; Florida, June 9, 1868; North Carolina, July 4, 1868 (after having rejected it on December 14, 1866); Louisiana, July 9, 1868 (after having rejected it on February 6, 1867); South Carolina, July 9, 1868 (after having rejected it on December 20, 1866).

Ratification was completed on July 9, 1868.

The amendment was subsequently ratified by Alabama, July 13, 1868; Georgia, July 21, 1868 (after having rejected it on November 9, 1866); Virginia, October 8, 1869 (after having rejected it on January 9, 1867); Mississippi, January 17, 1870; Texas, February 18, 1870 (after having rejected it on October 27, 1866); Delaware, February 8, 1901 (after having rejected it on February 8, 1867); Maryland, April 4, 1959 (after having rejected it on March 23, 1867); California, May 6, 1959; Kentucky, March 18, 1976 (after having rejected it on January 8, 1867).

### ARTICLE XV.

SECTION 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

SECTION 2. The Congress shall have power to enforce this article by appropriate legislation.

### PROPOSAL AND RATIFICATION

The fifteenth amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Fortieth Congress, on the 26th of February, 1869, and was declared, in a proclamation of

[16] See amendment XIX and section 1 of amendment XXVI.

the Secretary of State, dated March 30, 1870, to have been ratified by the legislatures of twenty-nine of the thirty-seven States. The dates of ratification were: Nevada, March 1, 1869; West Virginia, March 3, 1869; Illinois, March 5, 1869; Louisiana, March 5, 1869; North Carolina, March 5, 1869; Michigan, March 8, 1869; Wisconsin, March 9, 1869; Maine, March 11, 1869; Massachusetts, March 12, 1869; Arkansas, March 15, 1869; South Carolina, March 15, 1869; Pennsylvania, March 25, 1869; New York, April 14, 1869 (and the legislature of the same State passed a resolution January 5, 1870, to withdraw its consent to it, which action it rescinded on March 30, 1870); Indiana, May 14, 1869; Connecticut, May 19, 1869; Florida, June 14, 1869; New Hampshire, July 1, 1869; Virginia, October 8, 1869; Vermont, October 20, 1869; Missouri, January 7, 1870; Minnesota, January 13, 1870; Mississippi, January 17, 1870; Rhode Island, January 18, 1870; Kansas, January 19, 1870; Ohio, January 27, 1870 (after having rejected it on April 30, 1869); Georgia, February 2, 1870; Iowa, February 3, 1870.

Ratification was completed on February 3, 1870, unless the withdrawal of ratification by New York was effective; in which event ratification was completed on February 17, 1870, when Nebraska ratified.

The amendment was subsequently ratified by Texas, February 18, 1870; New Jersey, February 15, 1871 (after having rejected it on February 7, 1870); Delaware, February 12, 1901 (after having rejected it on March 18, 1869); Oregon, February 24, 1959; California, April 3, 1962 (after having rejected it on January 28, 1870); Kentucky, March 18, 1976 (after having rejected it on March 12, 1869); Tennessee, April 2, 1997 (after having rejected it on November 16, 1869).

The amendment was approved by the Governor of Maryland, May 7, 1973; Maryland having previously rejected it on February 26, 1870.

### ARTICLE XVI.

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

#### PROPOSAL AND RATIFICATION

The sixteenth amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Sixty-first Congress on the 12th of July, 1909, and was declared, in a proclamation of the Secretary of State, dated the 25th of February, 1913, to have been ratified by 36 of the 48 States. The dates of ratification were: Alabama, August 10, 1909; Kentucky, February 8, 1910; South Carolina, February 19, 1910; Illinois, March 1, 1910; Mississippi, March 7, 1910; Oklahoma, March 10, 1910; Maryland, April 8, 1910; Georgia, August 3, 1910; Texas, August 16, 1910; Ohio, January 19, 1911; Idaho, January 20, 1911; Oregon, January 23, 1911; Washington, January 26, 1911; Montana, January 30, 1911; Indiana, January 30, 1911; California, January 31, 1911; Nevada, January 31, 1911; South Dakota, February 3, 1911; Nebraska, February 9, 1911; North Carolina, February 11, 1911; Colorado, February 15, 1911; North Dakota, February 17, 1911; Kansas, February 18, 1911; Michigan, February 23, 1911; Iowa, February 24, 1911; Missouri, March 16, 1911; Maine, March 31, 1911; Tennessee, April 7, 1911; Arkansas, April 22, 1911 (after having rejected it earlier); Wisconsin, May 26, 1911; New York, July 12, 1911; Arizona, April 6, 1912; Minnesota, June 11, 1912; Louisiana, June 28, 1912; West Virginia, January 31, 1913; New Mexico, February 3, 1913.

Ratification was completed on February 3, 1913.

The amendment was subsequently ratified by Massachusetts, March 4, 1913; New Hampshire, March 7, 1913 (after having rejected it on March 2, 1911).

The amendment was rejected (and not subsequently ratified) by Connecticut, Rhode Island, and Utah.

### [ARTICLE XVII.]

The Senate of the United States shall be composed of two Senators from each State, elected

---

by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

This amendment shall not be so construed as to affect the election or term of any Senator chosen before it becomes valid as part of the Constitution.

#### PROPOSAL AND RATIFICATION

The seventeenth amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Sixty-second Congress on the 13th of May, 1912, and was declared, in a proclamation of the Secretary of State, dated the 31st of May, 1913, to have been ratified by the legislatures of 36 of the 48 States. The dates of ratification were: Massachusetts, May 22, 1912; Arizona, June 3, 1912; Minnesota, June 10, 1912; New York, January 15, 1913; Kansas, January 17, 1913; Oregon, January 23, 1913; North Carolina, January 25, 1913; California, January 28, 1913; Michigan, January 28, 1913; Iowa, January 30, 1913; Montana, January 30, 1913; Idaho, January 31, 1913; West Virginia, February 4, 1913; Colorado, February 5, 1913; Nevada, February 6, 1913; Texas, February 7, 1913; Washington, February 7, 1913; Wyoming, February 8, 1913; Arkansas, February 11, 1913; Maine, February 11, 1913; Illinois, February 13, 1913; North Dakota, February 14, 1913; Wisconsin, February 18, 1913; Indiana, February 19, 1913; New Hampshire, February 19, 1913; Vermont, February 19, 1913; South Dakota, February 19, 1913; Oklahoma, February 24, 1913; Ohio, February 25, 1913; Missouri, March 7, 1913; New Mexico, March 13, 1913; Nebraska, March 14, 1913; New Jersey, March 17, 1913; Tennessee, April 1, 1913; Pennsylvania, April 2, 1913; Connecticut, April 8, 1913.

Ratification was completed on April 8, 1913.

The amendment was subsequently ratified by Louisiana, June 11, 1914; Alabama, April 16, 2002; Delaware, July 1, 2010; Maryland, April 6, 2012.

The amendment was rejected by Utah (and not subsequently ratified) on February 26, 1913.

### ARTICLE [XVIII.][16]

SECTION 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

SEC. 2. The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation.

SEC. 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress.

#### PROPOSAL AND RATIFICATION

The eighteenth amendment to the Constitution of the United States was proposed to the legislatures of the

---

[16] Repealed by section 1 of amendment XXI.

several States by the Sixty-fifth Congress, on the 18th of December, 1917, and was declared, in a proclamation of the Secretary of State, dated the 29th of January, 1919, to have been ratified by the legislatures of 36 of the 48 States. The dates of ratification were: Mississippi, January 8, 1918; Virginia, January 11, 1918; Kentucky, January 14, 1918; North Dakota, January 25, 1918; South Carolina, January 29, 1918; Maryland, February 13, 1918; Montana, February 19, 1918; Texas, March 4, 1918; Delaware, March 18, 1918; South Dakota, March 20, 1918; Massachusetts, April 2, 1918; Arizona, May 24, 1918; Georgia, June 26, 1918; Louisiana, August 3, 1918; Florida, December 3, 1918; Michigan, January 2, 1919; Ohio, January 7, 1919; Oklahoma, January 7, 1919; Idaho, January 8, 1919; Maine, January 8, 1919; West Virginia, January 9, 1919; California, January 13, 1919; Tennessee, January 13, 1919; Washington, January 13, 1919; Arkansas, January 14, 1919; Kansas, January 14, 1919; Alabama, January 15, 1919; Colorado, January 15, 1919; Iowa, January 15, 1919; New Hampshire, January 15, 1919; Oregon, January 15, 1919; Nebraska, January 16, 1919; North Carolina, January 16, 1919; Utah, January 16, 1919; Missouri, January 16, 1919; Wyoming, January 16, 1919.

Ratification was completed on January 16, 1919. See *Dillon v. Gloss*, 256 U.S. 368, 376 (1921).

The amendment was subsequently ratified by Minnesota on January 17, 1919; Wisconsin, January 17, 1919; New Mexico, January 20, 1919; Nevada, January 21, 1919; New York, January 29, 1919; Vermont, January 29, 1919; Pennsylvania, February 25, 1919; and New Jersey, March 9, 1922.

The amendment was rejected (and not subsequently ratified) by Connecticut and Rhode Island.

## ARTICLE [XIX].

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.

Congress shall have power to enforce this article by appropriate legislation.

### PROPOSAL AND RATIFICATION

The nineteenth amendment to the Constitution of the United States was proposed to the legislatures of the several States by the Sixty-sixth Congress, on the 4th of June, 1919, and was declared, in a proclamation of the Secretary of State, dated the 26th of August, 1920, to have been ratified by the legislatures of 36 of the 48 States. The dates of ratification were: Illinois, June 10, 1919 (and that State readopted its resolution of ratification June 17, 1919); Michigan, June 10, 1919; Wisconsin, June 10, 1919; Kansas, June 16, 1919; New York, June 16, 1919; Ohio, June 16, 1919; Pennsylvania, June 24, 1919; Massachusetts, June 25, 1919; Texas, June 28, 1919; Iowa, July 2, 1919; Missouri, July 3, 1919; Arkansas, July 28, 1919; Montana, August 2, 1919; Nebraska, August 2, 1919; Minnesota, September 8, 1919; New Hampshire, September 10, 1919; Utah, October 2, 1919; California, November 1, 1919; Maine, November 5, 1919; North Dakota, December 1, 1919; South Dakota, December 4, 1919; Colorado, December 15, 1919; Kentucky, January 6, 1920; Rhode Island, January 6, 1920; Oregon, January 13, 1920; Indiana, January 16, 1920; Wyoming, January 27, 1920; Nevada, February 7, 1920; New Jersey, February 9, 1920; Idaho, February 11, 1920; Arizona, February 12, 1920; New Mexico, February 21, 1920; Oklahoma, February 28, 1920; West Virginia, March 10, 1920; Washington, March 22, 1920; Tennessee, August 18, 1920.

Ratification was completed on August 18, 1920.

The amendment was subsequently ratified by Connecticut on September 14, 1920 (and that State reaffirmed on September 21, 1920); Vermont, February 8, 1921; Delaware, March 6, 1923 (after having rejected it on June 2, 1920); Maryland, March 29, 1941 (after having rejected it on February 24, 1920, ratification certified on February 25, 1958); Virginia, February 21, 1952 (after having rejected it on February 12, 1920); Alabama, Sep-

tember 8, 1953 (after having rejected it on September 22, 1919); Florida, May 13, 1969; South Carolina, July 1, 1969 (after having rejected it on January 28, 1920, ratification certified on August 22, 1973); Georgia, February 20, 1970 (after having rejected it on July 24, 1919); Louisiana, June 11, 1970 (after having rejected it on July 1, 1920); North Carolina, May 6, 1971; Mississippi, March 22, 1984 (after having rejected it on March 29, 1920).

## ARTICLE [XX.]

SECTION 1. The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3d day of January, of the years in which such terms would have ended if this article had not been ratified; and the terms of their successors shall then begin.

SEC. 2. The Congress shall assemble at least once in every year, and such meeting shall begin at noon on the 3d day of January, unless they shall by law appoint a different day.

SEC. 3. If, at the time fixed for the beginning of the term of the President, the President elect shall have died, the Vice President elect shall become President. If a President shall not have been chosen before the time fixed for the beginning of his term, or if the President elect shall have failed to qualify, then the Vice President elect shall act as President until a President shall have qualified; and the Congress may by law provide for the case wherein neither a President elect nor a Vice President elect shall have qualified, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified.

SEC. 4. The Congress may by law provide for the case of the death of any of the persons from whom the House of Representatives may choose a President whenever the right of choice shall have devolved upon them, and for the case of the death of any of the persons from whom the Senate may choose a Vice President whenever the right of choice shall have devolved upon them.

SEC. 5. Sections 1 and 2 shall take effect on the 15th day of October following the ratification of this article.

SEC. 6. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission.

### PROPOSAL AND RATIFICATION

The twentieth amendment to the Constitution was proposed to the legislatures of the several states by the Seventy-Second Congress, on the 2d day of March, 1932, and was declared, in a proclamation by the Secretary of State, dated on the 6th day of February, 1933, to have been ratified by the legislatures of 36 of the 48 States. The dates of ratification were: Virginia, March 4, 1932; New York, March 11, 1932; Mississippi, March 16, 1932; Arkansas, March 17, 1932; Kentucky, March 17, 1932; New Jersey, March 21, 1932; South Carolina, March 25, 1932; Michigan, March 31, 1932; Maine, April 1, 1932; Rhode Island, April 14, 1932; Illinois, April 21, 1932; Louisiana, June 22, 1932; West Virginia, July 30, 1932; Pennsylvania, August 11, 1932; Indiana, August 15, 1932; Texas, September 7, 1932; Alabama, September 13, 1932; California, January 4, 1933; North Carolina, January 5, 1933; North Dakota, January 9, 1933; Minnesota, January 12, 1933; Arizona, January 13, 1933; Montana, January 13, 1933; Nebraska, January 13, 1933; Oklahoma, Jan-

uary 13, 1933; Kansas, January 16, 1933; Oregon, January 16, 1933; Delaware, January 19, 1933; Washington, January 19, 1933; Wyoming, January 19, 1933; Iowa, January 20, 1933; South Dakota, January 20, 1933; Tennessee, January 20, 1933; Idaho, January 21, 1933; New Mexico, January 21, 1933; Georgia, January 23, 1933; Missouri, January 23, 1933; Ohio, January 23, 1933; Utah, January 23, 1933.

Ratification was completed on January 23, 1933.

The amendment was subsequently ratified by Massachusetts on January 24, 1933; Wisconsin, January 24, 1933; Colorado, January 24, 1933; Nevada, January 26, 1933; Connecticut, January 27, 1933; New Hampshire, January 31, 1933; Vermont, February 2, 1933; Maryland, March 24, 1933; Florida, April 26, 1933.

### ARTICLE [XXI.]

SECTION 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

SECTION 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

SECTION 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress.

PROPOSAL AND RATIFICATION

The twenty-first amendment to the Constitution was proposed to the several states by the Seventy-Second Congress, on the 20th day of February, 1933, and was declared, in a proclamation by the Secretary of State, dated on the 5th day of December, 1933, to have been ratified by 36 of the 48 States. The dates of ratification were: Michigan, April 10, 1933; Wisconsin, April 25, 1933; Rhode Island, May 8, 1933; Wyoming, May 25, 1933; New Jersey, June 1, 1933; Delaware, June 24, 1933; Indiana, June 26, 1933; Massachusetts, June 26, 1933; New York, June 27, 1933; Illinois, July 10, 1933; Iowa, July 10, 1933; Connecticut, July 11, 1933; New Hampshire, July 11, 1933; California, July 24, 1933; West Virginia, July 25, 1933; Arkansas, August 1, 1933; Oregon, August 7, 1933; Alabama, August 8, 1933; Tennessee, August 11, 1933; Missouri, August 29, 1933; Arizona, September 5, 1933; Nevada, September 5, 1933; Vermont, September 23, 1933; Colorado, September 26, 1933; Washington, October 3, 1933; Minnesota, October 10, 1933; Idaho, October 17, 1933; Maryland, October 18, 1933; Virginia, October 25, 1933; New Mexico, November 2, 1933; Florida, November 14, 1933; Texas, November 24, 1933; Kentucky, November 27, 1933; Ohio, December 5, 1933; Pennsylvania, December 5, 1933; Utah, December 5, 1933.

Ratification was completed on December 5, 1933.

The amendment was subsequently ratified by Maine, on December 6, 1933, and by Montana, on August 6, 1934.

The amendment was rejected (and not subsequently ratified) by South Carolina, on December 4, 1933.

### ARTICLE [XXII.]

SECTION 1. No person shall be elected to the office of the President more than twice, and no person who has held the office of President, or acted as President, for more than two years of a term to which some other person was elected President shall be elected to the office of the President more than once. But this Article shall not apply to any person holding the office of President when this Article was proposed by the Congress, and shall not prevent any person who may be holding the office of President, or acting

as President, during the term within which this Article becomes operative from holding the office of President or acting as President during the remainder of such term.

SECTION 2. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission to the States by the Congress.

PROPOSAL AND RATIFICATION

This amendment was proposed to the legislatures of the several States by the Eightieth Congress on Mar. 21, 1947 by House Joint Res. No. 27, and was declared by the Administrator of General Services, on Mar. 1, 1951, to have been ratified by the legislatures of 36 of the 48 States. The dates of ratification were: Maine, March 31, 1947; Michigan, March 31, 1947; Iowa, April 1, 1947; Kansas, April 1, 1947; New Hampshire, April 1, 1947; Delaware, April 2, 1947; Illinois, April 3, 1947; Oregon, April 3, 1947; Colorado, April 12, 1947; California, April 15, 1947; New Jersey, April 15, 1947; Vermont, April 15, 1947; Ohio, April 16, 1947; Wisconsin, April 16, 1947; Pennsylvania, April 29, 1947; Connecticut, May 21, 1947; Missouri, May 22, 1947; Nebraska, May 23, 1947; Virginia, January 28, 1948; Mississippi, February 12, 1948; New York, March 9, 1948; South Dakota, January 21, 1949; North Dakota, February 25, 1949; Louisiana, May 17, 1950; Montana, January 25, 1951; Indiana, January 29, 1951; Idaho, January 30, 1951; New Mexico, February 12, 1951; Wyoming, February 12, 1951; Arkansas, February 15, 1951; Georgia, February 17, 1951; Tennessee, February 20, 1951; Texas, February 22, 1951; Nevada, February 26, 1951; Utah, February 26, 1951; Minnesota, February 27, 1951.

Ratification was completed on February 27, 1951.

The amendment was subsequently ratified by North Carolina on February 28, 1951; South Carolina, March 13, 1951; Maryland, March 14, 1951; Florida, April 16, 1951; Alabama, May 4, 1951.

The amendment was rejected (and not subsequently ratified) by Oklahoma in June 1947, and Massachusetts on June 9, 1949.

CERTIFICATION OF VALIDITY

Publication of the certifying statement of the Administrator of General Services that the amendment had become valid was made on Mar. 1, 1951, F.R. Doc. 51-2940, 16 F.R. 2019.

### ARTICLE [XXIII.]

SECTION 1. The District constituting the seat of Government of the United States shall appoint in such manner as the Congress may direct:

A number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State, but in no event more than the least populous State; they shall be in addition to those appointed by the States, but they shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment.

SEC. 2. The Congress shall have power to enforce this article by appropriate legislation.

PROPOSAL AND RATIFICATION

This amendment was proposed by the Eighty-sixth Congress on June 17, 1960 and was declared by the Administrator of General Services on Apr. 3, 1961, to have

been ratified by 38 of the 50 States. The dates of ratification were: Hawaii, June 23, 1960 (and that State made a technical correction to its resolution on June 30, 1960); Massachusetts, August 22, 1960; New Jersey, December 19, 1960; New York, January 17, 1961; California, January 19, 1961; Oregon, January 27, 1961; Maryland, January 30, 1961; Maine, January 31, 1961; Minnesota, January 31, 1961; New Mexico, February 1, 1961; Nevada, February 2, 1961; Montana, February 6, 1961; South Dakota, February 6, 1961; Colorado, February 8, 1961; Washington, February 9, 1961; West Virginia, February 9, 1961; Alaska, February 10, 1961; Wyoming, February 13, 1961; Delaware, February 20, 1961; Utah, February 21, 1961; Wisconsin, February 21, 1961; Pennsylvania, February 28, 1961; Indiana, March 3, 1961; North Dakota, March 3, 1961; Tennessee, March 6, 1961; Michigan, March 8, 1961; Connecticut, March 9, 1961; Arizona, March 10, 1961; Illinois, March 14, 1961; Nebraska, March 15, 1961; Vermont, March 15, 1961; Iowa, March 16, 1961; Missouri, March 20, 1961; Oklahoma, March 21, 1961; Rhode Island, March 22, 1961; Kansas, March 29, 1961; Ohio, March 29, 1961.

Ratification was completed on March 29, 1961.

The amendment was subsequently ratified by New Hampshire on March 30, 1961 (when that State annulled and then repeated its ratification of March 29, 1961); Alabama, April 16, 2002; Texas, May 22, 2009.

The amendment was rejected (and not subsequently ratified) by Arkansas on January 24, 1961.

#### CERTIFICATION OF VALIDITY

Publication of the certifying statement of the Administrator of General Services that the amendment had become valid was made on Apr. 3, 1961, F.R. Doc. 61-3017, 26 F.R. 2808.

### ARTICLE [XXIV.]

SECTION 1. The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

SEC. 2. The Congress shall have power to enforce this article by appropriate legislation.

#### PROPOSAL AND RATIFICATION

This amendment was proposed by the Eighty-seventh Congress by Senate Joint Resolution No. 29, which was approved by the Senate on Mar. 27, 1962, and by the House of Representatives on Aug. 27, 1962. It was declared by the Administrator of General Services on Feb. 4, 1964, to have been ratified by the legislatures of 38 of the 50 States.

This amendment was ratified by the following States: Illinois, November 14, 1962; New Jersey, December 3, 1962; Oregon, January 25, 1963; Montana, January 28, 1963; West Virginia, February 1, 1963; New York, February 4, 1963; Maryland, February 6, 1963; California, February 7, 1963; Alaska, February 11, 1963; Rhode Island, February 14, 1963; Indiana, February 19, 1963; Utah, February 20, 1963; Michigan, February 20, 1963; Colorado, February 21, 1963; Ohio, February 27, 1963; Minnesota, February 27, 1963; New Mexico, March 5, 1963; Hawaii, March 6, 1963; North Dakota, March 7, 1963; Idaho, March 8, 1963; Washington, March 14, 1963; Vermont, March 15, 1963; Nevada, March 19, 1963; Connecticut, March 20, 1963; Tennessee, March 21, 1963; Pennsylvania, March 25, 1963; Wisconsin, March 26, 1963; Kansas, March 28, 1963; Massachusetts, March 28, 1963; Nebraska, April 4, 1963; Florida, April 18, 1963; Iowa, April 24, 1963; Delaware, May 1, 1963; Missouri, May 13, 1963; New Hampshire, June 12, 1963; Kentucky, June 27, 1963; Maine, January 16, 1964; South Dakota, January 23, 1964; Virginia, February 25, 1977.

Ratification was completed on January 23, 1964. The amendment was subsequently ratified by North Carolina on May 3, 1989.

The amendment was rejected by Mississippi (and not subsequently ratified) on December 20, 1962.

#### CERTIFICATION OF VALIDITY

Publication of the certifying statement of the Administrator of General Services that the amendment had become valid was made on Feb. 5, 1964, F.R. Doc. 64-1229, 29 F.R. 1715.

### ARTICLE [XXV.]

SECTION 1. In case of the removal of the President from office or of his death or resignation, the Vice President shall become President.

SEC. 2. Whenever there is a vacancy in the office of the Vice President, the President shall nominate a Vice President who shall take office upon confirmation by a majority vote of both Houses of Congress.

SEC. 3. Whenever the President transmits to the President pro tempore of the Senate and the Speaker of the House of Representatives his written declaration that he is unable to discharge the powers and duties of his office, and until he transmits to them a written declaration to the contrary, such powers and duties shall be discharged by the Vice President as Acting President.

SEC. 4. Whenever the Vice President and a majority of either the principal officers of the executive departments or of such other body as Congress may by law provide, transmit to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office, the Vice President shall immediately assume the powers and duties of the office as Acting President.

Thereafter, when the President transmits to the President pro tempore of the Senate and the Speaker of the House of Representatives his written declaration that no inability exists, he shall resume the powers and duties of his office unless the Vice President and a majority of either the principal officers of the executive department[17] or of such other body as Congress may by law provide, transmit within four days to the President pro tempore of the Senate and the Speaker of the House of Representatives their written declaration that the President is unable to discharge the powers and duties of his office. Thereupon Congress shall decide the issue, assembling within forty-eight hours for that purpose if not in session. If the Congress, within twenty-one days after receipt of the latter written declaration, or, if Congress is not in session, within twenty-one days after Congress is required to assemble, determines by two-thirds vote of both Houses that the President is unable to discharge the powers and duties of his office, the Vice President shall continue to discharge the same as Acting President; otherwise, the President shall resume the powers and duties of his office.

#### PROPOSAL AND RATIFICATION

This amendment was proposed by the Eighty-ninth Congress by Senate Joint Resolution No. 1, which was

---

[17] So in original. Probably should be "departments".

approved by the Senate on Feb. 19, 1965, and by the House of Representatives, in amended form, on Apr. 13, 1965. The House of Representatives agreed to a Conference Report on June 30, 1965, and the Senate agreed to the Conference Report on July 6, 1965. It was declared by the Administrator of General Services, on Feb. 23, 1967, to have been ratified by the legislatures of 39 of the 50 States.

This amendment was ratified by the following States: Nebraska, July 12, 1965; Wisconsin, July 13, 1965; Oklahoma, July 16, 1965; Massachusetts, August 9, 1965; Pennsylvania, August 18, 1965; Kentucky, September 15, 1965; Arizona, September 22, 1965; Michigan, October 5, 1965; Indiana, October 20, 1965; California, October 21, 1965; Arkansas, November 4, 1965; New Jersey, November 29, 1965; Delaware, December 7, 1965; Utah, January 17, 1966; West Virginia, January 20, 1966; Maine, January 24, 1966; Rhode Island,. January 28, 1966; Colorado, February 3, 1966; New Mexico, February 3, 1966; Kansas, February 8, 1966; Vermont, February 10, 1966; Alaska, February 18, 1966; Idaho, March 2, 1966; Hawaii, March 3, 1966; Virginia, March 8, 1966; Mississippi, March 10, 1966; New York, March 14, 1966; Maryland, March 23, 1966; Missouri, March 30, 1966; New Hampshire, June 13, 1966; Louisiana, July 5, 1966; Tennessee, January 12, 1967; Wyoming, January 25, 1967; Washington, January 26, 1967; Iowa, January 26, 1967; Oregon, February 2, 1967; Minnesota, February 10, 1967; Nevada, February 10, 1967.

Ratification was completed on February 10, 1967.

The amendment was subsequently ratified by Connecticut, February 14, 1967; Montana, February 15, 1967; South Dakota, March 6, 1967; Ohio, March 7, 1967; Alabama, March 14, 1967; North Carolina, March 22, 1967; Illinois, March 22, 1967; Texas, April 25, 1967; Florida, May 25, 1967.

CERTIFICATION OF VALIDITY

Publication of the certifying statement of the Administrator of General Services that the amendment had become valid was made on Feb. 25, 1967, F.R. Doc. 67-2208, 32 F.R. 3287.

ARTICLE [XXVI.]

SECTION 1. The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.
SEC. 2. The Congress shall have power to enforce this article by appropriate legislation.

PROPOSAL AND RATIFICATION

This amendment was proposed by the Ninety-second Congress by Senate Joint Resolution No. 7, which was approved by the Senate on Mar. 10, 1971, and by the House of Representatives on Mar. 23, 1971. It was declared by the Administrator of General Services on July 5, 1971, to have been ratified by the legislatures of 39 of the 50 States.

This amendment was ratified by the following States: Connecticut, March 23, 1971; Delaware, March 23, 1971; Minnesota, March 23, 1971; Tennessee, March 23, 1971; Washington, March 23, 1971; Hawaii, March 24, 1971; Massachusetts, March 24, 1971; Montana, March 29, 1971; Arkansas, March 30, 1971; Idaho, March 30, 1971; Iowa, March 30, 1971; Nebraska, April 2, 1971; New Jersey, April 3, 1971; Kansas, April 7, 1971; Michigan, April 7, 1971; Alaska, April 8, 1971; Maryland, April 8, 1971; Indiana, April 8, 1971; Maine, April 9, 1971; Vermont, April 16, 1971; Louisiana, April 17, 1971; California, April 19, 1971; Colorado, April 27, 1971; Pennsylvania, April 27, 1971; Texas, April 27, 1971; South Carolina, April 28, 1971; West Virginia, April 28, 1971; New Hampshire, May 13, 1971; Arizona, May 14, 1971; Rhode Island, May 27, 1971; New York, June 2, 1971; Oregon, June 4, 1971; Missouri, June 14, 1971; Wisconsin, June 22, 1971; Illinois, June 29, 1971; Alabama, June 30, 1971; Ohio, June 30, 1971; North Carolina, July 1, 1971; Oklahoma, July 1, 1971.

Ratification was completed on July 1, 1971.

The amendment was subsequently ratified by Virginia, July 8, 1971; Wyoming, July 8, 1971; Georgia, October 4, 1971.

CERTIFICATION OF VALIDITY

Publication of the certifying statement of the Administrator of General Services that the amendment had become valid was made on July 7, 1971, F.R. Doc. 71-9691, 36 F.R. 12725.

ARTICLE [XXVII.]

No law, varying the compensation for the services of the Senators and Representatives, shall take effect, until an election of Representatives shall have intervened.

PROPOSAL AND RATIFICATION

This amendment, being the second of twelve articles proposed by the First Congress on Sept. 25, 1789, was declared by the Archivist of the United States on May 18, 1992, to have been ratified by the legislatures of 40 of the 50 States.

This amendment was ratified by the following States: Maryland, December 19, 1789; North Carolina, December 22, 1789; South Carolina, January 19, 1790; Delaware, January 28, 1790; Vermont, November 3, 1791; Virginia, December 15, 1791; Ohio, May 6, 1873; Wyoming, March 6, 1978; Maine, April 27, 1983; Colorado, April 22, 1984; South Dakota, February 21, 1985; New Hampshire, March 7, 1985; Arizona, April 3, 1985; Tennessee, May 23, 1985; Oklahoma, July 10, 1985; New Mexico, February 14, 1986; Indiana, February 24, 1986; Utah, February 25, 1986; Arkansas, March 6, 1987; Montana, March 17, 1987; Connecticut, May 13, 1987; Wisconsin, July 15, 1987; Georgia, February 2, 1988; West Virginia, March 10, 1988; Louisiana, July 7, 1988; Iowa, February 9, 1989; Idaho, March 23, 1989; Nevada, April 26, 1989; Alaska, May 6, 1989; Oregon, May 19, 1989; Minnesota, May 22, 1989; Texas, May 25, 1989; Kansas, April 5, 1990; Florida, May 31, 1990; North Dakota, March 25, 1991; Alabama, May 5, 1992; Missouri, May 5, 1992; Michigan, May 7, 1992; New Jersey, May 7, 1992.

Ratification was completed on May 7, 1992.

The amendment was subsequently ratified by Illinois on May 12, 1992; California, June 26, 1992; Rhode Island, June 10, 1993; Hawaii, April 29, 1994; Washington, April 6, 1995; Kentucky, March 21, 1996.

CERTIFICATION OF VALIDITY

Publication of the certifying statement of the Archivist of the United States that the amendment had become valid was made on May 18, 1992, F.R. Doc. 92-11951, 57 F.R. 21187.

PROPOSED AMENDMENTS TO THE CONSTITUTION NOT RATIFIED BY THE STATES

In addition to the 27 amendments that have been ratified by the required three-fourths of the States, six other amendments have been submitted to the States but have not been ratified by them.

Beginning with the proposed Eighteenth Amendment, Congress has customarily included a provision requiring ratification within seven years from the time of the submission to the States. The Supreme Court in Coleman v. Miller, 307 U.S. 433 (1939), declared that the question of the reasonableness of the time within which a sufficient number of States must act is a political question to be determined by the Congress.

In 1789, twelve proposed articles of amendment were submitted to the States. Of these, Articles III–XII were ratified and became the first ten

amendments to the Constitution, popularly known as the Bill of Rights. In 1992, proposed Article II was ratified and became the 27th amendment to the Constitution. Proposed Article I which was not ratified is as follows:

"ARTICLE THE FIRST

"After the first enumeration required by the first article of the Constitution, there shall be one Representative for every thirty thousand, until the number shall amount to one hundred, after which the proportion shall be so regulated by Congress, that there shall be not less than one hundred Representatives, nor less than one Representative for every forty thousand persons, until the number of Representatives shall amount to two hundred; after which the proportion shall be so regulated by Congress, that there shall not be less than two hundred Representatives, nor more than one Representative for every fifty thousand persons."

---

Thereafter, in the 2d session of the Eleventh Congress, the Congress proposed the following article of amendment to the Constitution relating to acceptance by citizens of the United States of titles of nobility from any foreign government.

The proposed amendment, which was not ratified by three-fourths of the States, is as follows:

*Resolved by the Senate and House of Representatives of the United States of America, in Congress assembled.* Two thirds of both Houses concurring, that the following section be submitted to the legislatures of the several states, which when ratified by the legislatures of three fourths of the states, shall be valid and binding, as a part of the constitution of the United States:

If any citizen of the United States shall accept, claim, receive or retain any title of nobility or honor, or shall, without the consent of Congress, accept and retain any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power, such person shall cease to be a citizen of the United States, and shall be incapable of holding any office of trust or profit under them, or either of them.

---

The following amendment to the Constitution relating to slavery was proposed by the 2d session of the Thirty-sixth Congress on March 2, 1861, when it passed the Senate, having previously passed the House on February 28, 1861. It is interesting to note in this connection that this is the only proposed (and not ratified) amendment to the Constitution to have been signed by the President. The President's signature is considered unnecessary because of the constitutional provision that on the concurrence of two-thirds of both Houses of Congress the proposal shall be submitted to the States for ratification.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following article be proposed to the Legislatures of the several States as an amendment to the Constitution of the United States, which, when ratified by three-fourths of said Legislatures, shall be valid, to all intents and purposes, as part of the said Constitution, viz:

"ARTICLE THIRTEEN

"No amendment shall be made to the Constitution which will authorize or give to Congress the power to abolish or interfere, within any State, with the domes-

tic institutions thereof, including that of persons held to labor or service by the laws of said State."

---

A child labor amendment was proposed by the 1st session of the Sixty-eighth Congress on June 2, 1926, when it passed the Senate, having previously passed the House on April 26, 1926. The proposed amendment, which has been ratified by 28 States, to date, is as follows:

JOINT RESOLUTION PROPOSING AN AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which, when ratified by the legislatures of three-fourths of the several States, shall be valid to all intents and purposes as a part of the Constitution:

"ARTICLE—.

"SECTION 1. The Congress shall have power to limit, regulate, and prohibit the labor of persons under eighteen years of age.

"SECTION 2. The power of the several States is unimpaired by this article except that the operation of State laws shall be suspended to the extent necessary to give effect to legislation enacted by the Congress."

---

An amendment relative to equal rights for men and women was proposed by the 2d session of the Ninety-second Congress on March 22, 1972, when it passed the Senate, having previously passed the House on October 12, 1971. The seven-year deadline for ratification of the proposed amendment was extended to June 30, 1982, by the 2d session of the Ninety-fifth Congress. The proposed amendment, which was not ratified by three-fourths of the States by June 30, 1982, is as follows:

JOINT RESOLUTION PROPOSING AN AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES RELATIVE TO EQUAL RIGHTS FOR MEN AND WOMEN

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE—

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SEC. 3. This amendment shall take effect two years after the date of ratification."

---

An amendment relative to voting rights for the District of Columbia was proposed by the 2d session of the Ninety-fifth Congress on August 22, 1978, when it passed the Senate, having pre-

ously passed the House on March 2, 1978. The proposed amendment, which was not ratified by three-fourths of the States within the specified seven-year period, is as follows:

JOINT RESOLUTION PROPOSING AN AMENDMENT TO THE CONSTITUTION TO PROVIDE FOR REPRESENTATION OF THE DISTRICT OF COLUMBIA IN THE CONGRESS.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein),* That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE

"SECTION 1. For purposes of representation in the Congress, election of the President and Vice President, and article V of this Constitution, the District constituting the seat of government of the United States shall be treated as though it were a State.

"SEC. 2. The exercise of the rights and powers conferred under this article shall be by the people of the District constituting the seat of government, and as shall be provided by the Congress.

"SEC. 3. The twenty-third article of amendment to the Constitution of the United States is hereby repealed.

"SEC. 4. This article shall be inoperative, unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission."





# LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **THE DISCOVERY OF AMERICA AN OUTGROWTH OF THE CONQUEST OF THE MOORS BY THE SPANIARDS,** call number E110.D61 Copy 1, and that the attached photocopies are a complete and true representation from that work.

THIS IS TO CERTIFY FURTHER, that work is marked with a Library of Congress stamp that bears the date July 28, 1884.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on July 24, 2017.

*Deirdre Scott*

Deirdre Scott
Business Enterprises Officer
Office of Business Enterprises
Library of Congress

E 110
.D61
Copy 1



# THE DISCOVERY OF AMERICA
## AN OUTGROWTH
### OF THE CONQUEST OF THE MOORS

By the Spaniards

# 81,500 PERSONS

### STOPPED AT THE

# · GRAND UNION HOTEL ·——

## DURING THE YEAR 1883,

#### For the following Reasons.

**1st.** On arriving at and leaving the City of NEW YORK, via GRAND CENTRAL DEPOT, they SAVED $3 CARRIAGE HIRE, and their BAGGAGE was TRANSFERRED to and from said DEPOT to this HOTEL, in 10 minutes, FREE of CHARGE.

**2d.** ARRIVING in the CITY from BROOKLYN, NEW JERSEY, PENNSYLVANIA, SOUTH or WEST, CANADA or EUROPE, by taking the 3d or 6th AVENUE ELEVATED CARS, at a cost of TEN CENTS, they reached the GRAND UNION HOTEL, opposite GRAND CENTRAL DEPOT, in 20 MINUTES, and SAVED $3 CARRIAGE HIRE,

**3d.** ARRIVING at foot of 42d Street, via NEW YORK, WEST SHORE & BUFFALO RAILROAD, they were transferred by CAB to GRAND UNION HOTEL in 15 MINUTES, and SAVED $3 CARRIAGE HIRE. The 42d STREET RAILROAD will be completed about January 1, 1885, and will convey passengers to and from said Depot to the GRAND UNION HOTEL for FIVE cents.

**4th.** TOURISTS en route for SARATOGA, NIAGARA, WHITE MOUNTAINS, and other SUMMER RESORTS via GRAND CENTRAL DEPOT, had their BAGGAGE delivered from this HOTEL to said DEPOT in 10 minutes FREE OF CHARGE.

**5th.** GUESTS made their SELECTIONS from 613 ROOMS, SINGLE and in SUITES, elegantly carpeted in AXMINSTER, WILTON and VELVETS, at $1 and UPWARDS per day,—EUROPEAN PLAN.

**6th.** DINING ROOMS, RESTAURANTS, CAFÉ, LUNCH and WINE ROOMS supplied with the BEST at moderate prices.

**7th.** DINNER, LUNCH and SUPPER PARTIES were ELEGANTLY entertained at a MUCH LESS EXPENSE than could have been secured at any other FIRST CLASS HOTEL in the CITY.

**8th.** Taking the Third and Sixth Avenue Elevated Railroad on 42d Street, or Horse Cars and Stages, which pass this Hotel, they reached all Depots and all parts of the City, at an expense of 5 or 10 cents.

**9th.** Families residing in Flats DINED at this Hotel as quietly and at a much less expense than at Home.

## —— · TWO ELEVATORS · —— ——

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



*Christopher Columbus*

INTERNET ARCHIVE

LIBRARY OF CONGRESS

## ON EUROPEAN PLAN.

Two hundred rooms for one or two persons, from Six to Ten Dollars per week.

Two hundred rooms for one or two persons, from Ten to Twenty Dollars per week.

Carpeted with Velvets and Axminsters. The furniture is of Black and French Walnut. The Mattresses are filled with Super Extra Black Horse Hair Drawings.

## IMPORTANT.

Travelers, families and tourists arriving at or leaving the city of New York, to visit Canada, Niagara, Saratoga, White Mountains, Long Branch or other Summer resorts, will find it convenient to stop at the

# GRAND UNION HOTEL,

### Opposite Grand Central Depot.

613 Elegantly Furnished Rooms, fitted up at a cost of ONE MILLION DOLLARS, ONE DOLLAR AND UPWARDS PER DAY. ELEGANT SUITES FOR FAMILIES. EUROPEAN PLAN. TWO ELEVATORS.

## FAMILIES, TRAVELERS AND TOURISTS

Can live better, for less money, at the GRAND UNION than at any other First Class Hotel In the City.

The dining rooms are elegantly carpeted. Its Restaurant, Café, Lunch and Wine Rooms supplied with the best, at moderate prices.

## AN ELEGANT RESTAURANT,

75 feet square, just finished, where families can dine quietly as at home, and at a MUCH LESS EXPENSE. Elegant accomodations for

## DINNER, LUNCH AND SUPPER PARTIES.

### The cuisine is unsurpassed.

Persons arriving at or leaving Grand Central Depot, SAVE THREE DOLLARS CARRIAGE HIRE and their baggage transferred to and from said depot to this hotel in ten minutes, FREE OF CHARGE.

One hundred elegant suites of rooms for small or large families, with or without parlors and bath rooms, from Ten to Forty Dollars per week.

### ELEGANTLY FURNISHED.

Meals on European Plan. You only pay for what you order.

TRY THE GRAND UNION HOTEL.

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

THE

# DISCOVERY OF AMERICA

AN OUT-GROWTH OF

## THE CONQUEST OF THE MOORS

BY THE SPANIARDS.

PUBLISHED
125 PARK AVENUE, BETWEEN 41st AND 42d STs.,
NEW YORK CITY
PRINTED BY THE BRENER PAPER COMPANY,
SPRINGFIELD, MASS

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

# PREFACE.

That the general public, and especially the young of our land may possess in condensed form, and become thoroughly familiar with the causes which lead to the discovery of America by Christopher Columbus in 1492, out of which grew the revival and final establishment of the Heliocentric system, and also the Government of the United States, proves the incentive for the publication of this work.

Entered according to Act of Congress, in the year 1883.

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



# THE DISCOVERY OF AMERICA.

The discovery of America by Christopher Columbus, was an out-growth of the conquest of the Moors, by the Spaniards.

The Moors, commanded by Arabian officers, expelled the Visigoths from Andalusia, south Spain, in the year 711, and established the Kingdom of Cordova, which they held until the year 1236. During the eighth century they also founded Granada, which at first, constituted a part of the Kingdom of Cordova.

Under the administration of the Mohammedan Emirs, Cordova became the seat of learning and refinement. Great encouragement was given to the study of Mathematics, Chemistry and the Physical Sciences : the works of Aristotle, Hippocrates and Ptolemy Syntax, were translated into Arabic, and became the authority of Saracén Astronomy, and of Medicine.

In its days of prosperity Cordova contained over two hundred

5

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

thousand houses, and a population of over one million.   The palaces of the Khalif were built of marble and stone, with polished marble balconies overhanging orange gardens and bowers of roses; with court-yards containing winding paths, ornamented with fountains of quick-silver and cascades of water.

The interiors of the palaces were magnificently decorated, the furniture was of citron and sandal wood, inlaid with gold, silver, mother-of-pearl, Malachite and lapis-lazuli.

In the year 1236, King Alhama made Granada the capitol of his new Kingdom of Granada, encompassing the city by a massive wall, surmounted by over one thousand towers.

The Vaga embraced several miles of land, upon which was raised the various products for the sustenance of the people.

Upon one of the hills, on the outskirts of the city, was erected the celebrated Alhambra, as a warriors' castle and palace of the Moorish kings, which was capable of containing a garrison of forty thousand men.

The palaces, mosques and other private and public buildings were finished in stone, the floors were laid in mosaic and variegated marbles, the side walls were of porcelain tiles, laid in various colors, ornamented with medallions of fruits, flowers and heraldic devices; they were also stuccoed and ornamented with arabesques of the most elegant and intricate designs, characteristic of this cultivated and refined Mohammedan people.   The ceilings were decorated in fret work, with panels and heavy moulded cornices painted in white and

6

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

gold, and frescoed in bright and beautiful colors.   The architecture of the whole city was exquisite and refined.

The beauties of Granada were likened unto a marble vase of pure gems, overflowing with dew-drops, sparkling in the rays of the morning sun.

The Moors were a cultivated people, living in Asiatic luxury, within an atmosphere of scholarly attainment and exquisite refinement, speaking the highest order of mellow and entrancing Arabic, extremely fond of dress, and possessing an enduring passion for ornaments.

The armor of the Moorish cavaliers was encrusted with gold and silver, chased in elegant designs: the sheaths of the cimeters were richly enamelled, and the blades of Damascus steel were elaborately emblazoned, and their belts were inlaid with ornamental figures in enamel.

The Arabian steeds of the Moorish Chivalry were gorgeously caparisoned in rich velvets of various colors, ornamented with gold and silver, and interwoven with silken braid.

The women of Granada lived in the height of luxury and magnificence, they wore anklets, bracelets, ear-rings and girdles of gold, wrought with exquisite art and delicacy, studded with diamonds, rubies, emeralds and other precious gems; their long and luxuriant hair flowed in tresses beautifully decorated with precious stones, neatly set in golden filagree; their features were of classic mould; they were finely formed and fully developed, and their

7

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

physical beauty was entrancing; they were graceful in their manners, fascinating in their conversation, and their bright sparkling eyes, and teeth of pearly whiteness glittering through ruby lips, gave to their countenances an expression of sweet, sympathetic and enduring love.

The Moors and Spaniards took great delight in waging partisan war upon each other.

The attack made by Abul Hassen, December 26th, 1481, upon the fortress of Zahara, and the taking of its people prisoners, resulted in the Marquis of Cadiz' storming and taking at the dead of night, the Moorish castle and city of Alhama.

Upon the Spanish troops rallying to defend Alhama from being reconquered, the news reaching King Ferdinand, he made immediate preparations and hastened on to take charge of the army, and Isabella followed after him and soon joined him at Cordova.

Ferdinand and Isabella had long awaited a pretext for inaugurating a Christian war of extermination against the Mohammedan Moors and the wealthy Jews residing in the Moorish kingdom.

The marriage of Ferdinand and Isabella consolidated the Spanish Empire, and destroyed the factions, which enabled them to bring into the field of war the troops of Castile and Aragon and their dependencies, for the prosecution of their Christian faith.

Christopher Columbus was born about the year 1435, in the city of Genoa, Italy, and followed the life of a mariner. Hearing of the discoveries made by Marco Polo, a Venetian, during his journey eastward, overland, in the twelfth century, in eastern and central

8

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



WASHINGTON'S HEAD-QUARTERS, NEWBURGH.

The Dining Rooms, Restaurant, Café, Lunch and Wine Rooms of the Grand Union Hotel are supplied with the best at moderate prices.

TRY THE GRAND UNION HOTEL.

9

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

Asia, and his navigation on the Pacific Ocean, and along the shores of India, and of the discoveries made in Africa by the Portugese King Henry, coupled with his correspondence with Toscanelli, a learned cosmographer, led Columbus to believe the earth a sphere.

He formed the conclusion that if Marco Polo reached India, the Kingdom of the Grand Khan of Tartary, by traveling eastward, he could certainly reach the opposite coast of India, by sailing westward.   Columbus supposed he would first reach the Island of Zapango, (Japan), which island Marco Polo had placed opposite China, five hundred leagues out in the ocean, and about fifteen hundred miles from the Indian coast.

It was the zeal, born of earnest and unswerving purpose, which reflected Columbus' true character and greatness.   Imbued with the belief that he was God's chosen instrument to prove the sphericity of the earth he constantly importuned the Governments of his day for needed assistance, until wearying from repeated rebuff, he visited Spain, and was informed by the Duke of Medina Celi that Isabella, Queen of Spain, had requested him to visit her at Cordova.

On his arrival at Cordova he found the Queen, surrounded by prelates and officers of the army, so engaged that she could not give him an audience and he became the guest of Alonzo de Quintanilla.

At about this time the elder Sultana, Ayxa, became very jealous of Zoraya, or the " Morning Star," the young and favorite sultana of the king, Abul Hassen, fearing lest her son, Boabdela, would be superceded by the offspring of Zoraya.

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

The ill-feeling existing between the Sultanas led to the formation of two factions, and terminated in a rebellion during which the streets of Granada flowed with the blood of the Moors.

Ferdinand encouraged the feud, on behalf of Ayxa, and Abul Hassen and his young family were expelled from Granada, and Boabdela was proclaimed king.

Large numbers of troops were now summoned to the seat of war, and vigorous preparations were made for the prosecution of the same, and owing to the internal feuds of the Moors and the imbecility of Boabdela, Ferdinand was enabled to attack their castles, one by one, and by the use of gunpowder and heavy Lombards, the Moorish castles, cities and vagas fell to the conquering Spaniards.

Columbus, after waiting seven years, and suffering great disappointments succeeded in having his theory discussed at a meeting of prelates and learned men, at the convent of St. Stephens, at Salamanca, but his theory of the world's being a sphere was condemned.

They ridiculed the theory of antipodes, with their heads hanging downwards, it being contrary to the belief of their theologians and philosophers, and in violation of their sacred scriptures. They argued that if the world was round, then a vessel attempting to make the ascent of the sphere would fall off into space.

They also argued that the earth was a flat surface, bordered by the waters of the sea, on the yielding support of which rested the crystalline dome of the sky, and the sun, moon and planets, were

11

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

a subordinate nature, their use being to give light to man who was elevated to supreme importance.   The Patristic Geography had governed the Christian church for twelve centuries, and was its authority for rejecting the theory of the sphericity of the earth.

Columbus defended his theory nobly and with religious fervor, but the decision was unfavorable to him.

The ancient philosophers and astronomers introduced various theories regarding the sphericity of the earth and the manner of its revolution.   The Heliocentric theory, taught by Pythagoras, about five hundred and fifty years, B. C., placed the sun as the centre round which, with the other planets, the earth revolved, in circular orbits, each supposed to rotate on its axis as it revolved round the sun.

This theory was accepted by Aristarchus of Samos, about three hundred and fifty years, B. C., and was superceded by the Geocentric system of Ptolemy, about one hundred and fifty years, A. D., which system placed the earth in the centre, fixed in space, the sun and the other planets revolving round it, thus giving the earth the position of superiority.   This theory was accepted by a large portion of the inhabitants of the earth for fourteen centuries.

No advancement was made toward establishing the theories of the ancients, or the Geography of the earth, or the science of Astronomy, until the advent of Columbus and his discovery of America in 1492, and the circumnavigation of the earth by Magellen in 1521, which proved its sphericity, and whose circumference is about twenty five thousand miles.

12

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

# A GREAT CONVENIENCE.

Persons with or without their families, intending visiting Canada, Niagara, Saratoga, White Mountains or other Summer resorts, by way of Grand Central Depot or West Shore and Buffalo Railroad, foot of West Forty second street, will find it convenient to stop over night at the Grand Union Hotel, as they will be able to secure a good night's rest, obtain their breakfast and reach the early trains which leave said depot, without any inconvenience; and save Three Dollars carriage hire.

### TRY THE GRAND UNION HOTEL.

---

## KEEP YOUR CHECKS.

Persons *en route* by rail to the city of New York, when approached by solicitors of luggage, will do well to keep their baggage checks in their pockets, and on arrival at the Grand Central Depot, walk accross the street to the Grand Union Hotel, register, hand their baggage checks to the clerk, who will dispatch a porter and have their baggage in their room in a few minutes, and return it to the depot when desired, free of charge. The transfer of baggage to and from Hotel without expense is an important saving, and the Grand Union is the only strictly First Class Hotel in the City of New York that offers this advantage to the traveling public. Conducted on the European plan. Its cuisine is beyond parallel. Its six hundred rooms representing an expense of more than one million of dollars, One dollar per day and upwards. Elevators and all modern improvements. The Bar is the most elegant in the city. Its Cafe' and Wine Room enjoys no superior. Stages, horse cars and elevated railway pass the door.

### GIVE THE GRAND UNION A TRIAL.

13

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

The chains which bound Physical Science and Astronomy for thousands of years, were, through his fearless spirit and intrepid action, not only rent asunder, through the discovery of America, which proved the sphericity of the earth, but it opened the way for the introduction of the Heliocentric system.

This system was awakened into life by Copernicus in the sixteenth century, and was adopted by Kepler, who introduced the principle of Gravity without discovering its practical application.

Copernicus and Kepler labored under the same difficulty as the ancient astronomers, they having no telescope to assist them in proving the truths of their theories.   Thus the theory of revolution and attraction of Gravitation was left for Galileo and Sir Isaac Newton to demonstrate their truths.

In the year 1609, Lippershey, a Dutchman, made a small telescope.   Galileo hearing of it and realizing the importance it would be to him in discovering the solar system, made one of a magnifying power of three, and finally succeeded in making one that magnified thirty times, with which, in 1610 he discovered the four satelites of Jupiter revolving in orbits round that planet, and also that Venus in her motion round the sun, showed phases like the moon.   Further observation showed him that the earth and each of the planets rotated on its axis as it revolved in an eliptical orbit round the sun, which was the centre and attractive force of the system.

Such important discoveries made by Galileo, and those that followed soon after, fully supported the system of Copernicus.

14

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

FAMILIES CAN LIVE BETTER

For Less Money, at

## THE GRAND UNION HOTEL,

than at any other

FIRST CLASS HOTEL IN THE CITY.

# TO FAMILIES

RESIDING IN HOTELS, FLATS, OR APARTMENT HOUSES.

THE RESTAURANT of the Grand Union Hotel, corner Forty-second street and Fourth (Park) avenue, opposite Grand Central Depot, is seventy-five feet square, elegantly fitted up, with nine large mirrors, and neatly frescoed.

THE THREE DINING ROOMS are richly carpeted, where families can dine us quietly as at home, and at much less expense. The table is supplied with the best the markets can furnish.

THE CUISINE IS UNSURPASSED.

YOU ONLY PAY FOR WHAT YOU ORDER.

THE PRICES ARE MODERATE.

THE ATTENDANCE IS COMPLETE.

EVERY CARE IS TAKEN

by the Managers of

## THE GRAND UNION HOTEL

TO PLEASE AND GIVE COMFORT

To its Numerous Guests.

YOU ARE SOLICITED TO GIVE THE GRAND UNION HOTEL A TRIAL.

15

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

Sir Isaac Newton is crowned with the honor of demonstrating the theory of the attraction of Gravitation, and his name became immortalized by the production of his great work, " Principia," in the year 1686.

We will now return to Columbus, and his efforts to obtain aid for the purpose of carrying out his theories and convictions.

The King and Queen, despite the decision of the learned men at Salamanca, saw the advantage to be derived from the discovery of a new and direct route to the Indies, and if successful the gain would be incalculable, as the Kingdom of the Grand Khan of Tartary was supposed to abound in gold, silver and precious stones, and to contain inexhaustible wealth, which would inure to the benefit of Spain.

They also saw that such a discovery would add to the glory of their reign, and their country, and aid in the extension of their Christian faith, and fearing that Columbus might seek the assistance of some other government, they promised him that his project should receive attention as soon as the Moors were conquered and expelled from Granada.

Columbus, disappointed, left the Court of Spain, with the intention of laying his project before the King of France. On his way thence, arriving at the gate of the Convent of Santa Maria de Rabida, he asked for bread and water for himself and his child, he there met the prior, Juan Parez, to whom he stated his project. The prior became interested in his theory, and introduced him to

16

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

Martin Alonzo Pinzon, a wealthy navigator, who upon hearing Columbus' explanation, became convinced of his ability to accomplish the voyage, and offered to bear one-eighth of the expense of such an expedition.

Columbus was urged to remain at Palos, whilst the prior, who at one time had been the Queen's Confessor, should see her.

The prior's representations to the Queen induced her to invite Columbus to appear at court, and she sent him twenty thousand maravedus, a sum equivalent to about $60, to renovate his wardrobe and to defray his traveling expenses.

Columbus arrived at the court at the time the surrender of Granada was being consummated. Boabdela, the last of the Moorish kings, gave up the keys of the Alhambra to Ferdinand and Isabella, and thus after a war of nearly 800 years, the Mohammedan Moors surrendered to the Christian Spaniards, amidst great rejoicings and festivities. · But the greatest soul of all amid the throng was Columbus, impatiently waiting for an opportunity to offer to Spain a much greater conquest than all the Moorish possessions in Europe, Africa or Asia.

Granada being conquered and the Moors expelled, the time had now arrived when the plans of Columbus, according to promise, must receive attention, but when the conditions under which he would undertake the expedition came to be discussed, his demands for titles and privileges were princely, and in the eyes of the Court, so extravagant that his terms and propositions were refused, and as

17

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

## THE CAFÉ, LUNCH AND WINE ROOMS

of the Grand Union Hotel are the most elegant in the city.   The
floors are of Italian marble, the base, chair-rail, dado, panels,
counters, and trusses are of various colored marbles.   The side
walls are laid in porcelain tiles of various colors, the panels of the
side walls are decorated with pictures of fruit, flowers, Chinese
Mandarin's and landscapes.

The side walls, friezes, cornices and dadoes of THE READING
ROOM CAFÉ are finished in Lin'crusta Walton, elegantly decorated,
being oxidized in bronze, copper, silver and gold.   One of the
rooms has twelve large mirrors, nine feet square, the other nine, set
in mahogany frames.   The ceilings are laid out in panels with
mahogany mouldings, neatly frescoed.

The mantles in THE LOBBY are made of Mexican onyx.

The above are well worthy of inspection.

You are solicited to give the Grand Union Hotel a trial.

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



LIBRARY OF CONGRESS

INTERNET ARCHIVE

TRAVELERS, TOURISTS and FAMILIES, arriving at or leaving Grand Central Depot, to visit Niagara, Saratoga, the White Mountains, Long Branch or other Summer Resorts, save Three Dollars carriage hire by STOPPING AT THIS HOTEL, and their baggage transferred to and from said depot to this Hotel, in TEN MINUTES, free of expense.

TRY THE

GRAND UNION HOTEL.

## GRAND UNION HOTEL.

OFF. GRAND CENTRAL DEPOT,

NEW YORK CITY.

613 Rooms fitted up at a cost of One Million Dollars. One Dollar and upwards per day. Elegant Suites for families. European Plan. Two Elevators. Dining Rooms, Restaurant, Cafe', Lunch and Wine Rooms, supplied with the best, at moderate prices. Families can live better, for less money, at the GRAND UNION than at any other first-class house in the city. Elegant accommodations for Dinner, Lunch and Supper parties. Prices Moderate. The Cuisine is unsurpassed.

Columbus would not waver, and would not listen to any other terms, he left the Court with the intention of visiting the King of France.

St. Angel and Alonzo Quintanilla described to the Queen the great wealth that would flow to Spain through the discovery of India at the small outlay of 15000 Florins (Columbus having agreed to furnish one-eighth of the money), and would far exceed the discoveries made by other nations, and would open between Spain and India, a commerce of great value to the church and to Spain, and if not successful the loss would be nominal.

They also plead the cause of Columbus with such zeal that the enthusiastic and generous spirit of Isabella was aroused. The King coldly attempted to dissuade her from the idea, which caused Isabella to exclaim, " I undertake the enterprise for my own crown of Castile, and will pledge my jewels to raise the necessary funds."

The funds, about fifteen thousand Florins, were advanced by St. Angel, receiver of the ecclesiastical revenues of Aragon, and were afterwards repaid out of the first gold brought by Columbus from the new world.

Columbus had proceeded about six miles from Granada, when he was overtaken by a messenger from the Queen requesting him to return. Upon his appearing again at Court, the kind reception he received from the Queen atoned for past neglect.

An agreement was then drawn up by the Royal Secretary, which the King and Queen signed on the 17th of April, 1492, whereby it was stipulated that Columbus should have the office of

20

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

Admiral in all lands and countries which he might discover, that he and his descendents were to receive the title of "Don," and that he was to be Viceroy and Governor General of such lands and countries, and have one-tenth of the net profits arising from gold and silver and all articles of merchandize, in whatever manner obtained.  He had the further privilege of furnishing one-eighth the cost of the expedition, and if he did so, he was to receive one-eighth of the profits.  This latter condition Columbus fulfilled, through the assistance of Martin Alonzo Pinzon.

A royal order was given, directing the authorities of Palos to furnish and equip two caravels.  This order was disobeyed.  Horror and dismay filled the minds of the sailors as they felt it would be certain death to enter the mysteries of the sea, and they refused to embark on the expedition.

Martin Alonzo Pinzon and his two brothers, seeing the difficulty attending the procuring of the vessels and crews, came forward and furnished one vessel and crew thoroughly equipped and ready for sea.  This induced others to consent to go, and they then succeeded in obtaining the other two vessels, and all were ready for sea on the first day of August, 1492.

The *Santa Maria* was commanded by Columbus, the *Pinta* by Martin Alonzo Pinzon, (with his brother Francisco Martin, as pilot), and the *Nina* by Vincente Yanez Pinzon.

The fleet consisted of the three small vessels just named, two being without decks, of fifty tons each, and the other being of eighty

21

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

## ALPHABET.

### For Families, Tourists and Travelers.

A   stands for Arrivals at the Grand Union Hotel.

B   stands for Baggage delivered free, safe and well.

C   stands for Comfort at the Grand Union found.

D   stands for Delays from stopping down town.

E   stands for Elegance of its 600 rooms.

F   stands for Families who regard them a boon.

G   stands for Guests numbering yearly 80,000 or more.

H   stands for Hospitality here dispensed as of yore.

I   stands for Improvements that cannot be beaten,

J   stands for Justice in charge for all things here eaten.

K   stands for Kindness bestowed upon all,

L   stands for Lunch for which many call.

M   stands for Meals on the European Plan.

N   stands for Neatness unexcelled in the land,

O   stands for Observance of every guest's need.

P   stands for Patronage received without greed.

Q   stands for Quality and quantity of food.

R   stands for Readiness to serve everything good.

S   stands for Statesmen who here find a home.

T   stands for Travelers and Tourists who to the Grand Union come.

U   stands for Unlimited accommodations most rare.

V   stands for Ventilation of rooms with Heaven's pure air.

W   stands for Windows all opening outside.

X   stands for 'Xertion to please far and wide.

Y   stands for You now reading this rhyme.

Z   stands for Zeal to stop here in time.

### Don't Fail to give the Grand Union Hotel a Trial.

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



*Lobby of the Grand Union Hotel.*

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

tons burden.   In all there were one hundred and twenty men on the expedition, of whom ninety were sailors.

When the squadron was ready to sail, Columbus, his officers and crews confessed to Juan Parez, and partook of the sacrament.

On Friday morning, August 3d, 1492, the expedition sailed from Palos.

Columbus and his companions proceeded on their voyage of discovery, meeting with many disappointments and hardships, and as they entered into unknown regions fear and trembling overcame all except Columbus.  The strength given to him came from his great faith, he felt that he was under the protection and guidance of the Almighty.

Columbus was so sanguine that he should reach India, that he carried with him a letter from Ferdinand, King of Spain, to the Grand Khan of Tartary.

On the 13th of September he was startled to find that the needle of his compass varied between five and six degrees to the northwest and no longer pointed to the pole.  This phenomenon of magnetic declination produced great alarm among the mariners, for without the guide of their compass, what was to become of them in a vast and trackless ocean?  Columbus invented a plausible theory about the attraction of the polar star, which quieted the pilot's fears.

Columbus suppressed the mutinous tendency of the crews with extraordinary tact, and afterwards upon great flights of birds hovering about their vessels, they became reconciled and felt they must

24

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



Isabella, Queen of Spain.

25

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

be near land.   On the night of the 11th of October, Columbus beheld a moving light which was seen several times, but at last disappeared.   This light was probably upon Walting's Island.

On the morning of October 12th, 1492, land was discovered, and all hearts were filled with joy and gladness.   Columbus fell upon his knees and thanked his Maker that He had given him the strength and fortitude which enabled him to overcome all obstacles, and that he had blessed him with success in discovering what he thought to be India, the Kingdom of the Grand Khan.

As they approached the land, the air was soft and balmy, and the breezes ladened with sweet fragrance, perfumed the transparent atmosphere.

The island on which they landed was one of the Bahama group and Columbus named it San Salvador.   Its inhabitants were nude, finely and beautifully formed, graceful in their manners, and strange and interesting in their habits.   They were apparently an amiable, innocent and happy people, who at first thought that Columbus' fleet of vessels were large birds, and that their sails were wings, and that Columbus and his crews had descended from the skies.

Thus the conquest of the Moors by the Spaniards, led Queen Isabella to furnish seven-eighths of the funds required to fit out the expedition of Columbus, which resulted in his discovery, on Friday, the 12th day of October, 1492, of what he supposed to be a portion of the continent of India, (hence he denominated the natives "Indians"), when in reality his discovery was that of America.

26

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



*Enewah; or, Laughing Daughter.*

27

Digitized by
INTERNET ARCHIVE

Digitized by
LIBRARY OF CONGRESS

# SUPPLEMENT.

At an expense of 15000 florins, Columbus gave to the world America, out of which has grown the United States, whose population exceeds 55,000,000, which with its yearly influx of from three to four hundred thousand imigrants, coupled with its native increase, invites the prediction, that during the next twenty years, her population will approximate one hundred million.

Its Constitution, which declares that " We the people of the United States, " in order to form a more perfect union, establish justice, insure domestic tran- " quility, provide for the common defence, promote the general welfare, and " secure the blessings of liberty to ourselves and our posterity, do ordain and " establish this constitution for the United States of America," is the base stone upon which our republican form of government was reared, and has been perpetuated.

To insure the faithful implanting and exercise of such constitutional provis ions, George Washington, "the father of his country" was selected and inaugurated first President of these United States, on the 30th of April, 1789, while standing on the balcony in front of the Senate Chamber, in the Old Court House in Wall Street, fronting Broad Street, the site now occupied by the Sub-Treasury, in full view of the multitude on the streets, roofs and in the windows of neighboring buildings. The balcony where Washington stood was supported by lofty columns, and upon the conclusion of the reading of the oath of office, Washington, with his hand resting upon the Bible, audibly responded, " I swear, so help me God." This declaration was the signal for, " Long live George Washington, President of the United States." A flag was hoisted amid the plaudits of the people, and the boom of cannon. Thus began the life of a government which to-day has no equal on earth.

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS



Inauguration of George Washington, April 30, 1789.

OLD CITY HALL, WALL ST. N.Y. 1789.

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

LIBRARY OF CONGRESS

0 011 563 743 5



On receipt of Ten Cents in postage stamps, a copy of this book will be forwarded to any part of the United States or Canada; or a copy of this book with Steel Plate Engravings will be mailed you on receipt of Twenty Cents in postage stamps.

Address, "S,"

GRAND UNION HOTEL,

New York City.

 



LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the online collections of the Library of Congress contain a publication entitled **THE UNITED STATES CODE, 2012 EDITION,** and that the attached photocopies from Volume Twenty-Eight – the title page, the copyright page and page 689 on which appears § *1994 Peonage Abolished*– is a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on November 19, 2020.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress



# UNITED STATES CODE

## 2012 EDITION

CONTAINING THE GENERAL AND PERMANENT LAWS
OF THE UNITED STATES ENACTED THROUGH THE
112TH CONGRESS

(ending January 2, 2013, the last law of which was signed on January 15, 2013)

Prepared and published under authority of Title 2, U.S. Code, Section 285b,
by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME TWENTY–EIGHT

### TITLE 42—THE PUBLIC HEALTH AND WELFARE
§§ 1401–3549

UNITED STATES

GOVERNMENT PRINTING OFFICE

WASHINGTON : 2014

76-427v28 D Sig-1

This book has been digitally archived to maintain
the quality of the original work for future generations
of legal researchers by William S. Hein & Co., Inc.

This volume printed on acid-free paper
by William S. Hein & Co., Inc.



Printed in the United States of America.

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800; DC area (202) 512-1800
Fax: (202) 512-2104   Mail: Stop SSOP, Washington, DC 20402-0001

out as a note under section 631 of Title 28. Judiciary and Judicial Procedure. Previously, "magistrates" substituted for "commissioners" pursuant to Pub. L. 90–578. See chapter 43 (§ 631 et seq.) of Title 28.

"District courts" substituted for "circuit courts" on authority of act Mar. 3, 1911, ch. 231, § 291, 36 Stat. 1167.

## § 1990. Marshal to obey precepts; refusing to receive or execute process

Every marshal and deputy marshal shall obey and execute all warrants or other process, when directed to him, issued under the provisions of section 1989 of this title. Every marshal and deputy marshal who refuses to receive any warrant or other process when tendered to him, issued in pursuance of the provisions of this section, or refuses or neglects to use all proper means diligently to execute the same, shall be liable to a fine in the sum of $1,000, for the benefit of the party aggrieved thereby.

(R.S. §§ 1985, 5517.)

### CODIFICATION

R.S. § 1985 derived from acts Apr. 9, 1866, ch. 31, § 5, 14 Stat. 28; May 31, 1870, ch. 114, § 10, 16 Stat. 142.

R.S. § 5517 derived from act May 31, 1870, ch. 114, § 10, 16 Stat. 142.

Section was formerly classified to section 51 of Title 8, Aliens and Nationality.

## § 1991. Fees; persons appointed to execute process

Every person appointed to execute process under section 1989 of this title shall be entitled to a fee of $5 for each party he may arrest and take before any United States magistrate judge, with such other fees as may be deemed reasonable by the magistrate judge for any additional services necessarily performed by him, such as attending at the examination, keeping the prisoner in custody, and providing him with food and lodging during his detention, and until the final determination of the magistrate judge; such fees to be made up in conformity with the fees usually charged by the officers of the courts of justice within the proper district or county, as near as may be practicable, and paid out of the Treasury of the United States on the certificate of the judge of the district within which the arrest is made, and to be recoverable from the defendant as part of the judgment in case of conviction.

(R.S. § 1987; Pub. L. 90–578, title IV, § 402(b)(2), Oct. 17, 1968, 82 Stat. 1118; Pub. L. 101–650, title III, § 321, Dec. 1, 1990, 104 Stat. 5117.)

### CODIFICATION

R.S. § 1987 derived from acts Apr. 9, 1866, ch. 31, § 7, 14 Stat. 29; May 31, 1870, ch. 114, § 12, 16 Stat. 143.

Section was formerly classified to section 53 of Title 8, Aliens and Nationality.

### CHANGE OF NAME

"United States magistrate judge" and "magistrate judge" substituted in text for "magistrate" wherever appearing pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of Title 28, Judiciary and Judicial Procedure. Previously, "magistrate" substituted for "commissioner" pursuant to Pub. L. 90–578. See chapter 43 (§ 631 et seq.) of Title 28.

## § 1992. Speedy trial

Whenever the President has reason to believe that offenses have been, or are likely to be com-

mitted against the provisions of section 1990 of this title or of section 5506 to 5516 and 5518 to 5532 of the Revised Statutes, within any judicial district, it shall be lawful for him, in his discretion, to direct the judge, marshal, and United States attorney of such district to attend at such place within the district, and for such time as he may designate, for the purpose of the more speedy arrest and trial of persons so charged, and it shall be the duty of every judge or other officer, when any such requisition is received by him to attend at the place and for the time therein designated.

(R.S. § 1988; June 25, 1948, ch. 646, § 1, 62 Stat. 909.)

### REFERENCES IN TEXT

Sections 5506 to 5510, 5516 to 5519 and 5524 to 5535 of the Revised Statutes, referred to in text, were repealed by act Mar. 4, 1909, ch. 321, § 341, 35 Stat. 1153; section 5506, 5511 to 5515, and 5520 to 5523, also referred to in text, were repealed by act Feb. 8, 1894, ch. 25, § 1, 28 Stat. 37. The provisions of sections 5506, 5510, 5516, 5518 and 5524 to 5532 of the Revised Statutes were reenacted by act Mar. 4, 1909, and classified to sections 51, 52, 54 to 59, 246, 428 and 443 to 445 of former Title 18, Criminal Code and Criminal Procedure. Those sections were repealed and reenacted as sections 241, 242, 372, 592, 593, 752, 1071, 1581, 1583 and 1588 of Title 18, Crimes and Criminal Procedure, in the general revision of Title 18 by act June 25, 1948, ch. 645, 62 Stat. 683.

### CODIFICATION

R.S. § 1988 derived from act Apr. 9, 1866, ch. 31, § 8, 14 Stat. 29.

Section was formerly classified to section 54 of Title 8, Aliens and Nationality.

### CHANGE OF NAME

Act June 25, 1948, effective Sept. 1, 1948, substituted "United States attorney" for "district attorney". See section 541 of Title 28, Judiciary and Judicial Procedure, and Historical and Revision Notes thereunder.

## § 1993. Repealed. Pub. L. 85–315, pt. III, § 122, Sept. 9, 1957, 71 Stat. 637

Section, R.S. § 1989, authorized President to employ land or naval forces to aid in execution of judicial process issued under sections 1981 to 1983 or 1985 to 1992 of this title, or to prevent violation and enforce due execution of sections 1981 to 1983 and 1985 to 1994 of this title. See section 332 of Title 10, Armed Forces.

## § 1994. Peonage abolished

The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore been established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void.

(R.S. § 1990.)

### CODIFICATION

R.S. § 1990 derived from act Mar. 2, 1867, ch. 187, § 1, 14 Stat. 546.







# LIBRARY
LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the online collections of the Library of Congress contain a serial entitled **DAILY CONGRESSIONAL RECORD, Proceedings and Debates of the 76th Congress, First Session, Appendix, Volume 84-Part 14, July 13, 1939-August 5, 1939** and that the attached photocopies from that serial, on which appear the remarks of the Hon. J. Thorkelson entitled "Invisible Government" - the title page, and pages 3741 through 3743- are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on September 17, 2020.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress



101 Independence Avenue, SE Washington, DC 20540–4917 Tel 202.707.5650 www.loc.gov; duplicationservices@loc.gov

UNITED STATES  OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 76th CONGRESS
FIRST SESSION

## Appendix

VOLUME 84—PART 14

JULY 13, 1939, TO AUGUST 5, 1939

(PAGES 3203 TO 4155)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1939

## ·APPENDIX TO THE CONGRESSIONAL RECORD

3741

The Chickasaw Nation will always remember with gratitude the friendship you have ever manifested for our people, and we are honored to call you brother. May the Great Spirit of our forefathers surround you with His presence always.

The Chickasaws have spoken.

JESSIE B. MOORE,
*Secretary-Treasurer, Chickasaw Tribal Protective Association, Official Organ of the Chickasaw Nation.*

### Invisible Government

EXTENSION OF REMARKS
OF

## HON. J. THORKELSON
OF MONTANA

IN THE HOUSE OF REPRESENTATIVES

*Tuesday, August 1, 1939*

Mr. THORKELSON. Mr. Speaker, the United States Congress will have much to answer for in its failure to recognize that business must be operated differently in a republican form of government than in an imperialistic form of government.

Congress will have much to answer for in its failure to adhere strictly to the fundamental principles upon which the Government must rely in order to be preserved as a republic; in failure to realize that we are gradually drifting away from sound regulated management, into an uncontrolled mass management, which will be directed by theoretical planning; in failure to understand that the present directing power is socialistic and that the guiding influence is communistic; in failure to understand that this movement is directed by a group that is not interested in our people but is instead set to secure a safe place for storage of its gold; in failure to understand that the movement of gold to the United States is deliberate and under the same management, and may be moved out faster than it came in; in failure to understand that the gold now in the United States is here because the invisible government does not control Germany, Italy, and Japan, and is therefore fearful that this gold may fall into the hands of those powers that have divorced themselves from the international money changers in the invisible government; in failure to realize that the present agitation for war is directed by the money changers to force these rebellious powers in line so that they and their own tribe may control the world by the power of gold.

In failure to realize that the President may be the instrument of the invisible government, as Kerensky was in Russia, only to be superseded by another Lenin when the invisible government's organized army, composed of the Communists and anarchists, attempts to take control of the Nation; in failure to recognize that the now popular appeal to the masses, in which the communistic proponents advocate Government ownership, unreasonable interracial relations, license and immorality, dissension and strikes, are for no other purpose than to fool the American people, to keep them unorganized and weak so that they may be overpowered by the organized Communists led by privately employed stooges of the internationalists; in failure to recognize that the attack upon our Government will come from within, and that it is already well organized, subtly, to be sure, but for that very reason a greater menace.

·In failure to understand that the so-called liberals among the teaching staffs of the colleges and in the employ of the Federal Government are deluded victims or real employees placed in those positions by the invisible government by stealth to promote their diabolical schemes of destruction and conversion of the United States into a proletarian state; in failure to understand that this movement is planned and conducted through the subterfuge of radical labor organizations whose memberships may not be actually aware of the real situation, and for that reason fail to recognize that the leadership in their own groups is in the hands of those who are intimately associated with communism and anarch-

ism, that the attack will come from within the United States like an evil cloud which at first appears threatening and then develops into a devastating storm, and that the base from which this evil force is operating and upon which it may rely for reserves is in Mexico, a country which is now in the nearly complete control of the Communists.

In order to clarify the issue, I shall publish a list of organizations which are led by radicals and which will be employed in attempted conversion of the Government as now contemplated by the Communists and so published in their own papers. This is not a secret, for no one is bolder than the Communist, and no one is blinder to this danger than the present Executive.

The organizations, their chairman and leaders, are:

American League for Peace and Democracy, 268 Fourth Avenue; Dr. Harry F. Ward (chairman), R. M. Lovett, Earl Browder, Clarence Hathaway.

Amalgamated Clothing Workers (C. I. O.), 15 Union Square, New York City; Sidney Hillman (president), Jacob S. Pototsky.

American Association for Social Security, 41 Union Square, New York City; Abraham Epstein (secretary), Bishop F. J. McConnell.

American Civil Liberties Union, 31 Union Square, New York City; Dr. H. F. Ward, Roger N. Baldwin, Arthur Garfield Hays, Robert W. Dunn.

American Federation of Teachers, Local No. 5, 114 East Sixteenth Street, New York City; C. J. Hendley (president), Rev. Jerome Davis (national president), Dr. Bernhard Stern.

American Committee for Protection of Foreign Born, 100 Fifth Avenue, New York City; Rev. Herman F. Reissig (chairman), Charles Recht, Carol Weiss King.

American Friends of the Chinese People, 168 West Twenty-third Street, New York City; M. S. Stewart (chairman), M. Forsyth, Prof. R. M. Lovett, George S. Counts.

American Friends of the Soviet Union, 461 Fourth Avenue, New York City; Corliss Lamont, A. A. Heller (treasurer).

American Student Union, 112 East Nineteenth Street; Joseph P. Lash (secretary), Celeste Strack (units in 300 colleges).

American Youth Congress, 55 West Forty-second Street, New York City (set up by Y. C. L., 634 Sixth Avenue, New York City); W. Hinckley (chairman), Joseph P. Lash.

Young Communist League, 464 Sixth Avenue, New York City; Carl Ross, Celeste Strack, Angelo Herndon.

Communist Workers School, 31 East Twelfth Street, New York City; A. Markoff (director), J. R. Brodsky, Dr. H. Selsan, L. Boudin, H. Sacker, Irving Schwab.

Co-Operative League of the United States of America, 167 West Twelfth Street, New York City (Moscow affiliate); Dr. J. P. Warbusse, president.

Communist Party, United States of America, 35 East Twelfth Street, New York City; W. Z. Foster (chairman), Earl Browder (general secretary), H. Benjamin, W. Weiner, J. W. Ford, A. W. Berry, A. Markoff.

Congress of Industrial Organizations, New York State Council, 1133 Broadway, New York City; John L. Lewis, national president; New York State, A. S. Haywood, president.

China Aid Council, 268 Fourth Avenue, New York City; M. Forsyth, J. Waterman Wise, Rabbi S. S. Wise, M. Stewart, J. P. Lash, J. P. Davis.

Communist Workers Bookshop, 50 East Thirteenth Street, New York City.

Daily Worker, 50 East Thirteenth Street, New York City; Clarence Hathaway, editor; 120,000 Sunday circulation.

Federated Press, 30 Irving Place, New York City; Frank L. Palmer, president. Serves 104 newspapers.

Federation of Architects, Engineers, Chemists, and Technicians (C. I. O.); M. E. Scherer, vice president; L. A. Berne, president.

Descendants of the American Revolution (born). 126 East Nineteenth Street, New York City; M. Hatfield, national chairman; Arthur Garfield Hays, attorney. Headquarters, 112 Park Avenue.

Garland Fund (American Fund for Public Service), 2 West Thirteenth Street, New York City; R. Baldwin, Morris L. Ernst.

International Labor Defense, 112 East Nineteenth Street, New York City (Moscow affiliate); V. Marcantonio (president), J. Brodsky.

International Ladies Garment Workers Union, 3 West Sixteenth Street, New York City; D. Dubinsky, president.

International Publishers, 381 Fourth Avenue, New York City, A. Trachtenberg.

Jewish Daily Freiheit, 50 East Thirteenth Street; M. J. Olgin, editor.

Jewish People's Committee versus Fascism and Anti-Semitism, 1133 Broadway, New York City; W. Weiner, president.

Labor Research Association, 80 East Eleventh Street, New York City; R. W. Dunn, director, Garland Fund aided.

International Workers Order, 80 Fifth Avenue, New York City; W. Weiner (president), J. Brodsky (attorney).

League for Mutual Aid, 104 Fifth Avenue, New York City; J. Davis, A. Schulkind (executive secretary), J. Baker.

League of American Writers, 381 Fourth Avenue, New York City; D. C. Stewart (president), M. Gold, G. Hicks, F. Folsom (executive secretary).

League of Women Shoppers, 220 Fifth Avenue, New York City; E. Preston (Mrs. R. N. Baldwin), M. Forsyth.

Methodist Federation for Social Service, 150 Fifth Avenue, New York City; Bishop F. J. McConnell.

National Committee for People's Rights, 150 Fifth Avenue, New York City; R. Kent (chairman), M. Gold.

National Lawyers Guild, 31 Union Square, New York City; national headquarters, Washington, D. C.

National Maritime Union (C. I. O.), 126 Eleventh Avenue; J. Curran, president.

National Mooney-Billings Committee, 112 East Nineteenth Street; Rabbi S. S. Wise.

National Negro Congress, 35 East Twelfth Street; A. P. Randolph, president, J. W. Ford, A. Herndon, J. P. Davis.

National Urban League, 1133 Broadway, New York City; Rev. L. Hollingsworth Wood, W. C. Poletti.

National Women's Trade Union League, 247 Lexington Avenue, New York City; R. Schneiderman, A. Nestor, M. Schwartz.

Negro Youth Congress, 35 East Twelfth Street, New York City; W. F. Richardson, chairman, E. R. Strong, secretary.

New School for Social Research, 66 West Twelfth Street, New York City; A. Johnson, president; B. Bass, attorney, Heywood Broun.

North American Committee to Aid Spanish Democracy, 381 Fourth Avenue, New York City; Bishop F. J. McConnell.

Peoples Press, 1133 Broadway, New York City; Corliss Lamont (owners), J. Waterman Wise, R. S. Childs.

Progressive Women's Council, 80 East Eleventh Street, New York City; C. Shavelson, president; Rose Nelson, secretary, R. Chalkin.

Rand School of Social Science (socialist), 7 East Fifteenth Street, New York City; D. Alexander, Norman Thomas.

Social Economic Foundation, Inc.; C. Lamont, A; A. Heller, C. Recht, M. Van Kleek, directors.

Social Work Today (magazine), 112 East Nineteenth Street; B. Goldman, S. M. Isaacs, L. Merrill, M. Van Kleek.

Scottsboro Defense Committee, 112 East Nineteenth Street, New York City; Rev. A. K. Chalmers, chairman.

Socialist Party, United States of America, 11 West Seventeenth Street, New York City; Norman Thomas, J. Altman.

Southern Tenant Farmers Union (C. I. O.), 112 East Nineteenth Street or 50 East Twelfth Street, New York City; H. Kester.

Transport Workers Union (C. I. O.), 80 East Eleventh Street, New York City; M. Quill, president, A. Hogan, T. Santo.

United Christian Council for Democracy, 150 Fifth Avenue, New York City; W. F. Cochran, president, R. Niebuhr.

United Office and Professional Workers of America (C. I. O.), 80 East Twentieth Street, New York City; L. Merrill, president.

Workers Library Publishers, Inc., 39 East Twelfth Street, New York City (specializes in party propaganda).

Workers Defense League, 112 East Nineteenth Street; J. Davis, R. Moss Lovett, M. Shapiro, N. Thomas.

Workers Alliance, New York State Section, 781 Broadway, New York City; S. Weldman, president, D. Lesser.

Women's International League for Peace and Freedom, 150 Fifth Avenue, New York City.

Young Pioneers, 80 Fifth Avenue, New York City (Communist subsidiary).

Bookniga Corporation, 245 Fifth Avenue, New York City.

I have here named a number of pink, red, and scarlet organizations which are directly or indirectly engaged in destructive activities against the Government of the United States. It is the President's duty to see that the law is faithfully obeyed, and I here and now call his attention to the fact that there is a definite plan on foot by the Communists to undermine and destroy our Government.

In such event, armed forces may be used to bring those who are guilty to the bar of justice:

(8) Whenever insurrection, domestic violence, unlawful combinations, or conspiracies in any State so obstruct or hinder the execution of the laws thereof, and of the United States, as to deprive any portion or class of the people of such State of any of the rights, privileges, or immunities, or protection, named in the Constitution and secured by laws for the protection of such rights, privileges, or immunities, and the constituted authorities of such State are unable to protect, or, from any cause, fail in or refuse protection of the people in such rights, such facts shall be deemed a denial by such State of the equal protection of the laws to which they are entitled under the Constitution of the United States; and in all such cases, or whenever any such insurrection, violence, unlawful combination, or conspiracy, opposes or obstructs the laws of the United States, or the due execution thereof, or impedes or obstructs the due course of justice under the same, it shall be lawful for the President, and it shall be his duty, to take such measures by the employment of the militia or the land and naval forces of the United States, or of either, or by other means, as he may deem necessary, for the suppression of such insurrection, domestic violence, or combinations, R. S. 5299, U. S. C. 50: 203; secs. 504, 1298, M. L., 1929.

Congress failed in its duty to the people in designating the present power to the President of the United States. There is no provision for the delegation of such power in the Constitution, and responsibility cannot in any sense be expected to rest upon those the President appoints, but must instead be assumed by Congress itself, to which the people entrust their safety. Congress failed to recognize the danger of Federal ownership of private industry, when it delegated power by special acts of Congress for the corporations now operated by the Federal Government in direct competition with business. Congress failed to recognize the power and rights which the people reserved to themselves in the tenth amendment of the Constitution when they allowed invasion of the States, not only in federally owned enterprises, but also in destructive taxing power. Congress failed to recognize that it has no power to delegate reorganization and shifting of personnel within the Federal Government except under supervision of Congress, that in the end is responsible for all departments.

We are now at the end of the session, and I sincerely hope when the next session comes around that Congress will in united effort repeal all this unconstitutional power and resume its rightful relation to the people, as provided for in the Constitution of the United States. When the Federal Government is allowed to usurp one business and industry after the other, when the last one is transferred under Federal control, we are no longer a republic, ruled by the people and represented by Congress, but we are instead either a monarchy or a dictatorial government, ruled by a despot. We can be right only if we rely upon the fundamental basic principles of our Government. In departing from these, we cannot escape chaos and destruction.

This danger is not far off, for it is recognized by Members within the Government itself. I quote.

STANFORD UNIVERSITY, CALIF., July 18.—Inflation and repudiation of the public debt are ahead of the United States, W. L. Crum,

APPENDIX TO THE CONGRESSIONAL RECORD

professor of economics and consulting expert of the United States
Treasury, told the Stanford business conference today.

"Inflation is already here; rise in the public debt is inflation,"
Crum said. "But it has not yet taken hold enough to send com-
modity prices soaring.

"Some act of circumstances will set it off—don't ask me when."
Crum addressed the research section of the conference, which
concluded the second day of its week-long discussion, with an off-
the-record after-dinner talk by former President Herbert Hoover.

The factor tending to conceal inflation is a surplus of commodities,
keeping prices down, should a sudden flare-up of public anxiety
touch off inflation fire, unwilling investor of production might sup-
ply enough goods to stop or slow the rise at prices, Crum said.

Its said bondholders would be injured, said stockholders might
offset part of effects of price rise by higher dividends, but cor-
porate profits probably would be taxed away.

"I know no protection against inflation for us can use to
take advantage of it if it is big way. The best we can do is buy a
small homestead," he said.

Debt will probably keep rising, he forecast. It may reach
eighty billion and the service cost rise from one billion to three.
Then the public outcry against paying so much to bondholders
will bring repudiation, he declared.

This is the outlook of the Treasury Department, which
I daresay every Member of Congress recognizes to be the
final outcome of the maddening spending and waste that
has been in vogue for the past 10 years. Disaster may be
averted, providing measures are taken now or in the next
Congress. Failure to take steps to restore economy and
soundness in the Government can only end in uncontrolled
inflation.

## The Government and the People

### EXTENSION OF REMARKS
OF
### HON. ROBERT M. LA FOLLETTE, JR.
OF WISCONSIN
### IN THE SENATE OF THE UNITED STATES
*Tuesday, August 1, 1939*

ADDRESS BY HON. LISTER HILL, OF ALABAMA, AT SILVER
ANNIVERSARY OF NATIONAL POPULAR GOVERNMENT
LEAGUE

Mr. LA FOLLETTE.  Mr. President, I ask unanimous con-
sent to have inserted in the Appendix of the RECORD a very
eloquent and able address delivered by the junior Senator
from Alabama [Mr. HILL] at the silver anniversary of the
American Popular Government League at Washington, D. C.,
on April 29, 1939.

There being no objection, the address was ordered to be
printed in the RECORD, as follows:

Long ago Mme. Roland exclaimed, "Oh, liberty, what crimes
are committed in thy name!" Tonight we might exclaim, "Oh,
States' rights, what crimes are attempted in thy name!"

Vermont under its present control went out of the Union in 1936
and under that control she thinks she is still out. She talks about
States' rights and seeks to frighten the people with such bugaboos
as "Federal invasion," "the growth of bureaucracy in Washington,"
and "the Federal Government seizing State lands and State prop-
erty for its own benefit." She grants private utility companies the
power of eminent domain to build dams for private benefit and
for the exploitation of the peoples' heritage but she would deny
that power to the Federal Government when as a servant of the
people it would build dams to protect them from the ravages, the
death and destruction of floods. I would stand to the bar for
the rights of my State. It is my homeland and I love it, but
there is a State sovereignty and there is a Federal sovereignty.
The State sovereignty cannot control floods for the very good
reason that a flood does not stop at a State line. It knows nothing
of such a line and has no respect for it.

The Federal Government, and the Federal Government alone,
can control floods, and it necessarily has the power to do the job.
Localities in which flood-control reservoirs must be constructed
will not pay the cost of rights-of-way, because most of the benefits
from the reservoirs go to other localities. The State itself will
not furnish the rights-of-way if the protection is for another State.
Unless the Federal Government can condemn rights-of-way for the
construction of reservoirs, there can be no check to the fury of the
flood. The issue is not State rights—the issue is whether States
prefer floods to reservoirs.

It was all right to build irrigation dams in the West as there
was no power generated at them. It was all right for the Federal
Government to spend over $300,000,000 building low dams on the
Ohio River as there was no power generated at them. It was all
right for the Federal Government to build low dams on many rivers,
but it is all wrong and all unconstitutional for the Federal Govern-
ment to build multipurpose high dams because these dams generate
hydroelectric power. Why we hear the cry of States' rights com-
ing from those who would deny the people's rights, we are reminded
of the old Dr. Johnson told us that patriotism was the last refuge
of a scoundrel. Professor Webb, of Texas, in his fascinating story,
Divided We Stand, reminds us that the power companies take their
toll from those who use heat in winter, ice in summer, or light in
darkness.

They fight the cities where the people want to manufacture
their own light; they get out injunctions to stop the construction
of dams for the conservation of national resources; they fight the
Government when it tries to set up a measuring stick to learn
what it really costs to generate electricity; they seek to control
State legislatures through lobbies and lucrative retainerships;
they inspire investigations designed to oust university professors
who have the intelligence to understand them and the courage to
teach young men and women the truths they have discovered;
they throw about them the panoply of patriotism and cry "States'
rights" when the Government seeks to protect the people, their
lives and their property from devastating floods. If they had had
their way and their cry had been heeded there would have been
and would have been no Boulder Dam, no Bonneville, no Grand
Coulee, no Fort Peck, no Tennessee Valley Authority.

Tonight we celebrate the silver anniversary of the National
Popular Government League founded to fight for the people's
rights and the Nations' resources. All honor to the brave men
and splendid women who brought the association into being—all
honor to Judson King, who, as its director, has given the best
years of his life to the league and held aloft its flag in the teeth
of the wild storm; all honor to Senator Robert L. Owen, the
league's first president, indomitable warrior who, though denied
the light of day, still sees the better day and fights that common
man may own his land; all honor to George W. Norris, whose
stout heart has never grown faint, whose mighty arm has never
been lowered in battle, and whose white plume, like that of
Henry of Navarre, is still in the thick of the fight leading us on to
immortal and inevitable victory. The people's rights, the Nation's
resources must and shall be preserved.

## Mother's Day

### EXTENSION OF REMARKS
OF
### HON. ALBEN W. BARKLEY
OF KENTUCKY
### IN THE SENATE OF THE UNITED STATES
*Wednesday, August 2, 1939*

ARTICLE BY DAN MCCONNELL

Mr. BARKLEY.  Mr. President, some weeks ago I had in-
serted in the CONGRESSIONAL RECORD an article written by Mr.
Earle W. Gage, of the State of New York, concerning the
origin of Mother's Day.  I did not vouch for the accuracy of
the statements contained in the article, but, at his request, I
had the article inserted in the RECORD.  That article attrib-
uted original sponsorship of Mother's Day to a Kentucky lady.
I have received protests from another lady, Miss Anna Jarvis,
of New Jersey, who had some part, evidently, in the idea of
originating Mother's Day, and, at her request, I ask unani-
mous consent to insert in the CONGRESSIONAL RECORD an article
by Dan McConnell, which she has sent to me with respect to
it. I repeat that I do not vouch for the statements in either
article.

There being no objection, the article was ordered to be
printed in the RECORD, as follows:

[From the Camden (N. J.) Courier-Post]

MOTHER'S DAY

(By Dan McConnell)

Mother's Day, now a nationally observed occasion when we all
pay tribute to the grandest and most-loved lady in our lives—
mother—was honored in Camden.

This reporter vividly recalls when and how the observance of
Mother's Day had its New Jersey beginning.

 

# LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **THE UNITED STATES STATUTES AT LARGE,** and the attached photocopies from Volume 88 –the title page and pages 1896 through 1910 are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on January 11, 2016.

Gregory L. Cooper
Duplication Services, Section Head
Office of Business Enterprises
Library of Congress

# STATUTES AT LARGE

CONTAINING THE

LAWS AND CONCURRENT RESOLUTIONS
ENACTED DURING THE SECOND SESSION OF THE
NINETY-THIRD CONGRESS
OF THE UNITED STATES OF AMERICA

# 1974

AND

## PROCLAMATIONS

## VOLUME 88

IN TWO PARTS

## PART 1

PUBLIC LAWS 93–246 THROUGH 93–446



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1976

prepare and execute without consideration such instruments as may be appropriate to carry out the purposes of this Act.

Approved December 31, 1974.

Public Law 93-579

AN ACT

December 31, 1974
[S. 3418]

To amend title 5, United States Code, by adding a section 552a to safeguard individual privacy from the misuse of Federal records, to provide that individuals be granted access to records concerning them which are maintained by Federal agencies, to establish a Privacy Protection Study Commission, and for other purposes.

Privacy Act of 1974.
5 USC 552a note.
Congressional findings.
5 USC 552a note.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Privacy Act of 1974".

SEC. 2. (a) The Congress finds that—

(1) the privacy of an individual is directly affected by the collection, maintenance, use, and dissemination of personal information by Federal agencies;

(2) the increasing use of computers and sophisticated information technology, while essential to the efficient operations of the Government, has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information;

(3) the opportunities for an individual to secure employment, insurance, and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems;

(4) the right to privacy is a personal and fundamental right protected by the Constitution of the United States; and

(5) in order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies.

Statement of purpose.

(b) The purpose of this Act is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

(1) permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by such agencies;

(2) permit an individual to prevent records pertaining to him obtained by such agencies for a particular purpose from being used or made available for another purpose without his consent;

(3) permit an individual to gain access to information pertaining to him in Federal agency records, to have a copy made of all or any portion thereof, and to correct or amend such records;

(4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information;

(5) permit exemptions from the requirements with respect to records provided in this Act only in those cases where there is an important public policy need for such exemption as has been determined by specific statutory authority; and

(6) be subject to civil suit for any damages which occur as a result of willful or intentional action which violates any individual's rights under this Act.

SEC. 3. Title 5, United States Code, is amended by adding after section 552 the following new section:

## "§ 552a. Records maintained on individuals

5 USC 552a.

"(a) DEFINITIONS.—For purposes of this section—

"(1) the term 'agency' means agency as defined in section 552(e) of this title;

Ante, p. 1564.

"(2) the term 'individual' means a citizen of the United States or an alien lawfully admitted for permanent residence;

"(3) the term 'maintain' includes maintain, collect, use, or disseminate;

"(4) the term 'record' means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

"(5) the term 'system of records' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

"(6) the term 'statistical record' means a record in a system of records maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual, except as provided by section 8 of title 13; and

"(7) the term 'routine use' means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected.

"(b) CONDITIONS OF DISCLOSURE.—No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

"(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

"(2) required under section 552 of this title;

"(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

"(4) to the Bureau of the Census for purposes of planning or carrying out a census or survey or related activity pursuant to the provisions of title 13;

"(5) to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;

"(6) to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Administrator of General Services or his designee to determine whether the record has such value;

"(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which

maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

"(8) to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

"(9) to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

"(10) to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the General Accounting Office; or

"(11) pursuant to the order of a court of competent jurisdiction.

"(c) ACCOUNTING OF CERTAIN DISCLOSURES.—Each agency, with respect to each system of records under its control, shall—

"(1) except for disclosures made under subsections (b)(1) or (b)(2) of this section, keep an accurate accounting of—

"(A) the date, nature, and purpose of each disclosure of a record to any person or to another agency made under subsection (b) of this section; and

"(B) the name and address of the person or agency to whom the disclosure is made;

"(2) retain the accounting made under paragraph (1) of this subsection for at least five years or the life of the record, whichever is longer, after the disclosure for which the accounting is made;

"(3) except for disclosures made under subsection (b)(7) of this section, make the accounting made under paragraph (1) of this subsection available to the individual named in the record at his request; and

"(4) inform any person or other agency about any correction or notation of dispute made by the agency in accordance with subsection (d) of this section of any record that has been disclosed to the person or agency if an accounting of the disclosure was made.

"(d) ACCESS TO RECORDS.—Each agency that maintains a system of records shall—

*Personal review.*

"(1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence;

*Amendment request.*

"(2) permit the individual to request amendment of a record pertaining to him and—

"(A) not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request, acknowledge in writing such receipt; and

"(B) promptly, either—

"(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or

"(ii) inform the individual of its refusal to amend the record in accordance with his request, the reason

for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official;

Review.

"(3) permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal, and not later than 30 days (excluding Saturdays, Sundays, and legal public holidays) from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such 30-day period; and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of this section;

Notation of dispute.

"(4) in any disclosure, containing information about which the individual has filed a statement of disagreement, occurring after the filing of the statement under paragraph (3) of this subsection, clearly note any portion of the record which is disputed and provide copies of the statement and, if the agency deems it appropriate, copies of a concise statement of the reasons of the agency for not making the amendments requested, to persons or other agencies to whom the disputed record has been disclosed; and

"(5) nothing in this section shall allow an individual access to any information compiled in reasonable anticipation of a civil action or proceeding.

"(e) AGENCY REQUIREMENTS.—Each agency that maintains a system of records shall—

"(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

"(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;

"(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

"(A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

"(B) the principal purpose or purposes for which the information is intended to be used;

"(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

"(D) the effects on him, if any, of not providing all or any part of the requested information;

Publication in Federal Register.

"(4) subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register at least annually a notice of the existence and character of the system of records, which notice shall include—

"(A) the name and location of the system;

"(B) the categories of individuals on whom records are maintained in the system;

"(C) the categories of records maintained in the system;

"(D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

"(E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

"(F) the title and business address of the agency official who is responsible for the system of records;

"(G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

"(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

"(I) the categories of sources of records in the system;

"(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

"(6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

"(7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

"(8) make reasonable efforts to serve notice on an individual when any record on such individual is made available to any person under compulsory legal process when such process becomes a matter of public record;

Rules of conduct.

"(9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance;

Confidentiality of records.

"(10) establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained; and

Publication in Federal Register.

"(11) at least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency.

"(f) AGENCY RULES.—In order to carry out the provisions of this section, each agency that maintains a system of records shall promulgate rules, in accordance with the requirements (including general notice) of section 553 of this title, which shall—

5 USC 553.

"(1) establish procedures whereby an individual can be notified

in response to his request if any system of records named by the individual contains a record pertaining to him;

"(2) define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual;

"(3) establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him, including special procedure, if deemed necessary, for the disclosure to an individual of medical records, including psychological records, pertaining to him;

"(4) establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under this section; and

"(5) establish fees to be charged, if any, to any individual for making copies of his record, excluding the cost of any search for and review of the record.

*Fees.*

The Office of the Federal Register shall annually compile and publish the rules promulgated under this subsection and agency notices published under subsection (e) (4) of this section in a form available to the public at low cost.

*Publication in Federal Register.*

"(g)(1) CIVIL REMEDIES.—Whenever any agency

"(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

"(B) refuses to comply with an individual request under subsection (d)(1) of this section;

"(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

"(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

*Jurisdiction.*

"(2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct. In such a case the court shall determine the matter de novo.

*Amendment of record.*

"(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

"(3)(A) In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. In such a case the court shall determine the matter de novo, and may examine the contents of

*Injunction.*

any agency records in camera to determine whether the records or any portion thereof may be withheld under any of the exemptions set forth in subsection (k) of this section, and the burden is on the agency to sustain its action.

"(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

Damages.

"(4) In any suit brought under the provisions of subsection (g) (1) (C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

"(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

"(B) the costs of the action together with reasonable attorney fees as determined by the court.

"(5) An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy, within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. Nothing in this section shall be construed to authorize any civil action by reason of any injury sustained as the result of a disclosure of a record prior to the effective date of this section.

"(h) RIGHTS OF LEGAL GUARDIANS.—For the purposes of this section, the parent of any minor, or the legal guardian of any individual who has been declared to be incompetent due to physical or mental incapacity or age by a court of competent jurisdiction, may act on behalf of the individual.

"(i) (1) CRIMINAL PENALTIES.—Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

"(2) Any officer or employee of any agency who willfully maintains a system of records without meeting the notice requirements of subsection (e) (4) of this section shall be guilty of a misdemeanor and fined not more than $5,000.

"(3) Any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

"(j) GENERAL EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553 (b) (1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from any part of this section except subsections (b), (c) (1) and (2), (e) (4) (A) through

5 USC 553.

(A), (b), (5), (7), (9), (10), and (11), and (i) if the system of records is—

"(1) maintained by the Central Intelligence Agency; or

"(2) maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals, and the activities of prosecutors, courts, correctional, probation, pardon, or parole authorities, and which consists of (A) information compiled for the purpose of identifying individual criminal offenders and alleged offenders and consisting only of identifying data and notations of arrests, the nature and disposition of criminal charges, sentencing, confinement, release, and parole and probation status; (B) information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual; or (C) reports identifiable to an individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment through release from supervision.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

5 USC 553.

"(k) SPECIFIC EXEMPTIONS.—The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from subsections (c)(3), (d), (e)(1), (e)(4) (G), (H), and (I) and (f) of this section if the system of records is—

5 USC 552.

"(1) subject to the provisions of section 552(b)(1) of this title;

"(2) investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section: *Provided, however,* That if any individual is denied any right, privilege, or benefit that he would otherwise be entitled by Federal law, or for which he would otherwise be eligible, as a result of the maintenance of such material, such material shall be provided to such individual, except to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

"(3) maintained in connection with providing protective services to the President of the United States or other individuals pursuant to section 3056 of title 18;

"(4) required by statute to be maintained and used solely as statistical records;

"(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service, Federal contracts, or access to classified information, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

"(6) testing or examination material used solely to determine individual qualifications for appointment or promotion in the

Federal service the disclosure of which would compromise the objectivity or fairness of the testing or examination process; or.

"(7) evaluation material used to determine potential for promotion in the armed services, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence.

5 USC 553.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553 (c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

44 USC 3103.

"(l) (1) ARCHIVAL RECORDS.—Each agency record which is accepted by the Administrator of General Services for storage, processing, and servicing in accordance with section 3103 of title 44 shall, for the purposes of this section, be considered to be maintained by the agency which deposited the record and shall be subject to the provisions of this section. The Administrator of General Services shall not disclose the record except to the agency which maintains the record, or under rules established by that agency which are not inconsistent with the provisions of this section.

Publication in Federal Register.

"(2) Each agency record pertaining to an identifiable individual which was transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, prior to the effective date of this section, shall, for the purposes of this section, be considered to be maintained by the National Archives and shall not be subject to the provisions of this section, except that a statement generally describing such records (modeled after the requirements relating to records subject to subsections (e) (4) (A) through (G) of this section) shall be published in the Federal Register.

"(3) Each agency record pertaining to an identifiable individual which is transferred to the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, on or after the effective date of this section, shall, for the purposes of this section, be considered to be maintained by the National Archives and shall be exempt from the requirements of this section except subsections (e) (4) (A) through (G) and (e) (9) of this section.

"(m) GOVERNMENT CONTRACTORS.—When an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function, the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system. For purposes of subsection (i) of this section any such contractor and any employee of such contractor, if such contract is agreed to on or after the effective date of this section, shall be considered to be an employee of an agency.

"(n) MAILING LISTS.—An individual's name and address may not be sold or rented by an agency unless such action is specifically authorized by law. This provision shall not be construed to require the withholding of names and addresses otherwise permitted to be made public.

Notice to Congress and OMB.

"(o) REPORT ON NEW SYSTEMS.—Each agency shall provide adequate advance notice to Congress and the Office of Management and Budget of any proposal to establish or alter any system of records in order to permit an evaluation of the probable or potential effect of such

proposition on the privacy and other personal or property rights of individuals or the disclosure of information relating to such individuals, and its effect on the preservation of the constitutional principles of federalism and separation of powers.

"(p) ANNUAL REPORT.—The President shall submit to the Speaker of the House and the President of the Senate, by June 30 of each calendar year, a consolidated report, separately listing for each Federal agency the number of records contained in any system of records which were exempted from the application of this section under the provisions of subsections (j) and (k) of this section during the preceding calendar year, and the reasons for the exemptions, and such other information as indicates efforts to administer fully this section.

"(q) EFFECT OF OTHER LAWS.—No agency shall rely on any exemption contained in section 552 of this title to withhold from an individual any record which is otherwise accessible to such individual under the provisions of this section.".

SEC. 4. The chapter analysis of chapter 5 of title 5, United States Code, is amended by inserting:

"552a. Records about individuals."

immediately below:

"552. Public information; agency rules, opinions, orders, and proceedings.".

SEC. 5. (a) (1) There is established a Privacy Protection Study Commission (hereinafter referred to as the "Commission") which shall be composed of seven members as follows:

(A) three appointed by the President of the United States,
(B) two appointed by the President of the Senate, and
(C) two appointed by the Speaker of the House of Representatives.

Members of the Commission shall be chosen from among persons who, by reason of their knowledge and expertise in any of the following areas—civil rights and liberties, law, social sciences, computer technology, business, records management, and State and local government—are well qualified for service on the Commission.

(2) The members of the Commission shall elect a Chairman from among themselves.

(3) Any vacancy in the membership of the Commission, as long as there are four members in office, shall not impair the power of the Commission but shall be filled in the same manner in which the original appointment was made.

(4) A quorum of the Commission shall consist of a majority of the members, except that the Commission may establish a lower number as a quorum for the purpose of taking testimony. The Commission is authorized to establish such committees and delegate such authority to them as may be necessary to carry out its functions. Each member of the Commission, including the Chairman, shall have equal responsibility and authority in all decisions and actions of the Commission, shall have full access to all information necessary to the performance of their functions, and shall have one vote. Action of the Commission shall be determined by a majority vote of the members present. The Chairman (or a member designated by the Chairman to be acting Chairman) shall be the official spokesman of the Commission in its relations with the Congress, Government agencies, other persons, and the public, and, on behalf of the Commission, shall see to the faithful execution of the administrative policies and decisions of the Commission, and shall report thereon to the Commission from time to time or as the Commission may direct.

Budget requests.

(5) (A) Whenever the Commission submits any budget estimate or request to the President or the Office of Management and Budget, it shall concurrently transmit a copy of that request to Congress.

Legislative recommendations.

(B) Whenever the Commission submits any legislative recommendations, or testimony, or comments on legislation to the President or Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress. No officer or agency of the United States shall have any authority to require the Commission to submit its legislative recommendations, or testimony, or comments on legislation, to any officer or agency of the United States for approval, comments, or review, prior to the submission of such recommendations, testimony, or comments to the Congress.

(b) The Commission shall—

Study.

(1) make a study of the data banks, automated data processing programs, and information systems of governmental, regional, and private organizations, in order to determine the standards and procedures in force for the protection of personal information; and

Ante, p. 1897.

(2) recommend to the President and the Congress the extent, if any, to which the requirements and principles of section 552a of title 5, United States Code, should be applied to the information practices of those organizations by legislation, administrative action, or voluntary adoption of such requirements and principles, and report on such other legislative recommendations as it may determine to be necessary to protect the privacy of individuals while meeting the legitimate needs of government and society for information.

(c) (1) In the course of conducting the study required under subsection (b) (1) of this section, and in its reports thereon, the Commission may research, examine, and analyze—

(A) interstate transfer of information about individuals that is undertaken through manual files or by computer or other electronic or telecommunications means;

(B) data banks and information programs and systems the operation of which significantly or substantially affect the enjoyment of the privacy and other personal and property rights of individuals;

(C) the use of social security numbers, license plate numbers, universal identifiers, and other symbols to identify individuals in data banks and to gain access to, integrate, or centralize information systems and files; and

(D) the matching and analysis of statistical data, such as Federal census data, with other sources of personal data, such as automobile registries and telephone directories, in order to reconstruct individual responses to statistical questionnaires for commercial or other purposes, in a way which results in a violation of the implied or explicitly recognized confidentiality of such information.

(2) (A) The Commission may include in its examination personal information activities in the following areas: medical; insurance; education; employment and personnel; credit, banking and financial institutions; credit bureaus; the commercial reporting industry; cable television and other telecommunications media; travel, hotel and entertainment reservations; and electronic check processing.

(B) The Commission shall include in its examination a study of—

(i) whether a person engaged in interstate commerce who maintains a mailing list should be required to remove an individual's name and address from such list upon request of that individual;

(ii) whether the Internal Revenue Service should be prohibited from transferring individually indentifiable data to other agencies and to agencies of State governments;

(iii) whether the Federal Government should be liable for general damages incurred by an individual as the result of a willful or intentional violation of the provisions of sections 552a (g) (1) (C) or (D) of title 5, United States Code; and

*Ante,* p. 1897.

(iv) whether and how the standards for security and confidentiality of records required under section 552a (e) (10) of such title should be applied when a record is disclosed to a person other than an agency.

(C) The Commission may study such other personal information activities necessary to carry out the congressional policy embodied in this Act, except that the Commission shall not investigate information systems maintained by religious organizations.

Religious organizations, exception.

(3) In conducting such study, the Commission shall—

Guidelines for study.

(A) determine what laws, Executive orders, regulations, directives, and judicial decisions govern the activities under study and the extent to which they are consistent with the rights of privacy, due process of law, and other guarantees in the Constitution;

(B) determine to what extent governmental and private information systems affect Federal-State relations or the principle of separation of powers;

(C) examine the standards and criteria governing programs, policies, and practices relating to the collection, soliciting, processing, use, access, integration, dissemination, and transmission of personal information; and

(D) to the maximum extent practicable, collect and utilize findings, reports, studies, hearing transcripts, and recommendations of governmental, legislative and private bodies, institutions, organizations, and individuals which pertain to the problems under study by the Commission.

(d) In addition to its other functions the Commission may—

(1) request assistance of the heads of appropriate departments, agencies, and instrumentalities of the Federal Government, of State and local governments, and other persons in carrying out its functions under this Act;

(2) upon request, assist Federal agencies in complying with the requirements of section 552a of title 5, United States Code;

(3) determine what specific categories of information, the collection of which would violate an individual's right of privacy, should be prohibited by statute from collection by Federal agencies; and

(4) upon request, prepare model legislation for use by State and local governments in establishing procedures for handling, maintaining, and disseminating personal information at the State and local level and provide such technical assistance to State and local governments as they may require in the preparation and implementation of such legislation.

(e) (1) The Commission may, in carrying out its functions under this section, conduct such inspections, sit and act at such times and places, hold such hearings, take such testimony, require by subpena the attendance of such witnesses and the production of such books, records, papers, correspondence, and documents, administer such oaths, have such printing and binding done, and make such expenditures as the Commission deems advisable. A subpena shall be issued only upon an affirmative vote of a majority of all members of the Com-

mission. Subpenas shall be issued under the signature of the Chairman or any member of the Commission designated by the Chairman and shall be served by any person designated by the Chairman or any such member. Any member of the Commission may administer oaths or affirmations to witnesses appearing before the Commission.

(2) (A) Each department, agency, and instrumentality of the executive branch of the Government is authorized to furnish to the Commission, upon request made by the Chairman, such information, data, reports and such other assistance as the Commission deems necessary to carry out its functions under this section. Whenever the head of any such department, agency, or instrumentality submits a report pursuant to section 552a (o) of title 5, United States Code, a copy of such report shall be transmitted to the Commission.

*Reports, transmittal to Commission.
Ante, p. 1897.*

(B) In carrying out its functions and exercising its powers under this section, the Commission may accept from any such department, agency, independent instrumentality, or other person any individually indentifiable data if such data is necessary to carry out such powers and functions. In any case in which the Commission accepts any such information, it shall assure that the information is used only for the purpose for which it is provided, and upon completion of that purpose such information shall be destroyed or returned to such department, agency, independent instrumentality, or person from which it is obtained, as appropriate.

(3) The Commission shall have the power to——

(A) appoint and fix the compensation of an executive director, and such additional staff personnel as may be necessary, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and without regard to chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but at rates not in excess of the maximum rate for GS-18 of the General Schedule under section 5332 of such title; and

*5 USC 5101,
5331.

5 USC 5332
note.*

(B) procure temporary and intermittent services to the same extent as is authorized by section 3109 of title 5, United States Code.

The Commission may delegate any of its functions to such personnel of the Commission as the Commission may designate and may authorize such successive redelegations of such functions as it may deem desirable.

(4) The Commission is authorized—

*Rules and regulations.*

(A) to adopt, amend, and repeal rules and regulations governing the manner of its operations, organization, and personnel;

(B) to enter into contracts or other arrangements or modifications thereof, with any government, any department, agency, or independent instrumentality of the United States, or with any person, firm, association, or corporation, and such contracts or other arrangements, or modifications thereof, may be entered into without legal consideration, without performance or other bonds, and without regard to section 3709 of the Revised Statutes, as amended (41 U.S.C. 5);

(C) to make advance, progress, and other payments which the Commission deems necessary under this Act without regard to the provisions of section 3648 of the Revised Statutes, as amended (31 U.S.C. 529); and

(D) to take such other action as may be necessary to carry out its functions under this section.

Compensation.

(2)(A) each [each]member of the Commission who is an officer or employee of the United States shall serve without additional compensation, but shall continue to receive the salary of his regular position when engaged in the performance of the duties vested in the Commission.

(2) A member of the Commission other than one to whom paragraph (1) applies shall receive per diem at the maximum daily rate for GS–18 of the General Schedule when engaged in the actual performance of the duties vested in the Commission.

Per diem.

5 USC 5332 note.

(3) All members of the Commission shall be reimbursed for travel, subsistence, and other necessary expenses incurred by them in the performance of the duties vested in the Commission.

Travel expenses.

(g) The Commission shall, from time to time, and in an annual report, report to the President and the Congress on its activities in carrying out the provisions of this section. The Commission shall make a final report to the President and to the Congress on its findings pursuant to the study required to be made under subsection (b)(1) of this section not later than two years from the date on which all of the members of the Commission are appointed. The Commission shall cease to exist thirty days after the date on which its final report is submitted to the President and the Congress.

Report to President and Congress.

(h)(1) Any member, officer, or employee of the Commission, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

Penalties.

(2) Any person who knowingly and willfully requests or obtains any record concerning an individual from the Commission under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

SEC. 6. The Office of Management and Budget shall—

(1) develop guidelines and regulations for the use of agencies in implementing the provisions of section 552a of title 5, United States Code, as added by section 3 of this Act; and

(2) provide continuing assistance to and oversight of the implementation of the provisions of such section by agencies.

5 USC 552a note.

Ante, p. 1897.

SEC. 7. (a)(1) It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

5 USC 552a note.

(2) the provisions of paragraph (1) of this subsection shall not apply with respect to—

(A) any disclosure which is required by Federal statute, or

(B) the disclosure of a social security number to any Federal, State, or local agency maintaining a system of records in existence and operating before January 1, 1975, if such disclosure was required under statute or regulation adopted prior to such date to verify the identity of an individual.

(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.

Appropriation,
5 USC 552a
note.

Sec. 8. The provisions of this Act shall be effective on and after the day of enactment, except that the amendments made by sections 3 and 4 shall become effective 270 days following the day on which this Act is enacted.

Sec. 9. There is authorized to be appropriated to carry out the provisions of section 5 of this Act for fiscal years 1975, 1976, and 1977 the sum of $1,500,000, except that not more than $750,000 may be expended during any such fiscal year.

Approved December 31, 1974.

Public Law 93-580

January 2, 1975
[S. J. Res. 133]

## JOINT RESOLUTION

To provide for the establishment of the American Indian Policy Review Commission.

### CONGRESSIONAL FINDINGS

25 USC 174
note.

The Congress, after careful review of the Federal Government's historical and special legal relationship with American Indian people, finds that—

(a) the policy implementing this relationship has shifted and changed with changing administrations and passing years, without apparent rational design and without a consistent goal to achieve Indian self-sufficiency;

(b) there has been no general comprehensive review of conduct of Indian affairs by the United States nor a coherent investigation of the many problems and issues involved in the conduct of Indian affairs since the 1928 Meriam Report conducted by the Institute for Government Research; and

(c) in carrying out its responsibilities under its plenary power over Indian affairs, it is imperative that the Congress now cause such a comprehensive review of Indian affairs to be conducted.

### DECLARATION OF PURPOSE

Congress declares that it is timely and essential to conduct a comprehensive review of the historical and legal developments underlying the Indians' unique relationship with the Federal Government in order to determine the nature and scope of necessary revisions in the formulation of policies and programs for the benefit of Indians.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That—

American In-
dian Policy Re-
view Commis-
sion.
Establishment.
25 USC 174
note.
Membership.

(a) In order to carry out the purposes described in the preamble hereof and as further set out herein, there is hereby created the American Indian Policy Review Commission, hereinafter referred to as the "Commission".

(b) The Commission shall be composed of eleven members, as follows:

(1) three Members of the Senate appointed by the President pro tempore of the Senate, two from the majority party and one from the minority party;

(2) three Members of the House of Representatives appointed by the Speaker of the House of Representatives, two from the majority party and one from the minority party; and

(3) five Indian members as provided in subsection (c) of this section.





Office of Business Enterprises
Duplication Services Section

 

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **UNITED STATES CODE, 2018 EDITION,** and that the attached photocopies from Volume One, Title 4-*Flag and Seal, Seat of Government, and the States* – the title page, the publisher's page and pages 705 through 709 – are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on August 27, 2020.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress



# UNITED STATES CODE

## 2018 EDITION

### CONTAINING THE GENERAL AND PERMANENT LAWS OF THE UNITED STATES ENACTED THROUGH THE 115TH CONGRESS

(ending January 2, 2019, the last law of which was signed on January 14, 2019)

Prepared and published under authority of Title 2, U.S. Code, Section 285b, by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME ONE

### ORGANIC LAWS

### TITLE 1—GENERAL PROVISIONS

### TO

### TITLE 5—GOVERNMENT ORGANIZATION AND EMPLOYEES §§ 101–5949

UNITED STATES
GOVERNMENT PUBLISHING OFFICE
WASHINGTON : 2019

This book has been digitally archived to maintain
the quality of the original work for future generations
of legal researchers by William S. Hein & Co., Inc.

This volume printed on acid-free paper
by William S. Hein & Co., Inc.



Printed in the United States of America.

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

# TITLE 4—FLAG AND SEAL, SEAT OF GOVERNMENT, AND THE STATES

*This title was enacted by act July 30, 1947, ch. 389, § 1, 61 Stat. 641*

| Chap. | | Sec. |
|---|---|---|
| 1. | The Flag ......................................... | 1 |
| 2. | The Seal ......................................... | 41 |
| 3. | Seat of the Government ................. | 71 |
| 4. | The States ..................................... | 101 |
| 5. | Official Territorial Papers ............. | 141 |

| Sec. | |
|---|---|
| 9. | Conduct during hoisting, lowering or passing of flag. |
| 10. | Modification of rules and customs by President. |

#### AMENDMENTS

1951—Act Oct. 31, 1951, ch. 655, § 11, 65 Stat. 713, added item for chapter 5.

#### POSITIVE LAW; CITATION

This title has been made positive law by section 1 of act July 30, 1947, ch. 389, 61 Stat. 641, which provided in part that: "title 4 of the United States Code, entitled 'Flag and seal, Seat of Government, and the States', is codified and enacted into positive law and may be cited as '4 U. S. C., §—'".

#### REPEALS

Section 2 of act July 30, 1947, provided that the sections or parts thereof of the Statutes at Large or the Revised Statutes covering provisions codified in this Act are repealed insofar as the provisions appeared in former Title 4, and provided that any rights or liabilities now existing under the repealed sections or parts thereof shall not be affected by the repeal.

TABLE SHOWING DISPOSITION OF ALL SECTIONS OF FORMER TITLE 4

| Title 4 Former Sections | Revised Statutes Statutes at Large | Title 4 New Sections |
|---|---|---|
| 1 .......... | R.S. §§ 1791, 1792 ............................... | 1 |
| 2 .......... | R.S. § 1792 .......................................... | 2 |
| 3 .......... | Feb. 8, 1917, ch. 34, 39 Stat. 900 ....... | 3 |
| 4 .......... | R.S. § 1793 .......................................... | 41 |
| 5 .......... | R.S. §§ 203 (first clause), 1794 ........... | 42 |
| 6 .......... | R.S. § 1795 .......................................... | 71 |
| 7 .......... | R.S. § 1796 .......................................... | 72 |
| 8 .......... | R.S. § 1798 .......................................... | 73 |
| 9 .......... | R.S. § 1836 .......................................... | 101 |
| 10 .......... | R.S. § 1837 .......................................... | 102 |
| 11 .......... | R.S. § 1838 .......................................... | 103 |
| 12 .......... | June 16, 1936, ch. 582, § 10, 49 Stat. 1521 .... | 104 |
| 13 .......... | Oct. 9, 1940, ch. 787, § 7, 54 Stat. 1060. | |
| 13 .......... | Oct. 9, 1940, ch. 787, § 1, 54 Stat. 1059 ....... | 105 |
| 14 .......... | Oct. 9, 1940, ch. 787, § 2, 54 Stat. 1060 ....... | 106 |
| 15 .......... | Oct. 9, 1940, ch. 787, § 3, 54 Stat. 1060 ....... | 107 |
| 16 .......... | Oct. 9, 1940, ch. 787, § 4, 54 Stat. 1060 ....... | 108 |
| 17 .......... | Oct. 9, 1940, ch. 787, § 5, 54 Stat. 1060 ....... | 109 |
| 18 .......... | Oct. 9, 1940, ch. 787, § 6, 54 Stat. 1060 ....... | 110 |

## CHAPTER 1—THE FLAG

| Sec. | |
|---|---|
| 1. | Flag; stripes and stars on. |
| 2. | Same; additional stars. |
| 3. | Use of flag for advertising purposes; mutilation of flag. |
| 4. | Pledge of allegiance to the flag; manner of delivery. |
| 5. | Display and use of flag by civilians; codification of rules and customs; definition. |
| 6. | Time and occasions for display. |
| 7. | Position and manner of display. |
| 8. | Respect for flag. |

#### AMENDMENTS

1998—Pub. L. 105-225, § 2(b), Aug. 12, 1998, 112 Stat. 1498, added items 4 to 10.

### § 1. Flag; stripes and stars on

The flag of the United States shall be thirteen horizontal stripes, alternate red and white; and the union of the flag shall be forty-eight stars, white in a blue field.

(July 30, 1947, ch. 389, 61 Stat. 642.)

#### SHORT TITLE OF 2018 AMENDMENT

Pub. L. 115-123, div. A, § 10101, Feb. 9, 2018, 132 Stat. 64, provided that: "This division [amending section 7 of this title and enacting provisions set out as a note under section 7 of this title] may be cited as the 'Honoring Hometown Heroes Act'."

#### SHORT TITLE OF 2017 AMENDMENT

Pub. L. 115-15, § 1, Mar. 28, 2017, 131 Stat. 79, provided that: "This Act [amending section 6 of this title] may be cited as the 'Vietnam War Veterans Recognition Act of 2017'."

#### SHORT TITLE OF 2009 AMENDMENT

Pub. L. 111-41, § 1, July 27, 2009, 123 Stat. 1962, provided that: "This Act [amending section 6 of this title] may be cited as the 'Korean War Veterans Recognition Act'."

#### SHORT TITLE OF 2007 AMENDMENT

Pub. L. 110-41, § 1, June 29, 2007, 121 Stat. 233, provided that: "This Act [amending section 7 of this title and provisions set out as a note under section 7 of this title] may be cited as the 'Army Specialist Joseph P. Micks Federal Flag Code Amendment Act of 2007'."

#### SHORT TITLE OF 2000 AMENDMENT

Pub. L. 106-252, § 1, July 28, 2000, 114 Stat. 626, provided that: "This Act [enacting sections 116 to 126 of this title and provisions set out as a note under section 116 of this title] may be cited as the 'Mobile Telecommunications Sourcing Act'."

#### EXECUTIVE ORDER NO. 10798

Ex. Ord. No. 10798, Jan. 3, 1959, 24 F.R. 79, which prescribed proportions and sizes of flags until July 4, 1960, was revoked by section 33 of Ex. Ord. No. 10834, set out as a note under this section.

#### EX. ORD. NO. 10834. PROPORTIONS AND SIZES OF FLAGS AND POSITION OF STARS

Ex. Ord. No. 10834, Aug. 21, 1959, 24 F.R. 6865, provided:
WHEREAS the State of Hawaii has this day been admitted into the Union; and
WHEREAS section 2 of title 4 of the United States Code provides as follows: "On the admission of a new

State into the Union one star shall be added to the union of the flag; and such addition shall take effect on the fourth day of July then next succeeding such admission."; and

WHEREAS the Federal Property and Administrative Services Act of 1949 (63 Stat. 377), as amended [see chapters 1 to 11 of Title 40, Public Buildings, Property, and Works, and division C (except sections 3302, 3307(e), 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of Title 41, Public Contracts] authorizes the President to prescribe policies and directives governing the procurement and utilization of property by executive agencies; and

WHEREAS the interests of the Government require that orderly and reasonable provision be made for various matters pertaining to the flag and that appropriate regulations governing the procurement and utilization of national flags and union jacks by executive agencies be prescribed:

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States and as Commander in Chief of the armed forces of the United States, and the Federal Property and Administrative Services Act of 1949, as amended [see Short Title of 1949 Act note under section 101 of Title 41, Public Contracts], it is hereby ordered as follows:

PART I—DESIGN OF THE FLAG

SECTION 1. The flag of the United States shall have thirteen horizontal stripes, alternate red and white, and a union consisting of white stars on a field of blue.

SEC. 2. The positions of the stars in the union of the flag and in the union jack shall be as indicated on the attachment to this order, which is hereby made a part of this order.

SEC. 3. The dimensions of the constituent parts of the flag shall conform to the proportions set forth in the attachment referred to in section 2 of this order.

PART II—REGULATIONS GOVERNING EXECUTIVE AGENCIES

SEC. 21. The following sizes of flags are authorized for executive agencies:

| Size | Dimensions of Flag | |
|---|---|---|
| | Hoist (width) | Fly (length) |
| | Feet | Feet |
| (1) .................................................. | 20.00 | 38.00 |
| (2) .................................................. | 10.00 | 19.00 |
| (3) .................................................. | 8.95 | 17.00 |
| (4) .................................................. | 7.00 | 11.00 |
| (5) .................................................. | 5.00 | 9.50 |
| (6) .................................................. | 4.33 | 5.50 |
| (7) .................................................. | 3.50 | 6.65 |
| (8) .................................................. | 3.00 | 4.00 |
| (9) .................................................. | 3.00 | 5.70 |
| (10) ................................................. | 2.37 | 4.50 |
| (11) ................................................. | 1.32 | 2.50 |

SEC. 22. Flags manufactured or purchased for the use of executive agencies:

(a) Shall conform to the provisions of Part I of this order, except as may be otherwise authorized pursuant to the provisions of section 24, or except as otherwise authorized by the provisions of section 21, of this order.

(b) Shall conform to the provisions of section 21 of this order, except as may be otherwise authorized pursuant to the provisions of section 24 of this order.

SEC. 23. The exterior dimensions of each union jack manufactured or purchased for executive agencies shall equal the respective exterior dimensions of the union of a flag of a size authorized by or pursuant to this order. The size of the union jack flown with the national flag shall be the same as the size of the union of that national flag.

SEC. 24. (a) The Secretary of Defense in respect of procurement for the Department of Defense (including military colors) and the Administrator of General Services in respect of procurement for executive agencies other than the Department of Defense may, for cause which the Secretary or the Administrator, as the case may be, deems sufficient, make necessary minor adjustments in one or more of the dimensions or proportionate dimensions prescribed by this order, or authorize proportions or sizes other than those prescribed by section 3 or section 21 of this order.

(b) So far as practicable, (1) the actions of the Secretary of Defense under the provisions of section 24(a) of this order, as they relate to the various organizational elements of the Department of Defense, shall be coordinated, and (2) the Secretary and the Administrator shall mutually coordinate their actions under that section.

SEC. 25. Subject to such limited exceptions as the Secretary of Defense in respect of the Department of Defense, and the Administrator of General Services in respect of executive agencies other than the Department of Defense, may approve, all national flags and union jacks now in the possession of executive agencies, or hereafter acquired by executive agencies under contracts awarded prior to the date of this order, including those so possessed or so acquired by the General Services Administration, for distribution to other agencies, shall be utilized until unserviceable.

PART III—GENERAL PROVISIONS

SEC. 31. The flag prescribed by Executive Order No. 10798 of January 3, 1959, shall be the official flag of the United States until July 4, 1960, and on that date the flag prescribed by Part I of this order shall become the official flag of the United States; but this section shall neither derogate from section 24 or section 25 of this order nor preclude the procurement, for executive agencies, of flags provided for by or pursuant to this order at any time after the date of this order.

SEC. 32. As used in this order, the term "executive agencies" means the executive departments and independent establishments in the executive branch of the Government, including wholly-owned Government corporations.

SEC. 33. Executive Order No. 10798 of January 3, 1959, is hereby revoked.

DWIGHT D. EISENHOWER.



**Standard proportions**

| Hoist (width) of flag 1.0 | Fly (length) of flag 1.9 | Hoist (width) of Union 0.5385 (7⁄13) | Fly (length) of Union 0.76 | 0.054 | 0.054 | 0.063 | 0.063 | Diameter of star 0.0616 | Width of stripe 0.0769 (1⁄13) |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | K | L |

### § 2. Same; additional stars

On the admission of a new State into the Union one star shall be added to the union of the flag; and such addition shall take effect on the fourth day of July then next succeeding such admission.

(July 30, 1947, ch. 389, 61 Stat. 642.)

### § 3. Use of flag for advertising purposes; mutilation of flag

Any person who, within the District of Columbia, in any manner, for exhibition or display, shall place or cause to be placed any word, figure, mark, picture, design, drawing, or any advertisement of any nature upon any flag, standard, colors, or ensign of the United States of America; or shall expose or cause to be exposed to public view any such flag, standard, colors, or ensign upon which shall have been printed, painted, or otherwise placed, or to which shall be attached, appended, affixed, or annexed any word, figure, mark, picture, design, or drawing, or any advertisement of any nature; or who, within the District of Columbia, shall manufacture, sell, expose for sale, or to public view, or give away or have in possession for sale, or to be given away or for use for any purpose, any article or substance being an article of merchandise, or a receptacle for merchandise or article or thing for carrying or transporting merchandise, upon which shall have been printed, painted, attached, or otherwise placed a representation of any such flag, standard, colors, or ensign, to advertise, call attention to, decorate, mark, or distinguish the article or substance on which so placed shall be deemed guilty of a misdemeanor and shall be punished by a fine not exceeding $100 or by imprisonment for not more than thirty days,

or both, in the discretion of the court. The words "flag, standard, colors, or ensign", as used herein, shall include any flag, standard, colors, ensign, or any picture or representation of either, or of any part or parts of either, made of any substance or represented on any substance, of any size evidently purporting to be either of said flag, standard, colors, or ensign of the United States of America or a picture or a representation of either, upon which shall be shown the colors, the stars and the stripes, in any number of either thereof, or of any part or parts of either, by which the average person seeing the same without deliberation may believe the same to represent the flag, colors, standard, or ensign of the United States of America.

(July 30, 1947, ch. 389, 61 Stat. 642; Pub. L. 90–381, §3, July 5, 1968, 82 Stat. 291.)

#### AMENDMENTS

1968—Pub. L. 90-381 struck out "; or who, within the District of Columbia, shall publicly mutilate, deface, defile or defy, trample upon, or cast contempt, either by word or act, upon any such flag, standard, colors, or ensign," after "substance on which so placed".

### § 4. Pledge of allegiance to the flag; manner of delivery

The Pledge of Allegiance to the Flag: "I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.", should be rendered by standing at attention facing the flag with the right hand over the heart. When not in uniform men should remove any non-religious headdress with their right hand and hold it at the left shoulder, the hand be-

ing over the heart. Persons in uniform should remain silent, face the flag, and render the military salute. Members of the Armed Forces not in uniform and veterans may render the military salute in the manner provided for persons in uniform.

(Added Pub. L. 105–225, § 2(a), Aug. 12, 1998, 112 Stat. 1494; amended Pub. L. 107–293, § 2(a), Nov. 13, 2002, 116 Stat. 2060; Pub. L. 113–66, div. A, title V, § 586, Dec. 26, 2013, 127 Stat. 777.)

### HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 4 ............ | 36:172. | June 22, 1942, ch. 435, § 7, 56 Stat. 380; Dec. 22, 1942, ch. 806, § 7, 56 Stat. 1077; Dec. 28, 1945, ch. 607, 59 Stat. 668; June 14, 1954, ch. 297, 68 Stat. 249; July 7, 1976, Pub. L. 94–344, (19), 90 Stat. 813. |

### CODIFICATION

Amendment by Pub. L. 107–293 reaffirmed the exact language of the Pledge, see section 2(b) of Pub. L. 107–293, set out as a Reaffirmation of Language note below.

### AMENDMENTS

2013—Pub. L. 113–66 inserted at end ''Members of the Armed Forces not in uniform and veterans may render the military salute in the manner provided for persons in uniform.''

2002—Pub. L. 107–293 reenacted section catchline without change and amended text generally. Prior to amendment, text read as follows: ''The Pledge of Allegiance to the Flag, 'I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.', shall be rendered by standing at attention facing the flag with the right hand over the heart. When not in uniform men should remove their headdress with their right hand and hold it at the left shoulder, the hand being over the heart. Persons in uniform should remain silent, face the flag, and render the military salute.''

### FINDINGS

Pub. L. 107–293, § 1, Nov. 13, 2002, 116 Stat. 2057, provided that: ''Congress finds the following:

''(1) On November 11, 1620, prior to embarking for the shores of America, the Pilgrims signed the Mayflower Compact that declared: 'Having undertaken, for the Glory of God and the advancement of the Christian Faith and honor of our King and country, a voyage to plant the first colony in the northern parts of Virginia,'.

''(2) On July 4, 1776, America's Founding Fathers, after appealing to the 'Laws of Nature, and of Nature's God' to justify their separation from Great Britain, then declared: 'We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness'.

''(3) In 1781, Thomas Jefferson, the author of the Declaration of Independence and later the Nation's third President, in his work titled 'Notes on the State of Virginia' wrote: 'God who gave us life gave us liberty. And can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are the Gift of God. That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that his justice cannot sleep forever.'

''(4) On May 14, 1787, George Washington, as President of the Constitutional Convention, rose to admonish and exhort the delegates and declared: 'If to please the people we offer what we ourselves disapprove, how can we afterward defend our work? Let us raise a standard to which the wise and the honest can repair; the event is in the hand of God!'

''(5) On July 21, 1789, on the same day that it approved the Establishment Clause concerning religion, the First Congress of the United States also passed the Northwest Ordinance, providing for a territorial government for lands northwest of the Ohio River, which declared: 'Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.'

''(6) On September 25, 1789, the First Congress unanimously approved a resolution calling on President George Washington to proclaim a National Day of Thanksgiving for the people of the United States by declaring, 'a day of public thanksgiving and prayer, to be observed by acknowledging, with grateful hearts, the many signal favors of Almighty God, especially by affording them an opportunity peaceably to establish a constitution of government for their safety and happiness.'

''(7) On November 19, 1863, President Abraham Lincoln delivered his Gettysburg Address on the site of the battle and declared: 'It is rather for us to be here dedicated to the great task remaining before us—that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion—that we here highly resolve that these dead shall not have died in vain—that this Nation, under God, shall have a new birth of freedom—and that Government of the people, by the people, for the people, shall not perish from the earth.'

''(8) On April 28, 1952, in the decision of the Supreme Court of the United States in Zorach v. Clauson, 343 U.S. 306 (1952), in which school children were allowed to be excused from public schools for religious observances and education, Justice William O. Douglas, in writing for the Court stated: 'The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concern or union or dependency one on the other. That is the common sense of the matter. Otherwise the State and religion would be aliens to each other—hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; ''so help me God'' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: ''God save the United States and this Honorable Court.'' '

''(9) On June 15, 1954, Congress passed and President Eisenhower signed into law a statute that was clearly consistent with the text and intent of the Constitution of the United States, that amended the Pledge of Allegiance to read: 'I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.'

''(10) On July 20, 1956, Congress proclaimed that the national motto of the United States is 'In God We Trust', and that motto is inscribed above the main door of the Senate, behind the Chair of the Speaker of the House of Representatives, and on the currency of the United States.

''(11) On June 17, 1963, in the decision of the Supreme Court of the United States in Abington School District v. Schempp, 374 U.S. 203 (1963), in which compulsory school prayer was held unconstitutional, Justices Goldberg and Harlan, concurring in the decision, stated: 'But untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and nonin-

volvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it. Neither government nor this Court can or should ignore the significance of the fact that a vast portion of our people believe in and worship God and that many of our legal, political, and personal values derive historically from religious teachings. Government must inevitably take cognizance of the existence of religion and, indeed, under certain circumstances the First Amendment may require that it do so.'

"(12) On March 5, 1984, in the decision of the Supreme Court of the United States in Lynch v. Donelly, 465 U.S. 668 (1984), in which a city government's display of a nativity scene was held to be constitutional, Chief Justice Burger, writing for the Court, stated: 'There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789 . . . [E]xamples of reference to our religious heritage are found in the statutorily prescribed national motto "In God We Trust" (36 U.S.C. 186) [now 36 U.S.C. 302], which Congress and the President mandated for our currency, see (31 U.S.C. 5112(d)(1) (1982 ed.)), and in the language "One Nation under God", as part of the Pledge of Allegiance to the American flag. That pledge is recited by many thousands of public school children—and adults—every year . . . Art galleries supported by public revenues display religious paintings of the 15th and 16th centuries, predominantly inspired by one religious faith. The National Gallery in Washington, maintained with Government support, for example, has long exhibited masterpieces with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection, among many others with explicit Christian themes and messages. The very chamber in which oral arguments on this case were heard is decorated with a notable and permanent—not seasonal—symbol of religion: Moses with the Ten Commandments. Congress has long provided chapels in the Capitol for religious worship and meditation.'

"(13) On June 4, 1985, in the decision of the Supreme Court of the United States in Wallace v. Jaffree, 472 U.S. 38 (1985), in which a mandatory moment of silence to be used for meditation or voluntary prayer was held unconstitutional, Justice O'Connor, concurring in the judgment and addressing the contention that the Court's holding would render the Pledge of Allegiance unconstitutional because Congress amended it in 1954 to add the words 'under God,' stated 'In my view, the words "under God" in the Pledge, as codified at (36 U.S.C. 172) [now 4 U.S.C. 4], serve as an acknowledgment of religion with "the legitimate secular purposes of solemnizing public occasions, [and] expressing confidence in the future."'

"(14) On November 20, 1992, the United States Court of Appeals for the 7th Circuit, in Sherman v. Community Consolidated School District 21, 980 F.2d 437 (7th Cir. 1992), held that a school district's policy for voluntary recitation of the Pledge of Allegiance including the words 'under God' was constitutional.

"(15) The 9th Circuit Court of Appeals erroneously held, in Newdow v. U.S. Congress (9th Cir. June 26, 2002), that the Pledge of Allegiance's use of the express religious reference 'under God' violates the First Amendment to the Constitution, and that, therefore, a school district's policy and practice of teacher-led voluntary recitations of the Pledge of Allegiance is unconstitutional.

"(16) The erroneous rationale of the 9th Circuit Court of Appeals in Newdow would lead to the absurd result that the Constitution's use of the express religious reference 'Year of our Lord' in Article VII violates the First Amendment to the Constitution, and that, therefore, a school district's policy and practice of teacher-led voluntary recitations of the Constitution itself would be unconstitutional."

REAFFIRMATION OF LANGUAGE

Pub. L. 107–293, §2(b), Nov. 13, 2002, 116 Stat. 2060, provided that: "In codifying this subsection [probably should be "section", meaning section 2 of Pub. L. 107–293, which amended this section], the Office of the Law Revision Counsel shall show in the historical and statutory notes that the 107th Congress reaffirmed the exact language that has appeared in the Pledge for decades.''

§ 5. Display and use of flag by civilians; codification of rules and customs; definition

The following codification of existing rules and customs pertaining to the display and use of the flag of the United States of America is established for the use of such civilians or civilian groups or organizations as may not be required to conform with regulations promulgated by one or more executive departments of the Government of the United States. The flag of the United States for the purpose of this chapter shall be defined according to sections 1 and 2 of this title and Executive Order 10834 issued pursuant thereto.

(Added Pub. L. 105–225, §2(a), Aug. 12, 1998, 112 Stat. 1494.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 5 | 36:173. | June 22, 1942, ch. 435, §1, 56 Stat. 377; Dec. 22, 1942, ch. 806, §1, 56 Stat. 1074; July 7, 1976, Pub. L. 94–344, (1), 90 Stat. 810. |

REFERENCES IN TEXT

Executive Order 10834, referred to in text, is set out as a note under section 1 of this title.

FREEDOM TO DISPLAY THE AMERICAN FLAG

Pub. L. 109–243, July 24, 2006, 120 Stat. 572, provided that:

"SECTION 1. SHORT TITLE.

"This Act may be cited as the 'Freedom to Display the American Flag Act of 2005'.

"SEC. 2. DEFINITIONS.

"For purposes of this Act—

"(1) the term 'flag of the United States' has the meaning given the term 'flag, standard, colors, or ensign' under section 3 of title 4, United States Code;

"(2) the terms 'condominium association' and 'cooperative association' have the meanings given such terms under section 604 of Public Law 96–399 (15 U.S.C. 3603);

"(3) the term 'residential real estate management association' has the meaning given such term under section 528 of the Internal Revenue Code of 1986 (26 U.S.C. 528); and

"(4) the term 'member'—

"(A) as used with respect to a condominium association, means an owner of a condominium unit (as defined under section 604 of Public Law 96–399 (15 U.S.C. 3603)) within such association;

"(B) as used with respect to a cooperative association, means a cooperative unit owner (as defined under section 604 of Public Law 96–399 (15 U.S.C. 3603)) within such association; and

"(C) as used with respect to a residential real estate management association, means an owner of a residential property within a subdivision, development, or similar area subject to any policy or restriction adopted by such association.

"SEC. 3. RIGHT TO DISPLAY THE FLAG OF THE UNITED STATES.

"A condominium association, cooperative association, or residential real estate management association may





**LIBRARY**
LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the online collections of the Library of Congress contain a publication entitled **THE CONGRESSIONAL GLOBE: CONTAINING THE SKETCHES OF THE DEBATES AND PROCEEDINGS OF THE SECOND SESSION OF THE TWENTY-EIGHTH CONGRESS** and that the attached photocopies from Volume XIV – the title page and pages 84-89 are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on October 3, 2019.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress



101 Independence Avenue, SE Washington, DC 20540–4917 Tel 202.707.5650 www.loc.gov;
duplicationservices@loc.gov

# THE

# CONGRESSIONAL GLOBE,

CONTAINING

## SKETCHES OF THE DEBATES AND PROCEEDINGS

OF THE

## SECOND SESSION

OF THE

## TWENTY-EIGHTH CONGRESS.

## VOLUME XIV.

BLAIR AND RIVES, EDITORS.

### CITY OF WASHINGTON:

PRINTED AT THE GLOBE OFFICE, FOR THE EDITORS.

## 1845.

posed to a proper emigration; but he had said that it would give an undue stimulus to emigration, neither benefiting the States from which the individuals went, nor the individuals themselves.

Mr. CHAPMAN continued. The gentleman from Maryland [Mr. Causin] told them of how much had been done for the West. Now, in the name of Heaven, he wanted to know what had been done for it. He wanted to know how much of the forty millions annually collected under the present unjust and oppressive tariff, went to his State. He came from the banner State, (Alabama,) which had given the largest democratic majority in favor of the democratic candidate for the presidency; and from the banner district in that State, which had also given the largest democratic majority in the State.

Mr. WENTWORTH here interrupted Mr. C. to contest the gentleman's right to the banner, as he himself claimed not only to come from the banner State and banner district, but also from the banner county and banner city.

Mr. CHAPMAN proceeded, and said he would not now contest that point with his friend from Illinois. He would add that in his State large quantities of public lands remained unsold than in any other, and the provisions of this bill were therefore more needed there than anywhere else. In illustration of the remark of the gentleman from Maryland, and for the purpose of making a comparison between the benefits received from the government by Maryland and Alabama; he would state that Maryland had 593 of the officers of the federal government more than she was entitled to; while Alabama had 180 less. He would further state that Alabama had not now a single officer at the seat of government, and that she stood in the enviable condition of not only having refused to touch a dollar of the distribution fund of 1841, but of not having expended within her limits any of the fifty millions collected by the tariff. Notwithstanding these facts, his State had been falsely charged with repudiation, and with having violated her plighted faith. He was proud of coming from a State whose escutcheon was untarnished; and he trusted that it ever would be, both in her public faith and in her disposition to maintain it.

Mr. McDOWELL then withdrew his amendment, when

Mr. B. CAREY offered the following as a substitute for the bill:

"All of the lands of the United States which shall have been subject to entry ten years, and under twenty years, prior to the time an application may be made to enter the same under the provisions of this act, [and still remaining unsold,] may be entered for settlement and cultivation at the price of one dollar per acre for any quantity not exceeding one hundred and sixty acres.

"And all of the lands of the United States which shall have been subject to entry twenty years, and under thirty years, prior to the time an application may be made to enter the same under the provisions of this act, and still remaining unsold, may be entered for settlement and cultivation at the price of seventy-five cents per acre for any quantity not exceeding one hundred and sixty acres.

"And all of the lands of the United States which shall have been subject to entry for thirty years and upwards, prior to the time an application may be made to enter the same under the provisions of this act, and still remaining unsold, may be entered for settlement and cultivation at the price of fifty cents per acre, for any quantity not exceeding one hundred and sixty acres.

"Provided, That none of the provisions of this act shall apply to any of the lands of the United State within any of the Territories.

"Sec. 2. And be it further enacted, That the person making entry or application for entry under the provisions of this act, and at either of the prices designated therein, shall first make an affidavit before the register or receiver of the proper land office where the entry is proposed to be made, that the said applicant enters and proposes to enter the same for his own use and benefit, for settlement and cultivation by and for him or herself; and that the said applicant has made no entry under the provisions of this act, or no entry in pursuance thereof, which, together with the additional entry then proposed to be made, will make the whole quantity so entered and proposed to be entered exceed one hundred and sixty acres; and all entries at either of the prices designated by this act, contrary to the true intent and meaning thereof, are hereby declared to be null and void; provided, that this act shall not apply to the alternate sections of land reserved or which may be reserved by the United States within any of the States.

"Sec. 3. And be it further enacted, That patents shall not issue for land entered under the provisions of this act until the expiration of three years after said entry; and at the time application may be made for a patent, the purchaser under this act, before he shall be entitled to the same, shall first prove, by disinterested witnesses, to the satisfaction of the commissioner of the general land office that said purchaser has resided upon and cultivated said land, so entered, for three consecutive years preceding his application for a patent; and all assignments in trust, or otherwise, all sales, conveyances, and transfers, by any of said purchasers of any said lands, before a patent shall have issued for the same, shall be absolutely null and void; and in the event of the death of any of said purchasers prior to the issuance of a patent in their behalf, all of the rights and privileges under the provisions of this act to which he or she was entitled, shall accrue and belong to his or her heirs, to enable them to perfect the title to said land and obtain a patent therefor."

On motion by Mr. S. CAREY, the committee rose and reported progress.

Mr. HOUSTON moved that the amendment of Mr. Carey be printed; which was agreed to.

Mr. HOUSTON offered a resolution to terminate debate in Committee of the Whole on Friday at 3 o'clock; when

The House adjourned.

CORRECTION.—In our report of the proceedings of the House on Tuesday, it was stated that the Committee on Commerce had reported unfavorably on the bill to authorize the purchase of the residue of the stock held by individuals in the Louisville and Portland canal; but the report ought to have gone on further to state that the bill was, on motion of Mr. TIBBATTS, referred to the Committee on Public Lands.

## HOUSE OF REPRESENTATIVES.

FRIDAY, January 3, 1845.

The minutes of yesterday were read and approved.

### ANNEXATION OF TEXAS.

Mr. C. J. INGERSOLL moved that the rules be suspended, that the House might resolve itself into Committee of the Whole on the state of the Union for the purpose of taking up the Texas question.

The SPEAKER remarked that the first business in order was the resolution of the gentleman from Alabama, [Mr. HOUSTON,] submitted yesterday before the adjournment, to fix the time for the termination of the debate in Committee of the Whole on the state of the Union, on the bill to reduce and graduate the price of the public lands in favor of settlers and cultivators.

Mr. HOUSTON said there appeared to be some opposition to that resolution, and therefore he would withdraw it at the present time.

The SPEAKER then announced the question on the suspension of the rules.

Mr. ELMER expressed the hope that it would not interfere with the morning hour.

Mr. VANCE inquired if this was not private bill day.

The SPEAKER explained. The business first in order was the unfinished business of yesterday growing out of the report of the report of the gentleman from New Hampshire, [Mr. BURKE,] on the affairs of Rhode Island; next the call of committees for reports for one hour; and afterwards private bills; but a motion to suspend the rules took precedence.

Mr. ROGERS called for the yeas and nays on the question of suspension, and they were ordered, and resulted thus—yeas 107, nays 63—as follows:

YEAS—Messrs. Anderson, Arrington, Ashe, Atkinson, Bayly, Belser, Benton, Bidlack, James A. Black, Blackwell, Bowlin, Brodhead, Aaron V. Brown, Milton Brown, William J. Brown, Burke, Burt, Caldwell, Carpenter, Shepherd Cary, Augustus A. Chapman, Chappell, Clinton, Cobb, Coles, Cross, Cullom, Daniel, Richard D. Davis, John W. Davis, Dean, Douglass, Dromgoole, Duncan, Dunlap, Elmer, Ficklin, Foster, French, Fuller, Hannibal Hamlin, Haralson, Hays, Herrick, Hopkins, Houston, Hubard, Hughes, Charles J. Ingersoll, Jameson, Cave Johnson, George W. Jones, Andrew Kennedy, Preston King, Kirkpatrick, Labranche, Leonard, Lucas, Lumpkin, Lyon, McCauslen, McClelland, McClernand, McConnell, McDowell, McKay, Mathews, Joseph Morris, Newton, Norris, Owen, Parmenter, Payne, E. D. Potter, Pratt, Purdy, Rathbun, David S. Reid, Reding, Relfe, Rhett, Roberts, Robinson, Russell, St. John, Thomas H. Seymour, David L. Seymour, Simpson, Thomas Smith, Robert Smith, Steenrod, Stetson, John Stewart, Stiles, James W. Stone, Alfred P. Stone, Strong, Taylor, Thompson, Tibbatts, Tucker, Weller, Wentworth, Wheaton, Benjamin White, Williams, Woodward, and Yost—107.

NAYS—Messrs. Abbot, Adams, Baker, Barringer, Barnard, Brengle, Buffington, Carroll, Catlin, Clinch, Collamer, Cranston, Darragh, Garrett Davis, Deberry, Dellet, Dickey, Fish, Florence, Foot, Giddings, Goggin, Grinnell, Grider, Edward S. Hamlin, Harper, Hudson, Hungerford, James B. Hunt, Joseph R. Ingersoll, Jenks, Perley B. Johnson, Daniel P. King, McIlvaine, Marsh, Edward J. Morris, Freeman H. Morse, Moseley, Patterson, Pollock, Elisha R. Potter, Preston, Ramsey, Charles M. Reed, Rockwell, Rodney, Rogers, Sample, Schenck, Senter, Severance, Albert Smith, Caleb B. Smith, Stephens, Summers, Thomasson, Tyler, Vance, Vanmeter, Vinton, Wethered, John White, and Winthrop—63.

So the rules were suspended.

The House then resolved itself into Committee of the Whole on the state of the Union, Mr. HOPKINS in the chair.

Mr. C. J. INGERSOLL moved that the commit-

tee take up the joint resolutions for annexing Texas to the United States, which he some time since reported from the Committee on Foreign Affairs.

The CHAIRMAN stated that it would be necessary first to lay aside the bill which was before the committee when it last rose—the bill to reduce and graduate the price of the public lands—and which consequently had precedence.

Mr. C. J. INGERSOLL moved to lay aside that bill.

Mr. SHEPARD CARY inquired if he was not entitled to the floor on that subject, and if any other gentleman could obtain the floor for the purpose of making such a motion as that now submitted by the gentleman from Pennsylvania without the surrender of the floor by him (Mr. CARY.)

The CHAIRMAN decided that the committee might select its own business.

The question was then taken on postponing the further consideration of the land bill; and it was agreed to.

Mr. C. J. INGERSOLL then moved to take up the Texas joint resolutions which he had designated; and the motion was agreed to.

The joint resolution was read at length by the Clerk as follows:

"JOINT RESOLUTION for annexing Texas to the United States.

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That annexation and union between the said United States and the republic of Texas take effect as settled the twentieth of April last, in the following words, viz:

"ARTICLE I. The republic of Texas, acting in conformity with the wishes of the people and government, cedes to the United States all the territories of Texas, to be held by them in full property and sovereignty, and to be annexed to the said United States as one of their Territories, subject to the same constitutional provisions with their other Territories. This cession (including all public lots and squares, vacant lands, mines, minerals, salt lakes and springs, public edifices, fortifications, barracks, ports and harbors, navy and navy yards, docks, magazines, arms, armaments, and accoutrements, archives and public documents, public funds, debts, taxes and dues unpaid at the time of annexation.

"ARTICLE II. The citizens of Texas shall be incorporated into the Union of the United States, maintained and protected in the free enjoyment of their liberty and property, and admitted, as soon as may be consistent with the principles of the federal constitution, to the enjoyment of all the rights, privileges, and immunities, of citizens of the United States.

"ARTICLE III. All titles and claims to real estate, valid under the laws of Texas, shall be held so by the United States, and measures adopted for the speedy adjudication of all unsettled claims to land, and patents shall be granted to those found valid.

"ARTICLE IV. The public land hereby ceded shall be subject to the laws regulating the public lands in the other Territories of the United States, as far as they may be applicable; subject; however; to such alterations and changes as Congress may from time to time think proper to make. If, in consequence of the mode in which lands have been surveyed in Texas, or from previous grants or locations, the sixteenth section cannot be applied to the purpose of education, Congress shall make equal provision by grant of land elsewhere. And it is also further understood that, hereafter, the books, papers, and documents of the General Land Office of Texas shall be deposited and kept at such place in Texas as the Congress of the United States shall direct.

"ARTICLE V. The United States assume and agree to pay the public debts and liabilities of Texas, however created for which the faith or credit of her government may be bound at the time of annexation; said debts and liabilities estimated not to exceed, in the whole, ten millions of dollars, to be ascertained and paid in the manner hereinafter stated:

"The payment of the sum of three hundred and fifty-seven dollars shall be made at the treasury of the United States, within ninety days after annexation, as follows: Two hundred and fifty thousand dollars to Frederick Dawson, of Baltimore, or his executors, on the delivery of that amount of ten per cent. bonds of Texas; one hundred thousand dollars, if so much be required, in the redemption of the exchequer bills which may be in circulation at the time of annexation. For the payment of the remainder of the debt and liabilities of Texas, which, together with the amount already specified, shall not exceed ten millions of dollars, the public lands herein ceded, and the net revenue from the same, are hereby pledged.

"ARTICLE VI. In order to ascertain the full amount of the debts and liabilities herein assumed, and the legality and validity thereof, four commissioners shall be appointed by the President of the United States, by and with the advice and consent of the Senate, who shall meet at Washington, Texas, within the period of six months after annexation, and may continue in session not exceeding twelve months, unless the Congress of the United States should prolong the time. They shall take an oath for the faithful discharge of their duties, and that they are not directly or indirectly interested in said claims at the time, and will not be during their continuance in office; and the said oath shall be recorded with their proceedings. In case of the death, sickness, or resignation of any of the commissioners, his or their place or places may be supplied by the appointment as aforesaid, or by the President of the United States during the recess of the Senate. They, or a majority of them, shall be authorized under such regulations as the Congress of the United States may prescribe, to hear, examine, and decide on all questions touching the legality and validity of said claims, and shall, when a claim

allowed, issue a certificate to the claimant, stating the amount, distinguishing principal from interest. The certificates so issued shall be numbered, and entry made of the number, the name of the person to whom issued, and the amount, in a book to be kept for that purpose. They shall transmit the records of their proceedings and the book in which the certificates are entered, with the vouchers and documents produced before them, relative to the claims allowed or rejected, to the Treasury Department of the United States, to be deposited therein; and the Secretary of the Treasury shall, as soon as practicable after the receipt of the same, ascertain the aggregate amount of the debts and liabilities allowed; and if the same, when added to the amount to be paid to Frederick Dawson, and the sum which may be paid in the redemption of the exchequer bills, shall not exceed the estimated sum of ten millions of dollars, he shall, on the presentation of a certificate of the commissioners, issue, at the option of the holder, a new certificate for the amount, distinguishing principal from interest, and payable to him or order, out of the net proceeds of the public lands hereby ceded, or stock of the United States, for the amount allowed, including principal and interest, and bearing an interest of three per cent. per annum from the date thereof; which stock, in addition to being made payable out of the net proceeds of the public lands hereby ceded, shall also be receivable in payment for the same. In case the amount of the debts and liabilities allowed, with the sums aforesaid to be paid to Frederick Dawson, and which may be paid in the redemption of the exchequer bills, shall exceed the sum of ten millions of dollars, the said secretary, before issuing a new certificate, or stock, as the case may be, shall make in each case such proportionable and ratable deduction on its amount as to reduce the aggregate to the said sum of ten millions of dollars; and he shall have power to make all needful rules and regulations necessary to carry into effect the powers hereby vested in him.

"ARTICLE VI. Until further provision shall be made, the laws of Texas, as now existing, shall remain in force; and all executive and judicial officers of Texas, except the President, Vice President, and heads of departments, shall retain their offices, with all power and authority appertaining thereto; and the courts of justice shall remain in all respects as now established and organized.

"ARTICLE VII. Immediately after annexation, the President of the United States, by and with the advice and consent of the Senate, shall appoint a commissioner, who shall proceed to Texas and receive the transfer of the territory thereof, and all the archives and public property, and other things herein conveyed, in the name of the United States. He shall exercise all executive authority in said territory necessary to the proper execution of the laws, until otherwise provided.

"Resolved, That the said articles are hereby declared to be the fundamental law of union between the said United States and Texas, so soon as the supreme authorities of the said republic of Texas shall agree to the game. And it shall be the duty of the President of the United States, so soon as he shall be officially notified of such agreement on the part of Texas, to announce the same by proclamation.

"Resolved, further, by the authority aforesaid, That it is understood and intended that whatever was stipulated to be done immediately, or at a fixed period after the exchange of said compact, shall be done immediately, or in a like period after the supreme authorities of Texas shall have formally agreed to these resolutions."

Mr. C. J. INGERSOLL rose and addressed the Chairman. But before proceeding with his remarks,

Mr. WELLER appealed to him to yield the floor, simply to move an amendment.

Mr. INGERSOLL. I have no objection, if it does not deprive me of my right to the floor.

Mr. WELLER. Undoubtedly it will not.

The CHAIRMAN having signified his assent to the same,

Mr. WELLER moved to amend the resolution, by striking out all after the enacting clause, and inserting the resolutions he had had the honor some days since to introduce. His object was, he said, to make the proposition more acceptable to the House than the form presented by the chairman of the Committee on Foreign Affairs, although he did not say (he was so understood to remark) that he would not vote for the resolution of the committee, in case it should receive the preference of the House.

Mr. INGERSOLL. Does the gentleman desire the reading of his resolutions?

Mr. WELLER. No; it is the same bill presented by myself a few days since.

Mr. DOUGLASS moved to amend the amendment of Mr. WELLER, by substituting therefor the resolutions which he had had the honor to introduce a few days since.

The resolutions of Mr. DOUGLASS are in the following words:

"Joint resolutions for the reannexation of Texas to the United States, in conformity with the treaty of eighteen hundred and three, for the purchase of Louisiana.

"Whereas, by the provisions of the treaty of eighteen hundred and three, between the United States and France, commonly called the Louisiana treaty, all that country known as Texas was ceded and conveyed to the United States; and whereas it was stipulated in the said treaty that the inhabitants of the ceded territory should be incorporated into the union of the United States, and admitted as soon as possible, according to the principles of the federal constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and in the mean time should be protected in the free enjoyment of their liberty, proper-

ty, and the religion which they professed; and whereas the present inhabitants of Texas, being the rightful owners thereof, have signified their willingness and desire to be reannexed to the United States and incorporated into the Union, according to the principles of the federal constitution, and the stipulations of the said treaty; therefore—

"Be it resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That, from and after the passing of these resolutions, and the concurrence of the supreme authorities of Texas therein, the country known as Texas be, and the same is hereby, reannexed to and made a portion of the territory of the United States; and the inhabitants of the said territory of Texas shall be incorporated into the union of the United States, and admitted as soon as possible, according to the principles of the federal constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States; and in the mean time they shall be protected in the free enjoyment of their liberty, property, and the religion which they profess.

"And be it further resolved, That all titles to real estate, valid under the existing laws of Texas, shall be deemed and held valid by the United States.

"And be it further resolved, That the public lands in the said Territory of Texas, be, and the same are hereby, pledged for the payment of the debts for which the faith of Texas stands pledged, supposed not to exceed ten millions of dollars; and in addition to the public lands hereby pledged, all the net revenue derived from customs and duties imposed on the importation of foreign merchandise, and collected within the limits of the said Territory of Texas, after deducting a sum sufficient to defray the expenses incurred by the United States for the support of the said Territory of Texas, shall be applied to the payment of the said debts of Texas, until the same shall be extinguished; and after the extinguishment of said debts, the residue of the proceeds of the sales of said lands, and the said customs and duties, shall go into the treasury of the United States.

"And be it further resolved, That the amount and validity of said debts shall be ascertained, and the said debts disposed of, and the proceeds thereof, and the said duties and customs applied to their payment in such manner as the Congress of the United States shall direct.

"And be it further resolved, That the territory and property hereby annexed and ceded to the United States, shall be construed to embrace all public lots and squares, vacant lands, mines, minerals, salt lakes and springs, public edifices, fortifications, barracks, ports, and harbors; navy and navy-yards; docks, magazines, arms, armaments, and accoutrements; archives and public documents; public funds, debts, taxes, and dues, unpaid, at the time of annexation.

"And be it further resolved, That it shall be the duty of the Congress of the United States, in disposing of the public lands, to appropriate the sixteenth section of every township to the purposes of education, the same as cannot be so applied in consequence of previous grant, or other causes, equal provision shall be made by grant of land elsewhere in the said territory.

"And be it further resolved, That nothing herein contained shall be construed to affect or in any way interfere with the sixth section of the act approved the sixth of March, eighteen hundred and twenty, admitting the State of Missouri into the Union, and commonly called the Missouri compromise, that act having passed and approved prior to the ratification of the treaty commonly called the Florida treaty, by which Texas was ceded to Spain.

"And be it further resolved, That if any disputes shall arise with any foreign power respecting the western boundary of Texas, the President of the United States is hereby requested to open negotiations for the adjustment of the same upon just and honorable terms, so soon as these resolutions shall be concurred in by the supreme authorities of Texas.

"10. And be it further resolved, That these resolutions are hereby declared to be the fundamental law of union between the United States and Texas so soon as the supreme authorities of Texas shall agree to the same; and it shall be the duty of the President of the United States, so soon as he shall be officially notified of such agreement on the part of Texas, to announce the same by proclamation."

The question then being announced on the amendment to the amendment—

Mr. WINTHROP rose to a point of order. There was a rule of the House declaring that "No bill or resolution shall, at any time, be amended by annexing thereto, or incorporating therewith, any other bill or resolution pending before the House." If he understood correctly these propositions of amendment now moved by the gentlemen, were the identical propositions which had been presented by the gentlemen respectively, and were now before the committee in separate and distinct forms.

Mr. WELLER remarked that this difficulty was obviated, as the chairman would discover, by changing the phraseology of the resolutions as had been done in both cases of amendment. It had been decided by every chairman for years past, that a slight change of phraseology took the matter out of the rule referred to by the gentleman from Massachusetts. In this case there had been an important change.

The CHAIRMAN overruled the point of order.

Mr. C. J. INGERSOLL said he supposed it was expected that he should preface this measure by some introductory views of its but he did not intend much more than mere statement—reserving argument till objections made it necessary. He should not, therefore, undertake to defend or vindicate the restoration of Texas to the United States, but simply explain what he believed to be the present position of that important measure. It has been abundantly discussed every where except in this House of Representatives. At popular meetings, by the American press, in several of the State legislatures, in the published proceedings of the Senate of the United States, in various executive communications to both branches of Congress, by several individual contributions to general information—in short, every where, every how considered, and universal sentiment ascertained, except in this hall, where untoward preventions have till now frustrated deliberation on it; even in European newspapers more than in this House, where it now first appears. Desirous of keeping so great a national consummation clear of party influences, Mr. I. would not, in addition, vouch the late presidential election, pregnant as it was of popular will on this subject, as well why as democratic, further than to say, in his own justification, that, without a word of argument, he had, at every meeting in his district during the canvass, said if elected he should deem himself instructed to vote for the immediate reannexation of Texas. For, said Mr. I., this is no recent opinion with me. I did not wait till presidents and secretaries, actual or past, recommended the recovery of that natural and indispensable part of the United States, as enlarged by the acquisition of Louisiana; but for many years have been the constant and unhesitating advocate of getting back Texas. When we reflect on what public sentiment was only one year ago, and is now, it is as pleasing as surprising to perceive how it has grown on this subject. Without government support, this progress is strong proof of popular will. When Congress came together last year, Texas was little known in the greater part of the United States, and less liked. Most people were ignorant of the localities, the advantages, the rights, and the realities of that fine region. A vote on it then would have been largely negative. There was little public attention but what was elicited by the manifesto of some members of Congress warning the country against annexation as the mother of disunion and of slavery—in twin calamities earnestly deprecated as its offspring. Whereas I venture to assert that the general disposition for Louisiana, which brought it into the Union without a clause in the constitution, was by no means so preponderant when that territory was acquired, either in 1803 or 1819, as the inclination is for Texas now. I go further, and assert that the war of 1812 was waged for nearly three years to a successful end by much less of a majority of the American people than now approve the recovery of Texas. A much greater and more formidable minority opposed that war than now repudiate Texas. I mean nothing invidious by these statements, but aver them as facts full of meaning.

If, then, we represent an American Union governed by the will of the people, it is our representative duty to bring back Texas into it, if we can. This is the duty of Congress, in both branches; and the numerous proffers in this House, of plans, not very different in their postulates, prove that many covet the honor of being the advocates of Texas. Indeed, except unfounded apprehensions of the spread of domestic slavery, there is hardly a great question of public policy on which the American will is more united.

Such being the case, I shall, as a sincere well-wisher of the measure, strive to conciliate harmonious action on it, by voting for any and every reasonable plan for its accomplishment. Tenacious of no one—ambitious of no selfish or peculiar honor in the movement—the earliest recovery of Texas will be my study, and every feasible arrangement I commend my vote. As it is a contract or bargain with another country, it seems to me that an arrangement, carefully digested, with the agents of that country, authorized ad hoc, must be the best mode, if not the only one. But if any gentleman can show that it may be as well done without regard to the terms and conditions of the treaty, that gentleman's plan shall have my vote, should the terms of the treaty be deemed too obnoxious for adoption. As it is annexation to and at the South I think the wishes of the South entitled to be most consulted; just as

those of Maine and Massachusetts were consulted in the late settlement of the northeastern boundary. Still, like that of Maine, the Texas question is national; and national considerations should prevail in the latter as they did in the former, when the Union, south, and west, and central, sustained the northeast in its plan of settlement. It is undeniable, however, that southern institutions, southern frontiers, southern institutions—I mean slavery and all—are to be primarily regarded in settling the restoration of Texas. It is a Texas question and a southern question. If southern Secretaries of State—one of whom originated, and another is striving to consummate, the affair—betray southern partialities which many of us may deem not quite national, that is no reason why a great national measure should not be effected of great national considerations. So, if our minister to Mexico discuss the matter with the Mexican authorities in a tone or temper which we may not approve, that is no sufficient reason why the affair itself should be frustrated. We must regard the merits and substance of the measure, and negotiation concerning it, without being prejudiced or prevented by the mere manner of dealing with them.

The national considerations have been too abundantly laid before public opinion in every form of argument, to require that I should reiterate them here. I shall, therefore, content myself with very summary intimations.

1. The commercial, agricultural, manufacturing, navigation, both riverain and oceanic—the whole interior view of the subject is, I think, irresistibly inviting. The acquisition of Louisiana, on all hands conceded to be inestimably beneficial to the whole United States, loses half of its value without Texas, which is a natural part of that complete region. Accordingly, since the treaty of Florida gave it up, every administration has been endeavoring to regain it. Louisiana, as acquired by the treaty of 1803—that is, including Texas and Oregon—would demonstrate and establish, in the progress of a few years, the prodigious advantages of free trade. There is no national benefit more important, as regards commerce, manufactures, agriculture, and all the useful arts, the wealth and the peace of a nation, than free trade. That does not mean unrestricted trade between foreign nations, but between all parts of any one nation. Between foreign nations there is no free trade. There can be none but by treaty. But when a nation so extended and diversified as this opens all its soil, vegetable and mineral productions, its commerce, navigation, and manufactures, to free trade among all its parts, Maine and Vermont, Maryland and Michigan, Louisiana and Arkansas, enjoy and feel, throughout the vast amelioration of their inhabitants, being protected by one and the same forbearing government, in the most precious of all industrial privileges—that of being let alone. Peace, plenty, prosperity, are the perennial fruits. The wider the area of freedom and equality the better, even though some of the laborers be bondmen. When notions of free trade and permanent peace began to dawn under the greatest of the French monarchs, and he desired to associate all Europe in one great republican confederation, it was but an imperfect idea of what these United States may be, with five Texian and ten Oregon States added to the twenty-six now in union under institutions of free trade, local sovereignty, and representative government.

Whatever objection to the incorporation of Texas there may be, they have no countenance in the beneficent economy of the measure.

2. The territorial limits are marked in the configuration of this continent by an Almighty hand. The Platte, the Arkansas, the Red, and the Mississippi rivers, without counting great, though minor streams, in that vast, terraqueous region of cotton, sugar, lead, and other mighty staples, which have in a few years kept pace with steam itself in marvellous development—those rivers are naturally our waters, with their estuaries in the bay of Mexico. The stupendous deserts between the Nueces and the Bravo rivers are the natural boundaries between the anglo-Saxon and the Mauritanian races. There ends the valley of the West. There Mexico begins. Thence, beyond the Bravo, begin the Moorish people and their Indian associates, to whom Mexico properly belongs; who should not invade that vast desert if they could, as on our side we, too, ought to stop there, because interminable conflicts must ensue either our going south or their coming north of that gigantic boundary. While peace is cherished, that boundary will be sacred. Not till the spirit of conquest rages will the people on either side molest or mix with each other; and whenever they do, one or the other race must be conquered, if not extinguished.

3. And there, if any where, in the providence of God, may negro slavery undergo some radical improvement. I do no mean, in this mere preliminary statement, more than to allude to that much-vexed topic. But I believe the passionate denunciation which, on this account, met the advent of Texas with curses, has been much mitigated. Soberer and better views have succeeded. Slavery cannot expand through the annexation of Texas: probably the contrary. The African race may have a chance in Texas or neighboring Mexico, of proving that it is not inferior to the Caucasian. In some judgments it is the doctrine of Scripture that the African's destiny is not to equal the European; at any rate, their transplantation from Africa to the south of North America cannot harm them.

4. The questions of right and title have been superabundantly argued. *Remitted* as we are by the course of events to our original right to Texas, is there any thing in our organic law which forbids reannexation? The common law of private right by "Hemitier (2) is, where he who hath the true property, or *jus proprietatis*, in lands, but is out of possession thereof, and hath no right to enter without recovering possession in an action, both afterwards the freehold cast upon him by some subsequent, and of course defective, title; in this case he is remitted, or sent back, by operation of law, to his ancient and more certain title. The right of entry, which he had gained by a bad title, shall be, *ipse facto*, annexed to his own inherent good one; and his defeasible estate shall be utterly defeated and annulled, by the instantaneous act of law, without his participation or consent."—3 *Blackstone's Com.* 19.

I shall merely add on this head, that if we can acquire foreign territory by purchase or by conquest—if *these* are right appurtenant to national sovereignty—I do not see why we may not, by act of Congress, by compact, though it be not by treaty, technically so called. Grants of money, possibly war, are involved in the measure; which, for these reasons, should be accomplished by act of Congress, not by treaty.

Having thus disposed of the policy and right to reannex Texas, let us consider what other nations have to say to it—Mexico, Great Britain, France, and the rest of the world; for we are amenable to Russia, Austria, Prussia, Spain, Naples, Holland, Belgium; why not to Brazil, Buenos Ayres, Chili, and Venezuela, as to Great Britain, the most pragmatic among the protestants against our action.

As there was a time when the United States cultivated entire segregation from European connection, so now is it now our policy to prevent foreign interference in our affairs. Our growth, numerous treaties and extensive intercourse with nearly all the world, even the empire of China, (and it has been attempted, I believe, with that of Japan,) have established the United States in the family of nations. The administration endeavored to arrange an American alliance to comprehend this hemisphere. While peace and forbearance are still our interest, it is plain that, by commerce and naval force in every sea, embassies in every country, and irresistible tendencies, we are, though not a meddling, yet a moving people.

To Mexico we offer explanation for our incorporation of Texas—explanation which she will be satisfied with. I shall refrain from argument—from arguing the extent of that explanation. Although the public correspondence between the two North American republics has become angry, I am happy to be authorized to assure this House that those beat acquainted with the true state of things apprehend little or no danger of war: the main sinew of war—money—will heal the breach, and end the controversy amicably. I afford me great satisfaction to be authorized to state that hostilities are not probable with Mexico.

With equal pleasure, I add, on the same authority, that there is as little danger of war with Great Britain. That great maritime empire, whose dominions controls nearly all Asia, some of Africa, much of America, and is primary in Europe, will not wage war with this country for Texas. Though perhaps desirous of close commercial alliance there, and that slavery should be no longer suffered, yet the present amicable relations between Great Britain and the United States authorize the confident belief that Texas will be no cause of quarrel between them.

France likewise, as has been already made public, will not take any part in any such quarrel. All the rest of Europe, and of the world, wisely looks on, not indifferent, but uninterfering spectators.

Thus the reannexation of Texas will be accomplished in peace with all the world, and with as much harmony among ourselves as can be expected of any great national measure of local action. It has become mere matter of when and how; the event is no longer problematical. When a commander-in-chief was to be chosen by Congress, in 1776, John and Samuel Adams suggested Colonel Washington, of Virginia, not so much for any great personal merits he had then displayed, as for the sake of uniting the South in a contest which began in the eastern North. When war was declared, in 1812, for injuries most felt and complained of in the North, the South and the West went up with great unanimity to the support of it. Why are Congress here annually assembled, and during many months in session, often without much performance? To make law? No. Most of that is done by twenty-nine local legislatures. We come here, and we stay here, to find and to show that we represent one nation; to dispel provincial prejudices; to cultivate national attachments; to *prevent* war; to preserve peace; to interchange mutual good offices; to show each other and all the world that we are a world by ourselves, and disown all disunion. Texas will naturalize this nationality as Louisiana did, as Maine did, as the wars of 1776 and 1812 did. A strong and salutary opposition there will always be to everything. But Texas, I predict, will prevail over party and section.

All that is necessary to carry the restoration of Texas is an expression by act of Congress, of nationality, a general expression by Congress, following that of the country, that it is right, and ought to take place. There is no war in this act, unless hostilities be forced upon us. It is not the way to war, but the pledge of peace. The treaty rejected last session may not have been the most desirable method of acquiring Texas. I never thought so. My humble opinion always was that so great an *event* should be signalized by act of Congress, publicly deliberated, and enacted in all the forms that solemnize the most momentous legislation. Public sentiment should have been invited to its aid. Popular enthusiasm would have succored the discussion, and sanctioned the result. But any method of acquisition may be effected without war. If the treaty had been confirmed, in ten days afterwards all opposition to it would have ceased, and a governor of the territory would have repaired to his post as quietly as Governor Claiborne took possession of Louisiana, and General Jackson of Florida. The delegate from Texas would now be here.—There is nothing to be dreaded but delay. Delay is imminently dangerous. There must be in Texas a great deal of personal, selfish opposition to annexation. Many eminent men may oppose it. It needs all the sympathies of a kindred people to sustain the measure against wayward and tantalizing procrastination here, the menaces of Mexico, and the machinations of other powers.

Texas is ours by locality, and by kindred attachments. In some parts of the United States it is common to regard the inhabitants of that marvellous republic with extreme repugnance, and to denounce them as outlaws, bandits, and the offscourings of a discontented populace. But what is the truth? Preparatory to this discussion I have looked somewhat into their history; and, without a single circumstance to mislead my judgment, cannot hesitate to pronounce them as eminently worthy of our association. Compare their revolution with ours, and the first nine years of their miserable independence with their first nine years. The despised origin of Texas reminds one of the contumely with which ours was affronted, when Chatham said:

"When your lordships look at the papers transmitted us from America—when you consider their decency, firmness, and wisdom—you cannot but respect their cause, and wish to make it your own. For myself, I must declare and avow that, in all my reading and observation, (and it has been my favorite study,) I have read Thucydides, and have studied and admired the master statesmen of the world,—but for solidity of reasoning, force of sagacity, and wisdom of conclusion, under such a complication of difficult circumstances, no nation or body of men can stand in preference to the general Congress at Philadelphia. I trust it is obvious to your lordships that all attempts to impose servitude upon such men—to establish despotism over such a nation, must be vain—must be fatal."

Or compare them with any other people born of a revolution—with England, with Holland, with France—as those nations were when they first de-

posed the government that enslaved them, and set up for themselves. The last of the revolutions of the most refined European nation produced a government called the bastard of a bloody knight. The insurrection of Texas against Santa Anna's despotism was the legitimate assertion of a free people's independence—achieved by admirable combinations, immortalized by a victory never surpassed in exploit, consecrated by generosity seldom equalled in magnanimous policy. Their declaration of independence is an eloquent paraphrase of ours. Their constitution is an improvement on that which has rendered this country eminently prosperous. I have looked through their code of laws, and find them distinguished for wisdom. Ever since their independence, while the proudest nations of the Old World have been more or less disturbed by troubles, and this country not free from them, the affairs of Texas have been administered with exemplary good sense, in perfect tranquillity, and great success. We have invited them to union; exposed them by it to Mexican hostilities, and European seductions. Our government did this, and it would be disgraceful now to leave them to the proclaimed brutalities of Mexican invasion, or the tender mercies of European mediation. Whether our executive did right or wrong in this invitation, after all that has happened, it would be disgraceful to desert them. Even if we do not incorporate, we should defend them. One branch of our government made a treaty with them, which another rejected; not because the alliance was condemned, but merely the method of it. This time last year there was much more than a constitutional majority for incorporating by treaty Texas into the United States; as at this moment there is a large majority of the House of Representatives ready to vote for that incorporation, provided it can be effected on terms which vary, and perhaps fundamentally vary, as to the method of incorporation, but no more. The measure itself, freed from these varieties of mere method, would at any moment receive the votes of more than three-fourths of both branches of Congress and five-sixths of the people of this country.

The reason why the American people are resolved on the recovery of Texas, besides those which I before stated as to the advantages of the Union, is a deep-seated, well-nigh-universal sentiment of national independence, which will not tolerate European interference with our affairs, our borders, our institutions, our unquestionable rights. We provoke or seek no wars. Our institutions render it impossible to rush into them precipitately. The forms of our government are such that conciliation, compromise, concession, must always be exhausted before war can be declared. But a large majority of the whole country, without distinction of party, will never submit to aggression, encroachment, or interference, from any foreign power, especially that one which is the most formidable of all, and with which we have already been several times forced into conflict. That power is like the elements which clip us round about; northeast joins us, northwest jostles us, southwest interferes with us—everywhere crosses our way, and by sea and land, by abuse and counteraction, warning us to beware. Let us thank Providence for the encouragement to unite, at least in a lofty spirit of national independence—not anxious for conflict, but not afraid—not jealous nor secure. In this affair of Texas, let us be not merely just and fair; not, but generous, long-suffering, magnanimous, right; and when right, go forward to reannex all of Louisiana as we bought it, including Texas and Oregon.

Of the two millions seven hundred thousand suffrages at the late presidential election, at least two millions, I reckon, if not more, voted for Texas: of the twenty-six States, Maine, New Hampshire, New York, Pennsylvania, Virginia, South Carolina, Georgia, Alabama, Louisiana, Mississippi, Arkansas, Tennessee, Kentucky, Indiana, Illinois, Michigan, and Missouri—seventeen States: and, counting by population, more, I believe, than three-fourths, if not five-sixths, of the American people. Will Congress, then, after the presidential election, make a party question of Texas—Texas, which, during the late election, proved stronger than party? Will Congress do this, when every one must see that all but time is settled?—that to give time may encourage foreign machinations, may increase difficulties, may endanger hostilities, may render it necessary to do forcibly what may now be done peaceably, but cannot prevent reannexation? For procrastination must not be the thief of Texas. The method of it is matter of little moment; Any

method I will vote for; and I trust that Congress will show the world that the United States have the right, and will maintain it, to replace Texas where it was from the treaty of Louisiana, in 1803, to the treaty of Florida, in 1819—an integral and essential part of this Union.

Mr. BELSER said this was a question which had been already decided by that omnipotent tribunal, the people; and sufficient had been said upon it, throughout this Union. But he had observed that an error had grown up in all our political discussions. He had scarcely heard an argument in this House in which the speakers had not gone back to what had taken place in the preceding presidential election; and, although he could not claim for himself a perfect exemption, yet he could say that he had laid down the rule for his guidance in future—that, whatever might be the question which was the subject of consideration by the representatives of the people on this floor, he would endeavor to confine himself to the record. Arguments made on the hustings in regard to the candidates for the presidency were well enough: they formed a part of the strength of our form of government: but when they were reiterated in this hall, they unfitted the representatives of the people for correct thinking, and amounted to a waste of the public time.

The question of annexing a foreign state or republic to this government, by virtue of a concurrence of the law-making power of both, was a grave and important one, and it should be well pondered on before the step was taken; for he admitted, in candor, that there was no precedent for it in the history of this country precisely in point. It was true that Louisiana and Florida, and some other small slips of foreign territory, had been added to the United States; but these additions had been made, in the first instance, by virtue of the treaty-making power, as an incident of sovereignty, which authorizes such acquisitions, either by purchase or by conquest; and afterwards, under the power to admit new States confided to Congress, they had become members of the Union. On this subject, there were no legislative expositions that met the question, and hence they must look beyond the constitution and history of the federal government, to ascertain our true position. By some it was broadly contended that even the treaty-making power cannot admit territory into this Union, out of which to form new States for admission into it, without the consent of each of the States of the Union. The government of the United States, it was said, was a political form, and that no other partner could be admitted into it, without the consent of the whole; and that if it was attempted to admit Texas without this general consent, the present partners would be under no obligation to adhere to the contract. It was further said that slavery was a stain on our national character; and hence the government of the United States had no right to extend, or in any manner increase it by the incorporation of new slave territory into the Union; that by virtue of the federal compact, it should be limited to those States where it existed at the time the compact was formed. There were others, who, to some extent, disagreed with those whom he had already mentioned; they admitted the right to admit foreign territory into this government by virtue of the treaty-making power, but denied the right to do the same thing by a legislative act of both the governments in question; maintaining the proposition that the treaty-making power must first admit the territory before Congress can admit the new States spoken of in the constitution. They say that, by the constitution, the power of making treaties was vested in the President and Senate; and being thus conferred, that Congress cannot do that which the President and two-thirds of the Senate are alone authorized to do; that such legislation, if permitted, would supersede the written constitution, and substitute for it the "omnipotence of the British Parliament." They further say that the United States having recognised the independence of Texas, she is an independent nation; and that every compact between independent nations is a treaty. Now, if this were true, the whole question was at an end; and hence it became their duty to examine those objections which had been made against annexation by the law-making power of the two governments.

He had said that no precise case in point was to be found in the history of this country; nor could they find any analogous case in the history of any

other government, because there was no government like this. Louisiana and Florida were admitted into the Union by the treaty-making power as an incident of sovereignty, and afterwards were created into a Territory and State; and he put the acquisition of Texas on the same ground of sovereignty, in his joint resolutions of which he had given notice, and which he had caused to be published in the Globe of last night. Several instances had occurred in the history of the government, of the acquisition of territory, which was obtained on the ground of national preservation, which was above all law; but he expressed the opinion that the doctrine was unsound which assumed that every legislative contract between sovereign and independent nations was a treaty; and must go to the treaty-making power of the country. Every legislative contract was not a treaty, nor was it necessary that they should all go before the treaty-making power. When gentlemen said that the legislative power of this government had no right to annex foreign territory to it, he asked them to point out to him any express power in the constitution which authorized the treaty-making power to do it. How was it acquired? Why, the treaty-making power acquired it as an incident of sovereignty: but it was as much an incident of sovereignty in the legislative department to erect new States out of territory acquired by law, as it was to obtain the territory out of which they were to be formed by treaty.

Now it made no difference whether this legislative contract be for territory, trade, or boundary, or anything else. These differences of object did not alter the principle, except when controlled by the constitution.

Mr. B. proceeded to refer to various contracts entered into between this government and the States—legislative contracts for territory. If the position was correct which was maintained in the Virginia resolutions, and which contained to this day the republican creed that the States were sovereignties, and that the United States government had no other powers than those which were specially delegated to it, he wanted gentlemen to point out to him the difference between legislative compacts between this government and the States of the Union, for the acquisition of territory, and between this government and foreign governments.

On the 6th Sept. 1780, Congress passed a law to produce tranquillity in this government. The scenes which had taken place under the old confederation were fresh in the recollection of that body. The States were asked to cede their waste and unappropriated lands for the common benefit, and to secure the general tranquillity of the government. Mr. B. cited the various cessions made in accordance with this recommendation: that of New York on the 1st of March, 1781; of Virginia, the mother of States, the birth-place of Jefferson, the citadel of liberty, on the 1st March, 1784; of Massachusetts on the 19th April, 1785; of South Carolina on the 9th August, 1787; of North Carolina on the 2d April, 1790; of Connecticut on the 30th May, 1800; of Georgia, on the 24th April, 1802; of Georgia, (by another act,) on the 17th March, 1812, &c. There were (said Mr. B.) legislative contracts for the acquisition of territory in this country before and after the adoption of the federal constitution, and they were never submitted to the treaty-making power.

But he did not stop here; he said that the chief portion of his argument would be to prove the fact that the legislative power of the Union has the right to annex foreign territory; and while he said this, he must be permitted to observe, at present, his mind doubted on the policy of a foreign government erecting itself into a State and asking admission into the Union. He was going to remain uncommitted on that point, and he wished gentlemen supporting that view to be heard. It was a great constitutional question, and one which they should not treat lightly.

There were also legislative contracts of this Union with foreign nations. This latter proposition was the point which he wished to establish. Without going minutely into the matter, he said that all our non-intercourse acts were of that character. We said to France, If you will remove certain restrictions on trade, we will; and the same to Great Britain. What, he asked, were these but legislative compacts with foreign nations? But another case, directly in point, was the treaty of boundary between the govern-

ment and Texas—one of the highest acts of sovereignty that could be performed. It was a legislative compact to all intents and purposes; he admitted that the Senate did pass it unanimously, but it never was submitted to them as a treaty.

He knew that men were very apt to be fond of their own creations, and he claimed no exemption from this frailty. If ever he had given his attention to any subject, it had been to this; and he asked honorable gentlemen to do him the justice to look at his proposition for the annexation of Texas published in the Globe; and if he could show precedents for the mode proposed, it was more than could be shown for any other proposition. Mr. B. stated briefly the provisions of his proposition. One was to annex the territory; another to authorize the President of the United States; as soon as jurisdiction was obtained over it, to raise a temporary government, until otherwise provided by Congress; another to provide for settling the difficulties with foreign nations which might arise; and another to grant protection to the Texians during the negotiation. Any member who believed he could vote to exercise the great right of self-preservation—which was no more or less than this, when our institutions were endangered by a crisis not contemplated by the framers of our constitution at the formation of that instrument, that we had a right to adopt the necessary measures to meet that crisis—any member who could bring his mind to agree with him on that point —ay, any member who believed that the law-making power had the right to annex Texas—could vote for these resolutions. At the proper time, he intended to offer them to this body.

As further precedents to justify this measure on the ground of national security, Mr. B. referred to 3d vol. laws of the United States, page 65, when would be found a legislative act, authorizing Mr. Jefferson to take possession of the country ceded by France in 1803 under the treaty of Paris, and to establish a temporary government, which was to exist until Congress should alter it. In his resolution he provided that the President should be governed by the laws relating to the territorial governments of this union, so far as they were applicable. When the men of the revolution, fresh from the field of glory—when the men who had aided to form our matchless constitution were present, this authority was given to Mr. Jefferson, and subsequently similar authority was given to Mr. Madison. Any member, then, who had these constitutional scruples about annexing foreign territory, had only to put the question on the ground of national preservation. As further precedents going to establish the same principle, Mr. B. referred to the act of 15th January, 1811, to take possession of the country lying east of the Perdido, and south of the State of Georgia, and Mississippi territory, of 12th February, 1813, to take possession of the country lying south of the Mississippi territory, and west of the Perdido.

These (he said) were cases which were put on the ground of necessity; and the President, in each instance, was vested with certain powers to carry the object of the government into effect. Suppose they were to pass these resolutions of his which were sustained by these precedents; it would be the duty of the President to appoint a governor, secretary of state, and legislative council, to exist for the time being; and he could go further; if it became necessary to have a delegate in the next Congress of the United States to represent that Territory, he could order an election therefor. It seemed to him that every other plan he had seen on this floor had been deficient in this respect.

He would say to this House, that he was not wedded to any particular scheme. He would vote for annexation in any constitutional form. If he was in doubt, he would do as judges were instructed to do when they were in doubt. He would give effect to the legislative power of the Union.

Mr. B. wished to direct some of his remarks to the gentleman from Illinois, [Mr. DOUGLASS,] and he did it with much good will, for he respected the gentleman as a man, and as a legislator. He wanted to show the gentleman where he thought the gentleman's resolutions were not the resolutions which should be adopted by this House. Mr. B. himself much preferred the resolutions of the gentleman from Ohio [Mr. WELLER.] Still he thought they did not go far enough, so far as regards the superseding the government of Texas, and establishing our own in lieu of it. He admitted, with the gentleman, that in 1819 that country had been improperly ceded. What had induced our

able men to do it, belonged to history. What had induced them to surrender the guaranty given to Texas in 1803, was a matter which, perhaps, we would never know, at least in such a manner as to give it full faith. Now, according to the law of nations, there was but one case in which the government could part with a citizen of the United States, and that was the case of actual necessity. This was the law of nations; and it had also been decided by the supreme judicial authority of the government that the right of an American citizen under a treaty of boundary became a vested right—that the government could not trade him away like cattle or other property. He knew the gentleman's argument would be that a subsequent treaty of this character was not binding; but as far as our act went, we had incorporated these citizens of Texas, into another government; and it would come with a very bad grace from us now to deny the validity of the treaty. Having made an injudicious arrangement at that time, it became a motive why we should get it back.

Mr. DOUGLASS interposed, and (Mr. B. yielding the floor,) explained that he had not placed his resolutions, nor should he, in his argument, on the principle of the invalidity of the treaty of 1819, ceding Texas; as far as we were concerned. His position was, that although that treaty was in violation of the treaty of 1803, we were bound by that latter treaty, so far as our claim to Texas was concerned; but while we lost our rights—we were not released from the obligation to fulfil the treaty of 1803 when Texas demanded it; when Texas, having complied with the prescribed forms, demanded admission into this Union, under that treaty of 1803, we were bound to grant it.

Mr. BELSER resumed. He admitted that this treaty put an obligation upon us to get Texas back; but he never would base his argument on that notion upon the ground, after a treaty was solemnly ratified by this government, that we were legally bound to set it aside. These were his notions of national honor and integrity. We were estopped by our own act.

But Mr. B. further held that when the inhabitants of Texas were treated away, it was at their option to become, or not, members of that government to which they were passed; and if they chose not to, and had remained separate and distinct, then they were as free, sovereign and independent as any government on earth. He held that, this was the case: that when Santa Anna overthrew the government of 1824, Texas became absolved from it; and had acted just as our forefathers had—declared her independence, and maintained it. He put the question on the ground of conquest; that was the proper ground before this House; it was the ground which could be sustained by the laws of nations, by common sense, and the ground which every republican who goes for extending the area of freedom could subscribe to.

He had heard a great deal about the violation of the treaty with Mexico of 1832; but the only obligation of that treaty, he contended, was to preserve peace with the citizens of Mexico and her territories—not to abstain from preventing her from exercising dominion over a territory which was separate from her, and which she had never held by any other compact than that of 1824, above alluded to, and which was overthrown by a despot.

Another view of this question he wished to put to honorable gentlemen on this floor. How had we removed the aborigines of this country? When the first navigator discovered this continent, it was in possession of independent nations of Indians. The European governments became anxious to exercise dominion in the New World, and claimed most of their possessions in it by virtue of discovery; and since that period, the Indian title had been extinguished, partly by voluntary cession and partly from its giving way to the advance of civilization. Just let any gentleman step out on the eastern portico of the Capitol, and look at those two figures, [laughter]—Columbus with a ball in his hand, and an Indian princess, [renewed laughter]—and they could learn an instructive lesson from it. Gentlemen might laugh as much as they pleased; but it showed the superior power of civilization—the difference between the two races. Gentlemen talked about limiting the area of freedom—the area of the Anglo-Saxon race. It could never be done. In the language of his honorable friend the chairman of the Committee on Foreign Affairs [Mr. C. J. INGERSOLL,] it would go on and on to

the boundary prescribed by the God of nature; and he hoped the time would come when it would go further [laughter]—than the gentleman placed that boundary.

After this country had been discovered, (continued Mr. B.) we made the settlements of Plymouth and of Jamestown, which still remained; and we could trace in the West the Jesuit missionary and the French soldier, when they marched from the lakes to the Ohio. But the grand question was, "Where is the people who then lived in this country? Do you (said Mr. B.) occupy their lands? You certainly do. And how did you obtain them? You may talk about treaties and Indian cessions, but you obtained them by purchase. He had been arguing for the extension of civilization in this country, and he now wanted to ask the committee to look at some of the best calculations that have been made in regard to the increase of population half a century or a century from now. If you take up the writings of the best calculators, you will find that they estimate that, in fifty years, the Anglo-Saxon race in it will number one hundred millions of souls, and that in one hundred years hence they will number three hundred millions.

Gentlemen might talk about preventing the extension of the area of freedom, but they could not do it. What was to become of the young men of the West—what was to become of the rising generation there half a century hence? They will go to Oregon, to Texas; yes, far beyond the Rocky mountains; and whoever lived to see that period would hear the song of the American reaper on the shores of the Pacific. The threat of President Houston that he would plant his standard on the walls of the capital of the Montezumas, had been much ridiculed; but its accomplishment was not so improbable as some persons supposed. If Mexico persisted in her idle claims of sovereignty over the republic of Texas, and in her present course of injustice towards her people, the day was not far distant when the declaration of the Texian President would prove itself to be true.

Mr. B. referred to the population of the West, and to the foreign emigration there. He was willing to vote for any amendment of the naturalization laws that would guard against the frauds that had been complained of, but he never would vote to extend the term of residence required before naturalization. Now he wanted this country, not only for the native-born American to go to, but for every lover of liberty in the Old World. He had equal the question of the extension of civilization; and there were other questions which he would also touch on, if time permitted. In regard to the question of slavery, he would only say that, if it was an evil, the British government and the Southern men fastened it on us. It was in the compact which bound the States together, and could not be done away with without destroying that compact. If the people of the North and Northwest had a right to new States in which the institution of slavery did not exist, the people of the South had an equal right to be surrounded by States with institutions similar to their own, to secure their safety. He did not wish to annex Texas to the Union for the purpose of restoring the balance of power between the North and the South. That day had gone by; the sceptre had departed from Judah; all he wanted was security for those institutions which were established by the agency of this government.

Mr. B. concluded by saying, that he was clear in the conviction that Texas could be annexed as a Territory to the United States, by the law-making power of both governments. He was equally clear in the opinion that we could annex it in the same way on the ground of national preservation. But he somewhat doubted the right of Texas to form herself into a State, and ask to be admitted into the Union. He was prepared to vote for any proposition to incorporate it according to the views above indicated.

The foregoing is but an imperfect sketch of the remarks of Mr. B. They will be given in full in a few days.

The question being put on the amendment, Mr. DROMGOOLE suggested that the mover [Mr. DOUGLASS] was not in his seat, and he submitted whether it would be proper to take the question in his absence. The gentleman would, no doubt, like to be heard on his amendment.

Mr. DOUGLASS (from another part of the hall) observed that he did design to make some remarks on his amendment, and would, perhaps, do so on

CONGRESSIONAL GLOBE.

another occasion, before the close of the debate. If, however, the committee was disposed to take the question now, he would waive his right to be heard.

Mr. BAYLY said it was obvious that a debate of this important and interesting nature would not so soon be closed, and that many gentlemen wished to be heard on it who were not disposed to proceed at this late hour. Without any intention to occupy the floor on this subject, he moved that the committee rise.

This motion prevailing, the committee rose, and reported progress.

Mr. TIBBATTS, on leave, introduced the following joint resolution, which were read the first and second time, referred to the Committee of the Whole on the state of the Union, and ordered to be printed, viz:

A bill to authorize the people of Texas to form a constitution and State government, and for the admission of such State into the Union, on an equal footing with the other States.

A joint resolution pledging to the citizens of Texas the protection of the nation till the question of reannexation be definitively settled.

Mr. BELSER, on leave, introduced a joint resolution for the annexation of the republic of Texas to the United States: read twice, referred to the Committee of the Whole, and ordered to be printed. [This joint resolution has already been published in the Globe.]

The bill from the Senate to grant certain lands to the State of Indiana to enable that State to extend and complete the Wabash and Erie canal, was read twice, and referred to the Committee of the Whole on the State of the Union.

The House then adjourned.

The following notices of petitions presented to-day, were handed to the reporters by the members presenting them:

By Mr. MOSELEY: The petition of citizens of Buffalo, New York, for an appropriation for a sea wall to protect Buffalo harbor.

By Mr. HOPKINS: The memorial of Wm. Ballard Preston and 18 others, members of the bar, asking for increase of compensation for the judge of the western district of the State of Virginia: referred to the Committee on the Judiciary.

By Mr. BAYLY: The petition of sundry citizens of Northampton, Virginia, and ship-owners and masters, praying for an appropriation to "buoy out" Sand Shoal Inlet.

By C. H. REED: The memorial of James Haggart and 130 citizens of Black Rock, New York, praying the passage of an act to prevent, under proper penalties, all other than American vessels from transporting passengers and baggage from one American port to another on our coast or lakes.

By Mr. HENRY DODGE: The memorial of S. Morgan and 118 citizens, of Oswego county, State of New York, asking Congress for an appropriation for the improvement of the Fox and Wisconsin rivers, in the Territory of Wisconsin: referred to the Committee on Public Lands.

By Mr. SEVERANCE: The petition of Dudley P. Bailey and 40 others, of Maine, that Congress will pass, with all convenient haste, a law by which every citizen, who may be desirous of cultivating the earth for a living, shall be enabled to enter upon the public lands and occupy a reasonable sized farm thereon, free of cost. The petition of Zebah Washburn and seven others, of Kennebec county, Maine, that Congress will reject all propositions for the annexation of Texas to the United States as a slaveholding territory. The petition of John James and 54 others, of Lebanon, that Congress will reject all propositions for the annexation of Texas to the United States. The petition of Eli B. Lord and 56 others, of Maine, that Congress will abolish slavery in the District of Columbia, and the Territories of the United States.

By Mr. ROCKWELL: The remonstrance of 179 citizens of North Adams, Massachusetts, against the annexation of Texas as a slaveholding territory.

By Mr. LABRANCHE: The petition of citizens of Louisiana, against the removal of the surveyor general's office from Donaldsonville to Baton Rouge.

By Mr. JOHN W. DAVIS: The petition of James Reily and 34 others, praying a grant of land to complete the Wabash and Erie canal to the Ohio river. Also the petition of Lewis Kightnyer and 170 others, upon the same subject.

By Mr. ROGERS: The petition of Anthony McKellor and 64 others, citizens' of the county of Washington, and State of New York, praying Congress to devise and adopt speedy and effectual measures for the abolition of slavery throughout the United States. Also the petition of 49 citizens of the county of Washington, and State of New York, for the reduction of the rate of postage, and the abolition of the franking privilege.

By Mr. REEZE: The petition of John Anderson, of Missouri, praying that there be refunded to him the amount paid into the treasury, arising from land rents, obtained from lands granted to Roger Cagle by the Spanish authorities prior to the cession of that country to the United States, and which tract has since been confirmed to the said Roger Cagle or his legal representatives: referred to the Committee of Claims, with the accompanying papers.

By Mr. HERRICK: The petition of Elliot R. Swords and 39 others, citizens of Saco, in the State of Maine, praying that the propositions for the annexation of Texas to the United States be rejected: referred to the Committee on Foreign Affairs.

By Mr. JOHN STEWART: The petition of Samuel Frothingham, of Middletown, in Middlesex county, Connecticut, asking Congress for an increase of pension.

By Mr. McCLELLAND: The petition of Roswell Hale, of Adrian, Michigan, for an increase of pension. The claim of the Messrs. Eldred, of Detroit, for damages, &c., on account of the seizure of the "Copper Rock." The claim of Captain John Martin, of Detroit, for payment for property destroyed during the war.

By Mr. CATLIN: The petition of Mark Rutledge and 165 others, citizens of Norwich, Connecticut, praying for a reduction of postage: referred to the Committee on the Post Office and Post Roads.

By Mr. PARMENTER: The petition of Commodore Joseph Smith, commanding the American squadron in the Mediterranean, and 540 officers and men of the United States frigate Cumberland, praying that the spirit portion of the navy ration may be abolished: referred to the Committee on Naval Affairs.

By Mr. TYLER: The petition of Zalmon G. Keeler and others, of Chautauqua county, New York, praying for a reduction in the rates of postage. The remonstrance of Zalmon G. Keeler and others, of Chautauqua county, New York, against the annexation of Texas, or the admission of any new slave State into the Union. The petition of E. T. Foote and others, of Chautauqua county, New York, praying for the abolition of slavery and the slave trade in the District of Columbia and the Territories of the United States, as well as the internal slave trade, and for the repeal of certain laws in relation to slavery in the District of Columbia.

By Mr. GRINNELL: The petition of E. H. Holmes for extension of a patent.

## HOUSE OF REPRESENTATIVES.

### SATURDAY, January 4, 1845.

The journal of yesterday was read and approved.

Mr. REUBEN CHAPMAN asked the indulgence of the House to make an explanation which he considered personal to himself. Mr. C., with the unanimous assent of the House, proceeded.

He said it would be recollected that, in the course of his remarks in Committee of the Whole a few days ago, on the bill to graduate and reduce the price of the public lands, he had occasion to avert to the fact that Alabama was one of the indebted States, and needed all the means within her limits, of raising revenue to discharge her liabilities, and preserve her faith; that at this time two-thirds of the lands within the State belonged to the general government, consequently the State was deprived of her principal source of revenue, not having the power to tax the lands of the United States. Nevertheless, Mr. C. said, that his State had, under these, and every other disadvantage, preserved her faith, by promptly discharging her obligations. In this connection Mr. C. said he felt himself called upon to notice an article that appeared in the National Intelligencer of this city of the 27th of August last.

Mr. C. said he sent then an extract he had taken from that paper for the clerk to read, and he did read it. He sent the same extract now, and, he called upon the clerk to say (and he did say) that it was identically the same, without any alteration whatever. The following is the extract referred to:

From the National Intelligencer of Aug. 27, 1844.

"ALABAMA ELECTIONS.—The Texas flag waves over the State in triumph. Unable to pay their own debt, the people vote to assume the immense debt of Texas. The whigs have struggled nobly for their principles, and for protection to our own citizens, but it has been in vain. The fancied benefits of foreign aggression and war have dazzled the eyes of the Locofocos of the State, and we cannot shut them to lose sight of what their own country stands so humanably in need of. Steady, whigs, steady; strike earnestly from this to the election, in aver of the good cause. Do your duty, and leave the result to Providence. Elsewhere all is well. Locofocoism is doomed."—Southern Tuscaloosa Advocate.

Mr. C. said that he had seen, in the National Intelligencer of this morning, some comments upon his speech, so far as it related to this extract; and although he trusted the editors of that paper entertained no such design, the article of this morning might be understood as charging Mr. C. with an intention of imposing upon the House the extract referred to as an editorial article. Mr. C. said it would be observed that the extract published in the Intelligencer of this morning and that he had read read at the clerk's table were identically the same—both gave credit to the "Southern Tuscaloosa Advocate" for the origin of the extract referred to. Mr. C. disclaimed any intention of charging the editors of the Intelligencer with originating the extract, though it appeared in that paper under the editorial head. It was credited, however, as stated. Mr. C. said that the ground of his complaint was, that a paper of the high character of the National Intelligencer, and of its extensive circulation, should circulate such a slander upon his State upon no better authority. The article had the endorsement of the National Intelligencer, and this is one of the cases where the endorsers, and not the makers, ought to be held responsible. The National Intelligencer is a paper of great reputation: although he differed entirely with its editors politically, he respected them as opponents worthy of notice. Mr. C. read the paper regularly as the best whig authority; and he not only knew that it had a wide circulation in all quarters of the globe, but for the financial condition of the States it was considered by capitalists of high authority. By the endorsement of the slander, the injury to the credit of his State had been 'so unfairly inflicted, and not by the original slanderer. Now, Mr. C. said, there is no such paper as that credited. He knew of no "Southern Tuscaloosa Advocate," and he called upon his colleague from that district to state whether there was any such paper.

Mr. PAYNE stated that there was no such paper as the "Southern Tuscaloosa Advocate," to his knowledge, nor had any such paper ever existed.

Mr. CHAPMAN said he did not intend to insinuate that the editors of the Intelligencer had made a false extract—he had no doubt but that the article was extracted from some paper, though the name was incorrectly given. Mr. C. said it was due to the editors of the Intelligencer to state, that there was a paper called the "Southern Advocate" in Alabama, but not at Tuscaloosa: he would not say that the article did or did not appear in that print, though he was in the habit of reading it, and had never seen such an article. Mr. C. said his only object in trespassing on the House was, to acquaint himself of any just cause of censure for what he has said and done in this matter; he felt sure he had succeeded in satisfying the House that he had done no more than his duty, and that he was fully sustained by the facts in what he had said and done.

Mr. PHENIX asked leave to present a memorial on a subject now before the House?

The SPEAKER said it was not in order; it could only be received by general consent.

[A voice: "On what subject?"]

No objection being made—

Mr. PHENIX presented a memorial from the Society of Friends, in New York and Vermont, against the annexation of Texas; and he asked for the reading thereof.

The memorial—discussing at some length the evils of slavery, and protesting against annexation on reasons connected therewith—was nearly read by the clerk; when

Mr. McCLERNAND moved to dispense with the reading, and to lay the petition on the table; but being informed by the clerk that but one paragraph remained unread, he withdrew his motion.

Mr. CAMPBELL renewed the motion of the gentleman from Illinois. He hoped the paper would not be read. He did not think the gentleman from New York [Mr. PHENIX] had acted with his usual fairness in introducing this paper in this manner, and calling for its reading, its contents being unknown by the House. Why inflict such a paper on the House? There had not been a more violent antislavery paper before the House at this session. He would have excepted more frankness and candor from the gentleman from New York.

Mr. PHENIX remarked that these resolutions came from the very highest source. He had not been exactly aware of its contents, but, as he had been requested, he had asked its reading. He now moved the reference to the Committee of the Whole on the state of the Union.

The question was taken, and the further reading of the petition was dispensed with.

The second division of the motion of Mr. CAMPBELL (being the first motion in order) was taken—the yeas and nays having been ordered on motion of Mr. HAMLIN of Ohio; and the vote stood—yeas 87, nays 87—as follows:

YEAS—Messrs. Arrington, Atkinson, Bayly, Barringer, Belser, Bidlack, James' Black, James A. Black, Bowlin, Boyd, Brodhead, Aaron V. Brown, Milton Brown, William J. Brown, Burke, Burt, Caldwell, Campbell, Chappell, Clinch, Clinton, Cobb, Coles, Cross, Cullom, Daniel, John W. Davis, Dawson, Dean, Deberry, Dellet, Dromgoole, Duncan, Ellis, Ficklin, Foster, French, Fuller, Goggin, Hammett, Haralson, Hays, Holmes, Hopkins, Houston, Hubard, Hughes, Jameson, Cave Johnson, Andrew Johnson, George. W. Jones, Andrew Kennedy, Lucas, Lumpkin, McClernand, McConnell, McDowell, Isaac E. Morse, Newton, Owen, Payne, Pettit, Peyton, Pratt, David S. Reid, Relfe, Roberts, Simpson, Slidell, Robert Smith, Rembrandt, Stephens, Stiles, James W. Stone, Strong, Summers, Taylor, Thomasson, Thompson, Tibbatts, Tucker, Weller, Wentworth, Woodward, Yancey, and Yost—87.

NAYS—Messrs. Abbot, Anderson, Baker, Barnard, Benton, Brengle, Brinkerhoff, Buffington, Jeremiah E. Cary, Carroll, Catlin, Chilton, Clingman, Collamer, Cranston, Dana, Darragh, Garrett Davis, Richard D. Davis, Dickey, Dillingham, Elmer, Farlee, Fish, Florence, Foot, Giddings,



**LIBRARY**
LIBRARY OF CONGRESS



Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the online collections of the Library of Congress contain a publication entitled **THE UNITED STATES CODE, 2012 EDITION,** and that the attached photocopies from Volume Twelve – the title page, the copyright page and pages 291 - 296 on which appears **§ 1028** *Fraud and related activity in connection with identification documents, authentication features and information*– is a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on January 4, 2021.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress



# UNITED STATES CODE

## 2012 EDITION

### CONTAINING THE GENERAL AND PERMANENT LAWS OF THE UNITED STATES ENACTED THROUGH THE 112TH CONGRESS

(ending January 2, 2013, the last law of which was signed on January 15, 2013)

Prepared and published under authority of Title 2, U.S. Code, Section 285b, by the Office of the Law Revision Counsel of the House of Representatives



## VOLUME TWELVE

### TITLE 18—CRIMES AND CRIMINAL PROCEDURE

TO

### TITLE 19—CUSTOMS DUTIES

§§ 1–1654

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 2013

This book has been digitally archived to maintain
the quality of the original work for future generations
of legal researchers by William S. Hein & Co., Inc.

This volume printed on acid-free paper
by William S. Hein & Co., Inc.



Printed in the United States of America.

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800; DC area (202) 512-1800
Fax: (202) 512-2104   Mail: Stop SSOP, Washington, DC 20402-0001

Words "of Agriculture" were inserted after "Secretary" for reasons of identification.

Words "upon conviction thereof" were omitted as surplusage, since punishment can not be imposed until after conviction.

Other changes were made in phraseology without change of substance.

#### AMENDMENTS

1994—Pub. L. 103–322 substituted "fined under this title" for "fined not more than $1,000".

### § 1027. False statements and concealment of facts in relation to documents required by the Employee Retirement Income Security Act of 1974

Whoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 (as amended from time to time) to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

(Added Pub. L. 87–420, §17(c), Mar. 20, 1962, 76 Stat. 42; amended Pub. L. 93–406, title I, §111(a)(2)(B)(i), (ii), Sept. 2, 1974, 88 Stat. 851; Pub. L. 103–322, title XXXIII, §330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

#### REFERENCES IN TEXT

The Employee Retirement Income Security Act of 1974, referred to in text, is Pub. L. 93–406, Sept. 2, 1974, 88 Stat. 829, as amended. Title I of the Employee Retirement Income Security Act of 1974 is classified generally to subchapter I (§1001 et seq.) of chapter 18 of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 29 and Tables.

#### AMENDMENTS

1994—Pub. L. 103–322 substituted "fined under this title" for "fined not more than $10,000".

1974—Pub. L. 93–406 substituted "Employee Retirement Income Security Act of 1974" for "Welfare and Pension Plans Disclosure Act" in section catchline, and "title I of the Employee Retirement Income Security Act of 1974" and "title" for "the Welfare and Pension Plans Disclosure Act" and "Act", respectively, in text.

#### EFFECTIVE DATE OF 1974 AMENDMENT

Amendment by Pub. L. 93–406 effective Jan. 1, 1975, except as provided in section 1031(b)(2) of Title 29, Labor, see section 1031(b)(1) of Title 29.

#### EFFECTIVE DATE

Section effective 90 days after Mar. 20, 1962, see section 19 of Pub. L. 87–420, set out as a note under section 664 of this title.

### § 1028. Fraud and related activity in connection with identification documents, authentication features, and information

(a) Whoever, in a circumstance described in subsection (c) of this section—

(1) knowingly and without lawful authority produces an identification document, authentication feature, or a false identification document;

(2) knowingly transfers an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority;

(3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor), authentication features, or false identification documents;

(4) knowingly possesses an identification document (other than one issued lawfully for the use of the possessor), authentication feature, or a false identification document, with the intent such document or feature be used to defraud the United States;

(5) knowingly produces, transfers, or possesses a document-making implement or authentication feature with the intent such document-making implement or authentication feature will be used in the production of a false identification document or another document-making implement or authentication feature which will be so used;

(6) knowingly possesses an identification document or authentication feature that is or appears to be an identification document or authentication feature of the United States or a sponsoring entity of an event designated as a special event of national significance which is stolen or produced without lawful authority knowing that such document or feature was stolen or produced without such authority;

(7) knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law; or

(8) knowingly traffics in false or actual authentication features for use in false identification documents, document-making implements, or means of identification;

shall be punished as provided in subsection (b) of this section.

(b) The punishment for an offense under subsection (a) of this section is—

(1) except as provided in paragraphs (3) and (4), a fine under this title or imprisonment for not more than 15 years, or both, if the offense is—

(A) the production or transfer of an identification document, authentication feature, or false identification document that is or appears to be—

(i) an identification document or authentication feature issued by or under the authority of the United States; or

(ii) a birth certificate, or a driver's license or personal identification card;

(B) the production or transfer of more than five identification documents, authentication features, or false identification documents;

(C) an offense under paragraph (5) of such subsection; or

(D) an offense under paragraph (7) of such subsection that involves the transfer, possession, or use of 1 or more means of identification if, as a result of the offense, any individual committing the offense obtains anything of value aggregating $1,000 or more during any 1-year period;

(2) except as provided in paragraphs (3) and (4), a fine under this title or imprisonment for not more than 5 years, or both, if the offense is—

(A) any other production, transfer, or use of a means of identification, an identification document,¹ authentication feature, or a false identification document; or

(B) an offense under paragraph (3) or (7) of such subsection;

(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed—

(A) to facilitate a drug trafficking crime (as defined in section 929(a)(2));

(B) in connection with a crime of violence (as defined in section 924(c)(3)); or

(C) after a prior conviction under this section becomes final;

(4) a fine under this title or imprisonment for not more than 30 years, or both, if the offense is committed to facilitate an act of domestic terrorism (as defined under section 2331(5) of this title) or an act of international terrorism (as defined in section 2331(1) of this title);

(5) in the case of any offense under subsection (a), forfeiture to the United States of any personal property used or intended to be used to commit the offense; and

(6) a fine under this title or imprisonment for not more than one year, or both, in any other case.

(c) The circumstance referred to in subsection (a) of this section is that—

(1) the identification document, authentication feature, or false identification document is or appears to be issued by or under the authority of the United States or a sponsoring entity of an event designated as a special event of national significance or the document-making implement is designed or suited for making such an identification document, authentication feature, or false identification document;

(2) the offense is an offense under subsection (a)(4) of this section; or

(3) either—

(A) the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce, including the transfer of a document by electronic means; or

(B) the means of identification, identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, possession, or use prohibited by this section.

¹ So in original.

(d) In this section and section 1028A—

(1) the term "authentication feature" means any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified;

(2) the term "document-making implement" means any implement, impression, template, computer file, computer disc, electronic device, or computer hardware or software, that is specifically configured or primarily used for making an identification document, a false identification document, or another document-making implement;

(3) the term "identification document" means a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals;

(4) the term "false identification document" means a document of a type intended or commonly accepted for the purposes of identification of individuals that—

(A) is not issued by or under the authority of a governmental entity or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and

(B) appears to be issued by or under the authority of the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international governmental or quasi-governmental organization;

(5) the term "false authentication feature" means an authentication feature that—

(A) is genuine in origin, but, without the authorization of the issuing authority, has been tampered with or altered for purposes of deceit;

(B) is genuine, but has been distributed, or is intended for distribution, without the authorization of the issuing authority and not in connection with a lawfully made identification document, document-making implement, or means of identification to which such authentication feature is intended to be affixed or embedded by the respective issuing authority; or

(C) appears to be genuine, but is not;

(6) the term "issuing authority"—

(A) means any governmental entity or agency that is authorized to issue identifica-

tion documents, means of identification, or authentication features; and

(B) includes the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international government or quasi-governmental organization;

(7) the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e));

(8) the term "personal identification card" means an identification document issued by a State or local government solely for the purpose of identification;

(9) the term "produce" includes alter, authenticate, or assemble;

(10) the term "transfer" includes selecting an identification document, false identification document, or document-making implement and placing or directing the placement of such identification document, false identification document, or document-making implement on an online location where it is available to others;

(11) the term "State" includes any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession, or territory of the United States; and

(12) the term "traffic" means—

(A) to transport, transfer, or otherwise dispose of, to another, as consideration for anything of value; or

(B) to make or obtain control of with intent to so transport, transfer, or otherwise dispose of.

(e) This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States, or any activity authorized under chapter 224 of this title.

(f) ATTEMPT AND CONSPIRACY.—Any person who attempts or conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

(g) FORFEITURE PROCEDURES.—The forfeiture of property under this section, including any

seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853).

(h) FORFEITURE; DISPOSITION.—In the circumstance in which any person is convicted of a violation of subsection (a), the court shall order, in addition to the penalty prescribed, the forfeiture and destruction or other disposition of all illicit authentication features, identification documents, document-making implements, or means of identification.

(i) RULE OF CONSTRUCTION.—For purpose of subsection (a)(7), a single identification document or false identification document that contains 1 or more means of identification shall be construed to be 1 means of identification.

(Added Pub. L. 97–398, § 2, Dec. 31, 1982, 96 Stat. 2009; amended Pub. L. 99–646, § 44(a), Nov. 10, 1986, 100 Stat. 3601; Pub. L. 100–690, title VII, § 7023, Nov. 18, 1988, 102 Stat. 4397; Pub. L. 101–647, title XII, § 1205(e), Nov. 29, 1990, 104 Stat. 4831; Pub. L. 103–322, title XXXIII, § 330016(1)(K), (M), (O), Sept. 13, 1994, 108 Stat. 2147, 2148; Pub. L. 104–208, div. C, title II, § 211(a)(1), Sept. 30, 1996, 110 Stat. 3009–569; Pub. L. 104–294, title VI, § 601(a)(3), (p), Oct. 11, 1996, 110 Stat. 3498, 3502; Pub. L. 105–318, § 3(a)–(h)(1), Oct. 30, 1998, 112 Stat. 3007–3009; Pub. L. 106–578, § 3, Dec. 28, 2000, 114 Stat. 3076; Pub. L. 108–21, title VI, § 607(b), Apr. 30, 2003, 117 Stat. 689; Pub. L. 108–275, §§ 2(c), 3, July 15, 2004, 118 Stat. 832; Pub. L. 108–458, title VII, § 7216, Dec. 17, 2004, 118 Stat. 3833; Pub. L. 109–13, div. B, title II, § 203(a), May 11, 2005, 119 Stat. 315; Pub. L. 109–177, title VI, § 603, Mar. 9, 2006, 120 Stat. 253.)

AMENDMENTS

2006—Subsecs. (a)(6), (c)(1). Pub. L. 109–177, § 603(1), (2), inserted "or a sponsoring entity of an event designated as a special event of national significance" after "United States".

Subsec. (d)(3). Pub. L. 109–177, § 603(3), inserted "a sponsoring entity of an event designated as a special event of national significance," after "political subdivision of a State,".

Subsec. (d)(4)(B), (6)(B). Pub. L. 109–177, § 603(4), inserted "a sponsoring entity of an event designated by the President as a special event of national significance," after "political subdivision of a State,".

2005—Subsec. (a)(8). Pub. L. 109–13 substituted "false or actual authentication features" for "false authentication features".

2004—Subsec. (a)(7). Pub. L. 108–275, § 3(1), substituted "transfers, possesses," for "transfers" and "abet, or in connection with," for "abet,".

Subsec. (b)(1)(D). Pub. L. 108–275, § 3(2), substituted "transfer, possession," for "transfer".

Subsec. (b)(2). Pub. L. 108–275, § 3(3), substituted "5 years" for "three years" in introductory provisions.

Subsec. (b)(4). Pub. L. 108–458 substituted "30 years" for "25 years".

Pub. L. 108–275, § 3(4), inserted "an act of domestic terrorism (as defined under section 2331(5) of this title) or" after "facilitate".

Subsec. (d). Pub. L. 108–275, § 2(c), inserted "and section 1028A" after "In this section" in introductory provisions.

2003—Pub. L. 108–21, § 607(b)(6), inserted ", authentication features," after "documents" in section catchline.

Subsec. (a)(1). Pub. L. 108–21, § 607(b)(1)(A), inserted ", authentication feature," after "an identification document".

Subsec. (a)(2). Pub. L. 108–21, §607(b)(1)(B), inserted ", an identification document" and "or feature" after "such document".

Subsec. (a)(3). Pub. L. 108–21, §607(b)(1)(C), inserted ", authentication features," after "possessor".

Subsec. (a)(4). Pub. L. 108–21, §607(b)(1)(D), inserted ", authentication feature," after "possessor" and "or feature" after "such document".

Subsec. (a)(5). Pub. L. 108–21, §607(b)(1)(E), inserted "or authentication feature" after "implement" wherever appearing.

Subsec. (a)(6). Pub. L. 108–21, §607(b)(1)(F), inserted "or authentication feature" before "that is or appears", ", or authentication feature" before "of the United States" and "or feature" after "such document" and struck out "or" at end.

Subsec. (a)(7). Pub. L. 108–21, §607(b)(1)(G), inserted "or" after semicolon at end.

Subsec. (a)(8). Pub. L. 108–21, §607(b)(1)(H), added par. (8).

Subsec. (b)(1)(A). Pub. L. 108–21, §607(b)(2)(A)(i)(I), inserted ", authentication feature," before "or false" in introductory provisions.

Subsec. (b)(1)(A)(i). Pub. L. 108–21, §607(b)(2)(A)(i)(II), inserted "or authentication feature" after "document".

Subsec. (b)(1)(B). Pub. L. 108–21, §607(b)(2)(A)(ii), inserted ", authentication features," before "or false".

Subsec. (b)(2)(A). Pub. L. 108–21, §607(b)(2)(B), inserted ", authentication feature," before "or a false".

Subsec. (c)(1). Pub. L. 108–21, §607(b)(3), inserted ", authentication feature," before "or false" in two places.

Subsec. (d). Pub. L. 108–21, §607(b)(4), added pars. (1), (5), (6) and (12), redesignated former pars. (1), (2), (3), (4), (5), (6), (7), and (8) as pars. (2), (3), (4), (7), (8), (9), (10), and (11), respectively, and in par. (4)(A) inserted "or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit" after "entity".

Subsecs. (h), (i). Pub. L. 108–21, §607(b)(5), added subsec. (h) and redesignated former subsec. (h) as (i).

2000—Subsec. (c)(3)(A). Pub. L. 106–578, §3(1), inserted ", including the transfer of a document by electronic means" after "commerce".

Subsec. (d)(1). Pub. L. 106–578, §3(2)(A), inserted "template, computer file, computer disc," after "impression,".

Subsec. (d)(3) to (8). Pub. L. 106–578, §3(2)(B)–(F), added pars. (3) and (7) and redesignated former pars. (3), (4), (5), and (6) as (4), (5), (6), and (8), respectively.

1998—Pub. L. 105–318, §3(b)(1), inserted "and information" at end of section catchline.

Subsec. (a). Pub. L. 105–318, §3(a)(3), struck out "or attempts to do so," before "shall be punished" in concluding provisions.

Subsec. (a)(7). Pub. L. 105–318, §3(a)(1), (2), (4), added par. (7).

Subsec. (b)(1)(D). Pub. L. 105–318, §3(b)(1), added subpar. (D).

Subsec. (b)(2)(A). Pub. L. 105–318, §3(b)(2)(A), substituted ", transfer, or use of a means of identification, an identification document, or a" for "or transfer of an identification document or".

Subsec. (b)(2)(B). Pub. L. 105–318, §3(b)(2)(B), inserted "or (7)" after "(3)".

Subsec. (b)(3). Pub. L. 105–318, §3(b)(3), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed to facilitate a drug trafficking crime (as defined in section 929(a)(2) of this title);".

Subsec. (b)(5), (6). Pub. L. 105–318, §3(b)(4)–(6), added par. (5) and redesignated former par. (5) as (6).

Subsec. (c)(3). Pub. L. 105–318, §3(c), added par. (3) and struck out former par. (3) which read as follows: "the production, transfer, or possession prohibited by this section is in or affects interstate or foreign commerce, or the identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, or possession prohibited by this section."

Subsec. (d). Pub. L. 105–318, §3(d), amended subsec. (d) generally. Prior to amendment, subsec. (d) consisted of pars. (1) to (5) defining "identification document", "produce", "document-making implement", "personal identification card", and "State" as used in this section.

Subsec. (f). Pub. L. 105–318, §3(e), added subsec. (f).

Subsec. (g). Pub. L. 105–318, §3(f), added subsec. (g).

Subsec. (h). Pub. L. 105–318, §3(g), added subsec. (h).

1996—Subsec. (a)(4), (5). Pub. L. 104–294, §601(p), struck out "or" after semicolon in par. (4) and inserted "or" after semicolon in par. (5).

Subsec. (b). Pub. L. 104–294, §601(a)(3), substituted "fine under this title" for "fine of under this title" wherever appearing.

Subsec. (b)(1). Pub. L. 104–208, §211(a)(1)(A), in introductory provisions inserted "except as provided in paragraphs (3) and (4)," after "(1)" and substituted "15 years" for "five years".

Subsec. (b)(2). Pub. L. 104–208, §211(a)(1)(B), inserted "except as provided in paragraphs (3) and (4)," after "(2)" in introductory provisions and struck out "and" at end.

Subsec. (b)(3) to (5). Pub. L. 104–208, §211(a)(1)(C), (D), added pars. (3) and (4) and redesignated former par. (3) as (5).

1994—Subsec. (b)(1). Pub. L. 103–322, §330016(1)(O), substituted "under this title" for "not more than $25,000".

Subsec. (b)(2). Pub. L. 103–322, §330016(1)(M), substituted "under this title" for "not more than $15,000".

Subsec. (b)(3). Pub. L. 103–322, §330016(1)(K), substituted "under this title" for "not more than $5,000".

1990—Subsec. (d)(5). Pub. L. 101–647 inserted "commonwealth," before "possession or territory of the United States".

1988—Subsec. (a)(6). Pub. L. 100–690 inserted "knowingly" before "possesses", "lawful" before first reference to "authority", and "such" before second reference to "authority".

1986—Subsec. (e). Pub. L. 99–646 substituted "chapter 224 of this title" for "title V of the Organized Crime Control Act of 1970 (18 U.S.C. note prec. 3481)".

EFFECTIVE DATE OF 2000 AMENDMENT

Pub. L. 106–578, §5, Dec. 28, 2000, 114 Stat. 3077, provided that: "This Act [amending this section, repealing section 1738 of this title, and enacting provisions set out as a note below] and the amendments made by this Act shall take effect 90 days after the date of enactment of this Act [Dec. 28, 2000]."

EFFECTIVE DATE OF 1996 AMENDMENT

Pub. L. 104–208, div. C, title II, §211(c), Sept. 30, 1996, 110 Stat. 3009–570, provided that: "This section [amending this section and sections 1425 to 1427, 1541 to 1544, and 1546 of this title and enacting provisions set out as a note under section 994 of Title 28, Judiciary and Judicial Procedure] and the amendments made by this section shall apply with respect to offenses occurring on or after the date of the enactment of this Act [Sept. 30, 1996]."

COORDINATING COMMITTEE ON FALSE IDENTIFICATION

Pub. L. 106–578, §2, Dec. 28, 2000, 114 Stat. 3075, provided that:

"(a) IN GENERAL.—The Attorney General and the Secretary of the Treasury shall establish a coordinating committee to ensure, through existing interagency task forces or other means, that the creation and distribution of false identification documents (as defined in section 1028(d)(3) [now 1028(d)(4)] of title 18, United States Code, as added by section 3(2) of this Act) is vigorously investigated and prosecuted.

"(b) MEMBERSHIP.—The coordinating committee shall consist of the Director of the United States Secret Service, the Director of the Federal Bureau of Investigation, the Attorney General, the Commissioner of Social Security, and the Commissioner of Immigration and Naturalization, or their respective designees.

"(c) TERM.—The coordinating committee shall terminate 2 years after the effective date of this Act [see Effective Date of 2000 Amendment note above].

"(d) REPORT.—

"(1) IN GENERAL.—The Attorney General and the Secretary of the Treasury, at the end of each year of the existence of the committee, shall report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on the activities of the committee.

"(2) CONTENTS.—The report referred to in paragraph (1) shall include—

"(A) the total number of indictments and informations, guilty pleas, convictions, and acquittals resulting from the investigation and prosecution of the creation and distribution of false identification documents during the preceding year;

"(B) identification of the Federal judicial districts in which the indictments and informations were filed, and in which the subsequent guilty pleas, convictions, and acquittals occurred;

"(C) specification of the Federal statutes utilized for prosecution;

"(D) a brief factual description of significant investigations and prosecutions;

"(E) specification of the sentence imposed as a result of each guilty plea and conviction; and

"(F) recommendations, if any, for legislative changes that could facilitate more effective investigation and prosecution of the creation and distribution of false identification documents."

[For transfer of the functions, personnel, assets, and obligations of the United States Secret Service, including the functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 381, 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.]

[For abolition of Immigration and Naturalization Service, transfer of functions, and treatment of related references, see note set out under section 1551 of Title 8, Aliens and Nationality.]

CONSTITUTIONAL AUTHORITY

Pub. L. 105–318, §2, Oct. 30, 1998, 112 Stat. 3007, provided that: "The constitutional authority upon which this Act [see Short Title of 1998 Amendments note set out under section 1001 of this title] rests is the power of Congress to regulate commerce with foreign nations and among the several States, and the authority to make all laws which shall be necessary and proper for carrying into execution the powers vested by the Constitution in the Government of the United States or in any department or officer thereof, as set forth in article I, section 8 of the United States Constitution."

CENTRALIZED COMPLAINT AND CONSUMER EDUCATION SERVICE FOR VICTIMS OF IDENTITY THEFT

Pub. L. 105–318, §5, Oct. 30, 1998, 112 Stat. 3010, provided that:

"(a) IN GENERAL.—Not later than 1 year after the date of enactment of this Act [Oct. 30, 1998], the Federal Trade Commission shall establish procedures to—

"(1) log and acknowledge the receipt of complaints by individuals who certify that they have a reasonable belief that 1 or more of their means of identification (as defined in section 1028 of title 18, United States Code, as amended by this Act) have been assumed, stolen, or otherwise unlawfully acquired in violation of section 1028 of title 18, United States Code, as amended by this Act;

"(2) provide informational materials to individuals described in paragraph (1); and

"(3) refer complaints described in paragraph (1) to appropriate entities, which may include referral to—

"(A) the 3 major national consumer reporting agencies; and

"(B) appropriate law enforcement agencies for potential law enforcement action.

"(b) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this section."

FRAUD AND RELATED ACTIVITY IN CONNECTION WITH IDENTIFICATION DOCUMENTS

Pub. L. 98–473, title II, §609L, Oct. 12, 1984, 98 Stat. 2103, provided that:

"(a) For purposes of section 1028 of title 18, United States Code, to the maximum extent feasible, personal descriptors or identifiers utilized in identification documents, as defined in such section, shall utilize common descriptive terms and formats designed to—

"(1) reduce the redundancy and duplication of identification systems by providing information which can be utilized by the maximum number of authorities, and

"(2) facilitate positive identification of bona fide holders of identification documents.

"(b) The President shall, no later than 3 years after the date of enactment of this Act [Oct. 12, 1984], and after consultation with Federal, State, local, and international issuing authorities, and concerned groups make recommnedations [recommendations] to the Congress for the enactment of comprehensive legislation on Federal identification systems. Such legislation shall—

"(1) give due consideration to protecting the privacy of persons who are the subject of any identification system,

"(2) recommend appropriate civil and criminal sanctions for the misuse or unauthorized disclosure of personal identification information, and

"(3) make recommendations providing for the exchange of personal identification information as authorized by Federal or State law or Executive order of the President or the chief executive officer of any of the several States."

§ 1028A. Aggravated identity theft

(a) OFFENSES.—

(1) IN GENERAL.—Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

(2) TERRORISM OFFENSE.—Whoever, during and in relation to any felony violation enumerated in section 2332b(g)(5)(B), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person or a false identification document shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 5 years.

(b) CONSECUTIVE SENTENCE.—Notwithstanding any other provision of law—

(1) a court shall not place on probation any person convicted of a violation of this section;

(2) except as provided in paragraph (4), no term of imprisonment imposed on a person under this section shall run concurrently with any other term of imprisonment imposed on the person under any other provision of law, including any term of imprisonment imposed for the felony during which the means of identification was transferred, possessed, or used;

(3) in determining any term of imprisonment to be imposed for the felony during which the

means of identification was transferred, possessed, or used, a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section; and

(4) a term of imprisonment imposed on a person for a violation of this section may, in the discretion of the court, run concurrently, in whole or in part, only with another term of imprisonment that is imposed by the court at the same time on that person for an additional violation of this section, provided that such discretion shall be exercised in accordance with any applicable guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28.

(c) DEFINITION.—For purposes of this section, the term "felony violation enumerated in subsection (c)" means any offense that is a felony violation of—

(1) section 641 (relating to theft of public money, property, or rewards[1]), section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee), or section 664 (relating to theft from employee benefit plans);

(2) section 911 (relating to false personation of citizenship);

(3) section 922(a)(6) (relating to false statements in connection with the acquisition of a firearm);

(4) any provision contained in this chapter (relating to fraud and false statements), other than this section or section 1028(a)(7);

(5) any provision contained in chapter 63 (relating to mail, bank, and wire fraud);

(6) any provision contained in chapter 69 (relating to nationality and citizenship);

(7) any provision contained in chapter 75 (relating to passports and visas);

(8) section 523 of the Gramm-Leach-Bliley Act (15 U.S.C. 6823) (relating to obtaining customer information by false pretenses);

(9) section 243 or 266 of the Immigration and Nationality Act (8 U.S.C. 1253 and 1306) (relating to willfully failing to leave the United States after deportation and creating a counterfeit alien registration card);

(10) any provision contained in chapter 8 of title II of the Immigration and Nationality Act (8 U.S.C. 1321 et seq.) (relating to various immigration offenses); or

(11) section 208, 811, 1107(b), 1128B(a), or 1632 of the Social Security Act (42 U.S.C. 408, 1011, 1307(b), 1320a-7b(a), and 1383a) (relating to false statements relating to programs under the Act).

(Added Pub. L. 108-275, §2(a), July 15, 2004, 118 Stat. 831.)

REFERENCES IN TEXT

The Immigration and Nationality Act, referred to in subsec. (c)(10), is act June 27, 1952, ch. 477, 66 Stat. 163, as amended. Chapter 8 of title II of the Act is classified generally to part VIII (§1321 et seq.) of subchapter II of chapter 12 of Title 8, Aliens and Nationality. For complete classification of this Act to the Code, see Short

---

[1] So in original. Probably should be "records".

Title note set out under section 1181 of Title 8 and Tables.

The Social Security Act, referred to in subsec. (c)(11), is act Aug. 14, 1935, ch. 531, 49 Stat. 620, as amended, which is classified generally to chapter 7 (§301 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

§ 1029. Fraud and related activity in connection with access devices

(a) Whoever—

(1) knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices;

(2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period;

(3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices;

(4) knowingly, and with intent to defraud, produces, traffics in, has control or custody of, or possesses device-making equipment;

(5) knowingly and with intent to defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000;

(6) without the authorization of the issuer of the access device, knowingly and with intent to defraud solicits a person for the purpose of—

(A) offering an access device; or

(B) selling information regarding or an application to obtain an access device;

(7) knowingly and with intent to defraud uses, produces, traffics in, has control or custody of, or possesses a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications services;

(8) knowingly and with intent to defraud uses, produces, traffics in, has control or custody of, or possesses a scanning receiver;

(9) knowingly uses, produces, traffics in, has control or custody of, or possesses hardware or software, knowing it has been configured to insert or modify telecommunication identifying information associated with or contained in a telecommunications instrument so that such instrument may be used to obtain telecommunications service without authorization; or

(10) without the authorization of the credit card system member or its agent, knowingly and with intent to defraud causes or arranges for another person to present to the member or its agent, for payment, 1 or more evidences or records of transactions made by an access device;

shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

(b)(1) Whoever attempts to commit an offense under subsection (a) of this section shall be subject to the same penalties as those prescribed for the offense attempted.





# LIBRARY OF CONGRESS

Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **THE PAPERS OF ABRAHAM LINCOLN, LEGAL DOCUMENTS AND CASES,** and that the attached photocopies from Volume 3 – the spine, the title page and back page, the picture of Abraham Lincoln, copyright page, 2 Contents pages,  and the case, **Dungey V. Spencer, 1855** in chapter 39, pgs. 133-148– are a true representation from that work.

THIS IS TO CERTIFY FURTHER, that the spine label bears a sticker with the Library of Congress Call number, "LLKF 213.L53S76 2008 v. 3 Copy 2". Further, there is a barcode sticker on the back cover that reads, "LC Copyright 00255666162".

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto April 10, 2018.

Deirdre Scott

Deirdre Scott
Business Enterprises Officer
Office of Business Enterprises
Library of Congress

LL

KF 213
.L53
S76
2008
v. 3
Copy 2

# The Papers of
# Abraham Lincoln

## LEGAL DOCUMENTS AND CASES

*Volume Three*

DANIEL W. STOWELL, *Editor*

Susan Krause, *Assistant Editor*
John A. Lupton, *Assistant Editor*
Stacy Pratt McDermott, *Assistant Editor*
Christopher A. Schnell, *Assistant Editor*
Dennis E. Suttles, *Assistant Editor*
Kelley B. Clausing, *Research Associate*
R. Dan Monroe, *NHPRC Editing Fellow*

University of Virginia Press
CHARLOTTESVILLE & LONDON



This edition has been prepared by the staff of The Papers of Abraham Lincoln, a project of the Illinois Historic Preservation Agency and the Abraham Lincoln Presidential Library and Museum, cosponsored by the Abraham Lincoln Association and the University of Illinois at Springfield. Grants from the National Historical Publications and Records Commission and the National Endowment for the Humanities supported the preparation of this edition.

University of Virginia Press
© 2008 by the Illinois Historic Preservation Agency
All rights reserved
Printed in the United States of America

First published 2008

9 8 7 6 5 4 3 2 1

The paper used in this publication meets the minimum requirements of ANSI/NISO Z39.48-1992 (R 1997) (Permanence of Paper).

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA

Lincoln, Abraham, 1809–1865.
  [Papers. Selections]
  The papers of Abraham Lincoln : legal documents and cases /
Daniel W. Stowell, editor.
    p.    cm.
  Includes bibliographical references and index.
  ISBN 978-0-8139-2606-3 (cloth : alk. paper)
  1. Law—United States—Cases.   2. Law—Illinois—Cases.   3. Law—Illinois—
Sangamon County—Cases.   4. Lincoln, Abraham, 1809–1865—Career in law.
5. Lawyers—Illinois—Biography.   I. Stowell, Daniel W.   II. Title.
  KF213.L53S76   2007
  973.7092—dc22
  [B]

                                                                    2007017906

*Frontispiece:* Abraham Lincoln, Chicago, February 28, 1857. (Courtesy Abraham Lincoln Presidential Library, Springfield, Illinois)

# CONTENTS

raham Lincoln,
ibraham Lincoln
n Lincoln Asso-
n the National
onal Endowment

ements of

I/

3. Law—Illinois—
—Career in law.
itle.

2007017906

(Courtesy Abraham

### VOLUME 3

*35 Allen v. Illinois Central Railroad et al.* | *Allen v.
Illinois Central Railroad* (1854–1859)   1
RAILROADS, CONSTRUCTION, DAMAGE TO PROPERTY

*36 Stigleman, Johnson & Company v. Paddleford and Norton* | *Stigle-
man, Johnson & Company v. Paddleford et al.* (1854–1857)   24
CONSTRUCTION, BREACH OF CONTRACT, MECHANIC'S LIEN

*37 Welles et al. v. Welles et al.* | *Matheny v. Welles et al.* | *Welles et al. v.
Hofferkemp et al.* (1855–1856)   44
ESTATE SETTLEMENT

*38 McDaniel et al. v. Correll et al.* (1855–1863)   65
WILLS, MENTAL COMPETENCE, INHERITANCE

*39 Dungey v. Spencer* (1855)   133
SLANDER, RACE, BLACK LAWS, REFUTATION

*40 Clark and Morrison v. Page et al.* | *Bacon v. Ohio & Mississippi
Railroad* (1855–1859)   149
RAILROADS, FINANCING, CORPORATE FRAUD

*41 Aspinall v. Lewis, Johnson & Company* (1856–1857)   193
SALE OF PATENT RIGHTS, PROMISSORY NOTES, INTERSTATE DEBT COLLECTION

*42 Eads & Nelson v. Ohio & Mississippi Railroad* (1855–1858)   205
SALVAGE, RIVERS, RAILROADS

*43 Christian County, Illinois v. Overholt & Squier* (1856–1857)   225
CONSTRUCTION, PROSPECTIVE PROFITS, BREACH OF CONTRACT

*44 Rugg v. Haines* (1856–1862)   248
PATENT INFRINGEMENT, AGRICULTURAL MACHINERY

vi   CONTENTS

45 *Davenport v. Sconce and Don Carlos* (1857–1860)   286
   LAND SPECULATION, FRAUD

46 *Hurd et al. v. Rock Island Bridge Company* (1856–1857)   308
   RAILROAD BRIDGES, RIVER NAVIGATION, STEAMBOATS, EFFIE AFTON CASE

47 *Johnston v. Jones and Marsh* (1849–1862)   384
   LAND OWNERSHIP, CHICAGO WATERFRONT

Chapter 89

1855

[ DUNGEY V. SPENCER

*De Witt County Circuit Court*

SLANDER, RACE, BLACK LAWS, REPUTATION

A wide array of races and nationalities inhabited antebellum Illinois. A small number of American Indians and free African Americans lived in the state. Descendants of early French and Canadian settlers of the Mississippi River valley lived alongside more recent immigrants from Germany, Ireland, and England. Migrants from New England and the Mid-Atlantic states mingled with settlers from the upper-South states of Kentucky, Tennessee, Virginia, and North Carolina. A smaller number of residents came from other European nations, such as Norway, Switzerland, Sweden, and Portugal. In this mixture of peoples in antebellum Illinois, the perception of a person's racial and ethnic background was vitally important to his or her legal and social status.[1]

Although born in Tennessee, William Dungey[2] grew up on his parents' farm in Williamson County, Illinois. During one of his visits to De Witt County, Illinois, perhaps to visit Charles Dungey,[3] he met and

1. Douglas K. Meyer, *Making the Heartland Quilt: A Geographical History of Settlement and Migration in Early-Nineteenth-Century Illinois* (Carbondale: Southern Illinois University Press, 2000), 138, 141, 178, 198, 202; 257; James E. Davis, *Frontier Illinois* (Bloomington: Indiana University Press, 1998), 304-6.

2. William Dungey, b. c. 1836, in Tennessee; d. 16 April 1907, in Eastern Township, Franklin County, Illinois. On January 17, 1859, Dungey purchased land east of Benton in Franklin County, Illinois. By 1860, Dungey owned $2,000 in real property and $275 in personal property. U.S. Census Office, Eighth Census of the United States (1860), Franklin County, IL, 284; Proof of Death, filed 7 May 1907, William Dungey probate file 277, Franklin County Circuit Court, Franklin County Courthouse, Benton, IL; U.S. General Land Office, Shawneetown District, Monthly Abstracts of Land Located on Military Land Warrant Certificates, 1847-56, RG 952.125, IrAu

3. Charles Dungey, b. c. 1826, in Tennessee. During the 1850's, Dungey owned a farm near the farm of Samuel Spencer north of Wapella. By 1860, Dungey owned real and personal property worth $550. U.S. Census Office, Eighth Census of the United States (1860), De Witt County, IL, 565; Dead, Record Entry, Charles Dungey and wife to Walter Kain, 4 October 1858, Deed Record P, 771; Deed Record Entry, Charles Dungey and wife to Walter Kain, 4 October 1859, Deed Record P, 772, both in DEWCH.

later married Dorinda Spencer,[4] who lived on a farm north of Wapella. Sometime before 1855, a family quarrel developed between William Dungey and his brother-in-law, Joseph Spencer.[5] Spencer allegedly told others that Dungey was a "negro."

Dungey retained Abraham Lincoln as his attorney and sued Spencer in the De Witt County Circuit Court in Clinton, Illinois.

DECLARATION, PRAECIPE[6]
16 April 1855

In the Circuit Court
of De Witt County.
May Term 1855.

State of Illinois |
De Witt County | ss,

William Dungey, plaintiff, complains of Joseph Spencer, defendant, being in custody &c. of a plea of trespass on the case;

For that whereas the said plaintiff is a white man; and heretofore, towit, on the      day of ^August^ 1851 at the county and State aforesaid, was lawfully married to a white woman, with whom, as his wife, he has ever since lived within this State. Yet the said defendant well knowing the persons, ^said plaintiff was so married to said white woman,^ heretofore, towit, on the first day of January, in the year of our Lord one thousand eight hundred and fifty ^five^ (^&^ since the aforesaid marriage of said plaintiff, and whilst he was living with his wife as aforesaid) at the county aforesaid, in the presence and hearing of divers good citizens of this state, falsely and maliciously, spoke, uttered and published, of, and concerning the plaintiff, the false scandalous, malicious, and defamatory words following, that is to say "He" (the plaintiff meaning) "is a negro" "He" (the plaintiff meaning) "is a negro, and it will be easily proved, if called for." "Black Bill" (the plaintiff meaning) "is a negro" "Black Bill" (the plaintiff meaning) "is a negro, and it will be easily proved if called for" "They" (the plaintiff ^& his^ family ^connections^ meaning) are all negroes, and it can be easily proved"

4. Dorinda Spencer Dungey, b. c. 1828, in Illinois. She was the daughter of Samuel and Elizabeth Spencer, Samuel Spencer owned farmland two miles north of Wapella, along the Illinois Central Railroad. In 1850, he owned $2,800 in real property. Dorinda Spencer married William Dungey before Justice of the Peace John B. Swearingen on August 31, 1851. U.S. Census Office, Seventh Census of the United States (1850), De Witt County, IL, 404; Certification of Marriage, 16 October 1855, case file, DEWCC, DEWCH.

5. Joseph Spencer, b. c. 1824, in Kentucky. Joseph Spencer was the fourth son of Samuel and Elizabeth Spencer and owned land near his parents' farm. Joseph Spencer owned $1,600 in real property in 1850. In 1855, he owned $1,950 in livestock and produced forty-seven pounds of wool on his farm. 1850 Census, De Witt County, IL, 404; Deed Record Entry, Samuel Spencer to Joseph Spencer, 5 January 1846, Deed Record D, 438; Deed Record Entry, Margaret Burns et al, to Joseph Spencer, 9 June 1851, Deed Record G, 400, both in DEWCH; Illinois Secretary of State, State Census (1855), De Witt County, 29.

6. ADS, filed 17 April 1855, HW, DLC.

And whereas also, the said plaintiff is not a person of color, negro or mulatto; and whereas, heretofore, to-wit, on the _____ day of August 1851 at, and within the county and State aforesaid, he, the said plaintiff was lawfully married to a white woman, with whom as his wife, he has since lived, within this State. Yet the said defendant, well knowing the, the said plaintiff was so married to said white woman, heretofore, to-wit, on the first day of January in the year of our Lord one thousand eight hundred and fifty five, (and after the marriage of the plaintiff as aforesaid, and whilst he was living with his wife as aforesaid,) at the county aforesaid, falsely and maliciously, spoke in the presence and hearing of divers good citizens of this State, spoke, uttered and published, of and concerning the said plaintiff, and of and concerning his marriage aforesaid, the false, scandalous, malicious, and defamatory words following, that is to say: "He" (the plaintiff meaning) "is a negro." "He" (the plaintiff meaning) is a negro and it will be easily proved, if called for." "Black Bill" (the plaintiff meaning) "is a negro" "Black Bill" (the plaintiff meaning) "is a negro, and it will be easily proved, if called for." "They" (the plaintiff, and his family connections meaning) "are all negroes, and it can easily be proved."

By means whereof the said plaintiff has been brought into public scandal, infamy and disgrace and has been injured, and has sustained damage in the sum of one thousand dollars; and therefore he brings his suit &c.

.   .   Lincoln p. q.

[*Præcipe*]

William Dungey    }  Trespass on the Case.
vs               }  Damage $1000.
Joseph Spencer   }

The clerk of the De Witt county circuit court will issue process in the above entitled cause, returnable to the next term.

April 16. 1855.         Lincoln, p. q

African American, American Indian, and mulatto men and women in Illinois did not share the same freedoms as their white neighbors. Every person who had one-fourth "negro" blood was deemed to be a mulatto, and every person who had one-half "Indian" blood was considered an American Indian. Neither African Americans, mulattoes, nor American Indians could give evidence in a court of law for or against whites or serve on a jury.[7]

Illinois law also placed restrictions on the movement, marriage, assembly and business activities of these men and women. Indentured African Americans and mulattoes could not purchase liquor in small quantities from a tavern owner for immediate consumption without

7. "Who May Be Witnesses in Criminal Cases," 3 March 1845, *Revised Statutes of the State of Illinois* (1845), 164.

the permission of their master. [...]
Indians from buying liquor. People of color, black or mulatto, of either
sex were forbidden from marrying a white person. Those found guilty
in criminal court of this offense would have their marriage annulled
and would be liable to a fine, a whipping of no more than thirty-nine
lashes, and a jail term of no more than a year. African Americans and
mulattoes had to register their certificates of freedom with the local
county clerk. Those who did not have the required certificate were to
be turned over to the sheriff and advertised as runaway slaves. Slaves
and servants could travel no more than ten miles from their homes
without permission, could not assemble in groups of three or more for
dancing or reveling, and could not own property for any reason other
than for their own use.[8]

Falsely labeling a person as an African American, an American In-
dian, or a mulatto in antebellum Illinois could be interpreted as a slan-
derous attack and could lead to a lawsuit in an Illinois court. Slanderous
words that naturally implied damages to a person's reputation, charac-
ter, or property were of two kinds. The first kind required no proof of
special damages because the words, if true, implied that the subject was
guilty of a criminal offense. For example, accusing an African Ameri-
can of marrying a white person was accusing the individual of violat-
ing Illinois law. Such an accusation was the basis for a slander action.
A second kind of slander involved the suffering of economic or social
damage as a direct result of the false words spoken. For example, falsely
calling someone a leper would restrict his or her social interactions and
ability to work for others.[9]

Lincoln's legal career included at least thirty-two legal cases in-
volving African Americans. In thirteen cases, African Americans
were litigants, and the actions in these cases ranged from foreclosure
of mortgage to partition, dower, divorce, and criminal indictment for
poisoning. In three other cases, including *Dungey v. Spencer,* slander-
ous accusations involved race. Another case centered on the breach of
a promise to marry because of race. Among the remaining fifteen cases
involving African Americans, seven cases dealt with fugitive slaves and
one case with indentured servitude. African Americans were involved
only as property in the remaining seven cases, and three of these cases

8. "An Act relative to Criminal Jurisprudence," 26 February 1833, *The Revised Laws of Illi-
nois* (1833), 200; "Marriages," 3 March 1845, *Revised Statutes of the State of Illinois* (1845), 353;
"Negroes and Mulattoes," 3 March 1845, *Revised Statutes of the State of Illinois* (1845), 387–91.
9. Sabin D. Puterbaugh, *Puterbaugh's Illinois Pleading and Practice,* 2d ed. (Chicago:
Callaghan & Cutler, 1867), 353.



stemmed from the settlement of the Kentucky estate of Mary Lincoln's father.[10]

On May 14, 1855, Abraham Lincoln appeared in court before Judge David Davis[t] on behalf of Dungey. Spencer's attorneys, Clifton H. Moore,[t] James B. McKinley,[t] and Lawrence Weldon,[t] filed their client's demurrer to Lincoln's declaration arguing that the charges were insufficient in law to be heard in court. Judge Davis upheld the demurrer, and Lincoln asked permission to amend the declaration. Davis granted Lincoln's request and continued the case to the fall term.[11]

Lincoln amended Dungey's original declaration by adding language to the first and second counts. To the second count, Lincoln added wording that directly connected Spencer's alleged slander with the marriage of his sister to William Dungey. Lincoln also added a third count in the form of an amendment.

## AMENDMENT TO THE DECLARATION[12]
May 1855

(Additional count, by way of amendment, made May 1855.)

And whereas also the said plaintiff is not a negro, and whereas the said defendant, heretofore, towit, on the first day of January in the year of our Lord one thousand, eight hundred and fiftyfive, at the county aforesaid, in the presence and hearing of divers good citizens of this state, falsely and maliciously spoke, uttered and published, of and concerning the said plaintiff, the false, scandalous, malicious and defamatory words following, that is to say: "He" (the plaintiff meaning) "is a negro." "He" (the plaintiff meaning) "is a negro, and it will be easily proved, if called for." "Black Bill" (the plaintiff meaning) "is a negro" "Black Bill" (the plaintiff meaning) is a negro, and it will be easily proved if called for" "They" (the plaintiff and his family connections meaning) "are all negroes, and it can be easily proved".

By means of the committing of which grievances by said defendant, one John Casey,[13] who before, was at the time aforesaid, was about to sell to said plaintiff, a certain tract of land, on advantageous terms to said plaintiff, afterwards towit, on the day and year aforesaid, at &cc aforesaid,

10. Martha L. Benner and Cullom Davis et al., eds., *The Law Practice of Abraham Lincoln: Complete Documentary Edition*, DVD-ROM (Urbana: University of Illinois Press, 2000).

11. Order, 14 May 1855, Circuit Court Record #2, 100, DBWCC, DBWCH.

12. ADS, HW, DLC. The amendment is attached to the original declaration and praecipe.

13. John Casey purchased public land in McLean County, Illinois in 1849, 1850, and 1852, U.S. General Land Office, Danville District, Receiver's Register of Receipts, 221, 263, 671, US 263,286, A-A; U.S. General Land Office, Danville District, Monthly Abstract of Land Located on Military Land Warrant Certificates, 220:186; U.S. General Land Office, Danville District, Monthly Abstract of Land Located on Military Land Warrant Certificates, 262:186, both in RG 952, 200, P-I.

refused to sell said land to said plaintiff, whereby said plaintiff lost great gains which he otherwise would have realized, by the purchase of said land, to his damage of one thousand dollars.[14]

Lincoln p.q.

Joseph Spencer immediately charged that his brother-in-law William Dungey did not have enough money to pay the court costs in this suit. To counter Spencer's charge, Dungey filed a bond for costs with the court.

## AFFIDAVIT OF JOSEPH SPENCER[15]
15 May 1855

State of Illinois    }      De Witt Circuit Court
County of De Witt    }      May Term AD 1855

William Dungey
     vs             In case
Joseph Spencer

Joseph Spencer Defendant in this cause being duly sworn states on oath that the plaintiff in this cause has no property subject to execution as he verily believes and that said Plaintiff is so unsettled as to endanger the officers of this court with respect to there legal demands he therefore asks that the said Plaintiff be ruled to give security for costs

Joseph Spencer

[*Certification*] Sworn & Subscribed this 15 day of May 1855
Robt Lewis
clerk

## BOND FOR COSTS[17]
15 May 1855

William Dungey
     vs             In the De Witt Circuit court
Joseph Spencer

We do hereby enter ourselves security for costs in the above entitled cause, and acknowledge ourselves bound to pay or cause to be paid all costs which may accrue in this action, either to the opposite party or

---

14. The original declaration was faulty because Lincoln failed to make a transition between the words Spencer said and the actual damages Dungey incurred. Because the alleged slander accused Dungey of a crime (a black man's marrying a white woman) and ruined a land transaction, which affected Dungey's success as a farmer, the slanderous words could be the basis for a case. Puterbaugh, *Illinois Pleading and Practice*, 354.

15. HDS, written by James B. McKinley, case file, DEWCC, DEWCH.

16. "Joseph" written over "Sp"

17. HDS, written by Abraham Lincoln, filed 15 May 1855, case file, DEWCC, DEWCH.

to any of the officers of this court in pursuance of the laws of this state.
Dated this 15th day of May A.D. 1855.

> Wm Scogin[18]
> Abraham Clark[19]

On May 17, 1855, the court issued a subpoena ordering Charles Dungey of De Witt County to appear in court at the October term as a witness for Spencer.[20] In preparation for that term, Spencer's attorneys obtained a deposition from Joseph Catrell[21] of Williamson County.

## DEPOSITION OF JOSEPH CATRELL[22]
8 October 1855

William Dungey
  vs            } Trespass on the case
Joseph Spencer

Deposition of Joseph Catrell a       witness on the part of the defendant sworn and examined on the 8th day of October AD 1855 at the office of William M. Eubanks, Clerk of the Circuit Court, in and for the County of Williamson in the State of Illinois.

Interroga-   Are you acquainted with William Dungey the plaintiff in
tory 1st     this case. If so how long have you known him
ans          I am. I have known him ever since he has been in this
             Country some seven or Eight years.

Int. 2nd     Are you acquainted with his Father[23] or reputed Father, if
             so how long have You known him and what is his name and
             where did he live when you knew him first
             (Excepted to by plff)[24]

18. William Scogin, b. c. 1814, in Ohio; d. 14 May 1881, in De Witt County, Illinois. Scogin was a farmer near Wapella, Illinois. In 1850, he owned $400 in real property. By 1860, he owned $2,500 in real and personal property. 1850 Census, De Witt County, IL, 409; 1860 Census, De Witt County, IL, 667; *De Witt County, Illinois, Cemetery Inscriptions*, 2 vols. (Decatur, IL: Decatur Genealogical Society 1974), 2:67.

19. Abraham Clark, b. c. 1800, in Ohio; d. 19 November 1868, in De Witt County, Illinois. Clark was a farmer who lived near Samuel and Joseph Spencer. In 1850, he owned $800 in real property. By 1860, Clark had $9,100 in real and personal property. 1850 Census, De Witt County, IL, 402; 1860 Census, De Witt County, IL, 676; *De Witt County Cemetery Inscriptions*, 2:72.

20. Subpoena, 17 May 1855, case file, DEWCC, DEWCH.

21. Joseph Catrell, b. c. 1800, in North Carolina. During the 1850s, Catrell and his family lived in Tennessee. By 1860, Catrell lived in Williamson County, Illinois, and was a farmer who owned $700 in real property. U.S. Census Office, Seventh Census of the United States (1850), Williamson County, IL, 245.

22. HDX, written by Williamson County Circuit Clerk William M. Eubanks, case file, DEWCC, DEWCH.

23. "F" written over "f."

24. Parenthetical written in margin to the left of this interrogatory.

140    DUNGEY V. SPENCER

Ans 2nd   I am acquainted with his his reputed Father, his name is called Charles Dungey. I think it is seventeen or Eighteen years, since I first knew him. When f I first became acquainted with him he lived in Giles County, Tennessee Excepted to by plff[25]

Int 3rd   What was his reputation there as regards his color (This interrogatory objected to by plff)

Ans 3rd   It was the general understanding of the people that he was mixed blooded.
(This ans objected to by plff)

Int. 4th   From that reputation and your own knowledge, would you say that it was your opinion that Charles Dungey the plaintiffs Father has negro blood in him. (objected to by the plff)

Ans 4th   Y I would think he have has My opinion is that he has negro blood in him.
(This answer objected to by plff)

Int 5th   In the County where the Dungey ∧family∧ have lived in Tennessee, and where you first knew them, what were they called, white people or negroes. (Objected to by plff)

Ans 5th   They were called mixed blooded.
(This ans objected to by plff)

Int 6th   What is the general reputation of the plaintiff and his Fathers family in this Country as to Being white, or black (Int. objected to by the plff)

Ans 26 6th   As far as my knowledge extends and I have heard men speak, they are not white. (objected to by the plaintiff)

Cross examined by the plaintiff

Int. 1   In what part of Giles County in Tennessee did he Charles Dungey live when you first knew him.

Ans 1   I think he lived a South East Course from the County Site[27]

Int. 2.   How far from the County Site did he live

Ans 2   I cannot say.

Int. 3   Was you ever at his house

Ans 3   I never was.

Int 4   Was you ever in the immediate neighborhood in which he lived

Ans 4   From what they told me I was.

25. This line written in margin to the left of this interrogatory.
Giles County, Tennessee, is located seventy miles south of Nashville, Tennessee, and borders Alabama.
26. "A" written over "I"
27. Pulaski is the county seat of Giles County, Tennessee.

Int 5th     Was you acquainted with any of the citizens or persons who resided in the immediate neighborhood where Dungey lived, and if so who are they

Ans 5     I was tolerable well acquainted ∧with∧ some of them, Washington Wynne, and James Gallaspy, Lawy. Bruce, Maj. or Col. Litle.

Int 6th     How far did they or either of them live from the house of Charles Dungey

Ans 6th     I could not state.

Int 7th     What was the County Seat of Giles County at the time you knew Dungey

Ans 7th     I cannot tell

Int 8th     Where did you reside at the time you first become acquainted with Charles Dungey

Ans 8th     I lived in Davidson County, with Franklin F. Foster near the mouth of Stones River

<div align="center">
his<br>
Joseph X Catrell<br>
mark
</div>

Int 9th     How far was that, from where Charles Dungey then lived

Ans 9th     I would guess, somewhere between 25 and thirty miles

Int 10th     Did you ever see Charles Dungey's Father or Mother

Ans.28 10th     I never did.

<div align="center">
his<br>
Joseph X Catrell<br>
mark
</div>

[Certification]
State of Illinois    } SS
Williamson County

    I William M Eubanks Clerk of Circuit Court for said County do hereby certify, that the foregoing deposition of Joseph Catrell, was taken by me at my office in Marion on the 8th day of October AD 1855 That the same was carefully read to said witness and signed by him

[SEAL]    In testimony whereof I hereto set my hand and seal of our said Court at office in Marion this 9th day of October AD 1855

             Wm M Eubanks Clk

Several days later, Spencer received an unusual letter from Marion, Illinois, that urged him to seek witnesses from Giles County, Tennessee, where the Dungeys once lived.[29]

28. "Ans" written over "Int"

29. This letter was addressed in Marion in Williamson County, Illinois, not Marion in De Witt County, Illinois. James N. Adams, comp., and William E. Keller, ed., *Illinois Place Names*

142   DUNGEY V. SPENCER

D. H. AND O. H. TO JOSEPH SPENCER[30]
8 October 1855

Mr Spencer Sir if you want To prove your case clear you will go to giles county Tennessee, for Witenness &c the old Stock live there

The people call them Negros Therre,      , they have tride this Before therre in Tenns, but Failed in therre Su Suit &c call on me at Som proper time. I, can give you anomber of good men that will Swar the Dungeys are mixt with Negro

What I, Say I Know. I dont Sign my name for Sertin Resans best none to my Self     oct the 8 1855.

                                    D. H
                                    O. H

I Wish you to keep This to your Self and friends.
    you know what I, mean

On Monday, October 15, 1855, Lincoln appeared before Judge Davis, who ordered Spencer to answer Dungey's amended declaration by Tuesday. The next morning, Spencer's attorneys filed a demurrer to the amended declaration. Judge Davis sustained the objections to the first and third counts but overruled the demurrer to the second count. This time Judge Davis upheld Lincoln's second count as amended. Lincoln's revised second count included language that described Spencer's slanderous words as being "of and concerning" the marriage of William and Dorinda Dungey. Judge Davis ordered the parties to plead their cause by that afternoon.[31]

PLEA, JOINDER[32]
[17 October 1855]

Joseph Spencer }
    ats               }              Oᵗ Term AD 1855
William Dungey }                De Witt circuit Cout

And the said Joseph Spencer by Moore MᶜKinly & Weldon his attys comes and defends the wrong and injury when &c and says that he is not

(Springfield: Illinois State Historical Society, 1969; reprint, Springfield: Illinois State Historical Society, 1989), 340.

30. ADS, written by an unknown author, case file, DEWCC, DEWCH.

31. Order, 15 October 1855, Circuit Court Record 2, 170; Order, 16 October 1855, Circuit Court Record 2, 185; Judge's Docket Entry, October Term 1855, Judge's and Clerk's Docket, all in DEWCC, DEWCH; Declaration, Praecipe, 15 April 1855.

The case file includes certification of the marriage of William and Dorinda Spencer Dungey by De Witt County Clerk John McGraw. The certification may have been used as evidence. Certification of Marriage, 16 October 1855, DLC, HW.

32. ADS, written and signed by Lawrence Weldon, who also signed Clifton H. Moore's and James B. McKinley's names, case file, DEWCC, DEWCH.

DUNGEY V. SPENCER   143

guilty of the said supposed grievances above lain to his charge or any or either of them in manner and form as the said William Dungey had also thereof complain aga[in]st him and of this the said Joseph Spencer puts himself upon the country. &c

Moore McKinly & Weldon

[*Joinder*] And the plaintiff doth the like.

Lincoln p.q.

On October 18, 1855, Judge Davis impaneled a jury, which heard eight witnesses. While it was not unusual to have a large number of witnesses in a slander suit, the expenses incurred by the Williamson County witnesses, who traveled two hundred miles from Marion to Clinton to attend court, increased the court costs in this suit. Judge Davis wrote in the judge's docket: "It is certified by the court that all the witnesses used by the plaintiff on the trial of this cause were really necessary."[33]

According to a reminiscence by Lawrence Weldon, Lincoln used his wit and humor to persuade the jury that there was some reasonable doubt that Dungey was a "negro" by suggesting that Dungey was of Moroccan or North African descent. After the jury heard the arguments of the attorneys, they left the courtroom to deliberate.

JUDGMENT[34]
18 October 1855

William Dungey
vs.                        Trespass on the Case.
Joseph Spencer

This day came the parties, and issue being joined between them a jury came, who being duly elected, tried, and sworn herein, and who having heard the evidence and arguments of counsel for verdict say, "We the jury find the defendant guilty in manner and form as charged in the declaration, and assess the plaintiffs damage at the sum of six hundred dollars.["] It is therefore adjudged by the Court that the plaintiff recover of and from the defendant the sum of Six Hundred dollars, the damages aforesaid assessed, together with his costs herein expended, and that he have execution therefor. And now by the agreement of the parties the defendant releases all errors which may exist in the record herein, and

33. Judge's Docket Entry, October Term 1855, Judge's and Clerk's Docket, DEWCC, DEWCH. Witnesses called to give testimony at the trial during the October term of the court included Hiram Crum, Robert Turner, William Rawls, Walter Kerr, Allen Turner, Anthony Breeding, Jonathan Miller, and Charles Dungey. Fee Book Entry, October Term 1855, Fee Book, 249, DEWCC, DEWCH.

34. HD, written by De Witt County Circuit Clerk Robert Lewis, 18 October 1855, De Witt County Circuit Court Record #2, 204, DEWCC, DEWCH.

the plaintiff releases four hundred dollars of the principal of the judgment herein.

Dungey remitted four hundred dollars of the judgment in return for Spencer's assurance that he would not appeal the case to the Illinois Supreme Court. The court ordered Spencer to pay Dungey $200 in damages and $142.90 in court costs. Moore took responsibility for distributing Spencer's payment of the judgment and costs in the suit.[35]

### CLIFTON H. MOORE TO WILLIAM DUNGEY[36]
7 April 1856

Clinton Ills April 7/56

Wm Dungy Esqr
Sir

Inclosed please find my Check on Lucas & Simonds for 49.75 avails of 50.00 paid me by Jos Spencer for you, I paid me 100, 50.00 of which I send to Lincoln your Lawyer & fifty to you, go to any of the merchants in in your place & they will pay you 50, for it, write your name on the back of it before you sell it

Yours &c
C H Moore

Forty years later, a reporter from a New York City newspaper asked Lawrence Weldon about his memories of Abraham Lincoln. One of the events Weldon recalled was this case.

### REMINISCENCE OF LAWRENCE WELDON[37]
4 April 1895

It was a family quarrel between two brothers-in-law, Jack Dungey and Joe Spencer. Dungee was a Portuguese who came up from a Portuguese settlement in Tennessee to make his home in Illinois. He was extremely

35. On April 7, 1857, Moore, on behalf of Spencer, paid $200 to Lincoln and Dungey. The sheriff credited an additional $100 to Dungey on April 24. Dungey received $200 on April 30 and $75 from Moore on November 10, 1856. Judgment Docket Entry, 15 November 1855, Judgment Docket, folio 63, DeWCC, DeWCHS; Clifton H. Moore to William Dungey, 7 April 1856, Letter Book No. 6, Box 1, C. H. Moore and V. Warner Collection, IHi; Writ of Execution, 52, July 1856, page filer Execution Docket Entry, 24 September 1856, Execution Docket, 51-52, both in DeWCC, DeWCHS.

36. ALS (letterpress copy), Letter Book No. 6, Box 1, C. H. Moore and V. Warner Collection, IHi.

37. PD, excerpt from an interview with Lawrence Weldon by Janet Jennings for the undernamed, Lawrence Weldon, "Reminiscences of Lincoln as a Lawyer, Incidents of his Practice in Illinois—Interesting Cases—A Notable Address to a Jury," Intelligencer (New York), 4 April 1895, 3213-3215.



dark complexioned, but not a bad looking fellow; and, after a time, he married Spencer's sister, with the approval of the Spencer family, as shown at the trial. The Spencers were called well-to-do people; and Joe Spencer who was worth probably five or six thousand dollars,[38] was regarded as well off for that early day in the West. I don't remember the origin of the quarrel, but it became bitter: and the last straw was laid on when Spencer called Dungee a "nigger," and followed it up, they said, by adding "a nigger married to a white woman." The statute of Illinois made it a crime for a Negro to marry a white woman, and, because of that, the words were slanderous.[39] I could not believe Joe Spencer, tho a rough, ignorant fellow, would be such a fool as to involve his sister by this charge against his brother-in-law. He did not deny calling Dungee a "nigger," but denied the words which made the complaint in the declaration, on which Dungee, through Mr. Lincoln, brought the suit for slander, claiming, I think, two thousand dollars damages. C. H. Moore, a well-known lawyer of Illinois, was associated with me as counsel for Spencer. Judge David Davis was on the bench, and the suit was brought in the De Witt Circuit Court. When the case came up, Mr. Moore and myself appeared for the defense and demurred to the declaration, which, to the annoyance of Mr. Lincoln, the court sustained. Whatever interest Mr. Lincoln took in the case before that time, his professional pride was now aroused by the fact, that the court had decided, that his papers were deficient. Looking across the trial table at Moore and myself and shaking his long, bony finger, he said: "Now, by Jing, I will beat you boys!"

"By Jing" was the extent of his expletives, and beyond that he did not go in the expression of surprise or indignation. At the next term of the court Mr. Lincoln appeared with his papers amended, and fully determined to make good his promise to "beat you boys"; and we thought his chances pretty good to do it, too. We knew our man was a fool not to have settled it: but still we were bound to defend and clear him, if we could. Tho it was nearly forty years ago, I shall never forget Mr. Lincoln's looks as he rose to state his case to the jury. He was not excited, but manifested a great earnestness, not only because of his client but he also wanted to redeem himself from the implication arising from the fact that he had been, as the lawyers say, "demurred out of court." I recall some of his opening sentences when he said:

"Gentlemen of the Jury: I do not believe that the best way to build up and maintain a good reputation is to go to law about it, and during my practice at the bar it has been my uniform policy to discourage slander suits. But, gentlemen, in this case, forbearance had ceased to be a virtue, and this courtroom, dedicated to the sacred cause of justice, is the only place where my client can seek protection and vindication. If the malice

---

38. In 1860, Joseph Spencer owned $1,600 in real property. By 1855, he also owned $1,650 worth of livestock. 1860 Census, De Witt County, IL, 404; 1855 Census, De Witt County, IL, 20.
39. "Marriages," 3 March 1845, *Revised Statutes of the State of Illinois* (1845), 47.

of the defendant had rested satisfied with speaking the words once or twice, or even thrice, our client would have borne it in silence. But when he went from house to house, *gabbling*, yes, *gabbling* about it, then it was that my client determined to bring this suit."

It would be impossible to describe the force of the word "gabbling," as emphasized by Mr. Lincoln. It was as splendid in its dramatic effect, as the word "fail" in *Richelieu*, when uttered by Booth or Barrett.[40] Another equally dramatic and powerful stroke, was his direct reference to Spencer's accusation that Dungee was a "nigger." It had a curious touch of the ludicrous, by Mr. Lincoln's pronunciation of a word, which instead of detracting seemed to add to the effect. I hear him now, as he said:

"Gentlemen of the Jury, my client is not a Negro, tho it is no crime to be a Negro, no crime to be born with a black skin. But my client is not a Negro. His skin may not be as white as ours, but I say he is not a Negro, tho he may be a Moore."

"Mr. Lincoln," interrupted Judge Davis, scarcely able to restrain a smile, "You mean a Moor, not Moore."[41]

"Well, your honor, Moor, not C. H. Moore," replied Mr. Lincoln, with a sweep of his long arm toward the table where Moore and I sat. "I say my client may be a Moor, but he is not a Negro."

In the argument of the case on the testimony Mr. Lincoln made a most powerful and remarkable speech, abounding in wit, logic and eloquence of the highest order. His thoughts were clothed in the simplest garb of expression, and in words understood by every juror in the box. After the instructions were given by the court the jury retired, and in a few moments returned with a judgment for the plaintiff, in a sum which was a large amount for those days, tho I do not recall the exact figures. Of course it was going to break up our man, who, strange to say, could not realize the situation, but wanted to carry the case to the Supreme Court. Mr. Lincoln had said his client did not want to make money out of the suit, so we told Spencer the best thing he could do would be to get Dungee to remit some of the damage and be thankful. He finally accepted this advice, and we went to Mr. Lincoln and said:

"Mr. Lincoln, you have beaten us, as you said you would. We want now to ground the weapons of our unequal warfare, and as you said your

40. Sir Edward Bulwer Lytton's *Richelieu* was first performed at the National Theater in New York City on September 4, 1839. American actors Edwin Booth (1833–93), brother of John Wilkes Booth, and Lawrence Barrett (1838–91) were highly acclaimed for their interpretations of Cardinal Richelieu and De Mauprat during their 1886–89 tour of the United States. During their March 19, 1891, performance of *Richelieu* at the Broadway Theater in New York City, Barrett fell ill, and he died two days later. Eugene Tompkins and Quincy Kilby, *The History of the Boston Theater, 1854–1901* (1908), 65–67; Eleanor Ruggles, *Prince of Players: Edwin Booth* (New York: W. W. Norton & Company 1953), 355–57.

41. The Moors were Arab and Berber tribes in northwest Africa who conquered Spain in the eighth century.

client did not want to make money out of the suit we thought you might get him to remit some of the judgment. We know Spencer has acted the fool, but this judgment will break him up."

Said Mr. Lincoln:

"Well, I will cheerfully advise my client to remit on the most favorable terms. The defendant is a fool. But he has one virtue. He is industrious and has worked hard for what he has, so I am not disposed to hold him responsible. If every fool was to be dealt with by being held responsible in money for his folly, the poorhouses of the country would have to be enlarged very much beyond their present capacity."

Well, the result of Mr. Lincoln's advice to his client was that Dungee agreed to remit the whole judgment, by Spencer paying the costs of the suit and Mr. Lincoln's fee.[42] Mr. Lincoln then proposed to leave the amount of his fee to Moore and myself. We protested against this, and insisted that Mr. Lincoln should fix the amount of his own fee. After a few moments thought he said: "Well, gentlemen, don't you think I have honestly earned twenty-five dollars?" We were astonished, and had he said one hundred dollars it would have been what we expected. The judgment was a large one for those days; he had attended the case at two terms of court, had been engaged for two days in a hotly-contested suit, and his client's adversary was going to pay the bill. The simplicity of Mr. Lincoln's character in money matters is well illustrated by the fact, that for all this he charged twenty-five dollars.[43]

Illinois law narrowly defined the parameters for slander in order to limit the courts' involvement in family disputes. Statutes also restricted the freedoms of African American, American Indian, and mulatto men and women in Illinois. Spencer's public use of a racial pejorative against his brother-in-law Dungey implied an allegation of an illegal act. People of color, black or mulatto, were forbidden to marry a white person. If Dungey had African American ancestry, then his marriage to Spencer's sister was illegal and Spencer's words were not slanderous. Lincoln set out to prove that his client was not a person of color as defined by law and, further, that Spencer's allegation damaged Dungey's reputation as well as his ability to transact business. The defense needed only to prove by its witnesses that Dungey's race was questionable. The later reminiscence by defendant attorney Lawrence Weldon provides a glimpse of Lincoln's resolve at being bested in the legal process and his response to regain his own reputation as

42. Dungey remitted $400 of the $600 judgment. Judgment, 18 October 1855, De Witt County Circuit Court Record #2, 204, DEWCC, DEWCH.

43. Lincoln received at least $50 in fees for this case. C. H. Moore to William Dungey, 7 April 1856, presented above.

a skilled jurist. Weldon also described Lincoln's performance before a jury, using logic, persuasion, and dramatic effect to defend his client. Additionally, the reminiscence reveals some aspects of the interaction between attorneys and clients. Weldon seemingly believed that Dungey was Portuguese and had not violated racial law, but he was unable to convince his client Spencer to settle the dispute.





Office of Business Enterprises
Duplication Services Section

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **The New York Packet, Friday, November 23, 1787** and that the attached photocopies from that Issue – the front page, and pages 2-3 on which appears *Federalist No. 10* and four pages of the same transcribed – are a true representation from that work.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on September 3, 2020.

Rosalina Delgado-Jones
Assistant Business Enterprises Officer
Office of Business Enterprises
Library of Congress



101 Independence Avenue, SE Washington, DC 20540–4917 Tel 202.707.5650 www.loc.gov;
duplicationservices@loc.gov

# The New-York Packet

Tuor Tvdibvqve honta bvllo Dithoivisqe Agbito. Vre.

FRIDAY, NOVEMBER 23, 1787.

[N°. 7½¼]

JUST PUBLISHED,
And to be Sold by the Printers hereof,

**The Columbian Almanack;**

OR
**EPHEMERIS**

Of the Motion of the Sun and Moon; the true Places and Aspects of the Planets; the Rising and Setting of the Sun; the Rising, Setting, and Southing of the Moon.
For the Year of Our Lord,

1788.

By Joy M'Cartiff, or Leap-Year, and the twelfth of American Independence.
Calculated for the Meridian of the Middle States, particularly New-York.

Containing, &c.

## New-York R U M,

OF the first quality, and sold proof, for sale by...

## S H R U B.

OF the very best quality, by the hogshead, barrel, or smaller quantity,—for sale by Charles Tillinghast...

## To the P U B L I C.

## THOMAS MAULE,

## WANTED IMMEDIATELY,

## JOHN SIMON,

## Jas. B. Foster,

## BROTHERS COSTER, & Co.

## FLAX-SEED,

The FEDERALIST, No. 10.

*To the People of the State of New-York.*

**TO BE LET**

**TO BE SOLD**

**LAND-OFFICE**

**FOR SALE**

**THOMAS JOHNSON, SCHOOL-MASTER**

**To be Sold at Public Auction**

**At the TANNERY**

**Ten Guineas Reward**

# FEDERALIST NO. 10

**The Same Subject Continued: The Union as a Safeguard Against Domestic Faction and Insurrection**

From the *New York Packet*
Friday, November 23, 1787.

Author: **James Madison**

To the People of the State of New York:

AMONG the numerous advantages promised by a well-constructed Union, none deserves to be more accurately developed than its tendency to break and control the violence of faction. The friend of popular governments never finds himself so much alarmed for their character and fate, as when he contemplates their propensity to this dangerous vice. He will not fail, therefore, to set a due value on any plan which, without violating the principles to which he is attached, provides a proper cure for it. The instability, injustice, and confusion introduced into the public councils, have, in truth, been the mortal diseases under which popular governments have everywhere perished; as they continue to be the favorite and fruitful topics from which the adversaries to liberty derive their most specious declamations. The valuable improvements made by the American constitutions on the popular models, both ancient and modern, cannot certainly be too much admired; but it would be an unwarrantable partiality, to contend that they have as effectually obviated the danger on this side, as was wished and expected. Complaints are everywhere heard from our most considerate and virtuous citizens, equally the friends of public and private faith, and of public and personal liberty, that our governments are too unstable, that the public good is disregarded in the conflicts of rival parties, and that measures are too often decided, not according to the rules of justice and the rights of the minor party, but by the superior force of an interested and overbearing majority. However anxiously we may wish that these complaints had no foundation, the evidence, of known facts will not permit us to deny that they are in some degree true. It will be found, indeed, on a candid review of our situation, that some of the distresses under which we labor have been erroneously charged on the operation of our governments; but it will be found, at the same time, that other causes will not alone account for many of our heaviest misfortunes; and, particularly, for that prevailing and increasing distrust of public engagements, and alarm for private rights, which are echoed from one end of the continent to the other. These must be chiefly, if not wholly, effects of the unsteadiness and injustice with which a factious spirit has tainted our public administrations.

By a faction, I understand a number of citizens, whether amounting to a majority or a minority of the whole, who are united and actuated by some common impulse of passion, or of interest, adversed to the rights of other citizens, or to the permanent and aggregate interests of the community.

There are two methods of curing the mischiefs of faction: the one, by removing its causes; the other, by controlling its effects.

There are again two methods of removing the causes of faction: the one, by destroying the liberty which is essential to its existence; the other, by giving to every citizen the same opinions, the same passions, and the same interests.

It could never be more truly said than of the first remedy, that it was worse than the disease. Liberty is to faction what air is to fire, an aliment without which it instantly expires. But it could not be less folly to abolish liberty, which is essential to political life, because it nourishes faction, than it would be to wish the annihilation of air, which is essential to animal life, because it imparts to fire its destructive agency.

The second expedient is as impracticable as the first would be unwise. As long as the reason of man continues fallible, and he is at liberty to exercise it, different opinions will be formed. As long as the connection subsists between his reason and his self-love, his opinions and his passions will have a reciprocal influence on each other; and the former will be objects to which the latter will attach themselves. The diversity in the faculties of men, from which the rights of property originate, is not less an insuperable obstacle to a uniformity of interests. The protection of these faculties is the first object of government. From the protection of different and unequal faculties of acquiring property, the possession of different degrees and kinds of property immediately results; and from the influence of these on the sentiments and views of the respective proprietors, ensues a division of the society into different interests and parties.

The latent causes of faction are thus sown in the nature of man; and we see them everywhere brought into different degrees of activity, according to the different circumstances of civil society. A zeal for different opinions concerning religion, concerning government, and many other points, as well of speculation as of practice; an attachment to different leaders ambitiously contending for pre-eminence and power; or to persons of other descriptions whose fortunes have been interesting to the human passions, have, in turn, divided mankind into parties, inflamed them with

mutual animosity, and rendered them much more disposed to vex and oppress each other than to co-operate for their common good. So strong is this propensity of mankind to fall into mutual animosities, that where no substantial occasion presents itself, the most frivolous and fanciful distinctions have been sufficient to kindle their unfriendly passions and excite their most violent conflicts. But the most common and durable source of factions has been the various and unequal distribution of property. Those who hold and those who are without property have ever formed distinct interests in society. Those who are creditors, and those who are debtors, fall under a like discrimination. A landed interest, a manufacturing interest, a mercantile interest, a moneyed interest, with many lesser interests, grow up of necessity in civilized nations, and divide them into different classes, actuated by different sentiments and views. The regulation of these various and interfering interests forms the principal task of modern legislation, and involves the spirit of party and faction in the necessary and ordinary operations of the government.

No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men are unfit to be both judges and parties at the same time; yet what are many of the most important acts of legislation, but so many judicial determinations, not indeed concerning the rights of single persons, but concerning the rights of large bodies of citizens? And what are the different classes of legislators but advocates and parties to the causes which they determine? Is a law proposed concerning private debts? It is a question to which the creditors are parties on one side and the debtors on the other. Justice ought to hold the balance between them. Yet the parties are, and must be, themselves the judges; and the most numerous party, or, in other words, the most powerful faction must be expected to prevail. Shall domestic manufactures be encouraged, and in what degree, by restrictions on foreign manufactures? are questions which would be differently decided by the landed and the manufacturing classes, and probably by neither with a sole regard to justice and the public good. The apportionment of taxes on the various descriptions of property is an act which seems to require the most exact impartiality; yet there is, perhaps, no legislative act in which greater opportunity and temptation are given to a predominant party to trample on the rules of justice. Every shilling with which they overburden the inferior number, is a shilling saved to their own pockets.

It is in vain to say that enlightened statesmen will be able to adjust these clashing interests, and render them all subservient to the public good. Enlightened statesmen will not always be at the helm. Nor, in many cases, can such an adjustment be made at all without taking into view indirect and remote considerations, which will rarely prevail over the immediate interest which one party may find in disregarding the rights of another or the good of the whole.

The inference to which we are brought is, that the CAUSES of faction cannot be removed, and that relief is only to be sought in the means of controlling its EFFECTS.

If a faction consists of less than a majority, relief is supplied by the republican principle, which enables the majority to defeat its sinister views by regular vote. It may clog the administration, it may convulse the society; but it will be unable to execute and mask its violence under the forms of the Constitution. When a majority is included in a faction, the form of popular government, on the other hand, enables it to sacrifice to its ruling passion or interest both the public good and the rights of other citizens. To secure the public good and private rights against the danger of such a faction, and at the same time to preserve the spirit and the form of popular government, is then the great object to which our inquiries are directed. Let me add that it is the great desideratum by which this form of government can be rescued from the opprobrium under which it has so long labored, and be recommended to the esteem and adoption of mankind.

By what means is this object attainable? Evidently by one of two only. Either the existence of the same passion or interest in a majority at the same time must be prevented, or the majority, having such coexistent passion or interest, must be rendered, by their number and local situation, unable to concert and carry into effect schemes of oppression. If the impulse and the opportunity be suffered to coincide, we well know that neither moral nor religious motives can be relied on as an adequate control. They are not found to be such on the injustice and violence of individuals, and lose their efficacy in proportion to the number combined together, that is, in proportion as their efficacy becomes needful.

From this view of the subject it may be concluded that a pure democracy, by which I mean a society consisting of a small number of citizens, who assemble and administer the government in person, can admit of no cure for the mischiefs of faction. A common passion or interest will, in almost every case, be felt by a majority of the whole; a communication and concert result from the form of government itself; and there is nothing to check the inducements to sacrifice the weaker party or an obnoxious individual. Hence it is that such democracies have ever been spectacles of turbulence and contention; have ever been found incompatible with personal security or the rights of property; and have in general been as short in their lives as they have been violent in their deaths. Theoretic politicians, who have patronized this species of government, have erroneously supposed that by reducing mankind to a perfect equality in their political rights, they would, at the same time, be perfectly equalized and assimilated in their possessions, their opinions, and their passions.

A republic, by which I mean a government in which the scheme of representation takes place, opens a different prospect, and promises the cure for which we are seeking. Let us examine the points in which it varies from pure democracy, and we shall comprehend both the nature of the cure and the efficacy which it must derive from the Union.

The two great points of difference between a democracy and a republic are: first, the delegation of the government, in the latter, to a small number of citizens elected by the rest; secondly, the greater number of citizens, and greater sphere of country, over which the latter may be extended.

The effect of the first difference is, on the one hand, to refine and enlarge the public views, by passing them through the medium of a chosen body of citizens, whose wisdom may best discern the true interest of their country, and whose patriotism and love of justice will be least likely to sacrifice it to temporary or partial considerations. Under such a regulation, it may well happen that the public voice, pronounced by the representatives of the people, will be more consonant to the public good than if pronounced by the people themselves, convened for the purpose. On the other hand, the effect may be inverted. Men of factious tempers, of local prejudices, or of sinister designs, may, by intrigue, by corruption, or by other means, first obtain the suffrages, and then betray the interests, of the people. The question resulting is, whether small or extensive republics are more favorable to the election of proper guardians of the public weal; and it is clearly decided in favor of the latter by two obvious considerations:

In the first place, it is to be remarked that, however small the republic may be, the representatives must be raised to a certain number, in order to guard against the cabals of a few; and that, however large it may be, they must be limited to a certain number, in order to guard against the confusion of a multitude. Hence, the number of representatives in the two cases not being in proportion to that of the two constituents, and being proportionally greater in the small republic, it follows that, if the proportion of fit characters be not less in the large than in the small republic, the former will present a greater option, and consequently a greater probability of a fit choice.

In the next place, as each representative will be chosen by a greater number of citizens in the large than in the small republic, it will be more difficult for unworthy candidates to practice with success the vicious arts by which elections are too often carried; and the suffrages of the people being more free, will be more likely to centre in men who possess the most attractive merit and the most diffusive and established characters.

It must be confessed that in this, as in most other cases, there is a mean, on both sides of which inconveniences will be found to lie. By enlarging too much the number of electors, you render the representatives too little acquainted with all their local circumstances and lesser interests; as by reducing it too much, you render him unduly attached to these, and too little fit to comprehend and pursue great and national objects. The federal Constitution forms a happy combination in this respect; the great and aggregate interests being referred to the national, the local and particular to the State legislatures.

The other point of difference is, the greater number of citizens and extent of territory which may be brought within the compass of republican than of democratic government; and it is this circumstance principally which renders factious combinations less to be dreaded in the former than in the latter. The smaller the society, the fewer probably will be the distinct parties and interests composing it; the fewer the distinct parties and interests, the more frequently will a majority be found of the same party; and the smaller the number of individuals composing a majority, and the smaller the compass within which they are placed, the more easily will they concert and execute their plans of oppression. Extend the sphere, and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength, and to act in unison with each other. Besides other impediments, it may be remarked that, where there is a consciousness of unjust or dishonorable purposes, communication is always checked by distrust in proportion to the number whose concurrence is necessary.

Hence, it clearly appears, that the same advantage which a republic has over a democracy, in controlling the effects of faction, is enjoyed by a large over a small republic,--is enjoyed by the Union over the States composing it. Does the advantage consist in the substitution of representatives whose enlightened views and virtuous sentiments render them superior to local prejudices and schemes of injustice? It will not be denied that the representation of the Union will be most likely to possess these requisite endowments. Does it consist in the greater security afforded by a greater variety of parties, against the event of any one party being able to outnumber and oppress the rest? In an equal degree does the increased variety of parties comprised within the Union, increase this security. Does it, in fine, consist in the greater obstacles opposed to the concert and accomplishment of the secret wishes of an unjust and interested majority? Here, again, the extent of the Union gives it the most palpable advantage.

The influence of factious leaders may kindle a flame within their particular States, but will be unable to spread a general conflagration through the other States. A religious sect may degenerate into a political faction in a part of the Confederacy; but the variety of sects dispersed over the entire face of it must secure the national councils against

any danger from that source. A rage for paper money, for an abolition of debts, for an equal division of property, or for any other improper or wicked project, will be less apt to pervade the whole body of the Union than a particular member of it; in the same proportion as such a malady is more likely to taint a particular county or district, than an entire State.

In the extent and proper structure of the Union, therefore, we behold a republican remedy for the diseases most incident to republican government. And according to the degree of pleasure and pride we feel in being republicans, ought to be our zeal in cherishing the spirit and supporting the character of Federalists.



# AFFIDAVIT OF TRUTH



2021006585

PRESENTED: 01-29-2021 09:50:15 AM   RECORDED: 01-29-2021 10:14:17 AM

In Official Records of Terri Hollingsworth Circuit/County Clerk

PULASKI CO, AR FEE $90.00

### Plain Statement of Facts

A matter must be expressed to be resolved. In commerce truth is sovereign. Truth is expressed in the form for an affidavit. An Affidavit not rebutted stands as Truth in commerce. An Affidavit not rebutted, after thirty (30) days, becomes the judgment in commerce. A truth Affidavit, under commercial law, can only satisfied by Truth Affidavit rebuttal (point for point), by payment, by agreement, by resolution, or by Common Law Rules, by a jury.

# AFFIDAVIT OF TRUTH

Be it known to all courts, governments, and other parties, that I, **Alaahcontayna AI™©**, am a natural In Full Life, freeborn Sovereign Moorish American (moor) of Moabite descent subject only to the Divine law of Allah 1:101 YUSUF {Holy Quran}.

**I am not a "person" or a "citizen" as defined in commercial "statutes"** of the United States or statutes of the several states when such definition includes "artificial entities." I refuse to be treated as a "federally" or "state" created entity which is only capable of exercising certain rights, privileges, or immunities as specifically "granted" by "federal" or "state" "governments." I, **Alaahcontayna AI ™©** am created by Allah alone and subject only to my creator, Allah according to AL-AN'AAM 2:14 and AL-AN'AAM 2:102 (Holy Quran}....

I may voluntarily choose to comply with the "laws" which serve to bring harmony to society, but no such "laws," not their "enforcers," have any authority over me. I am not in any "jurisdiction," for I, **Alaahcontayna AI ™©** am not of subject status. Unless I have willfully harmed or violated someone or their property without their consent, I have not committed any crime; and am therefore not subject to any penalty.

Thus, be it known to all, that I reserve my natural common law right not to be compelled to perform under any contract that I did not enter into knowingly, voluntarily, and intentionally. And furthermore, I do not accept the liability associated with the compelled and pretended "benefit" of any hidden or unrevealed contract or commercial agreement.



As such, the hidden or unrevealed contracts that supposedly create obligations to perform, for persons of  subject status, are inapplicable to me, and are null and void. If I have participated in any of the supposed "benefits" associated with these hidden contracts, I have done so under duress, fir lack of any other practical alternative. I may have received such "benefits" but I have not accepted them in a manner that binds me to anything.

Any such participation does not constitute "acceptance" in contract law, because of the absence of full disclosure of valid "offer," and voluntary consent without misrepresentation or coercion, under contract law. Without a valid voluntary offer and acceptance, knowingly entered into by both parties, there is no "meeting of the minds," and therefore no valid contract. Any supposed "contract" is therefore void, <u>ab initio</u>.

From my age of consent to the date affixed below I have never signed a contract knowingly, willingly, intelligently, and voluntarily whereby I have waived any of my natural common law rights, and, as such, **Take Notice** that I revoke, cancel, and void <u>ab initio</u> my signature on any and all contracts, agreements, forms, or any instrument which may be construed in any way to give any agency or department of any federal or state government authority, venue, or jurisdiction over me.

Typical examples of such compelled and pretended "benefits" are:

1. <u>**"The use of Federal Reserve Notes to discharge debts"**</u>**:** I have used these only because only because in America, there is no other widely recognized currency.
2. <u>**"The use of a bank account, with my signature on the bank signature card"**</u>**:** If there is any hidden contract behind the bank signature card, my signature thereon gives no validity to it. The signature is only for verification of identify. I can be obligated to fulfill no hidden or unrevealed contract whatsoever, due to the absence of full disclosure and voluntary consent.

   Likewise, my use of the bank account thereof is due to the absence of a bank not associated with the Federal Reserve system. In general, people have been prevented from issuing their own currencies, and such prevention is in violation of the United States Constitution. Were there an alternative, I would be happy to use it. To not use any bank at all is impossible or very difficult, as everyone knows, in today's marketplace.

3. <u>**"The use of a Social Security number"**</u>**:** The number normally assigned to persons of subject status, I use exceptionally, under duress, only because of the extreme inconvenience

of operating without one in today's marketplace, where it is requested by banks, employers, lenders, and any other government agencies and businesses. My reason for using it is *not* because I wish to participate in the Social Security system, as I don't wish to participate. Let it be known that I use the Social Security number assigned to me *for information only*.

4. **"The use of a driver's license":** As a free Sovereign, there is no legal requirement for me to have such a license for travelling in my car.

Technically, the unrevealed legal purpose of a driver's licenses is commercial in nature. Since I don't carry passengers for hire, there is no law requiring me to have a license to travel for own pleasure and that of my family and friends. However, because of the lack of education of police officers on this matter, should I be stopped for any reason and found to be without a license, it is likely I wound be ticketed and fined or obligated to appear in court.

Therefore, under duress, I carry a license to avoid extreme inconvenience.

However, I reserve the right as a freeborn Sovereign not to carry a license.

5. **"State plates on my car":** Similarly, even though technically, my car does not fit the legal definition of a "motor vehicle," which is used for commercial purposes, nevertheless, I have registered said automobile with the state and carry the state plates on it and obtained auto insurance because of running the risk of police officer's or other authority figures harassment and extreme inconvenience. However, I reserve the rights as a freeborn Sovereign at any time not have any auto insurance, to register or have any state plate, buy instead fit my automobile with "NOT FOR HIRE "OLOTWF" PRIVATE PROPERTY" plate on my automobile.

6. **"The use of a "Passport":** There is no real need for me to have a passport (or other associated permits, visas, etc.) to travel. I have the right to travel without hindrance, wherever, however, and whenever I wish, so long as I do not encroach upon the private property of others. Though without a passport, my right to travel is unduly hindered. Therefore, under duress, I only use a passport to prevent extreme inconvenience and to ensure that I can travel from one country to another at all.

7. **"Past tax returns filed":** Any tax returns I may have filed in the past, were filed due to the dishonest atmosphere of fear and intimidation created y the Internal Revenue Service (IRS) and the local assessor's offices; not because there is any law requiring me to do so. Once I discovered that the IRS and other tax agencies have been misinforming the public, I have felt it is my responsible duty to society to terminate my voluntary participation. Because such returns were filed under Threat, Duress, and Coercion (TDC), and no two-way contract was ever signed with full disclosure, there is nothing in any past filing of returns or payments that created any valid contract.                    Therefore, no legal obligation on my part was ever created.

8. **"Birth Certificate":** The fact that a birth certificate was granted to me by a local hospital or government agency when I entered this world, is irrelevant to my Sovereignty. No status, high or low, can be assigned to another person through a piece of paper, without the recipient's full knowledge and consent.

Therefore, such a piece of paper provides date and place information only. It indicates nothing about jurisdiction, nothing about property ownership, nothing about rights, and nothing about subject status. The only documents that can have any legal meaning, as it concerns my status in society, are those which I have signed as an adult, with full knowledge and consent, free from misrepresentation or coercion of any kind.

9. **"Marriage license":** The acquisition of a marriage license is now being revealed as being necessary only for slaves. The act of a Sovereign such as myself obtaining such a license, through social custom and ignorance of law, has no legal effect in changing my status. This is because any such change in status, if any may contract or statute. Since no hidden, unrevealed, and undisclosed information, if it exists, can be lawfully held to binding, it is null and void.

10. **"Children in public school":** The attendance of my children in government-supported "public" schools or government-controlled "private" schools does not create any legal tax obligation for the supposed "privilege" of public school attendance. If any of my children have attended government supported "public" or controlled "private" schools, such was done under duress and not out of free will.

11. **"Declaration of Citizenship":** Any document I may have ever signed, in which I answered "yes" to the question, " Are you a U.S. citizen?" – cannot be used to compromise my status as a Sovereign, nor obligate me to perform in any manner. This is because without full written disclosure of the definition and consequences of such supposed "citizenship," provided in a document bearing my signature given freely without misrepresentation or coercion, there can be no legally binding contract.

I am not a "United States citizen." I am not "a resident of," an "inhabitant of," "a "franchise of," a "ward of," the "property of," the chattel of, " or "subject to the jurisdiction of ," any "monarch" or any corporate "commonwealth" "federal," "state," "territory," "county," "council," "city," "municipal body politic," or other "government" allegedly "created' under the " of a "constitution' or other "enactment." I am not subject to any "legislation," department, or agency created by such "authorities," nor to the "jurisdiction" of any employees, officers, or agents deriving their "authority" therefrom. Nor do any of the "statutes" or "regulations" of such "authorities" apply to me or have any "jurisdiction" over me.

Further, I am not subject of any "courts" or bound by "precedents" of any "courts," driving their "jurisdiction" from said "authorities." **Take Notice** that I hereby revoke, cancel, and void <u>ab initio</u> any such "instrument" or any presumed "election" made by any "government, or any agency or department thereof, that I am or ever have voluntary elected to be treated as a "monarch" or a "United States citizen," subject to its "jurisdiction" or a "resident" of any "commonwealth," "state," "territory," "possession," "instrumentality," or "enclave," "division," "district, or "province," subject to their "jurisdiction(s)."

12. **"Constitution":** The document supposedly setting forth the foundations of a "country" and "its" "government," has not inherent authority of obligation.                    A "constitution" has no authority or obligation at all, unless a contract between two or more individuals, and then it is limited only to those individuals who have specifically entered into it. At most, such a document could be a contract the existing people at the time of its creation, but no-one has the right, authority, or power to bind their posterity. I have not knowingly, voluntarily entered into such a document is inapplicable to me, and anyone claiming to derive their "authority' from such document has no "jurisdiction" over me.

13. **"Past voter registration":** Similarly, since no obligation to perform in any manner was ever revealed in print, as part of the requirements for the supposed "privilege" to vote for government officials, any such registration on my part cannot be legal evidence of any obligation to perform. Likewise, I have granted No jurisdiction over me, to any political office. It is my inherent right to vote on election or issues that I fell affect all of society; NOT because I need anyone to rule over me. On the contrary – I have used the voting process only to instruct *my public servants* what a Sovereign would like done.

14. **"Use of the 2-letter state code and zip code":** My use of the 2-letter state code and zip code in my "address," which is secretly codified to indicate United States "federal zone" jurisdiction, has no effect whatsoever on my Sovereign status. Simply by receiving or sending "mail" through a quasi-federal messenger service, the postal service, at a location indicated with a 2-letter state and zip code, cannot place me under federal jurisdiction or obligation. Such a presumption would be ludicrous.

I use these codes only for the purposes of information and making it more efficacious for the U.S. Postal Service to deliver my mail.

15. **"Use of semantics":** There are some immature people with mental imbalances, such as the craving to dominate other people, who masquerade as "government." Just because they alter definitions of words in law books to their supposed advantage, doesn't mean I accept

those definition.                                                                    **The fact**
that they define the words 'person," "address," "mail," "resident," "motor vehicle,"
"driving," "passenger," "employee," "income," and many others, in ways different from
the common usage, so as to be associated with a subject or slave status, means nothing in
real life. Because the courts have become entangled in the game of semantics, be it known
to all "courts" and all parties, that if I have ever signed any document or spoke any words
on record, using words defined by twists in law books different from the common usage,
there can be no effect whatsoever on my Sovereign status in society thereby, nor can there
be created any "obligation" to perform in any manner, by the mere use of such words.
Where the definition in common dictionary differs from the meaning in the "law"
dictionary, it is the meaning in common dictionary that prevails, because it is more
trustworthy.

Such compelled and supposed "benefits" include, but are not limited to, the aforementioned
typical examples.  MY USE OF SUCH ALLEGED "BENEFITS" IS UNDER DURESS
ONLY, AND IS WITH FULL RESERVATION OF ALL MY COMMON LAW RIGHTS
WITHOUT PREJUDICE AT UCC 1-308. I have waived none of my intrinsic rights and
freedoms by use thereof. Furthermore, my use of such compelled "benefits" may be
temporary, until better alternatives become available, practical, and widely recognized.

## FEDERAL JURISDICTION

It is further relevant to this Affidavit that any violation of my Rights, Freedom, or Property
by the U.S. federal government, or any agent thereof, would be illegal and unlawful excess,
clearly outside the limited boundaries of federal jurisdiction.          My understanding is
that the jurisdiction of the U.S. federal government is defined by Article I, Section 8,
Clause 17 of the U.S. Constitution, quoted as follows:

"The Congress shall have the power . . . To exercise <u>exclusive legislation</u> in <u>all cases
whatsoever, over such district (NOT EXCEEDING TEN MILES SQUARE)</u> as may, by
cession of a particular states and the acceptance of Congress, become <u>the seat of the
Government of the United States,</u> [District of Columbia] and to exercise like authority over
all places purchased by consent of the legislature of the state in which the same shall be, for
the Erection of Forts, Magazines, Arsenals, dock yards and other needful Buildings; And –
To make all laws which shall be necessary and proper for carrying into Execution the
foregoing Powers…" [emphasis added]

*and*  Article IV, Section 3, Clause 2:

"The Congress shall have the Power to dispose of and make all needful Rules and
Regulations respecting the Territory or other Property belonging to the United States; and

nothing in this Constitution shall be so construed as Prejudice any Claims of United States, or of any particular State."

The definition of the "United States" being used here, then, is limited to its **territories**:

1) The District of Columbia
2) Commonwealth of Puerto Rico
3) U.S. Virgin Islands
4) Guam
5) American Samoa
6) Northern Mariana Islands
7) Trust Territory of the Pacific Islands
8) Military bases within the several states
9) Federal agencies within the several states

It does **not** include the several states **themselves**, as is confirmed by the following cites:

"We have in our political system a Government of the United States and a government of each of the several Sates. Each one of these government is distinct from the others, and each has citizens of its own who owe it allegiance, and whose rights, within its jurisdiction, it must protect. The same person may be at the same time citizen of the United States and a Citizen of a State, but his rights of citizenship under one of these governments will be different from those he has under the other. " Slaughter House Cases **United States vs Cruikshank**, 92 U.S. 542 (1875).

"THE UNITED STATES GOVERNMENT IS FOREIGN CORPORATION WITH RESPECT TO A STATE." [emphasis added] **Volume 20: Corpus Juris Sec**. §1785: NY re: Merriam 36 N.E. 505 1441 S.Ct. 1973, 41 L.Ed.287.

This is further confirmed by the following quote from the Internal Revenue Service:

Federal jurisdiction "includes the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa." – Internal Revenue Code Section 312(e).

In **legal** terminology, the word **"includes"** means **"is limited to."**

When referring to this "District" United States, the Internal Revenue Code uses the term **"WITHIN"** the United States. When referring to the several States, the Internal Revenue Code uses the term **"WITHOUT"** the United States.

Dozens, perhaps hundreds, of court cases prove that federal jurisdiction is limited to few federal territory areas above indicated. For example, in two Supreme Court cases, it was decided:

"The laws of Congress in respect to those matters do extend into territorial limits of the states, but have force only in the District of Columbia, and other places that are within the exclusive jurisdiction of the national government," **Caha v. United States**, 152 U.S., at 215.

"We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Arkansas or any if the new States were formed..."

"[B]ecause, the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in cases in which it is expressly granted..."

"Arkansas is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law, **"Pollard v. Hagan**, 44 U.S. 221, 223, 228, 229.

Likewise, Title 18 of the United States Code at §7 specifies that the "territorial jurisdiction" of the United States extends only **outside** the boundaries of lands belonging to any of the several States.

**Therefore,** in addition to the fact that no unrevealed federal contract can obligate me to perform in any manner without my fully informed and uncoerced consent, likewise, no federal statutes or regulation apply to me or have any jurisdiction over me. I hereby affirm that I do not reside or work in any federal territory of the "District" United States, and that therefore no U.S. federal government statutes or regulations have any authority over me.

## POWERS AND CONTRACTUAL OBLIGATIONS OF UNITED STATES AND STATE GOVERNMENT OFFICIALS

All United States and State government officials are hereby put on notice that I expect them to have recorded valid Oaths of Office in accordance with the U.S. Constitution, Article VI:

"The Senators and Representatives before mentioned, and the members of the several State Legislatures, and all executive and judicial officers, both of the United States and of the several States, shall be bound by oath or affirmation to support this Constitution..."

I understand that by their Oaths of Office all U.S. and State government officials are contractually bound by the U.S. Constitution as formulated by its framers, and not as "interpreted," subverted, or corrupted by the U.S. Supreme Court or other courts.

According to the Ninth Amendment to the U.S. Constitution:

"The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."
and the Tenth Amendment to the U.S. Constitution:

" The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Thus, my understanding from these Amendments is that the powers of all U.S. and State government officials are limited to those specifically granted by the U.S. Constitution.

I further understand that any laws, statutes, ordinances, regulations, rules, and procedures contrary to the U.S. Constitution, as written by its framers, are null and void, as expressed in the Sixteenth American Jurisprudence Second Edition, Section 177:

"The general misconception is that any statute passed by legislators bearing the appearance of law constitutes the law of the land. The U.S. Constitution is the supreme law of the land, and any statute, to be valid, must be in agreement. It is impossible for both the Constitution and a law violating it to be valid; one must prevail. This is succinctly stated as follows: "The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void, and ineffective for any purpose; since unconstitutionality dates from the time of its enactment, and not merely from the date of the decision so branding it. An unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed. Such a statute leaves the question that it purports to settle just as it would be had the statute not been enacted."

"Since an unconstitutional law is void, the general principles follow that it imposes no duties, confers no right, creates no office, bestows no power or authority on anyone, affords no protection, and justifies no acts performed under it..."

"A void act cannot be legally consistent with a valid one. An unconstitutional law cannot operate to supersede any existing valid law. Indeed, insofar as a statute runs counter to the fundamental law of the land, it is superseded thereby."

"No one is bound to obey an unconstitutional law and no courts are bound to enforce it."" [emphasis added]

and as expressed once again in the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

All U.S. and State government officials are therefore hereby put on notice that any violations of their contractual obligations to act in accordance with their U.S. Constitution, may result in prosecution to the full extent of the law, as well as the application of all available legal remedies to recover damages suffered by any parties damaged by any actions of U.S. and State government officials in violation of the U.S. Constitution.

**Notice for the Agent is Notice for the Principle applies under this notice.**
**Notice for the county clerk for Pulaski County, Arkansas State and record court for original jurisdiction, is notice for all**

# REVOCATION OF POWER OF ATTORNEY

Furthermore, I **Alaahcontayna Al ™©** hereby revoke, rescind, and make void <u>ab initio</u>, all powers of attorney, in fact or otherwise, implied in law or otherwise, signed either by me or anyone else, as it pertains to the Social Security number assigned to me, as it pertains to my birth certificate, marriage or business license, or any other licenses or certificates issued by any and all government or quasi-governmental entities, due to the use of various elements of fraud by said agencies to attempt to deprive me of my Sovereignty and/or property

I, **Alaahcontayna Al ™©**, hereby waive, cancel, repudiate, and refuse to knowingly accept any alleged "benefit" or gratuity associated with any of the aforementioned licenses, number, or certificates. I do hereby revoke and rescind all powers of attorney, in fact or otherwise, signed by me or otherwise, implied in law or otherwise, with or without my consent or knowledge, as it pertains to any and all property real or personal corporeal or incorporeal obtained in the past, present, or future. I am the sole and absolute legal owner and possess allodial title to any and all such property.

**Take Notice** that I, **Alaahcontayna Al ™©**, also revoke, cancel, and make void <u>ab initio</u> all powers of attorney, in fact, in presumption, or otherwise, signed either by me or anyone else, claiming to act on my behalf, with or without my consent, as such power of attorney

pertains to me or any property owned by me, by, but not limited to, any and all quasi/colorable, public, government entities or corporations on the grounds of constructive fraud, concealment, and nondisclosure of pertinent facts.


I now affix my signature to these affirmations:

With all inalienable human natural credible living self-aware Man rights reserved Without Prejudice" UCC 1-207 and 1-308


Affirmant    **Alashcontayna Al ™©**

(Seal)


Subscribe and sworn to before me, a Notary Public, of the State of Oklahoma,


C o u n t y o f  Tulsa this 25 day of  January, 2021.


Notary Public


My Commission Expires On:



I hereby certify that the foregoing instrument is a true and correct copy of the
Original _____ OTI _____
filed in this office 1  29 , 20 21 at THIS COUNTY WHEREOF
I have hereunto set my hand and seal of this office this 9 29 20 21
TERRI HOLLINGSWORTH, Pulaski County Arkansas Circuit County Clerk
By: _____ Deputy Clerk
VEGINIA STEWART HAMPTON